UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| STEPHEN DEL SESTO, AS RECEIVER AND | : | |
| ADMINISTRATOR OF THE ST. JOSEPH | : | |
| HEALTH SERVICES OF RHODE ISLAND | : | |
| RETIREMENT PLAN; GAIL J. MAJOR; | : | |
| NANCY ZOMPA; RALPH BRYDEN; | : | |
| DOROTHY WILLNER; CAROLL SHORT; | : | |
| DONNA BOUTELLE; and EUGENIA | : | |
| LEVESQUE, | : | |
| | : | |
|     Plaintiffs | : | |
|     v. | : | C.A. NO.: _____ |
| | : | |
| PROSPECT CHARTERCARE, LLC; | : | |
| CHARTERCARE COMMUNITY BOARD; ST. | : | Jury Trial Demanded |
| JOSEPH HEALTH SERVICES OF RHODE | : | |
| ISLAND; PROSPECT CHARTERCARE | : | |
| SJHSRI, LLC; PROSPECT CHARTERCARE | : | Class Action |
| RWMC, LLC; PROSPECT EAST HOLDINGS, | : | |
| INC.; PROSPECT MEDICAL HOLDINGS, | : | |
| INC.; ROGER WILLIAMS HOSPITAL; | : | |
| CHARTERCARE FOUNDATION; THE RHODE | : | |
| ISLAND COMMUNITY FOUNDATION; | : | |
| ROMAN CATHOLIC BISHOP OF | : | |
| PROVIDENCE; DIOCESAN | : | |
| ADMINISTRATION CORPORATION; | : | |
| DIOCESAN SERVICE CORPORATION; and | : | |
| THE ANGELL PENSION GROUP, INC., | : | |
| | : | |
|     Defendants. | : | |

**COMPLAINT**

# TABLE OF CONTENTS

Plaintiffs ............................................................................................................................1

Defendants.........................................................................................................................2

Jurisdiction and Venue.......................................................................................................7

Class Action Allegations ....................................................................................................9

    A.   Numerosity ...........................................................................................................9

    B.   Commonality........................................................................................................9

    C.   Typicality...........................................................................................................10

    D.   Adequacy ..........................................................................................................11

    E.   Rule 23(b)(1) Requirements ..............................................................................12

    F.   Rule 23(b)(2) Requirements ..............................................................................12

    G.   Rule 23(b)(3) Requirements ..............................................................................12

Related Proceedings.........................................................................................................14

Overview ..........................................................................................................................15

Facts ................................................................................................................................17

    A.   Concerning That the Plan is Subject to ERISA ...................................................17

        1.   Exemption for Church Plans ....................................................................17

        2.   The Plan did not satisfy the "principal-purpose" requirement.................21

        3.   SJHSRI Was Not a Chuch Plan Because It Was Not "Controlled by or Associated with a Church or a Convention or Association of Churches" .............24

        4.   SJHSRI was not a tax exempt organization at least as of the 2014 Asset Sale.................................................................................................26

        5.   Fraudulent Inclusion of SJHSRI in the Catholic Directory.........................30

    B.   SJHSRI's Obligations Under the Plan .................................................................49

    C.   Defendants Knew the Plan was Underfunded......................................................55

    D.   Misrepresentations to Plan Participants ..............................................................60

    E.   Fraudulent Misrepresentations and Omissions to State Regulators......................77

    F.   Misleading the State Court in Connection with *Cy Pres* Proceedings .........................92

    G.   Facts Concerning Successor Liability...................................................................99

    H.   Further Stripping of SJHSRI's Assets Through the Asset Purchase on or about June 20, 2014.......................................................................................................105

Causes of Action............................................................................................................110

    COUNT I (ERISA, Minimum Funding) ......................................................................110

    COUNT II (ERISA, Breach of Fiduciary Duty) .........................................................112

    COUNT III (ERISA, Aiding and Abetting Breaches of Fiduciary Duty) ........................115

    COUNT IV (ERISA, Declaratory Relief)....................................................................117

i

COUNT V (Fraudulent Transfer, § 6-16-4(a)(1)) .................................................................. 118

COUNT VI (Fraudulent Transfer, §§ 6-16-4(a)(2) and/or 6-16-5(a)) .............................. 120

COUNT VII (Fraud through Intentional Misrepresentations and Omissions)................... 122

COUNT VIII (Fraudulent Scheme)..................................................................................... 122

COUNT IX (Conspiracy) ..................................................................................................... 123

COUNT X (Actuarial Malpractice)...................................................................................... 124

COUNT XI (Breach of Contract) ........................................................................................ 125

COUNT XII (Alter Ego) ....................................................................................................... 125

COUNT XIII (De Facto Merger) ......................................................................................... 126

COUNT XIV (Joint Venture)................................................................................................ 127

COUNT XV (Successor Liability) ....................................................................................... 128

COUNT XVI (Civil Liability Under R.I. Gen. Laws § 9-1-2 for Violations of the Rhode
    Island Hospital Conversions Act) ............................................................................... 129

COUNT XVII (Civil Liability Under R.I. Gen. Laws § 9-1-2 for Violations of 26 U.S.C.
    § 7206(2)).................................................................................................................... 130

COUNT XVIII (Liquidation pursuant to R.I. Gen. Laws §§ 7-6-60 & -61)......................... 130

COUNT XIX (Rhode Island Law, Breach of Fiduciary Duty)............................................. 131

COUNT XX (Rhode Island Law, Aiding and Abetting Breaches of Fiduciary Duty)........... 131

COUNT XXI (Declaratory Judgment, Liability and Turn Over of Funds, State Law) ......... 132

JURY DEMAND ...................................................................................................................... 133

**PLAINTIFFS**

1.     The St. Joseph Health Services of Rhode Island Retirement Plan (the "Plan") is a defined benefit retirement plan based in Rhode Island with over 2,700 participants.

2.     Plaintiff Stephen Del Sesto is a resident of East Providence, Rhode Island. He brings this action on behalf of the Plan and all of the Plan participants, in his capacity as Receiver for and Administrator of the Plan.  He was appointed by the Rhode Island Superior Court in the case captioned *St. Joseph Health Services of Rhode Island, Inc. v. St. Josephs Health Services of Rhode Island Retirement Plan, as amended*, PC-2017-3856 (the "Receivership Proceeding").

3.     Plaintiff Gail J. Major resides in Cranston, Rhode Island and is a participant in the Plan.  She brings this action in her individual capacity and on behalf of all other Plan participants.

4.     Plaintiff Nancy Zompa resides in Cranston, Rhode Island and is a participant in the Plan.  She brings this action in her individual capacity and on behalf of all other Plan participants.

5.     Plaintiff Ralph Bryden resides in North Scituate, Rhode Island and is a participant in the Plan.  He brings this action in his individual capacity and on behalf of all other Plan participants.

6.     Plaintiff Dorothy Willner resides in Cranston, Rhode Island and is a participant in the Plan.  She brings this action in her individual capacity and on behalf of all other Plan participants.

1

7.    Plaintiff Caroll Short resides in Smithfield, Rhode Island and is a participant in the Plan.  She brings this action in her individual capacity and on behalf of all other Plan participants.

8.    Plaintiff Donna Boutelle resides in Johnston, Rhode Island and is a participant in the Plan.  She brings this action in her individual capacity and on behalf of all other Plan participants.

9.    Plaintiff Eugenia Levesque resides in West Greenwich, Rhode Island and is a participant in the Plan.  She brings this action in her individual capacity and on behalf of all other Plan participants.

10.    The Plaintiffs who bring this action both in their individual capacity and on behalf of all other Plan participants are referred to collectively as the "Proposed Class Representatives."

<u>**DEFENDANTS**</u>

11.    Defendant PROSPECT CHARTERCARE, LLC ("Prospect Chartercare") is a limited liability company organized and existing under the laws of the State of Rhode Island, with its principal office in Los Angeles, California.  Directly, and through its 100% owned subsidiaries PROSPECT CHARTERCARE SJHSRI, LLC[1] and PROSPECT CHARTERCARE RWMC, LLC,[2] Prospect Chartercare owns and operates health care

---

[1] Not to be confused with St. Joseph Health Services of Rhode Island which until the 2014 Asset Sale owned and operated Fatima Hospital.  St. Joseph Health Services of Rhode Island is controlled by the nonprofit corporation CharterCARE Community Board, not the for-profit Prospect Chartercare.

[2] Not to be confused with the corporation Roger Williams Hospital that owned and operated Roger Williams Hospital prior to the 2014 Asset Sale, which is owned or controlled by CharterCARE Community Board, not Prospect Chartercare.  Flow charts setting forth the relationships of certain Defendants and other entities, before the 2014 Asset Sale and as a result of the 2014 Asset Sale, are attached hereto at Tab 1.

facilities in Rhode Island, including but not limited to two hospitals, Roger Williams Hospital and Our Lady of Fatima Hospital ("Fatima Hospital"), having acquired them in connection with an asset sale that closed on June 20, 2014 (the "2014 Asset Sale"). Prospect Chartercare currently has two members.

12.     One member of Prospect Chartercare, holding a 15% ownership interest, is Defendant CharterCARE Community Board ("CCCB"), an entity organized and existing under the laws of the State of Rhode Island as a non-profit corporation, with its principal office in Providence, Rhode Island.  Prior to the 2014 Asset Sale, CCCB was known as CharterCARE Health Partners, or CCHP.

13.     The other member of Prospect Chartercare, holding the remaining 85% ownership interest, is Defendant Prospect East Holdings, Inc. ("Prospect East"), a for-profit corporation organized and existing under the laws of the State of Delaware with a principal office and place of business in Los Angeles, California.  Prospect East is the wholly owned subsidiary of Defendant Prospect Medical Holdings, Inc.

14.     Defendant Prospect Medical Holdings, Inc. ("Prospect Medical Holdings") is a corporation organized and existing under the laws of the State of Delaware with a principal office and place of business in Los Angeles, California.  Prospect Medical Holdings owns all of the shares of Prospect East.

15.     Defendant St. Joseph Health Services of Rhode Island ("SJHSRI") is an entity organized and existing under the laws of the State of Rhode Island as a non-profit corporation, with its principal office in Providence, Rhode Island.

16.     Prior to the 2014 Asset Sale, SJHSRI owned Fatima Hospital.  Since then, SJHSRI no longer operates a hospital or otherwise provides health care.  Instead, SJHSRI's business consists of defending lawsuits and workers' compensation claims,

3

collecting certain debts and receivables, paying or settling certain liabilities which were excluded from the 2014 Asset Sale, and, until the Receiver was appointed, administering the Plan.

17.    Defendant Roger Williams Hospital ("RWH") is an entity organized and existing under the laws of the State of Rhode Island as a non-profit corporation, with its principal office in Providence, Rhode Island.  RWH is the survivor of a merger in 2010 with Roger Williams Medical Center, and has sometimes done business under that name.

18.    Prior to the 2014 Asset Sale, RWH owned the hospital it operated under the name of Roger Williams Hospital.  Upon the sale, RWH ceased operating a hospital or otherwise providing medical care, and existed only to provide funds to SJHSRI and possibly other individuals and entities (but did not provide funds to the Plan), defend lawsuits and workers' compensation claims, collect certain debts and receivables, and pay or settle certain liabilities which were excluded from the 2014 Asset Sale.

19.    At all relevant times CCCB was the ostensible parent company of both SJHSRI and RWH, although, as discussed below, the separate corporate statuses of CCCB, SHJSRI, and RWH must be disregarded to prevent fraud.

20.    Defendant PROSPECT CHARTERCARE SJHSRI, LLC ("Prospect Chartercare St. Joseph") is a limited liability company organized and existing under the laws of the State of Rhode Island with its principal office in Los Angeles, California. Prospect Chartercare St. Joseph has owned Fatima Hospital since the 2014 Asset Sale. The sole member of Prospect Chartercare St. Joseph is Prospect Chartercare.

21.    Defendant PROSPECT CHARTERCARE RWMC, LLC ("Prospect Chartercare Roger Williams") is a limited liability company organized and existing under

4

the laws of the State of Rhode Island with its principal office in Los Angeles, California. Prospect Chartercare Roger Williams has owned Roger Williams Hospital since the 2014 Asset Sale. The sole member of Prospect Chartercare Roger Williams is Prospect Chartercare.

22. As used herein, "Prospect Entities" refers collectively to Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East.

23. As used herein, "Old Fatima Hospital" refers to Fatima Hospital when it was owned and operated by SJHSRI, and "New Fatima Hospital" refers to Fatima Hospital since June 20, 2014 when it has been owned and operated by Prospect Chartercare St. Joseph. "Old Roger Williams Hospital" refers to Roger Williams Hospital when it was owned and operated by RWH, and "New Roger Williams Hospital" refers to Roger Williams Hospital since June 20, 2014 when it has been owned and operated by Prospect Chartercare Roger Williams.

24. SJHSRI, CCCB, RWH, the Diocesan Defendants, and the Prospect Entities have contractually, publically, and repeatedly described the ownership and operation of New Fatima Hospital and New Roger Williams Hospital as a joint venture between the Prospect Entities and CCCB and they must be treated as joint venturers.

25. Defendant CharterCARE Foundation ("CC Foundation") is an entity organized and existing under the laws of the State of Rhode Island as a non-profit corporation, with its principal office in North Providence, Rhode Island. It was formerly named CharterCare Health Partners Foundation. Its sole member is CCCB.

26. Defendant Rhode Island Community Foundation, d/b/a Rhode Island Foundation ("RI Foundation"), is an entity organized and existing under the laws of the

5

State of Rhode Island as a non-profit corporation, with its principal office in Providence, Rhode Island.  RI Foundation holds and invests funds on behalf of CC Foundation to which Plaintiffs claim to be entitled, and is named herein solely as a stakeholder of property claimed by Plaintiffs, so that Plaintiffs may be accorded complete relief.  When Defendant RI Foundation is intended to be referred to herein it is always specifically identified by name, and statements generally referencing "Defendants," "all of the Defendants," or "all of the other Defendants," do not refer to Defendant RI Foundation unless Defendant RI Foundation is referred to by name.

27.    The Roman Catholic Bishop of Providence ("Corporation Sole") is a corporation sole, created by an act of the Rhode Island General Assembly entitled *An Act to Create the Roman Catholic Bishop of Providence, and His Successors, a Corporation Sole*, with its principal office in Providence, Rhode Island.  Since May 31, 2005, Bishop Thomas Tobin was the President and Chief Executive Officer of Corporation Sole.  He was acting within the scope of his employment by Defendant Corporation Sole with respect to all of his actions and omissions alleged herein.

28.    Diocesan Administration Corporation ("Diocesan Administration") is an entity organized and existing under the laws of the State of Rhode Island as a non-profit corporation, with its principal office in Providence, Rhode Island.  It aids in administering the affairs of the Roman Catholic Diocese of Providence ("Diocese of Providence") and was instrumental in various matters alleged herein concerning the Diocese of Providence.  Since May 31, 2005, Bishop Tobin was the President and Chief Executive Officer of Diocesan Administration.  He was acting within the scope of his employment by Defendant Diocesan Administration with respect to all of his actions and omissions alleged herein.

6

29.     Diocesan Service Corporation ("Diocesan Service") is an entity organized and existing under the laws of the State of Rhode Island as a non-profit corporation, with its principal office in Providence, Rhode Island.  It aids in administering the affairs of and services provided by the Diocese of Providence and was instrumental in various matters alleged herein concerning the Diocese of Providence.  Since May 31, 2005, Bishop Tobin was the President and Chief Executive Officer of Diocesan Service.  He was acting within the scope of his employment by Defendant Diocesan Service with respect to all of his actions and omissions alleged herein.

30.     Defendants Corporation Sole, Diocesan Administration, and Diocesan Service, are collectively referred to herein as the "Diocesan Defendants."

31.     The Angell Pension Group, Inc. ("Angell") is a corporation organized and existing under the laws of Rhode Island with its principal office in East Providence, Rhode Island.  Since 2005, Angell provided actuarial services in connection with the Plan, and, at least since 2011, Angell provided administrative services which included dealing directly with and advising Plan participants, initially on behalf of and as agents for SJHSRI and CCCB, and later on behalf of and as agents for SJHSRI, CCCB, and the Prospect Entities.

### JURISDICTION AND VENUE

32.     Plaintiffs brings this Complaint under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a) and (e)(1), as some of the claims asserted herein are founded on violations of Sections 502(a)(1)(A), 502(a)(1)(B), 502(a)(2), 502(a)(3) & 503 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and on federal common law such as estoppel in favor of participants and beneficiaries to enforce benefits promises, even where those promises may not be included in a written plan.

Although SJHSRI operated the Plan as if it qualified for exemption from ERISA as a "church plan," Plaintiffs base their ERISA claims on factual allegations that prove that the requirements for the exemption upon which SJHSRI relied were not met, on many different levels and at various different times. Accordingly, the Plan and various entities involved with the Plan became and continue to be subject to ERISA.

33. In addition, Plaintiffs assert various state law claims that arise out a common nucleus of operative facts as the claims based on ERISA, over which the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). Some of those state law claims are within the concurrent jurisdiction of the federal courts and the state courts and, therefore, are not preempted under ERISA.

34. Plaintiffs assert other state law claims that may be pre-empted if the Court determines that the Plan was covered by ERISA at the times those claims arose. Since the issue of whether the Plan was covered by ERISA will be disputed, Plaintiffs plead those claims in the alternative. The Court also has supplemental jurisdiction over those alternative state law claims pursuant to 28 U.S.C. § 1367(a), even if it is ultimately determined that the Plan was not governed by ERISA.

35. Venue in the District of Rhode Island is proper under 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action is situated, in Rhode Island. Venue in the District of Rhode Island is also proper under 29 U.S.C. § 1132, in that the Plan is administered and certain breaches concerning the Plan took place in Rhode Island.

36. All of the Defendants have sufficient minimum contacts with and are subject to the personal jurisdiction of the Court.

8

## CLASS ACTION ALLEGATIONS

37.    The Proposed Class Representatives bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following class of persons similarly situated: All participants or beneficiaries of the Plan (the "Class").  The Receiver joins in the application of the Proposed Class Representatives that they be appointed class representatives, and that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23.

38.    Excluded from the Class are any high-level executives at SJHSRI or at the other Defendants, or any employees who have responsibility or involvement in the administration of the Plan, or who are subsequently determined to be fiduciaries of the Plan, or who knowingly participated in any of the wrongful acts described herein.

### A.    NUMEROSITY

39.    The exact number of Class members is unknown to the Proposed Class Representatives at this time, but may be readily determined from records maintained by Defendants in conjunction with records obtained by the Receiver.  The number of Plan beneficiaries is estimated to exceed 2,700.  Upon information and belief, many, if not all, of those persons are likely members of the Class, and thus the Class is so numerous that joinder of all members is impracticable.

### B.    COMMONALITY

40.    The issues regarding liability in this case present common issues of law and fact, with answers that are common to all members of the Class, including but not limited to (1) whether and/or when the Plan became subject to ERISA, and if so, whether violations of ERISA have occurred; (2) the determination of Defendant

9

SJHSRI's obligations and the Plan participants' rights under the Plan, and whether those obligations were breached and those rights violated; (3) the determination of whether all of the Defendants committed fraud; (4) the determination of whether all of the Defendants engaged in a civil conspiracy; (5) the determination of whether all of the Defendants aided and abetted fraud; (6) whether the transfers of assets in connection with the 2014 Asset Sale and/or 2015 *Cy Pres* Proceeding constitute fraudulent transfers; (7) whether Defendants violated the Hospital Conversions Act in connection with obtaining regulatory approval of the 2014 Asset Sale; (8) whether the Diocesan Defendants aided and abetted the filing of a false tax return in connection with their agreement to continue to list SJHSRI in the Catholic Directory after the 2014 Asset Sale; (9) whether Defendants owe or owed fiduciary duties to participants of the Plan, either under ERISA or state law; and (10) issues of successor liability.

41.    The issues regarding the relief are also common to the members of the Class as the relief will include, but are not limited to (1) equitable relief ordering Defendants to fund the Plan, for the benefit of all Plan beneficiaries; (2) a judgment avoiding the transfers in connection with the 2014 Asset Sale and 2015 *Cy Pres* Proceeding; (3) a declaration that the Plan is subject to ERISA; and (4) awarding to Plaintiffs' counsel attorneys' fees and expenses as provided by the common fund doctrine, 29 U.S.C. § 1132(g), and/or other applicable doctrine.

## C.    TYPICALITY

42.    The Proposed Class Representatives' claims are typical of the claims of the other members of the Class, because their claims arise from the same events, practices and/or courses of conduct, including, but not limited to, Defendants' treatment of the Plan as exempt from ERISA, Defendants' transfers of assets in connection with

the 2014 Asset Sale and/or 2015 *Cy Pres* Proceeding, Defendants' misrepresentations to Plan beneficiaries, Defendants' misrepresentations to regulators in connection with the approval of the 2014 Asset Sale, and Defendants' fraudulent schemes to defraud Plaintiffs.  The Proposed Class Representatives' claims are also typical, because all Class members are similarly affected by Defendants' wrongful conduct.

43.    The Proposed Class Representatives' claims are also typical of the claims of the other members of the Class because, to the extent the Proposed Class Representatives seek equitable or declaratory relief, it will affect all Class members equally.  Specifically, the equitable relief sought includes but is not limited to requiring Defendants to make the Plan whole for all contributions that should have been made pursuant to ERISA funding standards, reformation of the Plan to correspond to Defendants' representations and promises in connection therewith, and for interest and investment income on such contributions.  The declaratory relief sought will address Defendants' obligations to all Plan participants.

44.    Defendants do not have any defenses unique to the Proposed Class Representatives' claims that would make the Proposed Class Representatives' claims atypical of the remainder of the Class.

**D.    ADEQUACY**

45.    The Proposed Class Representatives will fairly and adequately represent and protect the interests of all members of the Class.

46.    The Proposed Class Representatives do not have any interests antagonistic to or in conflict with the interests of the Class.

47.    Defendants have no unique defenses against the Proposed Class Representatives that would interfere with Plaintiffs' representation of the Class.

48.    The Proposed Class Representatives have engaged counsel (a) with extensive experience in complex litigation, (b) who have already devoted hundreds of hours and secured and reviewed approximately one million pages of documents in investigating those claims, and (c) with the approval of the Rhode Island Superior Court, represent the Receiver whose interests are identical to the interests of the Proposed Class Representatives.

E.    RULE 23(B)(1) REQUIREMENTS

49.    The requirements of Rule 23(b)(1)(A) are satisfied because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

50.    The requirements of Rule 23(b)(1)(B) are satisfied because adjudications of these claims by individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede the ability of other members of the Class to protect their interests.

F.    RULE 23(B)(2) REQUIREMENTS

51.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

G.    RULE 23(B)(3) REQUIREMENTS

52.    If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under (b)(3) is appropriate because questions of law or fact common to members of the

Class predominate over any questions affecting only individual members. The common issues of law or fact that predominate over any questions affecting only individual members include, but are not limited to: (1) whether and/or when the Plan became subject to ERISA, and if so, whether violations of ERISA have occurred; (2) the determination of Defendant SJHSRI's obligations and the Plan participants' rights under the Plan, and whether those obligations were breached and those rights violated; (3) the determination of whether all of the Defendants committed fraud; (4) the determination of whether all of the Defendants engaged in a civil conspiracy; (5) the determination of whether all of the Defendants aided and abetted fraud; (6) whether the transfers of assets in connection with the 2014 Asset Sale and/or 2015 Cy Pres Proceeding constitute fraudulent transfers; (7) whether Defendants violated the Hospital Conversions Act in connection with obtaining regulatory approval of the 2014 Asset Sale; (8) whether the Diocesan Defendants aided and abetted the filing of a false tax return in connection with their agreement to continue to list SJHSRI in the Catholic Directory after the 2014 Asset Sale; (9) whether Defendants owe or owed fiduciary duties to participants of the Plan, either under ERISA or state law; and (10) issues of successor liability.

53.    A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

A.    Individual Class members do not have an interest in controlling the prosecution of these claims in individual actions rather than a class action, because the equitable and declaratory relief sought by any Class member will either inure to the benefit of the Plan or affect each class member equally;

13

B.      Individual members also do not have any interest in controlling the prosecution of these claims because the monetary relief that they could seek in any individual action is identical to the relief that is being sought on their behalf herein;

C.      This litigation is properly concentrated in this forum, where most or all Defendants are headquartered and/or located, where Plaintiffs are located or live, and where the Receivership Proceeding concerning the Plan is already pending; and

D.      There are no difficulties managing this case as a class action.

RELATED PROCEEDINGS

54.     Concurrently with the filing of this Complaint, Plaintiffs have filed or are filing a parallel proceeding in the Rhode Island Superior Court (the "State Action"), asserting the state law claims made herein, but solely for the purposes of protecting Plaintiffs from the possible expiration of any time limitations during the pendency of the proceeding in this Court, should the Court for any reason decline to exercise supplemental jurisdiction over those state law claims.  Plaintiffs intend to ask that the State Action be stayed pending the resolution of the proceeding in this Court.

55.     Plaintiffs have also sought or will seek leave to intervene in a case that is currently pending in the Rhode Island Superior Court entitled *In re: CHARTERCARE HEALTH PARTNERS FOUNDATION, ROGER WILLIAMS HOSPITAL and ST. JOSEPH HEALTH SERVICES OF RHODE ISLAND*, C.A. No. KM-2015-0035 (the "2015 *Cy Pres* Proceeding"), in which Plaintiffs ask the state court to order that Defendants CC Foundation and RI Foundation hold the approximately $8,200,000 (and any proceeds thereof) that was transferred from SJHSRI and RWH pursuant to the order of the court in that proceeding, so as to protect Plaintiff's claims against those

14

funds and preserve the *status quo* pending the determination of the merits of those claims in this Court or in the State Action.

OVERVIEW

56.     This case concerns an insolvent defined benefit retirement plan with over 2,700 participants, consisting of hospital nurses and other hospital workers who, after many years of dedicated service to their patients and SJHSRI, learned in August of 2017 that the Plan had not been adequately funded.  The disclosure occurred when the Plan was placed into receivership by SJHSRI, with the request that the Rhode Island Superior Court approve a virtually immediate 40% across-the-board reduction in benefits.

57.     The harm to the Plan participants' pensions is the product of (at least) four separate but related factual scenarios and schemes:

    a.    For nearly fifty years SJHSRI used the Plan as a marketing tool to hire and retain employees, and promised employees and prospective employees that SJHSRI made 100% of the necessary contributions and that they had no investment risk, leading them to mistakenly but justifiably conclude that SJHSRI was making the necessary contributions and their pensions were safe;

    b.    For most of at least the past ten years, SJHSRI stopped making necessary contributions with the result that the Plan was grossly underfunded, but SJHSRI and other Defendants conspired to conceal it from Plan participants through fraudulent misrepresentations and material omissions regarding the Plan;

    c.    For many years SJHSRI and other Defendants secretly sought a means to terminate the Plan without exposing SJHSRI's substantial operating assets and charitable funds to lawsuits by Plan participants for benefits, including in December of 2012 when SJHSRI considered unilaterally terminating the Plan and paying benefits only to employees who were already retired, which would have deprived over 1,800 other Plan participants of any pension whatsoever, but reconsidered because SJHSRI feared that the excluded Plan participants would bring a successful class action

15

that would end up costing SJHSRI more than it would save by
terminating the Plan;

d.    Beginning in 2011, SJHSRI and other Defendants put into
operation a scheme to transfer SJHSRI's operating assets, cash,
and most of its expected future charitable income to entities
controlled by SJHSRI's parent company, intending that such assets
thereby would be out of reach of a suit by the Plan participants, and
then terminate the Plan.  This scheme had four key stages:

i.    First, in connection with the 2014 Asset Sale, SJHSRI and
related entities engaged in the fraudulent transfer of
SJHSRI's operating assets to the control of a for-profit
limited liability company, leaving SJHSRI with the insolvent
pension plan and no operating assets, in return for SJHSRI's
parent company getting a 15% stake in the for-profit
company that they thought would be safe from the claims of
Plan participants, and made fraudulent misstatements and
material omissions concerning the Plan to the state
regulatory agencies whose approval was required for the
transfer to go forward.

ii.    Next, to evade federal law imposing liability on control
groups and successors under ERISA, SJHSRI and other
Defendants conspired with the Diocesan Defendants to
falsely claim that the Plan continued to qualify as a "church
plan," which if true would have exempted it from ERISA.
This claim violated federal tax laws and ERISA.

iii.    Then, to secure cash which should have gone to bolster the
Plan, SJHSRI's parent company over the last four years
stripped at least $8,200,000 in charitable assets from
SJHSRI and its other subsidiary, and either spent or put the
money in a foundation it controlled.  This was accomplished
by misleading the Rhode Island Superior Court in 2015 into
approving these wrongful and fraudulent transfers under the
doctrine of *cy pres.*

iv.    Finally, having accomplished their goal of stripping SJHSRI
of virtually all value, SJHSRI and its affiliates sought to wash
their hands of the problem they created, and put the Plan
into receivership in August of 2017 and asked the state court
to reduce SJHSRI's liabilities to Plan participants by 40% on
the grounds that SJHSRI had insufficient assets to fund the
Plan.

58.     SJHSRI, the Prospect Entities, and other Defendants violated ERISA, committed fraud, breached their contractual obligations, violated their duty of good faith and fair dealing, and otherwise acted wrongfully.  As a result, they must be required to compensate losses to the Plan and remedy such violations, including returning all assets improperly diverted from the Plan, and to otherwise fully fund the Plan.

59.     They also ran afoul of Rhode Island laws prohibiting fraudulent conveyances.  The remedies for those violations include that the Prospect Entities must turn over to the Plan and its participants the entirety of the assets they acquired in the 2014 Asset Sale, with no credit or offset for what they paid for those assets, or for the improvements that they may have made on the facilities.  In other words, the Plaintiffs are entitled to judgment awarding them these assets, including but not limited to New Fatima Hospital and New Roger Williams Hospital, or ordering that these properties and other assets be sold and awarding Plaintiffs the proceeds from the sale up to the amount necessary to fully fund the Plan on a termination basis and ensure the pensions of all Plan participants.

## FACTS

**A.    CONCERNING THAT THE PLAN IS SUBJECT TO ERISA**

### 1.    Exemption for Church Plans

60.     The vast majority of defined benefit pension plans are subject to and required to comply with ERISA.

61.     The requirements under ERISA include the obligations to make the minimum contributions to the plan required by ERISA, to inform plan participants if the employer was not making those minimum contributions, and to pay premiums to the

Pension Benefit Guaranty Corporation ("PBGC") for insurance coverage to protect participants against insolvency of the plan.

62.    Moreover, entities which purchase the assets of an ERISA plan sponsor, and which continue to carry on essentially the same business at the same location and with the same employees, have liability for the plan under the doctrine of successor liability, which cannot be avoided by the parties' express exclusion of the pension liability from the asset sale.

63.    However, certain pension plans established and/or operated by churches or qualified church-controlled organizations are exempt from ERISA (hereinafter "Church Plan" or "Church Plans"), provided they comply with the terms of the exemption.  So too most governmental plans are exempted from ERISA.

64.    Although even Church Plans may elect to be covered under ERISA, in 1984, the Retirement Board for the predecessor to the Plan rejected a proposal to make that election, because the Board saw no benefit to SJHSRI in protecting employees by making the election, and wished to avoid the annual premium to the PBGC, which at that time they believed was $15,000 per year.

65.    At various times during the period from 1995 to the present, SJHSRI did not fund the Plan in accordance with the requirements of ERISA and the recommendations of the Plan's actuaries, with the result that the Plan is grossly underfunded.

66.    During the period from 1995 to the present, SJHSRI and the other entities and individuals administering the Plan and communicating with Plan participants never informed Plan participants that they claimed that the Plan was not subject to ERISA, that the Plan was underfunded, or that the Plan was not being funded in accordance

either with ERISA or the recommendations of SJHSRI's actuaries, with the result that all Plan participants who were not aiding and abetting Defendants or otherwise participating in the conspiracy were taken completely by surprise when that was disclosed in connection with the filing of the Receivership Proceeding in August of 2017.

67.    As discussed below, there came a time when the Plan no longer qualified as a Church Plan, but SJHSRI, RWH, CCCB, Angell, the Prospect Entities, and the Diocesan Defendants all fraudulently conspired to misrepresent that the Plan remained qualified as a Church Plan, in violation of federal tax laws and ERISA, as part of their scheme to avoid successor liability of the Prospect Entities and to shield New Fatima Hospital from liability for the Plan.

68.    Thus, the determination of whether and when the Plan ceased to qualify as a Church Plan is essential to determining the rights of the parties herein.

69.    The definition of "Church Plan" is set forth in 26 U.S.C. § 1002(33)(A)&(C) as follows:

> (A) The term "church plan" means a plan established and maintained (to the extent required in clause (ii) of subparagraph (B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26.
>
> *      *      *
>
> (C) For purposes of this paragraph--
>
>> (i) A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

19

(ii)  The term employee of a church or a convention or association of churches includes—

(I)   a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, regardless of the source of his compensation;

(II)   an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of title 26 and which is controlled by or associated with a church or a convention or association of churches; and

(III)   an individual described in clause (v).

(iii)   A church or a convention or association of churches which is exempt from tax under section 501 of title 26 shall be deemed the employer of any individual included as an employee under clause (ii).

(iv)   An organization, whether a civil law corporation or otherwise, is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches.

70.    As discussed below, the Plan did not qualify as a Church Plan for various reasons based on events that occurred at various times: (a) beginning in 2009; (b) continuing through the 2014 Asset Sale; and (c) culminating with the Plan being put into receivership in August of 2017.

71.    More specifically,

a.    at various times since 2009, the Plan did not qualify as a Church Plan because the Plan was not maintained by a qualifying "principal-purpose" organization;

b.    at various times since 2009, and certainly by the 2014 Asset Sale and the Plan being put into receivership in August of 2017, the Plan did not qualify as a Church Plan because SJHSRI was no longer "controlled by or associated with a church or a convention or association of churches;" and

c.    at various times since 2009, and certainly after the 2014 Asset Sale and the Plan being put into receivership in August of 2017, the Plan did not qualify as a Church Plan because SJHSRI was no longer

entitled to tax exempt status under the group exemption issued to the United States Conference of Catholic Bishops, and therefore was no longer properly included in the Catholic Directory because it was no longer "operated, supervised or controlled by or in connection with the Roman Catholic Church in the United States."

## 2. The Plan did not satisfy the "principal-purpose" requirement

72.     Under 29 U.S.C. § 1002 (33)(c)(i), a pension plan that includes employees of non-church entities cannot qualify as a Church Plan unless (a) the Plan was "maintained by an organization, the principal purpose of which is the administration or funding of a plan for the provision of retirement or welfare benefits or both…," *and* (b) the principal-purpose organization is controlled by or associated with a church.

73.     In addition, under 29 U.S.C. § 1002 (33)(c)(ii)(II), any non-church entity that employs plan participants must be "controlled by or associated with a church or a convention or association of churches" or the plan loses its status as a Church Plan.

74.     The prototypical "principal-purpose" organization is a church benefits board that administers a plan whose participants include employees of non-church agencies controlled by or associated with the church.

75.     The requirement that the plan must be maintained by a "principal-purpose" organization serves to ensure that the obligations of the organization responsible for administering or funding the pension plan are to the plan, not to interests or responsibilities that are or may be adverse to the interests of the plan.

76.     The separate requirement that the "principal-purpose" organization itself must be controlled by or associated with a church maintains the close connection between the organization administering or funding the plan and the church, upon which the special exemption from ERISA for Church Plans is based.

77.    As of 2009, SJHSRI had taken over the administration of the SJHSRI Plan, and SJHSRI's Finance Committee was administering the Plan and making its investment decisions.  At the same time, SJHSRI's Finance Committee was managing the operating hospitals' finances and managing other non-Plan matters, demonstrating that the Finance Committee was not a principal-purpose organization.

78.    In August 27, 2009, SJHSRI sent out notices to plan participants saying that SJHSRI had decided to freeze the Plan.  These notices were signed by "Plan Administrator, St. Joseph Health Services of Rhode Island."  SJHSRI owned and operated Old Fatima Hospital, and, therefore, was not and could not have been a principal-purpose organization.

79.    In 2011, SJHSRI's Board of Trustees itself amended the Plan.  Whereas prior amendments had been signed by SJHSRI's Retirement Board, the 2011 amendment was effectuated by SJHSRI's Board of Trustees, evidencing the lack of a principal-purpose organization.  Indeed, the 2011 SJHSRI Plan stated:

> The Employer shall be the Plan Administrator, hereinafter called the Administrator and named fiduciary of the Plan . . . .

SJHSRI was operating a fully functional hospital and, therefore, was not a "principal-purpose organization" devoted principally to administering or funding the Plan.

80.    On April 29, 2013, Bishop Tobin issued a Resolution ratifying the 2011 amendment of the Plan and also (*inter alia*) ratifying the following:

> That the Board of Trustees of St. Joseph Health Services of Rhode Island is the Retirement Board with respect to the Plan and acts on behalf of St. Joseph Health Services of Rhode Island as the Plan Administrator of the Plan;
>
> That the Board of Trustees of St. Joseph Health Services of Rhode Island has the authority, pursuant to the terms of the Plan, to appoint a

committee to act on its behalf with respect to administrative matters related to the Plan; and

That the Board of Trustees of St. Joseph Health Services of Rhode Island has appointed the Finance Committee of CharterCARE Health Partners to act on its behalf with respect to administrative matters relating to the Plan.

81.     This Resolution thus confirmed that SJHSRI's Board of Trustees was the Retirement Board.  The Board of Trustees was primarily responsible for direction of all of the activities of SJHSRI, including the operation of Old Fatima Hospital, and, therefore, was not a principal-purpose organization.  Moreover, the Board of Trustees delegated administration of the Plan to the wholly-secular CCCB Finance Committee, which directed financial matters for CCCB, including management of Old Fatima Hospital and Old Roger Williams Hospital, and, therefore, was not controlled by or associated with any church, and was not a principal-purpose organization.

82.     After the closing of the 2014 Asset Sale, the Board of Trustees and the CCCB Finance Committee ceased any administration of the Plan.  By resolution dated December 15, 2014, CCCB caused SJHSRI to delegate "the administration, management and potential wind-down" of the Plan to SJHSRI's president and to one of SJHSRI's attorneys, "each acting alone."  Neither of these individuals was an organization, much less a principal-purpose organization, or associated with a church.

83.     In August 2017, SJHSRI petitioned the Plan into receivership in the Receivership Proceeding.  The Receiver is acting on behalf of the Rhode Island Superior Court.  Accordingly, the Receiver is not controlled by or associated with any church.

### 3. SJHSRI Was Not a Chuch Plan Because It Was Not "Controlled by or Associated with a Church or a Convention or Association of Churches"

84.     As noted, under 29 U.S.C. § 1002 (33)(c)(ii)(II), a non-church entity that employs plan participants must be "controlled by or associated with a church or a convention or association of churches," or the plan does not qualify as a Church Plan.

85.     This requirement maintains the close connection between the employer and the church, upon which the special exemption from ERISA for Church Plans is based.

86.     An organization is "controlled" by a church when, for example, a religious institution appoints a majority of the organization's officers or directors. 26 C.F.R. § 1.414(e)–1(d)(2) (2000).  Since 2009, the majority of SJHSRI's directors and all of its officers were appointed by CCCB, which is a completely secular non-profit organization. Accordingly, at least since 2009 SJHSRI has not been "controlled by… a church," and, therefore, since 2009 SJHSRI has not qualified as a Church plan on that basis.

87.     To be "associated with a church," the organization must share "common religious bonds and convictions with that church or convention or association of churches." 29 U.S.C. § 1002(33)(C)(iv).

88.     In deciding whether an organization shares such common bonds and convictions with a church, three factors bear primary consideration:

    a.    whether the religious institution plays any official role in the governance of the organization;

    b.    whether the organization receives assistance from the religious institution; and

    c.    whether a denominational requirement exists for any employee or patient/customer of the organization.

24

89.     Starting in 2011, SJHSRI has filed its Form 990 with the IRS stating that CCCB was SJHSRI's "sole member."  This confirms the diminished or nonexistent roles of Bishop Tobin and the Diocese in SJHSRI's governance after the 2009 merger.

90.     Upon the conclusion of the 2014 Asset Sale, the Diocese had no meaningful role in the governance of SJHSRI.  To the contrary, the only rights it had concerned the "Catholicity" of SJHSRI's operation of the hospital and provision of health care.  Since SJHSRI no longer operated a hospital or otherwise provided health care as a result of the 2014 Asset Sale, that role was rendered completely moot.

91.     By resolution dated December 15, 2014, SJHSRI's bylaws were amended to eliminate even Bishop Tobin's nominal role in the appointment of directors or officers of SJHSRI.

92.     Upon the conclusion of the 2014 Asset Sale, SJHSRI received no assistance whatsoever from the Diocesan Defendants in particular or from the Roman Catholic Church in general.

93.     Indeed, as discussed below, rather than rendering assistance to SJHSRI, the Diocesan Defendants in connection with the 2014 Asset Sale required SJHSRI to pay nearly $640,000 on a loan which should have been forgiven, and used $100,000 of that sum to fund a separate pension plan for clergy.

94.     SJHSRI had no denominational requirement for any employee, patient, or customer of the hospital even when it operated Old Fatima Hospital, and certainly had no such requirement after the 2014 Asset Sale.

95.     Thus, SJHSRI was not "controlled by or associated with a church or a convention or association of churches," and, therefore, the Plan was not a Church Plan.

**4.     SJHSRI was not a tax exempt organization at least as of the 2014 Asset Sale**

96.     Pursuant to 29 U.S.C. § 1002 (33)(A)(ii), a church-controlled entity cannot be a "qualified church-controlled organization" unless it qualifies as a tax-exempt organization "under section 501 of Title 26."

97.     The only exemption "under section 501 of Title 26" for which SJHSRI might have qualified was under 26 U.S.C. § 501(c)(3), which applies to organizations that are "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes…."  The most common purposes for qualification under 26 U.S.C. § 501(c)(3) is for the organization to avoid the obligation to pay income tax and so that donations to such entities are tax deductible, but it has the separate significance of being a requirement for organizations that are controlled by or associated with a church, that seek to have their pension plans exempted from ERISA as Church Plans.

98.     All entities that claim 501(c)(3) status must first obtain recognition of that status by the Internal Revenue Service ("IRS"), with limited exceptions that were not applicable to SJHSRI.

99.     IRS recognition can be obtained in either of two ways.  The entity can apply directly to the IRS and receive recognition, or the entity can claim exemption under a group ruling issued by the IRS to a central organization, which provides an exemption for the central organization and for subordinate organizations under the central organization's supervision or control for whom the central organization claims the exemption.

100.    The central organization (not the IRS) determines in the first instance which organizations are included as subordinates under its group ruling, in accordance with IRS regulations.  That determination, however, is only *prima facie*, and does not conclusively establish either that the central organization properly claimed exempt status for a particular subordinate organization, or that the subordinate organization in fact is qualified as tax exempt.

101.    SJHSRI has never obtained its own tax exemption ruling from the IRS. Thus, the Plan cannot be a Church Plan if SJHSRI cannot claim exemption under a group ruling.

102.    Beginning in 1946, and re-issued each year thereafter, the IRS has approved a group exemption for the central organization presently known as the United States Conference of Catholic Bishops ("U.S. Conference of Bishops"), and certain subordinate organizations for whom the U.S. Conference of Bishops claims the exemption.

103.    The requirements for a subordinate organization to qualify under this group exemption include that the entity must be "operated, supervised, or controlled by or in connection with the Roman Catholic Church" in each year for which the exemption is claimed.

104.    Rather than requiring proof each year that a particular entity satisfies this requirement, the IRS accepts listing of the entity in an annual publication entitled *The Official Catholic Directory* ("Catholic Directory") as *prima facie* proof of this qualification on a year-by-year basis.

105.    The Catholic Directory contains diocesan entries, confirmed and approved by each diocese on an annual basis, for each subordinate organization that is

27

"operated, supervised, or controlled by or in connection with the Roman Catholic

Church," and entitled to exemption under the group ruling issued to the U.S. Conference

of Bishops.

106.   The Diocese of Providence and the Diocesan Defendants are responsible

to provide accurate and complete information to the Catholic Directory concerning

subordinate organizations in the Diocese of Providence that are "operated, supervised,

or controlled by or in connection with the Roman Catholic Church" that claim exemption

under the group ruling issued to the U.S. Conference of Bishops.

107.   Each year the U.S. Conference of Bishops reminds dioceses of their

obligation to every year ensure that all entries pertaining to subordinate organizations in

their diocese are kept current and accurate.

108.   Each year, the incumbent Bishop and Chancellor for the Diocese of

Providence (and the Diocesan Defendants) receives a memorandum from the U.S.

Conference of Bishop's Office of General Counsel, concerning the IRS group exemption

for that year.  Each year the memorandum attaches the latest private letter ruling from

the IRS and explains as follows:

> The latest ruling reaffirms the exemption from federal income tax under
> Section 501(c)(3) of the Internal Revenue Code of "the agencies and
> instrumentalities and educational, charitable, and religious institutions
> operated, supervised or controlled by or in connection with the Roman
> Catholic Church in the United States, its territories or possessions
> appearing in the Official Catholic Directory for [that year]"

> [Quoting the IRS Private Letter Ruling]

109.   The memorandum also explains the responsibilities of diocesan officials

as follows:

> Diocesan officials who compile OCD information to send to the OCD
> publisher **are responsible for the accuracy of such information**.  They

must ensure that only qualified organizations are listed, that organizations are listed under their correct legal names, *that organizations that cease to qualify are deleted promptly*, and that newly-qualified organizations are listed as soon as possible.

[Bolding in the original and italics supplied]

110.    Each year the Catholic Directory has required the Diocese of Providence to certify in writing that there were no changes for each subordinate organization that pertained to the Diocese.

111.    At all relevant times until 2015, the Diocesan Defendants listed SJHSRI in the Catholic Directory as a subordinate organization that was "operated, supervised, or controlled by or in connection with the Roman Catholic Church" in the Diocese of Providence, as a "hospital."

112.    Since 2015 the Diocesan Defendants have listed SJHSRI in the Catholic Directory as a subordinate organization that was "operated, supervised, or controlled by or in connection with the Roman Catholic Church" in the Diocese of Providence, as a "miscellaneous" entity.

113.    At least since the 2014 Asset Sale, which included the transfer of all of SJHSRI's operating assets, SJHSRI was *not* "operated, supervised, or controlled by or in connection with the Roman Catholic Church," either in the Diocese of Providence or anywhere else.

114.    Accordingly, SJHSRI was no longer entitled to come under the group exemption issued to the U.S. Conference of Bishops, and pursuant to federal law should have been deleted and removed from the Catholic Directory, effective on June 20, 2014 when the closing of the Asset Sale occurred, or at least prior to the issuance of the 2015 Catholic Directory.

115.    Accordingly, SJHSRI was no longer a "qualified church-controlled organization," because it no longer qualified as a church-controlled tax-exempt organization "under section 501 of Title 26."  As a result, the Plan was no longer a Church Plan, and, therefore, was no longer exempt from ERISA.

### 5.    Fraudulent Inclusion of SJHSRI in the Catholic Directory

116.    At all relevant times, SJHSRI, CCCB, RWH, CC Foundation, the Diocesan Defendants, the Prospect Entities, and Angell, knew that if the Plan ceased to qualify as a Church Plan, it would become subject to ERISA.

117.    For example, at a meeting of the SJHSRI Board of Trustees on January 15, 2009, chaired by Bishop Tobin, Bishop Tobin was informed that if the Diocese severed its association with SJHSRI, SJHSRI would have to administer the Plan under ERISA, "or identify a new religious sponsor for the plan, allowing it to remain a church plan."

118.    Beginning in 2011, the trustees and executive management of SJHSRI, RWH, and CCCB decided to seek substantial outside capital.

119.    From the outset of their deciding to seek outside capital, the board of trustees and executive management of SJHSRI, CCCB, and RWH placed a great deal of importance on retaining as much "local control" of the hospitals as possible and keeping existing management in place.  For them, "local control" meant control by many of the same individuals who had been controlling SJHSRI, RWH, and CCCB, prior to the 2014 Asset Sale.

120.    By the end of 2011, they authorized management to solicit offers from entities that invested in and/or operated hospitals in Rhode Island and across the United

States, and to advise those entities that their goals included retaining significant local control of the hospitals, and keeping existing management in place.

121.    One entity they solicited was LHP Hospital Group, Inc. ("LHP"), a for-profit corporation that operated five hospitals outside of Rhode Island.

122.    In 2012, LHP responded to the solicitation with a letter of intent that set forth terms of a proposed joint venture, under which LHP would pay $33,000,000 to pay off SJHSRI and RWH's bonded indebtedness, pay an additional $72,000,000 to fund the Plan, and commit an additional approximately $50,000,000 for future capital improvements and network expansion.

123.    The $72,000,000 figure was based upon Defendant Angell's estimate that the unfunded status of the Plan in 2011 was $72,000,000.  In 2012 that estimate changed to approximately $86,000,000, which initially caused concern regarding the sufficiency of the payment proposed by LHP.  However, in 2013 that estimate was reduced to approximately $73,000,000 based upon high returns earned on pension assets in 2013.

124.    The Trustees and executive management of SJHSRI, CCCB, and RWH did not favor LHP's insistence on applying so much capital to pay off the unfunded pension liability.  They wanted to allocate more of the purchase money for other purposes, instead of fulfilling their obligations to the Plan participants by choosing a buyer or joint-venturer who would adequately fund the Plan.

125.    Accordingly, the trustees and executive management of SJHSRI, CCCB, and RWH chose not to pursue a transaction with LHP, and to continue their search for outside capital.

126.    In 2013, and after some negotiations, Defendant Prospect Medical Holdings proposed a joint venture to operate Fatima Hospital and Roger Williams Hospital with Defendant CCCB, that involved the Prospect Entities paying off SJHSRI's and RWH's bonded indebtedness of approximately $31,000,000, paying $14,000,000 into the Plan, committing $50,000,000 over four years for capital projects and network development, and funding annual asset depreciation in the amount of $10,000,000.

127.    However, the $14,000,000 contribution to the Plan would only reduce SJHSRI's unfunded liabilities for the Plan to approximately $59,000,000.  The Letter of Intent stipulated that liability for the Plan would remain with SJHSRI, and, therefore, that Fatima Hospital under the operation of its new owners would be relieved of these unfunded liabilities.  Accordingly, the parties had to determine if there was a way that SJHSRI could retain that liability and the Prospect Entities could avoid that liability.

128.    Defendant Prospect Medical Holdings knew the Diocesan Defendants and the Diocese of Providence listed SJHSRI in the Catholic Directory and that SJHSRI treated the Plan as a Church Plan.

129.    All of the defendants knew that if the Plan ceased to qualify as a Church Plan, it would become subject to ERISA, and, in that event, a company that took over the operations of Fatima Hospital would have successor liability for the Plan.

130.    Accordingly, Prospect Medical Holding's proposal was conditioned upon liability for the Plan remaining with SJHSRI and that it continue to be claimed to be a Church Plan, to avoid the imposition on the Prospect Entities of successor liability for the Plan under ERISA.

131.    That condition required the cooperation of the Diocesan Defendants in continuing to allow SJHSRI to claim tax exempt status under the group ruling issued to

the U.S. Conference of Bishops, by continuing to list SJHSRI in the Catholic Directory as an entity that was "operated, supervised, or controlled by or in connection with the Roman Catholic Church" in the Diocese of Providence, even though all Defendants knew that was false.

132.    SJHSRI had other options that would have fully funded the Plan.  One option was the outright sale of the hospital, for which SJHSRI would have received a purchase price sufficient to fund the Plan.

133.    However, that conflicted with the goals of the board of trustees and executive management of SJHSRI, CCCB, and RWH of retaining as much "local control" of the hospitals as possible and keeping existing management in place.

134.    Another option was to affiliate with a company such as LHP that was willing to fully fund the Plan.  However, that conflicted with the goals of the board of trustees and executive management of SJHSRI, CCCB, and RWH to allocate more of the purchase money for other purposes.

135.    The board of trustees and executive management of SJHSRI, CCCB, and RWH chose to proceed with a transaction that did not necessitate fully funding the Plan.

136.    The board of trustees and executive management of SJHSRI, CCCB, and RWH decided to proceed with the proposal from Prospect Medical Holdings.

137.    All of the defendants were fully aware of the lack of *bona fides* for the claim that the Plan would be a Church Plan after SJHSRI sold all its operating assets.

138.    On May 28, 2013, when the strategy to keep Church Plan status was being discussed between and among SJHSRI, CCCB, RWH, and the Prospect Entities, a representative of the Prospect Entities had the following question, which was to be

33

discussed with representatives of SJHSRI, RWH, and CCCB in a "due diligence call re employee benefit plans" on May 30, 2013:

> If SJHSRI becomes a shell corporation, how will the plan remain a church plan?  Will the diocese assume control of the corporation?  How will the corporation remain in the Official Catholic Directory?

139.    CCCB also posed this same question to Angell on May 28, 2013 and described it as "the multi-million dollar question".

140.    These questions were raised at the level of the Executive Committee of CCCB's Board of Trustees on July 25, 2013.  At that meeting the question was asked "[w]ill the Bishop want to continue to sponsor the pension," the members of the committee discussed the "impact if Diocese/Bishop does not support" the proposed sale of assets, and it was noted that "no [Diocesan] sponsorship is a problem, especially with [the] pension plan."  The committee members acknowledged the need "to keep Church Plan status rather than ERISA," and that they were "trying to come up with a structure" for "a non-profit, church sponsored entity," which would create "no additional liability to [the] Bishop."

141.    Expressing concern over committing to the asset sale with the Prospect Entities without this issue being resolved, CCCB's Chief Executive Officer Kenneth Belcher raised the possibility at this July 25, 2013 meeting of signing the asset sale agreement but making it " 'subject to' if Bishop signs off on the pension piece."  He also "discussed concerns that [also] may be raised by the Vatican," whose approval of the transaction was required by the Diocesan Defendants.

142.    The conclusion of this meeting of the Executive Committee was to share the current version of the asset purchase agreement ("Asset Purchase Agreement") with Bishop Tobin and the Diocesan Defendants, and seek their support and agreement

34

to maintaining SJHSRI in the Catholic Directory prior to SJHSRI, RWH, and CCCB signing the Asset Purchase Agreement.

143.    On August 14, 2013, counsel for SJHSRI, CCCB, and RWH, together with CCCB "senior leadership," met at the offices of the Diocesan Defendants to obtain their cooperation.  That meeting was attended by Bishop Tobin, Rev. Timothy Reilly (the Chancellor of the Diocese of Providence), and Msgr. Paul Theroux (who was a member of the Diocesan Finance Council) (collectively the "Diocesan Defendants' Attendees").

144.    Counsel for SJHSRI, CCCB, and RWH brought the current version of the Asset Purchase Agreement to the meeting.  That draft (and the final version actually signed by the parties) provided for the sale of all of the operating assets of SJHSRI, including ownership of Fatima Hospital.  It also included the requirement that SJHSRI would retain liability for the Plan, and that the new owners and operators of New Fatima Hospital would have no obligations to the Plan.

145.    Counsel for SJHSRI, CCCB, and RWH also brought to the meeting with the Diocesan Defendants' Attendees on August 14, 2013 a document on the joint letterhead of counsel and CCCB, entitled "Overview of the Strategic Transaction with Prospect Medical Holdings, Inc., Presentation to the Board of Directors," referring to the Board of Trustees for SJHSRI, CCCB, and RWH.

146.    The latter document contained the legend "Privileged and Confidential: Attorney-Client Communication."  Nevertheless, counsel for SJHSRI, CCCB, and RWH showed it to the Diocesan Defendants' Attendees and went over it with them.

147.    That document outlined the salient details of the 2014 Asset Sale, whereby SJHSRI, CCCB, and RWH would sell "substantially all of their assets to Prospect CharterCARE LLC ('Newco')."  In return, the Prospect Entities would pay cash

of $45,000,000, commit to contribute $50,000,000 over four years for "physician network development and capital projects," and "fund depreciation in the amount of $10,000,000 per year."

148.    The document noted that Defendant CCCB would receive "a 15% ownership (membership) interest in Newco."

149.    The very first page of the presentation noted that only $14 million of the sales proceeds would be paid into "the Church-sponsored retirement plan (the 'Church Plan")."

150.    At this time, all of the defendants knew that SJHSRI's unfunded liability for the Plan was approximately $73,000,000.  Thus, they knew that the Asset Purchase Agreement contemplated leaving SJHSRI an unfunded liability for the Plan of approximately $59,000,000, and that SJHSRI would have no operating assets.

151.    The document then detailed certain promises that would be made to the Diocesan Defendants as part of the transaction, which were described as follows:

> Catholic identity covenants of Prospect and Newco
>
> -    Our Lady of Fatima Hospital and other legacy SJHSRI facilities will be operated in compliance with the ERDs[3]
>
> -    Roger Williams Medical Center and its facilities will not engage in prohibited activities
>
>    -    Abortion
>
>    -    Euthanasia
>
>    -    Physician-assisted suicide
>
> -    Any hospital or facility acquired or established after Closing must comply with restrictions on prohibited activities

_____

[3] Ethical and Religious Directives for Catholic Health Care Services.

-    The Bishop has a direct right to enforce the Catholicity covenants

-    CCHP intends to propose that the Bishop may require a name change of Our Lady of Fatima Hospital and other legacy SJHSRI facilities if he is unsuccessful in enforcing the covenants

152.    These "Catholic identity covenants" included essentially all the rights which the Diocesan Defendants and the Diocese of Providence were entitled to exercise over Old Fatima Hospital and Old Roger Williams Hospital, SJHSRI, and RWH, since 2009 when SJHSRI and RWH became part of CCCB.  Thus, notwithstanding the 2014 Asset Sale, the Diocesan Defendants were offered the promise that New Fatima Hospital and New Roger Williams Hospital would remain as Catholic as Old Fatima Hospital and Old Roger Williams Hospital had been before the asset sale.

153.    In other words, the Diocese and the Diocesan Defendants would transfer to the new hospitals the "Catholicity" and associated controls that they had previously enjoyed over Old Fatima Hospital, Old Roger Williams Hospital, SJHSRI, and RWH.

154.    Indeed, shortly after the closing of the 2014 Asset Sale, Bishop Tobin extolled the advantages of the arrangement in precisely those terms:

> For all intents as purposes, Fatima Hospital will retain its Catholicity, and that is guaranteed by contract now.  It's not just an aspiration, it's guaranteed by contract that the Catholic identity is still under the supervision of the local bishop and that in all of its ministries and external signs Fatima Hospital will be as Catholic as it has ever been.

155.    This "Overview of the Strategic Transaction" that counsel reviewed with the Diocesan Attendees then laid out the *quid pro quo* for freeing New Fatima Hospital from the unfunded liabilities of the Plan, and granting these extensive and perpetual "Catholic identity covenants" for New Fatima Hospital and New Roger Williams Hospital, Defendants SJHSRI, RWH, and CCCB, through their counsel, informed the Diocesan Defendants' Attendees at this meeting that it was a "requirement" of the parties to the

37

Asset Purchase Agreement that the Diocesan Defendants "[m]aintain the retirement plan of St. Joseph Health Services of Rhode Island as a 'Church Plan'."

156.    Thus, if they wanted the transaction to go forward, the Diocesan Defendants were required to agree (a) to SJHSRI being left with no operating assets; (b) to SJHSRI nevertheless retaining responsibility for the Plan and the unfunded liability of approximately $59,000,000; and (c) to the Plan remaining a Church Plan exempt from the requirments of ERISA.

157.    The Diocesan Defendants, and, indeed, all of the Defendants, understood that the consequences for the Plan participants would be that (a) there would no longer be an operating hospital supporting the Plan, (b) the entity supporting the Plan would have no operating assets, and (c) the Plan participants would not have the protections of ERISA, including insurance provided by the PBGC, if SJHSRI was unable to pay the benefits to which the Plan participants were entitled under the Plan.

158.    As further discussed below, SJHSRI's only "Catholic" attribute was through its operation of Fatima Hospital.  Thus, the Diocesan Defendants knew that by agreeing to the proposed asset sale they were giving up any control over, association, or connection with SJHSRI.

159.    Thus, although the Diocese would have no connection with SJHSRI, the requirement was that the Diocesan Defendants had to include SJHSRI in the Catholic Directory.

160.    All of the attendees at this meeting understood that continuing to list SJHSRI in the Catholic Directory would be a misrepresentation, and an unlawful evasion of tax law and ERISA, because neither the Diocesan Defendants nor the

Diocese of Providence would control or be associated with SJHSRI after the closing of the 2014 Asset Sale.

161.    At this meeting on August 14, 2013 (and again on several later occasions as discussed below) the Diocesan Defendants agreed to continue to list SJHSRI in the Catholic Directory.

162.    There can be no dispute over the fact that after the 2014 Asset Sale, the Diocese had no connection with SJHSRI.  In fact, after the Plan was placed in receivership in August of 2017, the Diocesan Defendants contended that their complete lack of connection with SJHSRI excused them from any responsibility for, or liability in connection with, the insolvency of the Plan.

163.    For example, after the Plan was put into receivership as insolvent, the Chancellor for the Diocese (also an officer in Defendants Diocesan Administration and Diocesan Service) stated the following in a Providence Journal op-ed:

> St. Joseph Health Services of Rhode Island is not a diocesan entity. The pension plan was adopted, sponsored, operated, managed and funded by SJHSRI, an independent corporation, and not by the Diocese of Providence. Changes over the last decade, including the formation of CharterCARE Health Partners, sharply reduced diocesan involvement in SJHSRI and the hospitals. And upon the 2014 transaction with Prospect, that involvement essentially ended.

164.    Another spokesperson for the Diocese and the Diocesan Defendants, Carolyn E. Cronin, made a similar claim in a statement to the press after the Plan was put into receivership:

> Once the hospitals were sold, even the Bishop's very limited role at SJHSRI -- maintaining Catholicity at the hospitals -- was mooted by the fact that SJHSRI no longer owned or ran any hospitals.

165.    Later in the day on August 14, 2013, counsel for SJHSRI, CCCB, and RWH attended a meeting of the Executive Committee of CCCB's Board of Trustees, and advised the committee of the results of his meeting with the Diocesan Defendants' Attendees, and assured them that SJHSRI, CCCB, RWH, and the Diocesan Defendants had a "common understanding," and that Bishop Tobin was "comfortable."

166.    On September 11, 2013, the Diocesan Chancellor contacted counsel for SJHSRI, CCCB, and RWH and stated that the "our Diocesan Finance Council and College of Consultors also need to consent to the act of alienation," and asked counsel to provide them with the Overview of the Strategic Transaction that counsel had shared with the Diocesan Defendants on August 14, 2013, because "[t]he Bishop thinks it would be a concise and helpful overview for the council members."

167.    Counsel for SJHSRI, CCCB, and RWH promised to send it to the Chancellor the next day, after deleting the references to "Attorney-Client Privilege."  The next day counsel followed through and sent it to the Chancellor, addressing the document as "[f]or the Bishop of the Roman Catholic Diocese of Providence, Rhode Island."  The document set forth exactly the same bargain, of (a) only $14,000,000 going to fund the Plan, (b) SJHSRI retaining liability for the Plan, (c) Fatima Hospital having no further responsibility for the Plan, and (d) CCCB and the Prospect Entities agreeing to the same extensive "Catholic identity covenants" controlling their operation of New Fatima Hospital and New Roger Williams Hospital, all in return for the Diocesan Defendants agreeing to "maintain the retirement plan of St. Joseph Health Services of Rhode Island as a 'Church plan.' "

168.    On September 17, 2013 the Diocesan Finance Council and College of Consultors met to decide whether to vote in favor of alienation of the assets of SJHSRI

pursuant to the proposed asset sale.  Bishop Tobin, Chancellor Reilly, and Monseigneur Theroux attended as members of both, with Bishop Tobin as Chairman.

169.   They requested that CCCB Chairman Belcher attend the meeting *alone*, without counsel or any other representatives of any of the parties other than the Diocesan Defendants, and he complied.

170.   At the meeting, Mr. Belcher went over with the Diocesan Finance Council and the College of Consultors the presentation from counsel for SJHSRI, CCCB, and RWH which set forth the trade of cutting Fatima Hospital loose from the Plan and extensive "Catholic identity covenants" applicable to both hospitals, in return for the "requirement" that the Diocese "maintain the retirement plan of St. Joseph Health Services of Rhode Island as a 'Church plan'."

171.   The Diocesan Finance Council and the College of Consultors approved the transaction.

172.   On September 18, 2013, Chancellor Reilly provided counsel for SJHSRI, CCCB, and RWH with a draft of Bishop Tobin's proposed letter to the Secretary of the Congregation for the Clergy in Rome requesting approval for the 2014 Asset Sale, and sought counsel's "comments/suggestions" concerning the letter.

173.   Bishop Tobin's draft letter to the Vatican purported to summarize the transaction.  It recounted the "merger" of SJHSRI and RWH into CCCB in 2009, and stated that "[s]hortly thereafter, in the wake of the global economic downturn, CharterCARE soon began to experience the need for increased capital and was confronted with a **spiraling and gaping unfunded liability within its employee-pension system**" (emphasis supplied).  The draft noted that the proposed sale would apply "approximately $14 million to fund the Church-sponsored employee pension plan."

41

174.    Bishop Tobin then stated that "without [approval of] this transaction, it appears that a consistent Catholic healthcare presence in the Diocese of Providence would be gravely compromised, and the financial future for employees-beneficiaries of the pension plan would be at significant risk.  I believe that the APA [Asset Purchase Agreement] between CharterCARE and Prospect will help avoid the catastrophic implications of such a failure, and at the same time, enhance the quality of care at SJHSRI/Our Lady of Fatima."

175.    Finally, the draft letter concluded with Bishop Tobin stating that "[i]t is my sincere hope that Your Excellency will understand the important role of this alienation for the faithful of the Diocese of Providence, and the thousands of patients, employees, and pensioners of SJHSRI."

176.    The draft letter did not refer to or otherwise disclose the Diocesan Defendants' undertaking to "[m]aintain the retirement plan of St. Joseph Health Services of Rhode Island as a 'Church Plan'," which would have been impossible to justify given that SJHSRI would no longer operate as a hospital or have any connection to the Diocese of Providence.

177.    Counsel for SJHSRI, CCCB, and RWH revised the draft by *deleting* the reference to "spiraling and gaping" liability, and substituted "significant" liability, stating that he preferred the revision "**in the event this letter was ever subject to discovery in a civil lawsuit**" (emphasis added).

178.    Counsel for SJHSRI, CCCB, and RWH left untouched, however, all of the other statements quoted above, including that $14 million would "fund the Church-sponsored employee pension plan," that without Vatican approval of the asset sale, "the financial future for employees-beneficiaries of the pension plan would be at significant

42

risk," and that such approval "will help avoid the catastrophic implications" of failure of the pension plan.

179.   The Diocesan Defendants, SJHSRI, RWH, and CCCB knew that even after the $14 million contribution, the Plan would remain seriously underfunded, and the financial future of the pensioners would be at much more than merely "significant risk." Moreover, approval of the alienation would not avoid the "catastrophic implications" of that failure.  To the contrary, such approval would increase the risk of such failure by depriving SJHSRI of operating income it needed to meet its obligations under the Plan, and hindering if not completely frustrating the Plan participants' rights to demand contributions by or recover damages from an asset-holding and income-generating hospital.

180.   Bishop Tobin did not disclose in his letter to the Vatican that the proposed asset sale increased the probability of the Plan failing.  Instead Bishop Tobin omitted that information and, in effect, said the opposite, that approval of the asset sale was actually necessary to secure the Plan.

181.   On September 27, 2013, Bishop Tobin signed his letter as altered by counsel for SJHSRI, CCCB, and RWH and sent it to the Vatican.

182.   These misrepresentations and omissions concerning the Plan in the Bishop's letter to the Vatican were included because Defendants SJHSRI, RWH, CCCB, and the Diocesan Defendants, all understood that Vatican approval was required for the transaction to proceed, and knew or were told that that the Vatican must approve specifically the "pension restructuring."

183.   On November 15, 2013, there was a meeting of the CCCB Investment Committee that was administering the Plan.  As part of a discussion concerning the

43

Plan, Chief Executive Officer Belcher informed them that "Bishop Thomas Tobin has signed off on the Plan, and the proposal has been sent to the Vatican for approval."

184.    Vatican approval was obtained in early 2014, along with other necessary approvals, and the asset sale closed on June 20, 2014, whereupon ownership of Fatima Hospital was transferred from SJHSRI to Prospect Chartercare St. Joseph and ownership of Roger Williams Hospital was transferred from RWH to Prospect Chartercare Roger Williams.

185.    In conformity with the "strategic plan" to which Defendants SJHSRI, CCCB, RWH, and the Diocesan Defendants had agreed prior to the closing of the asset sale, SJHSRI was not deleted from the 2014 Catholic Directory immediately after the 2014 Asset Sale, although it should have been.

186.    As the next step in that plan, counsel for SJHSRI, CCCB, and RWH contacted the Diocese in late 2014 to ensure that SJHSRI would be included in the Catholic Directory for the coming year, 2015.

187.    However, on November 11, 2014, the Diocesan Chancellor e-mailed a representative of the Prospect Entities and admitted that "Fatima and SJHSRI are not eligible for listing at this time."  He noted that "[r]ecently, the USCCB has instituted more formalized and rigorous policies and procedures, with increased expectations for the local Dioceses, in light of stricter IRS scrutiny of group rulings."  Moreover, the Chancellor observed that it was not a matter that could be handled discreetly out of public view, since "[t]he Prospect-CharterCARE merger has been major state news, and most in the local community are aware that a for-profit entity is now the parent company of Fatima and SJHSRI."

188. The response of the representative of the Prospect Entities was to e-mail Chancellor Reilly and Monseignor Theroux on December 2, 2014, with copies to SJHSRI and CCCB, stating that if SJHSRI were not listed in the Catholic Directory, that would "mean that the SJHS pension would no longer be treated as a church plan."

189. In the same e-mail, the representative for the Prospect Entities noted that the reason he was also addressing the e-mail to Monsignor Theroux was "due to his intimate knowledge of the situation and his role as chairman of the Prospect CharterCARE SJHSRI LLC Board of Directors."  As noted above, Msgr. Theroux also was a member of the Diocesan Finance Council, and had been present on several occasions when Bishop Tobin agreed to maintain SJHSRI in the Catholic Directory in return for Catholic identity covenants applicable to the hospitals and Fatima Hospital being relieved of liability to fund the Plan.

190. On December 23, 2014, counsel for SJHSRI sent an e-mail to counsel for the Diocesan Defendants, which he copied to the Prospect Entities and Angell, that reminded everyone of the consequences of the Diocesan Defendants not listing SJHSRI in the Catholic Directory:

> SJHSRI believes that if it is not included in the 2015 issue of the directory that the pension plan will no longer qualify as a church plan and that **the loss of that status will require that they immediately notify the applicable governmental authorities that the plan is currently underfunded**.

> [Emphasis supplied]

191. In response, the Diocesan Defendants on December 31, 2014 again improperly agreed that SJHSRI would remain in the Catholic Directory for 2015, under the continuing "sponsorship" of the Diocese of Providence.

45

192.   On or about January 1, 2015, the Diocesan Defendants contacted the editors of the Catholic Directory and saw to it that SJHSRI remained listed in the Catholic Directory for 2015, under the "miscellaneous" activities of the Diocese of Providence.

193.   That listing was repeated in the 2016 and 2017 editions of the Catholic Directory, the latter being the most recent edition as of June 2018.

194.   The Diocesan Defendants and the other Defendants knew that continuing to list SJHSRI in the Catholic Directory was misrepresenting to the U.S. Conference of Bishops, the editors of the Catholic Directory, and the IRS, that SJHSRI continued to be "operated, supervised, or controlled by or in connection with the Roman Catholic Church."

195.   Nevertheless, since 2014, the Diocesan Defendants have continued to certify to the editors of the Catholic Directory that there were no changes concerning SJHSRI, and, therefore, that SJHSRI continued under the sponsorship of the Diocese.

196.   The contact person that the Diocesan Defendants listed in the Catholic Directory for SJHSRI for 2015 and every year since has been an agent for the Prospect Entities with no connection to SJHSRI.

197.   The IRS was never notified that SJHSRI no longer was entitled to tax exempt status under the group ruling the IRS issued to the U.S. Conference of Bishops, as it should have been, and SJHSRI thereafter continued to file informational nonprofit organization returns to the IRS that it was no longer entitled to file, and failed to file income tax returns that it was required to file.

198.   Specifically, Defendant SJHSRI on or about August 16, 2016, filed with the IRS a "Return of Organization Exempt From Tax," Form 990, that falsely claimed

that SJHSRI had tax exempt status under 26 U.S.C. § 501(c)(3) for the tax year from October 1, 2014 through September 30, 2014.

199.    Defendant SJHSRI on or about August 10, 2017, filed with the IRS a "Return of Organization Exempt From Tax," Form 990, that falsely claimed that SJHSRI had tax exempt status under 26 U.S.C. § 501(c)(3) for the tax year from October 1, 2015 through September 30, 2016.

200.    The Diocesan Defendants knew that their agreeing to continue to list SJHSRI in the Catholic Directory would enable Defendant SJHSRI to file these false returns, and knew and expected that Defendant SJHSRI in fact would file these false returns.

201.    These false claims were material in that they hindered or had the potential for hindering the IRS's efforts to monitor and verify Defendant SJHSRI's tax liability.

202.    The Diocesan Defendants aided and abetted SJHSRI's filing of these false tax returns in violation of 26 U.S.C. § 7206(2), which states as follows:

Any person who—

*        *        *

(2) Aid or assistance.--Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document…

*        *        *

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

47

203.    The Diocesan Defendants aided or assisted in, procured, counseled, or advised the preparation or presentation of these tax returns, the returns were false as to a material matter, and the acts of the Diocesan Defendants were willful.

204.    Defendants SJHSRI, RWH, CCCB, the Prospect Entities, and the Diocesan Defendants all knew that the Diocese of Providence's power to delete SJHSRI from the Catholic Directory gave the Diocese a complete veto over the asset sale, because claiming that the Plan was a Church Plan, although unlawful, was a requirement by SJHSRI, RWH, CCCB, and the Prospect Entities for the sale to proceed, as expressly set forth in the Overview of the Strategic Transaction shared with the Diocesan Defendants on August 14, 2013.

205.    Thus, the Diocesan Defendants share responsibility for the 2014 Asset Sale and the retention of the Plan by an insolvent SJHSRI, not because they controlled SJHSRI (which they did not), but because they participated in a conspiracy with all of the other Defendants to fraudulently and falsely claim Church Plan status for the Plan, in an attempt to free Fatima Hospital from the unfunded liabilities on the Plan at the expense of the Plan participants, without which the 2014 Asset Sale to the Prospect Entities would not have been consummated and the Plan participants would not have been injured.

206.    The Diocesan Defendants chose to prefer their interest in having New Fatima Hospital operated under the Catholic identity covenants, and having New Fatima Hospital freed of approximately $59,000,000 in liabilities, over the interests of the Plan participants in their hard-earned pensions.

207.    The purpose for improperly including SJHSRI in the Catholic Directory was to enable SJHSRI to falsely assert that the Plan was a Church Plan, in assist

48

SJHSRI and all of the other Defendants in their fraudulent scheme to avoid liability for the Plan and keep the insolvency of the Plan hidden.

208.    Another inducement for the Diocesan Defendants improperly agreeing to retain SJHSRI in the Catholic Directory was that if the asset sale went forward, the Diocesan Defendants would receive nearly $640,000 in repayment of a loan from the Inter-Parish Loan Fund.

209.    SJHSRI had previously requested that the loan be forgiven, since it concerned improvements to a property that the Diocesan Defendants continued to own after the 2014 Asset Sale, and which had benefitted from the improvements.

210.    It was the decision of Bishop Tobin to deny SJHSRI's request that the loan should be forgiven.

211.    In connection with the 2014 Asset Sale, the Inter-Parish Loan Fund received proceeds of $638,838.25 from the proceeds of the sale of SJHSRI's assets.

212.    On August 22, 2014, Bishop Tobin directed that $100,000 of this amount be transferred to the Priests' Retirement Fund instead of the SJHSRI Plan, and that the balance be applied towards a Diocesan Line of Credit.

B.    SJHSRI's Obligations Under the Plan

213.    From 1965 to 1995, SJHSRI's employees participated in the pension plan that the Diocesan Defendants established for the employees of the Diocese of Providence (the "Diocesan Plan").

214.    Prior to January 1, 1973, SJHSRI's employees were required to contribute to the Diocesan Plan 2% of the first $4,800 of their annual earnings, and 4% of their annual earnings in excess of $4,800.  As of January 1, 1973, employees were not required (or permitted) to make contributions to the Plan.

49

215.    The Plan documents at all relevant times included both a Trust and a highly-technical and lengthy separate instrument that purported to set forth the terms of the Plan.  During the period from 1965 through 1995, the Plan was part of the Diocesan Plan, and was amended or restated at least ten times.

216.    In 1995, in connection with the tenth restatement of the Diocesan Plan, SJHSRI and the Diocesan Defendants took certain steps to unilaterally remove SJHSRI employees from the Diocesan Plan, which up to then had covered both the employees of SJHSRI and the lay employees of the Diocese of Providence.

217.    At the same time SJHSRI and the Diocesan Defendants established and/or caused SJHSRI to establish a separate plan for SJHSRI, without obtaining the agreement of or even providing notice to the Plan participants or SJHSRI's employees.

218.    Up until then, the assets of the Diocesan Plan allocable to the lay employees of the Diocese and to the employees of SJHSRI were co-mingled in the same investment accounts.  In 1995, a portion of the assets of the Diocesan Plan was allocated to the employees of SJHSRI and transferred to separate accounts to fund the Plan.  Thereafter, the funds were kept segregated.  This enabled the Diocesan Defendants to fund the Diocesan Plan as they saw fit, while SJHSRI was not funding the Plan.  Another purpose and effect of the split was to insulate the pension benefits of the lay employees of the Diocese from the claims of the employees of SJHSRI.

219.    Following its separation from the Diocesan Plan, the Plan was unilaterally revised by SJHSRI on three occasions, in 1999, 2011, and 2016.

220.    The various iterations of the Plan contain different provisions (the "Exculpatory Provisions") that were inserted so as to enable arguments regarding the

construction of the Plan that would make any funding obligation illusory and which would constitute a fraud on the Plan participants.

221.   The Exculpatory Provisions so construed are ineffective, for various reasons, including, but not limited to, that (a) they contradict the reasonable expectations of Plan participants, (b) they are contrary to representations made over many years to Plan participants upon which Plan participants relied to their detriment such that Defendants are estopped from relying on such provisions, (c) they violate the obligation of good faith and fair dealing, and (d) they generally represent an unconscionable fraud on Plan participants.

222.   The Exculpatory Provisions so construed also contradict statements that SJHSRI, RWH, CCCB, and the Prospect Entities made to various Rhode Island state agencies to obtain their approval for the 2014 Asset Sale and to the Rhode Island Superior Court in 2015 to obtain the court's approval of the transfer of approximately $8,200,000 from SJHSRI and RWH to CC Foundation.

223.   These statements acknowledged both that it was SJHSRI's "liability" and "obligation" to fund the Plan, but also represented that SJHSRI had the intent and means to "satisfy" that obligation.  Having succeeded in obtaining those approvals based upon the those representations, SJHSRI, RWH, CCCB, CC Foundation, and the Prospect Entities are judicially estopped from contending otherwise, and from enforcing the Exculpatory Provisions insofar as they would relieve SJHSRI of any such liability, since to allow them to use those provisions for that purpose would reward a fraud on both the Rhode Island Attorney General and the Rhode Island Superior Court.

224.   Moreover, insofar as the Exculpatory Provisions if so construed would have the effect of relieving Defendant SJHSRI from liability to fully fund the Plan or pay

51

the promised retirement benefits, then Defendants SJHSRI, Angell, and the Prospect

Entities breached their fiduciary obligations to disclose that material information to the

Plan participants, including, but not limited to, the information that Defendant SJHSRI

contended that it was not obligated to fund, and, in fact, was not funding the Plan.  All of

the other Defendants aided and abetted those breaches of fiduciary duties by

Defendants SJHSRI, Angell, and the Prospect Entities.

225.   All of the various iterations of the Plan have in common the fact that they

were never given to Plan participants.  In other words, Plan participants were never

provided with a copy of the Plan documents, either at any time during the applicability of

the Diocesan Plan or, subsequently, when the Plan for SJHSRI employees was

separately established.

226.   Notwithstanding the Exculpatory Provisions, SJHSRI's obligation to

properly fund the Plan was acknowledged in the annual financial statements for SJHSRI

prepared by different auditors through the years.

227.   For example, since 2006, all of SJHSRI's annual (both audited and

unaudited) financial statements have listed the unfunded portion of Plan obligations as a

liability on the balance sheet for SJHSRI, and reduced the net assets of SJHSRI by that

amount.

228.   In addition, the financial statements repeatedly referred to SJHSRI's policy

to make annual contributions to fund the Plan, and to determine the amount of the

contributions as if the Plan were subject to the funding obligations of ERISA.  For

example:

        a.   SJHSRI's financial statements for the fiscal years ending
            September 30, 1985, September 30, 1986, and September 30,
            1987, stated that "[t]he Hospital makes annual contributions to the
            Plan equal to the amount accrued for pension expense;"

b.  SJHSRI's financial statements for the fiscal years ending September 30, 1992, September 30, 1993, September 30, 1994, September 30, 1995, September 30, 1996, and September 30, 1997, stated that "[t]he Hospital's policy is to fund pension costs accrued which are within the guidelines established by ERISA;"

c.  SJHSRI's financial statements for the fiscal years ending September 30, 2001, and September 30, 2002, stated that "[t]he Corporation's policy is to fund at least the minimum amount required under ERISA guidelines;" and

d.  SJHSRI's financial statements for the fiscal years ending September 30, 2003, September 30, 2004, September 30, 2005, and September 30, 2006, stated that "[a]lthough the plan is not subject to ERISA, the Corporation's policy is to fund at least the minimum amount required under the ERISA guidelines."

229.  These financial statements all were expressly approved by the SJHSRI's Board of Trustees, SJHSRI's management, and SJHSRI's auditors.

230.  Even in years when SJHSRI's annual financial statements did not expressly acknowledge that it was SJHSRI's policy to fund the Plan under ERISA guidelines, those financial statements never disclosed that SJHSRI had not adhered to its oft-stated policy to fund the Plan under ERISA guidelines.

231.  Similarly, the annual reports that Angell and Angell's predecessor actuaries provided to SJHSRI concerning the actuarial status of the Plan repeatedly acknowledged both that SJHSRI was liable to fully fund the Plan and that SJHSRI's policy was to make contributions to the Plan as if it were subject to ERISA.  For example:

a.  In the Actuarial Valuations of the Plan as of July 1, 1995, July 1, 1996, July 1, 1997, July 1, 1998, and July 1, 1999, Watson Worldwide[4] stated that "[s]ince this a church plan it is not subject to the minimum funding requirements of ERISA.  However, it is the Hospital's funding policy to follow the ERISA guidelines each year in determining the contribution requirement.  This funding

---

4 Watson Worldwide were the actuaries at the time.

policy will ensure that sufficient assets are available to plan participants to pay retirement benefits;"

b.   In the Actuarial Valuations of the Plan as of July 1, 2000, July 1, 2001, and July 1, 2002, Aon Employee Benefits Consulting[5] stated that "[w]hile the Plan is a church plan, and is not subject to the funding requirements of ERISA, the current funding policy follows the ERISA guidelines.  Therefore, the minimum contribution level has been determined as the amount that would be required by ERISA in the absence of church plan status;"

c.   In the Actuarial Valuations of the Plan as of July 1, 2006 and July 1, 2007, Angell stated that "[w]hile the Plan is a church plan, and is not subject to the funding requirements of ERISA, the current funding policy follows the ERISA guidelines without regard to the current liability calculations;" and

d.   In the Actuarial Valuations of the Plan as of July 1, 2008, and for each year thereafter, Angell stated that "[w]hile the Plan is a church plan, and is not subject to the funding requirements of ERISA, the current funding policy follows the ERISA guidelines without regard to the current liability calculations or Pension Protection Act of 2006 modifications."[6]

232.   In December 2009, and after review and consultation with SJHSRI, Moody's Investor Services affirmed its rating of SJHSRI's Series 1999 bonds.  In its rating statement, Moody's noted the Plan had been frozen and stated: "[w]hile there is no required funding by ERISA, the need to fund adequately the pension is an obligation of the hospital."

233.   Other statements that Defendants SJHSRI, RWH, and CCCB made to state regulators in connection with obtaining approval for the 2014 asset sale also represented that they were obligated by the Plan to make necessary contributions.

---

[5] Aon Employee Benefits Consulting were the actuaries at the time.

[6] The caveat for "the current liability calculations or Pension Protection Act of 2006 modifications" is irrelevant, since neither the then current liability calculations nor the Pension Protection Act of 2006 modifications eliminated or even affected the ERISA guidelines for funding.

234.    For example, in response to an official query concerning how the Plan

would be operated after the asset sale, they stated on April 15, 2014 as follows:

> Response: The pension liability will remain in place post transaction.
> Subsequent to the $14 Million contribution to the Plan upon transaction,
> **future contributions to the Plan will be made based on recommended
> annual contribution amounts as provided by the Plan's actuarial
> advisors**. Moving forward, the investment portfolio of the plan will be
> monitored by the Investment Committee of the Board of Trustees.
>
> [Emphasis supplied]

235.    Similarly, SJHSRI management and its boards repeatedly acknowledged

that SJHSRI's policy was to make contributions to the Plan as if it were subject to

ERISA, and that is was a "fiduciary obligation" of board members to see to it that the

Plan was properly funded.  For example:

> a.    SJHSRI Chief Financial Officer John Flynn on September 5, 1996
> advised Watson Worldwide that the SJHSRI Finance Committee
> wanted to "[a]dopt an approach [to the Plan] that will allow for a
> consistent method over time to adequately fund the plan, taking
> into consideration the Hospital's ability to make the necessary
> contributions and **ensuring the Finance Committee and the
> Retirement Board that they will meet their fiduciary
> responsibility for providing adequate funding**" [emphasis
> supplied]; and

> b.    SJHSRI's Human Resources Department disseminated as
> authoritative a history of the Plan captioned "St. Joseph Health
> Services of Rhode Island Retirement Plan History," which stated
> that "[t]he Corporation's policy is to fund pension costs accrued
> that are within the guidelines of ERISA."

## C.    DEFENDANTS KNEW THE PLAN WAS UNDERFUNDED

236.    On May 12, 2008, SJHSRI and RWH entered into a "MEMORANDUM OF

UNDERSTANDING" that agreed in principle to their merger.

237.    Officials from RWH evaluated SJHSRI's pension liability in connection with

the merger that ultimately took place in 2009, which also was approved by the R.I.

Department of Health and Attorney General under the Hospital Conversions Act. According to the minutes for a meeting of the executive committee of the RWH's Board of Trustees on October 23, 2008, the estimated underfunding for the Plan as of September 20, 2008 was $29 million.

238.  As of February 2, 2009, SJHSRI and RWH entered into a Health Care System Affiliation and Development Agreement among Roger Williams Hospital and Roger Williams Medical Center, and St. Joseph Health Services of Rhode Island and Roman Catholic Bishop of Providence (the "SJHSRI-RWH Affiliation Agreement").  The SJHSRI-RWH Affiliation Agreement provided that "CharterCare Health Partners" (later re-named CharterCare Community Board and referred to herein as CCCB) would be formed and would completely control RWH and would control SJHSRI on all matters except certain religious issues.

239.  On July 9, 2009, Angell informed SJHSRI, RWH, and CCCB that the estimated unfunded benefit obligation as of July 1, 2009 was approximately $60,000,000 and would increase over the next four years even if SJHSRI contributed an additional $8.7 million over that period.

240.  On March 15, 2011, the Finance, Audit and Compliance Committee of the Board of Directors for CCCB met to discuss, *inter alia*, the shortfall in the Plan's funding, and the following discussion took place amongst members of the committee and Jeffrey Bauer (President and Chief Executive Officer of Defendant Angell):

> Mr. McQueen asked how much the Hospital would need to fund into the Plan to carry it to term.  Mr. Bauer indicated approximately $50M would be needed. . . .
>
> Mr. Stiles asked what was happening in the public sector.  Were there any modifications available that should be looked at in order to minimize the Hospital's liability?  **Mr. Bauer indicated that any modifications to the**

>
> **Plan would be difficult because it is a protected benefit and cannot be changed**.
>
> [Emphasis supplied]

241.    Other communications between Angell and SJHSRI also informed SJHSRI management and directors of the extent of the Plan's unfunded status.  For example, in 2010, Angell advised SJHSRI that SJHSRI should make a "recommended maximum contribution" of $1,624,311 to the Plan, or at least a "minimum contribution" of $1,444,178, and advised that a contribution of $21,314,085 was needed to reach a 100% funding level.

242.    The term "minimum contribution" referred to the minimum contribution amount determined under Internal Revenue Service rules that can be paid by plans subject to ERISA without incurring a penalty.  For plans that are underfunded, it typically includes at least two components: (a) a "target normal cost' that is based on plan expenses and the expected benefit payout over the coming year; and (b) a shortfall amortization charge, which is a sum necessary to return the plan to fully-funded status over a period of years.

243.    The term "recommended maximum contribution" referred to the maximum contribution that SJHSRI could deduct from federal income taxes if it were a for-profit corporation.

244.    The term "100% funding level," or, indeed, any percentage funding level, is a term of art that Angell intended and SJHSRI understood is based on the assumption that the Plan would continue for years, which at many times was a false assumption as discussed below, and also is based upon an assumed future rate of return on pension plan assets.  In addition, in accordance with actuarial standards,

customs, and practices, a "funding level" percentage applies only at the point in time the estimate is made, must be based solely on the pension plan's existing liabilities, not pension liabilities incurred after that date, and is subject to possibly drastic change if investment returns actually realized were less than the assumed rate of return on which the estimate was based.

245.   SJHSRI disregarded the 2010 recommendation and made no contribution.

246.   In 2011, Angell advised SJHSRI that SJHSRI should make a "recommended maximum contribution" of $1,626,074 to the Plan, or at least a "minimum contribution" of $1,433,706, and advised that a contribution of $22,426,204 was needed to reach a 100% funding level.  SJHSRI disregarded the recommendation and made no contribution.

247.   In 2012, Angell advised SJHSRI that SJHSRI should make a "recommended maximum contribution" of $1,793,075 to the Plan, or at least a "minimum contribution" of $1,480.468, and advised that a contribution of $13,690.720 was needed to reach a 100% funding level.  SJHSRI disregarded the recommendation and made no contribution.

248.   In 2013, Angell advised SJHSRI that SJHSRI should make a "recommended maximum contribution" of $3,056,708 to the Plan, or at least a "minimum contribution" of $2,144,292, and advised that a contribution of $25,081,206 was needed to reach a 100% funding level.  SJHSRI disregarded the recommendation and made no contribution.

249.   On or about December 2, 2013, the Prospect Entities requested that Angell provide them with an updated estimate of the amount of unfunded benefits if the Plan were terminated.

250.    On December 10, 2013, Angell advised that the updated estimate of the amount of unfunded benefits if the Plan were terminated was over $98,000,000.  The reason this was so much higher than the sum needed to reach a 100% funding level in 2013 was that the termination liability would be paid by SJHSRI's purchase of annuities from an insurance company to fund those benefits, which would cost much more than if SJHSRI continued to operate the Plan and the Plan earned the assumed rate of return of 7.75%.

251.    On December 13, 2013, a principal in Mercer (US) Inc., the company that was managing the Plan's portfolio assets on behalf of SJHSRI, informed CCCB Chief Financial Officer Conklin that "the Plan's funded status on a current market basis [of 4.6%] is around 50%," and that this funding level was more reliable than the finding level of over 90% that Angell had calculated based on an assumed rate of return of 7.75%.

252.    The market rate to which the Mercer representative referred was the rate that single employer defined benefit plans (such as the Plan) that are governed by ERISA are required to use.  The Mercer representative noted that Angell was using a higher estimated rate of return because the Plan's purported Church Plan status relieved them of the obligation to use the market rate of return, and that using the higher rate of return in determing the Plan's funding level had the effect of greatly increasing the Plan's funding level over what it would have been under ERISA.

253.    Angell prepared revised calculations and met with the Prospect Entities on or about January 8, 2014 and shared with them the facts concerning the unfunded status of the Plan and the cost of terminating the Plan and purchasing annuities.

59

254.    In connection with the sale of their assets to the Prospect Entities discussed below, CCCB submitted to the Prospect Entities consolidated financial statements on behalf of CCCB, SJHSRI, and RWH, stating that the unfunded liability on the pension was $91,036,390 as of April 30, 2013.

255.    The Diocesan Defendants were also fully familiar with the extent to which the Plan's liabilities were unfunded.  Indeed, as noted above, in September of 2013, Bishop Tobin had described the pension as "a spiraling and gaping unfunded liability."

256.    Thus, prior to and at the time of the 2014 Asset Sale, CCCB, SJHSRI, RWH, the Prospect Entities, the Diocesan Defendants, and Angell all had actual knowledge of the full extent of the Plan's unfunded liabilities.

**D.    MISREPRESENTATIONS TO PLAN PARTICIPANTS**

257.    SJHSRI used the Plan to hire and retain skilled employees.  Indeed, in October 1990, SJHSRI's actuary Watson Worldwide made a presentation to the SJHSRI board noting that "recruiting and retention of employees" was the first purpose of the Plan.

258.    It is equally clear that SJHSRI's policy to follow ERISA guidelines was dictated by competitive reasons.  For example, in 1977, SJHSRI changed the Plan so that the amount of benefits was based on a percentage of the employees' last salaries prior to retirement, comparable to what was required by ERISA, after conducting a survey of seven other competitor hospitals that had conformed their Plans to include this requirement.  Watson Worldwide in a letter to the President of SJHSRI on February 4, 1983 noted that "[t]he plan for the most part is consistent with the spirit of ERISA, primarily for competitive reasons."

60

259.    SJHSRI management and directors were informed on numerous occasions that SJHSRI's employees did not understand the provisions of the Plan.  For example:

a.    In a memorandum to SJHSRI Controller Paul Beaudoin on February 3, 1997, Watson Worldwide offered to update the employee booklet on the Plan.  Watson Worldwide dealt directly with Plan participants and made presentations to them concerning the Plan.  Nevertheless, they stated that "[i]t is our understanding that employees do not understand or know very much about the Plan."  Management declined to update the booklet.

b.    On February 2, 1990, SJHSRI's Vice President for Human Resources David DeJesus asked for authority to provide Plan participants with an annual statement that would contain the information that ERISA requires for annual plan statements.  SJHSRI never provided Plan participants with such information, which would have included disclosing the unfunded status of the Plan.

c.    At a meeting of the Investment Committee of the CCCB Board of Trustees on May 4, 2012, after board members were informed that SJHSRI was not required by ERISA to make contributions to the Plan, one board member asked whether Plan participants "truly understood the funding status of the Plan and the impact of the Plan being a Church Plan (non ERISA)."  The response by CCCB President and Chief Executive Officer Belcher was that he "believed that staff are aware and that this subject was discussed at employee forums."  However, this information was never mentioned in any written presentation to any employees and there is no evidence it was ever even orally conveyed at any employee forums or to any employees or other Plan participants at any other occasion.

260.    In contrast to the extremely difficult, obscure, and technical language set forth in Plan documents, SJHSRI, the Diocesan Defendants, Prospect Chartercare, and Angell made or provided statements to Plan participants, on different occasions, in many different contexts, over many years, and using plain language, that assured Plan participants that the Plan was an earned benefit of their employment, that the contributions necessary to properly fund the Plan were being made, that it was

61

management's policy, practice and duty to do so, and that SJHSRI and not the Plan participants bore the risk of Plan assets not earning expected returns or incurring investment losses.

261.    The Plan participants relied upon those statements to their detriment.

262.    Moreover, these assurances created a general understanding and commonly held belief amongst employees and retirees that SJHSRI had undertaken to fully fund the Plan and to assume any investment risk associated with Plan investments, and created a culture of trust and reliance that influenced even those employees and retirees who cannot recall specific communications, that cumulatively informed the reasonable expectations of Plan participants, such that detrimental reliance is presumed and proof of individualized reliance on specific representations is not necessary.

263.    Third parties such as SJHSRI's employee unions also relied upon these communications.

264.    These communications took many forms.  They included descriptions of the Plan in detailed booklets, less-detailed handouts and tri-fold pamphlets specific to the Plan, employee handbooks, presentations ("PowerPoints") used in slideshows, and memoranda and letters from SJHSRI management to employees.

265.    In addition, SJHSRI and its agents and representatives (including Defendant Angell) communicated with specific employees concerning the Plan and a specific employee's benefits through various letters and statements as described below.

266.    A detailed booklet entitled "Retirement Plan for Employees of the Diocese of Providence," issued prior to 1973, described the pension benefits being provided to the employees of SJHSRI as of January 1, 1973 and stated:

62

It is the desire of the diocese, its parishes and institutions, to make provision for its employees in retirement. Indeed, we have always had a sympathetic concern for the welfare of our employees and are confident that this implementation of that concern will provide the necessary sense of security and peace of mind that all envision.

\*        \*        \*

Q.    What does the Diocese contribute?

A.    The Diocese contributes the entire cost of the benefits you have earned prior to the adoption of the Retirement Plan. The Diocese will also contribute an additional amount which, when added to your contributions, will meet the cost of benefits you will earn during the remaining years of your employment.

\*        \*        \*

Q.    How will my Retirement Benefit be paid?

A.    You will receive a check each month beginning on your retirement date and terminating with the payment preceding your death.

267.    Another detailed booklet, entitled Saint Joseph's Hospital Retirement Plan (1973 edition) stated:

This booklet has been prepared to inform you about your Saint Joseph's Hospital Retirement Plan.

\*        \*        \*

One of the most important sources of your income will be our Retirement Plan . . . .

\*        \*        \*

HIGHLIGHTS OF THE PLAN

The Hospital will pay the entire cost of the Plan beginning January 1, 1973.

\*        \*        \*

COST OF THE PLAN

63

5.    Do I make any contributions to the Plan?

No.  The Hospital will pay the entire cost of the Plan beginning January 1, 1973 – not only your pension but also all actuarial, legal and investment expenses incurred in the administration of the Plan.

268.    On or about February 6, 1978, SJHSRI's then President sent a memorandum to employees, urging them not to unionize and describing the benefits SJHSRI already provided through the Diocesan Plan.  This memorandum contrasted the Hospital's pension benefits with what SJHSRI characterized as "vague promises" of union organizers and stated:

Know the facts when someone asks you to sign a union authorization card.  The union organizer makes vague promises, but the facts are that your Hospital has, on a regular basis, increased your wages and improved your benefits.

For example, during the past five years, the following improvements have been made by the Hospital:

*        *        *

Pension Plan – Improved from contributory to non-contributory effective January 1973.  Plan improved again effective January 1977; **Hospital pays full cost of the plan**.

[Emphasis supplied]

269.    Another detailed booklet, entitled "RETIREMENT PLAN ST JOSEPH HOSPITAL Providence/North Providence, Rhode Island (1982 Edition)" contains the following statement, in question and answer format:

WHO WILL PAY FOR MY BENEFITS?

The Hospital pays the entire cost of your benefits earned after 1972 and before 1965.  You and the Hospital shared the cost between 1965 and 1972.

**Each year independent actuaries calculate the amount of money which the Hospital will pay to the Plan Trustee.  This money is then**

64

**set aside and invested to provide each eligible employee with a
pension at retirement**.

[Emphasis supplied]

The preface to the booklet was a letter to employees signed by then-SJHSRI President

Azevedo, which concluded with the "hope that this Plan will be evidence of our personal

interest in your welfare, not only while actively in our employ but after you retire to enjoy

the rewards of a long and productive life."

270.    Similar language was included in the next edition of that booklet,

captioned "St. Joseph Hospital Retirement Plan Providence/North Providence, Rhode

Island (1986 Edition)", which stated:

> The St. Joseph Hospital Retirement Plan was established to help you
> make your retirement years economically more secure.  Since its inception
> in 1965, the Hospital has made many improvements to the Plan.  The
> most recent improvements became effective on July 1, 1985.
>
> The Hospital pays the entire cost of the Plan and no contributions are
> required by you.
>
> Your Retirement Plan will give you a lifetime monthly income when you
> become eligible to retire.  In addition, the Plan may provide benefits to
> your spouse or beneficiary after your death.
>
> *        *        *
>
> WHO PAYS FOR MY BENEFITS?
>
> **The Hospital pays the entire cost of your benefits.  Each year
> independent actuaries calculate the amount of money which the
> Hospital will pay to the Plan Trustee.  This money is then set aside
> and invested to provide each eligible employee with a pension at
> retirement.**
>
> [Emphasis Supplied]

271.    As already noted, however, although actuaries throughout the life of the

Plan annually calculated the amount of money that SJHSRI should pay into the Plan,

based upon the contribution requirements of ERISA and the Plan, SJHSRI routinely disregarded their recommendations and in many years chose to make no annual contributions whatsoever, with the result that the Plan became more and more underfunded over time.

272.   The highlighted language was repeated in a subsequent revision of that booklet in 1988 and draft revisions in 1993, 1995, 1996, and 1999.  It appears that SJHSRI stopped revising that booklet but continued to use it over time.  During the period it was in use, SJHSRI never omitted or in any way contradicted this language.

273.   Prior to 1995, the Diocese's Retirement Board sent terminated or retiring employees of SJHSRI documents entitled "STATEMENT OF INFORMATION FOR TERMINATED EMPLOYEES WITH VESTED RIGHTS".  For example, one such form dated January 15, 1994 stated:

> According to our records, your service with St. Joseph Hospital prior to your termination of employment on 12/3/92 entitles you to a benefit at age 65 from the Diocese of Providence Retirement Plan – St. Joseph Hospital (the "Plan").  The amount of this benefit is $192.42 per month commencing on 4/1/2020 and **payable to you for as long as you live**.

> [Emphasis supplied]

274.   From time to time SJHSRI offered seminars or made presentations to Plan participants to explain their benefits, and in the process assured Plan participants that they could rely on their pensions.  For example, on November 15 & 16, 1995, and again on March 4, 1998, SJHSRI, through its actuary and direct representative with Plan participants, Watson Worldwide, showed Plan participants a PowerPoint that stated that "[c]omputations [are] made annually to ensure assets are sufficient to meet current and expected future benefit obligations," without disclosing that in fact SJHSRI disclaimed

any obligation to follow the funding recommendations that were the product of those computations.

275.    On October 24, 1996, the President and Chief Executive Officer of SJHSRI sent a letter to employees of SJHSRI, which stated that he was "particularly pleased about the Pension Plan improvements," but neglected to disclose the fact that SJHSRI employees were no longer part of the Diocesan Plan.

276.    That same letter claimed that the Plan available to SJHSRI employees "is as good or better than those of many other organizations in the region," without disclosing that, unlike the case with the defined benefit plans of most organizations, SJHSRI claimed that the Plan was not governed by ERISA, and thus would not have insurance coverage against insolvency provided by the PBGC.

277.    From time to time thereafter, SJHSRI, the then-incumbent Bishop, and the Diocese of Providence communicated with SJHSRI employees concerning the Plan in terms that reassured Plan participants that the Bishop and Diocese of Providence had ongoing involvement in the Plan.

278.    For example, a handout was provided to Plan participants, entitled "RETIREMENT PLAN HIGHLIGHTS," that purported to summarize the Plan as of January 1, 1998 (three years after the split off of the Plan from the Diocesan Plan), and referred to the Bishop's and Diocese's ongoing involvement in the Plan:

> Who administers the Plan?
>
> The Roman Catholic Bishop of Providence has appointed a Retirement Board to administer the Plan.  The Board will establish rules and regulations for the administration of the Plan, and will be responsible for resolving any disputes concerning Plan operation.
>
> Who administers the Retirement Fund?

> The Diocese has established a Trust Fund with Fleet Investment Services. The Trustee of the Fund will hold, invest, and distribute the money in accordance with the terms and provisions of the Plan and Trust Agreement.

The statement that Plan assets were held in a trust established by the Diocese was false, since in connection with the separation of the two plans in 1995, a new trust was established by SJHSRI, but SJHSRI did not inform Plan participants of the separation, much less that only a portion of the Diocesan Plan assets were transferred to the new trust for the Plan alone.

279.    That handout also stated in part:

> Retirement is a time in life we all look forward to with great anticipation, a time when we have the opportunity to do the things we most enjoy. Maybe you have your sights set on traveling across the country?  Or perhaps spending time with the grandchildren?  But whether your retirement plans involve relaxing on the beach—or on the golf course—one thing's for certain: *You'll need money to achieve them.*

> That's why St. Joseph Health Services of Rhode Island offers the Retirement Plan to all eligible employees.  **The Retirement Plan is designed to help you meet your retirement savings goals by providing you with a monthly annuity during retirement.  And the best part of all is you contribute nothing for this benefit—it's paid for completely by the Hospital.**  In this way, your Retirement Plan benefit is an important part of your total retirement income.  And when combined with your Social Security benefit and your personal savings, this benefit can provide the financial security you need to follow through on your retirement plans.

> \*       \*       \*

> *Retirement Payment Options*

> What are the payment options?

> **You may choose a Life Annuity option, which provides you a fixed monthly payment throughout your lifetime.**  Or you may choose one of four Joint and Survivor options (100%, 75%, 66 2/3%, or 50%), which pay

a reduced monthly payment throughout your lifetime, and continue payments to your beneficiary after you die.

You may also choose a Ten-Year Guarantee option, which provides at least 120 guaranteed monthly payments (for a total of ten years) to you and your beneficiary.

[Italics in the original and bolded emphasis supplied]

280.    A pamphlet provided to Plan participants, entitled "Questions And Answers About The St. Joseph Health Services Retirement Plan," and dated "Effective 7/1/2001", stated *inter alia*:

> Q:    What forms of payment are available to me?
>
> A:    The normal form of payment is a life annuity.  **Under this form of payment, you will receive your monthly pension payments for as long as you live.**  All pension payments stop when you die.
>
> [Emphasis added]

281.    From time to time, SJHSRI provided statements to Plan participants discussing and quantifying their Plan benefits.  Thousands of these statements stated *inter alia*:

> St. Joseph Health Services of Rhode Island is pleased to give you this statement showing your estimated benefits in the Retirement Plan as of [insert date].  **Your pension benefit is an important part of your future retirement income**, along with Social Security, your 403(b) savings, and your other personal savings.  You automatically become a participant in the plan once you have completed 12 months of employment and worked at least 1,000 hours.  Some key features of this plan are:
>
> •    Simplicity—Participation in the plan is automatic.  You do not have to enroll or do anything until you retire.
>
> •    Security—Benefits are paid from a secure trust fund.
>
> •    **Company Paid—The plan is entirely paid for by St. Joseph Health Services of RI.  There is no cost to you.**

69

\*      \*      \*

SUMMARY OF PLAN PROVISIONS:

St. Joseph Health Services of Rhode Island Retirement Plan provides you with:

a)       **A monthly income payable for life when you retire**, in addition to your Social Security benefits.

b)       The right to retire as early as age 55 if you have completed at least 5 years of continuous service.

c)       The right to future pension benefits if you leave the Hospital after 5 or more years of continuous service.

d)       Death benefits payable to your surviving spouse or beneficiary if you die while still employed after completing 5 years of continuous service.

**The Hospital pays the entire cost of the plan.**  In addition, the Hospital pays into the Social Security System an amount equal to what you pay.

[Emphasis added]

282.   Similarly, in September of 2003, SJHSRI provided employees with a handout entitled "Understanding Your St. Joseph Health Services of Rhode Island Pension Statement," which set forth the following as "Pension Basics":

Pension Basics

Simple

-       Participation is automatic

Secure

-       Assets in trust fund

-       **No investment risk to you**

Valuable

-       Hospital pays the entire cost

70

-        Non-contributory Defined Benefit (DB) Plan

-        Rewards long service employees

[Emphasis supplied]

283.    However, the insolvency of the Plan is due in large part to SJHSRI's choosing not to fund the Plan when it was necessary to do so because the Plan did not meet investment targets, or, indeed, incurred substantial investment losses.  In other words, SJHSRI in fact placed the "investment risk" on Plan participants, contrary to the representation that they bore "no investment risk," and notwithstanding that, unlike participants in a defined contribution plan who exercise at least some control over their retirement investments, Plan participants were completely powerless to control investment risk in that it was solely SJHSRI, CCCB, or the Retirement Board, who determined how the Plan assets would be invested, without consultation with Plan participants or even advising them of the allocation of Plan assets, investment returns obtained on Plan assets, or the unfunded status of the Plan.

284.    Other handouts and similar communications containing the same or substantially equivalent language as that of the handouts quoted in paragraphs 266-283 were provided to Plan participants on other occasions, all as part of the process of hiring and retaining employees.

285.    From time to time, SJHSRI provided employee handbooks to its employees.  One dated "April, 2004," stated *inter alia*:

Pension Plan

Regular full-time and regular part-time employees are eligible to participate in the SJHSRI pension plan.  If an Employee is paid for 1,000 hours or more per retirement plan year he/she will enter the Plan on the first of the calendar month following the first anniversary of the employee's employment. **Pension Plan is fully paid by the Hospital.**  Vesting is

71

after 5-years of Continuous Service. To help you estimate your potential benefit at retirement, pension statements are distributed annually.

[Emphasis supplied]

286.    Beginning in 2009, SJHSRI also administered a defined contribution plan (a "403(b) Savings Plan"), which gave employees the right to make pre-tax contributions and to control their investments. With that plan SJHSRI provided a handout which answered the question "is there ever a time when benefits can be lost or denied" by stating:

> The value of your account depends on the value of Plan investment. This is why your account must be invested carefully.

With respect to the defined benefit plan, which is the Plan involved in this case, however, SJHSRI never told Plan participants that their benefits could be "lost" or diminished if the Plan assets suffered investment losses. To the contrary, as noted above, SJHSRI affirmatively represented that, under the defined benefit plan, there is "[n]o investment risk to you."

287.    The explanation of the 403(b) Savings Plan also stated:

> The Company reserves the right, of course, to amend the Plan or to discontinue contributions to it. No amendment can reduce the amount in your account or eliminate any of the benefit form options offered in the Plan. **If the Company permanently discontinues contributions to the Plan, you will be notified** and you will become 100% vested in your account.

> [Emphasis supplied]

No such disclosure was made in connection with the Plan.

288.    On January 28, 2011 SJHSRI prepared a PowerPoint presentation to one of the employees' unions, the Federation of Nursing and Health Care Professionals ("FNHCP"), seeking union approval for a plan to freeze SJHSRI's defined benefit plan

and substitute a defined contribution plan going forward for all employees belonging to FNHCP.  This presentation stated that the proposed freeze was necessary to protect the assets of the Plan.  However, management represented in the PowerPoint that the defined benefits earned on the years of service already performed "will not be affected."

289.    As noted above, Angell agreed to act on behalf of SJHSRI in dealing directly with Plan participants, and Angell also worked with the Prospect Entities in crafting presentations and dealt directly with employees of the Prospect Entities at New Fatima Hospital informing them of their rights under the Plan.

290.    As such, Angell owed both the Plan and Plan participants the duty to exercise reasonable care and the duty to make accurate and not misleading disclosures concerning the Plan.

291.    However, Angell never informed Plan participants of the Plan's underfunded status or the fact that SJHSRI was not making necessary contributions. To the contrary, Angell's statements to Plan participants implied and in many cases directly represented that their pension benefits were secure.

292.    For example, Angell continued to provide individual Plan participants with statements that set forth specific projected lifetime benefits, which Angell and all of the other Defendants knew could not be relied upon.

293.    On April 29 & 30, 2014, shortly before the sale of Fatima Hospital was approved, representatives of Angell, SJHSRI, RWH, and CCCB again participated in PowerPoint Presentations to SJHSRI employees intended to reassure them that the sale of the hospital to Prospect Medical would not affect their pension benefits.  In those presentations, the employees were informed that the terms of agreement for SJHSRI's joint venture with CCCB and Prospect Medical "includes a $14 Million contribution to the

73

Pension Plan to stabilize plan assets," and were shown a sample final benefit statement that again acknowledged that "[y]our pension benefit is an important part of your future retirement income," and reassured them that "[t]he Hospital pays the entire cost of the Plan," with payment options that included annuity payments for life.

294.    This was grossly misleading and false on multiple levels.

295.    At that time, all Defendants already knew that the $14 million contribution was not even remotely sufficient "to stabilize plan assets."

296.    The statement that "the Hospital pays the entire cost of the Plan" was also false and deceptive, on at least two levels.  "[T]he entire cost of the Plan" includes funding the Plan, and, therefore, the statement was false because no one was funding the Plan.  Moreover, given the timing of the presentation (two months before the closing) and the purpose to reassure employees concerning the effect of the 2014 Asset Sale on their pension benefits, the employees reasonably would have concluded that the "Hospital" referred to was New Fatima Hospital under the ownership and operation of the Prospect Entities.  That also was false since all of the Defendants knew that neither New Fatima Hospital nor the Prospect Entities accepted any obligations under the Plan, and that instead the obligations would belong to SJHSRI which no longer would have any operating assets and whose restricted assets and expected income would be grossly insufficient to fund the Plan.

297.    Moreover, all Defendants already knew that the Plan, which this PowerPoint presentation referred to as an "important part of [the Plan participants'] future retirement income" was insolvent, and the option to choose annuity payments for life was illusory if not an outright lie, because Plan assets would run out long before most of the Plan participants or their designated beneficiaries would have passed away.

74

298.    Many of SJHSRI's employees were members of another union, the United

Nurses & Allied Professionals ("UNAP"), under a collective bargaining agreement that

entitled them to pension benefits.  In connection with the 2014 Asset Sale, SJHSRI,

RWH, CCCB, and the Prospect Entities that were purchasing or guaranteeing the

purchase of the assets sought UNAP's agreement to a freeze on the accrual of pension

benefits upon the closing of the asset sale.  These Defendants offered the $14 million

contribution to the Plan as an inducement for UNAP and its members to agree to the

freeze on the accrual of pension benefits, and UNAP and its members agreed to the

freeze in return for that contribution and in return for the assurance that the $14 million

contribution would "stabilize" the Plan.

299.    At that time, all Defendants already knew that the $14 million contribution

was not even remotely sufficient to stabilize plan assets, and that the Plan assets would

run out many years before most of the Plan participants' rights to benefits were

satisfied.

300.    All Defendants made these misrepresentations and omitted this material

information because they knew that such disclosure would create so much negative

publicity and outcry that the applications to the Department of Health and the Attorney

General for approval of the asset sale without fully funding the Plan would be denied or

at the very least would be in serious jeopardy.

301.    On August 12, 2014, nearly two months after the Prospect Entities took

over ownership and operation of New Fatima Hospital, Defendant Angell sought

instructions from the Prospect Entities as to how Angell should respond to Plan

participants who were seeking information concerning the solvency of the plan.  The

Prospect Entities had attempted to structure the 2014 Asset Sale to avoid any

obligations under the Plan, and the Asset Purchase Agreement expressly stated that responsibility for the Plan after the asset sale closed would remain with SJHSRI. Thus, Angell was seeking instruction from the Prospect Entities concerning the information to provide to Plan participants, even though the Prospect Entities claimed to have no liability for the Plan.

302.   The Prospect Entities instructed Angell not to provide Plan participants with the information they were seeking concerning the solvency of the Plan. Moreover, the Prospect Entities instructed Angell to tell Plan participants that "while we [Angell] can't speak to the future solvency of the plan, we can share that the plan administrators review the annual recommended funding as advised by the plan's actuaries each year. There is also an investment committee that reviews and monitors the plan on an ongoing basis."

303.   Both Angell and the Prospect Entities knew that this statement was false and intended to mislead. The Prospect Entities and Angell could very well "speak to the future [in]solvency of the plan," and knew that SJHSRI for years had been disregarding Angell's funding recommendations and making no contributions, and that once the asset sale went through, SJHSRI would have insufficient funds to make the actuarial-recommended contributions even if it wanted to.

304.   Angell accepted and followed these instructions.

305.   On or about April 13, 2016, nearly two years after the asset sale, Angell worked with SJHSRI, CCCB, and Prospect Chartercare to prepare and make another PowerPoint presentation, this time at New Fatima Hospital, to former-employees of SJHSRI who were now employed at New Fatima Hospital, concerning the Plan and the rights of Plan participants, which again acknowledged that "[y]our pension benefit is an

76

important part of your future retirement income," and again reassured them that "[t]he Hospital pays the entire cost of the Plan," with payment options that included annuity payments for life.

306.    These Defendants knew that the "Hospital," which for nearly two years had been owned and operated by the Prospect Entities, claimed it had no obligations whatsoever to Plan participants.  Moreover, SJHSRI, RWH and CCCB had already decided to put the Plan into receivership and ask for a severe cut in benefit payments to all Plan participants, and were merely allowing time to pass in order to obscure the connection between the 2014 Asset Sale and the receivership, so that the inevitable firestorm of employee shock and anger and negative publicity that would be generated by the receivership would not be linked to the current operations of New Fatima Hospital and New Roger Williams Hospital.

307.    An earlier internal draft of the April 13, 2016 PowerPoint presentation stated that the Plan was a "Church Plan" and, therefore, that the Plan participants' benefits were not protected under ERISA.  However, as part of a long history of concealment from the Plan participants, this disclosure was deleted and did not appear in the presentation actually given.  Indeed, the Plan participants were never informed that the Plan was purported to be a Church Plan, such that the Plan participants' benefits were not protected under ERISA.

E.    **FRAUDULENT MISREPRESENTATIONS AND OMISSIONS TO STATE REGULATORS**

308.    In 2014 Defendants SJHSRI, RWH, CCCB and the Prospect Entities sought and obtained approval from the Rhode Island Department of Health and the Rhode Island Attorney General to convert Fatima Hospital and Rogers Williams Hospital into for-profit operations.

77

309.    On February 14, 2014, pursuant to the conspiracy in which the Diocesan Defendants were participating with all of the other Defendants to relieve Fatima Hospital of any liability under the Plan at the expense of the Plan participants, Bishop Tobin personally wrote to the Health Services Council to lobby in favor of regulatory approval of the for-profit hospital conversion:

> I write on behalf of the proposed partnership between CharterCARE Health Partners and Prospect Medical Holdings. . . .
>
> \*        \*        \*
>
> The Diocese of Providence is grateful to CharterCARE for all it has done to preserve the healing ministry of SJHSRI/Our Lady of Fatima Hospital, all within very difficult financial circumstances.  However, without this transaction, it appears that a consistent Catholic health care presence in the Diocese of Providence would be gravely compromised, **and the financial future for employee-beneficiaries of the pension plan would be at a significant risk.  I believe that this partnership will help avoid the catastrophic implications of such a failure**, and at the same time, enhance the quality of care at SJHSRI/Our Lady of Fatima.
>
> [Emphasis added]

310.    However, as explained above, rather than believing the 2014 Asset Sale would help avoid pension failure, Bishop Tobin personally, and, through him and other officials, the Diocesan Defendants, knew that "the proposed partnership between CharterCARE Health Partners and Prospect Medical Holdings" made pension failure much more likely, and, indeed, a virtual certainty, absent unanticipated and extremely improbable investment gains, because it would cut the link between the Plan and an operating hospital, and would transfer assets from SJHSRI that otherwise would be available to help fund the Plan.

311.    Thus they knew that the Plan was at much more than a "significant risk." Indeed, as noted above, in the draft letter written to papal authorities in September of

2013, only six months earlier, discussed above, Bishop Tobin had described the
pension as "a spiraling and gaping unfunded liability." He removed that reference from
the final version of that letter because he was warned that the letter may be "subject to
discovery in a civil lawsuit," and substituted "significant" for "spiraling and gaping."
Thus, the Diocesan Defendants not only were fully aware of the extent of the unfunded
liability, they also took steps to understate and conceal it.

312.   Angell acted as CCCB's and SJHSRI's consultant in connection with the
application for regulatory approval of the conversion of Fatima Hospital, Roger Williams
Hospital, and other health care facilities into for-profit entities.

313.   On April 9, 2014, CCCB provided Angell with a document prepared by the
Rhode Island Attorney General's office, consisting of questions to be answered in
connection with that application, and asked for Angell's assistance in answering the
following question:

> Please provide:
>
>               \*       \*       \*
>
> b.  documentation as to the determination that $14 m will stabilize the plan
> and a description and any written information of the understanding with
> employee representatives with respect to the freezing and the funding of
> the plan;

314.   Previously, on December 20, 2013, Angell had provided CCCB and
SJHSRI with calculations which demonstrated that if $14,000,000 was contributed to the
Plan, and assuming a future rate of return of 7.75%, the Plan would run out of funds in
2034, at a time when it would still have over $99 million in unpayable liabilities to Plan
participants.

315.    On March 27, 2014, Angell updated its calculations based on a slightly higher value of the Plan assets at the beginning of 2014, which projected that even with the $14,000,000 contribution, the Plan would run out of funds in 2036, at a time when it would still have over $98 million in liabilities to Plan participants.  To illustrate the consequences if the 7.75% rate of return proved to be too high, Angell also provided an alternative calculation, in which Angell assumed a lower rate of return of 5.75% rather that 7.75%, under which the Plan would run out of assets six years earlier in 2030, with additional unpayable liabilities to Plan participants.

316.    Indeed, if the 5.75% rate of return were utilized, the Plan would have been only 66% funded even in 2014 even with the contribution of $14,000,000.

317.    As noted above, moreover, the market discount rate in early 2014 that single employer benefit plans were required to use under ERISA was 4.6%, which if utilized would have produced an even lower funding level.

318.    On April 10, 2014, however, CCCB and SJHSRI asked Angell to modify that calculation for submission to the Attorney General and the Department of Health. The requested modification was that Angell utilize only the higher projected rate of return of 7.75%, delete all the calculations post-2014, and "simply show only the stabilization effect [in 2014] of the incoming $14M to the plan with no other information shown."

319.    An employee of Angell spoke to the CCCB representative who had requested the modification, and was told that CCCB "wants to show the projection of the funded status after the $14M contribution for 2014," in order to "highlight the 'stabilization' of the Plan."

320.   Angell was thereby being asked to present the 2014 funding level in isolation, for purposes of demonstrating Plan stabilization to the Attorney General and the Department of Health, knowing that it would be misleading, because the complete calculation demonstrated that the $14,000,000 contribution would *not* "stabilize" the Plan, since the complete calculation showed that, notwithstanding that contribution, the Plan would run out of money in 2036 with over $98,000,000 in liabilities to Plan participants even at the high assumed rate of return of 7.75%, or in 2030 with the rate of return of 5.75%.

321.   Angell agreed to disregard both of its prior calculations and provided SJHSRI, RWH, and CCCB with the requested new calculation to give to the Rhode Island Department of Health and the Rhode Island Attorney General in support of the application for approval of the asset sale.  That new calculation purported to show that the immediate effect of the $14 million contribution would be to increase the funding percentage of the Plan to 94.9%, and deleted the calculations which demonstrated that the Plan nevertheless would run out of money in either 2030 or 2036 depending on the estimated rate of return.

322.   That calculation also did not disclose that the funding percentage of 94.9% was based on assumed investment returns that SJHSRI, RWH, CCCB, and Angell knew were nearly 70% above market rates of return (*i.e.*, Angell's projected rate of return of 7.75% was over 68% greater than the market rate of 4.6%).

323.   In addition, the calculation did not disclose the fact that the use of any funding level percentage as a measure of the Plan's funding progress was contrary to and deviated from the standards of actuarial practice, that according to those standards the funding progress of a pension plan should not be reduced to a funding percentage

81

at a single point in time, or that pension plans should have a strategy in place to attain and maintain a funded status of 100% or greater over a reasonable period of time, not merely at a single point in time.

324.    These misrepresentations and omissions concerning the Plan's funding level were made to, and part of the information relied upon by, both the Rhode Island Department of Health and the Rhode Island Attorney General in approving the asset sale.

325.    On February 21, 2014, the Department of Health sent a list of questions to counsel for SJHSRI, RWH, and CCCB, and to counsel for the various Prospect Entities. On March 7, 2014, counsel for SJHSRI, RWH, and CCCB and counsel for the various Prospect Entities co-signed and sent the Department of Health a letter enclosing their clients' responses to the Department of Health's question, that repeated the question and responded, as follows:

> c.    Please identify to what extent, if any, this purchase price will be used by CharterCARE for community benefit versus paying off debts.

> Response:    The use of the sale proceeds as described is [sic] Section (b) above will benefit the community in three ways:

> \*       \*       \*

> b.    **The use of $14M to strengthen the St. Joseph Pension Plan will be of significant benefit to the community as it will assure that the pensions and retirement of many former employees, who reside in the community, are protected**.

> [Emphasis supplied]

326.    In fact, all of the Defendants knew this statement was false and misleading, and that the contribution of the $14,000,000 to the Plan would not "assure"

that the benefits of the Plan participants were protected, even according to the calculations that Angell shared with all of those other Defendants.

327.    On April 8, 2014, CCCB President and Chief Executive Officer Belcher testified at a public hearing held before the Project Review Committee of the Rhode Island Department of Health as part of the approval process.  He was asked to address three questions raised by a recent report on SJHSRI by Moody's Investor Services. The third question related to Moody's' concern over the funded status of employee retirement accounts, including the Plan.  Mr. Belcher testified as follows:

> MR. BELCHER: . . . But the third part was on the pension fund, and the impact on the pension fund with this -- and I think you know we shared information up-front is that at the time of the closing we'll be putting millions of dollars into the pension fund which will bring it to a level of roughly 91 and a half percent funding which is above the safe level that you need for sort of a quote safe level.  So all of this really helps stabilize the pension fund as well.

328.    SJHSRI, RWH, and CCCB intentionally misled the state regulators by the statement that a funding level of 91.5% "is above the safe level."  As discussed above, it is never proper to use a funding level on a single date to measure the health of a pension plan, but it especially inappropriate when the plan sponsor is selling all of its operating assets, because the plan sponsor will lack the means to make up the underfunding.  In that context, even if the projected rate of return of 7.75% were reasonable (which it was not), and were actually achieved over time, a funding level of 91.5% would practially guarantee pension plan failure, since it would denote insufficient funds to meet plan obligations even if all of the future assumptions upon which the funding level is based perform exactly as assumed, including thirty to forty years of investment returns.

329.    On April 11, 2014, CCCB reminded Angell that the Attorney General was also asking Supplemental Question S3-48, as follows:

>    S3-48 Will the pension liability remain in place – how much, and what is the plan going forward to fund the liability?

330.    On April 15, 2014, SJHSRI, RWH, CCCB, and the Prospect Entities responded to the Attorney General and answered that question as follows:

>    Response: The pension liability will remain in place post transaction. Subsequent to the $14 Million contribution to the Plan upon transaction, **future contributions to the Plan will be made based on recommended annual contribution amounts as provided by the Plan's actuarial advisors**. Moving forward, the investment portfolio of the plan will be monitored by the Investment Committee of the Board of Trustees.
>
>    [Emphasis supplied]

331.    When that statement was made, however, SJHSRI, RWH, and CCCB knew that it was their intention not to make any future contributions, and, therefore, that "future contributions to the Plan" would *not* "be made based on recommended annual contribution amounts as provided by the Plan's actuarial advisors."

332.    Indeed, in spite of this representation, in the more than four years since that statement was made, not a single penny has been contributed to the Plan other than the $14,000,000 contribution which they made to secure regulatory approval for the 2014 Asset Sale, contrary to the recommendations of the Plan's actuarial advisors.

333.    The Project Review Committee held a public hearing on May 6, 2014. During the testimony of the Department of Health's expert concerning the Plan, CCCB Chief Financial Officer Michael Conklin interrupted, and testified that the "recommended contributions going forward" to fund the Plan were $600,000 per year, which he assured the Committee would be paid out of SJHSRI's expected $800,000 annual income from

84

outside trusts, and profit sharing paid to CCCB in connection with its 15% share in Prospect Chartercare.

334.    Mr. Conklin thereby misrepresented that SJHSRI's expected future income was $800,000, when in fact it was less than $200,000, and suggested that CCCB's profit-sharing in Prospect Chartercare would provide additional funds, when no profit sharing was anticipated for the indefinite future.  CCCB has yet to receive any profit sharing whatsoever.

335.    Mr. Conklin also misrepresented that the projected annual contribution of $600,000 was an actuarial "recommended contribution," when in fact it was a number made up out of whole cloth by SJHSRI, RWH, and CCCB, and was much below the recommendations of the Plan actuary.

336.    Mr. Conklin also did not disclose that SJHSRI, RWH, and CCCB had no intention of making any of those contributions.

337.    The Project Review Committee accepted these false assurances, but was aware that even those assurances were based upon assumed investment rates of return, and if the investment returns on Plan assets were lower than anticipated, higher annual contributions would be needed to make up the difference.  The Committee referred to this possibility as the "investment risk" of the Plan, and at the hearing on May 6, 2014 asked CCCB President and Chief Executive Officer Belcher "who's bearing the investment risk going forward?"  He replied as follows:

> MR. BELCHER:    Heritage Hospitals.  It stays with the old CharterCare.
>
> MR. SGOUROS:    Heritage Hospitals, and so if the investment returns don't match up to the predictions, who's on the hook?
>
> MR. BELCHER:    The old hospitals, the old CharterCARE.  We have that responsibility.

As discussed above, SJHSRI, RWH, and CCCB fraudulently misrepresented their intentions, as it was never their intention to support the Plan, and they have made no contributions whatsoever to the Plan.

338.    Defendants also chose to conceal the unfunded status of the Plan out of concern that such disclosure would be seized upon by a competitor that was asking that the Department of Health to delay the proposed asset sale.  Indeed, at the same public hearing on May 6, 2014, a representative of that competitor strongly objected to the terms of the asset sale proposed by Defendants, and repeated his client's request that the Committee delay acting upon the application until his client's counter-proposal could be fully considered.

339.    The Attorney General did not immediately accept the assurances that there would be sufficient income following the asset sale to adequately fund the Plan. Instead, representatives of the Attorney General asked for proof of legal authority for RWH's assets to be used for that purpose.

340.    On May 8, 2014 counsel for SJHSRI, RWH, and CCCB provided the Attorney General with a resolution purportedly approved by RWH's Board of Trustees stating, *inter alia*:

> WHEREAS   As part of its retained assets, RWMC has $6,666,874 in Board Designated Funds ("the RWMC Board Designated Funds") that may be used for any purpose at the discretion and direction of the RWMC Board of Trustees;
>
> *            *            *
>
> RESOLVED  The RWMC Board of Trustees approves and directs use of the RWMC Board Designated Funds to satisfy the SJHSRI liabilities at close and any potential future funding and expenses relating to the SJHSRI pension plan, and any surplus shall be transferred to the CCHP Foundation.

341.   They e-mailed a copy of the resolution to the Attorney General's office (with cc to counsel for the Prospect entities) and stated:

> Finally, attached is the Roger Williams Medical Center (RWMC) Board of Trustees Resolution authorizing the use of the RWMC Board Designated Funds to satisfy the St. Joseph Health Services of Rhode Island (SJHSRI) liabilities at close and any potential future funding and expenses related to the SJHSRI pension plan, and any surplus shall be transferred to the CCHP Foundation.

342.   However, SJHSRI, RWH, and CCCB never intended that any part of RWH's "Board Designated Funds" would ever be contributed to the Plan, and, indeed, none have been.  They also knew that even $6,666,874 would be insufficient to meaningfully reduce the unfunded liability, such that there was not even a remote chance there would be any surplus left over to transfer to CC Foundation after that liability was paid.

343.   Instead of meaning what it says, this resolution evidences SJHSRI, RWH, and CCCB's willingness to tell regulators what they wanted to hear, even if it meant misrepresenting their intended funding sources and manipulating the board of trustees of affiliated companies.  In fact, in December 2014, soon after the closing of the asset sale, the board of trustees of RWH was replaced with individuals who were already planning to put the Plan into Receivership.

344.   A crucial fact not disclosed to either the Department of Health or the Attorney General was that *for years prior to the asset sale*, management at CCCB, RWH, and SJHSRI had been searching for a way to abandon the grossly underfunded Plan to the detriment of Plan participants, while at the same time protecting the assets of SJHSRI from the claims of Plan participants.

87

345.    For example, on January 2, 2012, the Chairman of the Investment Committee for CCCB's Board of Trustees informed CCCB's head of Personnel, Darlene Souza, and CCCB's Chief Financial Officer Conklin, that the Board of Trustees and management must consider the option of terminating the Plan and distributing the assets with a *pro rata* reduction in benefits.

346.    On December 31, 2012, Ms. Souza emailed Mr. Conklin and CCCB's Chief Executive Officer Belcher, wished them a "Happy New Year," and then advised them of what she called the "potentially good news" that, according to her reading of the Plan documents, they could "terminate the plan without a solvency issue," and:

-    deprive 1,798 (out of a total of 2,852) Plan participants of any benefit whatsoever,

-    pay benefits to an additional 744 Plan participants of only 88% of what they were due;

-    pay full benefits only to the remaining 1,054 Plan participants who had already reached normal retirement age; and

-    improve SJHSRI's balance sheet by over $29,000,000 by eliminating its liability for the unfunded portion of the Plan.

347.    However, Ms. Souza advised Messrs. Conklin and Belcher that there was a downside to the Plan termination, which was that other hospitals with supposed Church Plans had attempted to terminate their plans just as she was proposing, but those hospitals had been sued in class actions, and one of those cases had a pending settlement that obligated the hospital to pay a significant amount of the unfunded benefits, notwithstanding its alleged Church Plan status.

348.    Accordingly, Ms. Souza warned that if SJHSRI terminated the Plan and distributed reduced benefits, "we are exposed to a class action lawsuit" by the Plan participants who received no benefits, which could expose SJHSRI to "$30-$35m" as

damages, which "would potentially erode the $29m fiscal savings" resulting from eliminating SJHSRI's funding liability by termination of the Plan.

349.    On June 20, 2013, the CCCB Board discussed the possibility of seeking a "Special Master" for the Plan.

350.    In December 2013, the CCCB Board discussed putting the Plan into receivership.

351.    Thus, notwithstanding the strategic delay in doing so, the scheme to abandon the Plan was already in the works when SJHSRI, RWC, and CCCB assured the Project Review Committee on April 8, 2014 and May 6, 2014 that the "recommended" annual contributions to the Plan would be made and that SJHSRI, RWH, and CCCB were "on the hook" if the projected returns on investment did not materialize.

352.    Instead of representing their genuine intention, these statements were part of the conspiracy by all of the Defendants to obtain approval from the Attorney General and the Department of Health through false assurances, and to also thereby assuage the concerns of the unions, and of the general public (including Plan participants) who attended or followed reports of the hearing.

353.    In furtherance of that conspiracy, CCCB President and Chief Executive Officer Belcher and Thomas M. Reardon (president of Prospect Medical East) made a statement which the Providence Journal on May 12, 2014 published as an op-ed, which stated:

> The development and pursuit of innovation in health delivery should not come at the cost of one of the most cherished values in Rhode Island health care - that of local control. We are pleased that our proposal will assure preservation of local governance, as our joint venture board will

89

have equal representation from CharterCare and Prospect with a local board chair, with real veto powers.

354. This statement was materially false and intentionally deceptive, because under the Amended & Restated Limited Liability Company Agreement of Prospect Chartercare, LLC, previously agreed to in form by CCCB and the Prospect Entities, deadlocks between CCCB-appointed directors and Prospect-appointed directors for some of the most significant board-level decisions were to be resolved by allowing the decisions of Prospect-appointed board members to prevail.

355. On the same day that Mr. Belcher's statement appeared in the Providence Journal, CCCB emailed it to all of the employees of CCCB, SJHSRI, and RWH, stating, "[w]e want to share the following op-ed that appeared in today's Providence Journal." The same mailing assured all employees that "Prospect and CharterCARE equally share seats on the new company's eight-member governing board," withholding the critical information that although the number of seats were shared equally, the seats filled by the Prospect Entities had the power to make some of the most significant corporate decisions against the wishes of the directors chosen by CCCB, and certainly without disclosing that the 2014 Asset Sale was merely a step in the scheme to shield Fatima Hospital from liability on the Plan, and to strip assets from SJHSRI that were needed to satisfy its pension obligations to those same employees.

356. In addition to falsely reassuring the public and their own employees on the issue of local control, SJHSRI, RWH, CCCB, and the Prospect Entities also misled state regulators concerning the degree of local control that CCCB would have after the 2014 Asset Sale.

357.    On May 2, 2014, CCCB and the various Prospect Entities involved in the asset sale, through their counsel, responded to the following question of the Rhode Island Attorney General:

> Question: Please describe the governance structure of the new hospital after conversion, including a description of how members of any board of directors, trustees or similar type group will be chosen.

358.    Defendants responded in pertinent part as follows:

> Response:
>
> An overview of the governance structure for Prospect CharterCARE, LLC is as follows:
>
> Prospect CharterCARE, LLC will have a Board of Directors.
>
> Prospect CharterCARE, LLC's Board of Directors will have half of its members selected by and through PMH's ownership in Prospect CharterCARE, LLC and the other half of the members will be selected by and through CCHP's ownership Prospect CharterCARE, LLC.
>
> The Board of Directors will be responsible for determining the patient Care, strategic, and financial goals policies and objectives of Prospect CharterCARE, LLC.
>
> *       *       *
>
> Prospect CharterCARE, LLC's Board of Directors will be structured as follows: (i) eight (8) members; (ii) fifty (50%) percent of its members will be appointed by PMH; and (iii) fifty (50%) percent of its members will be appointed by CCHP. The purpose of the structure is to ensure a strong local presence and mission. The Board of Directors will include at least one physician representative.
>
> The Board of Directors will be responsible for determining the patient care, strategic, and financial goals, policies and objectives of Prospect CharterCARE, LLC. **The issues that the Board of Directors will address will require a majority vote of those Directors appointed by PMH, and a majority vote of those Directors appointed by CCHP.**
>
> [Emphasis supplied]

359.    The statement that "[t]he issues that the Board of Directors will address will require a majority vote of those Directors appointed by PMH, and a majority vote of those Directors appointed by CCHP" was also materially false, for the same reason that some of the most significant decisions were to be resolved by allowing Prospect-appointed board members' decisions to prevail.

### F.    MISLEADING THE STATE COURT IN CONNECTION WITH *CY PRES* PROCEEDINGS

360.    In November of 2009, SJHSRI, CCCB, and RWH filed a petition with the Rhode Island Superior Court, asking the court to approve certain changes affecting charitable donations pursuant to the statutory and common law doctrine of *cy pres*.

361.    The doctrine of *cy pres* is intended to be used in appropriate circumstances to allow charitable donations to be applied to a similar purpose when the original recipient of the donations is no longer able to fulfill that purpose.

362.    In the 2009 proceedings, the specific purpose of the *cy pres* petition was to inform the court that the original recipients of the charitable gifts had been reconstituted in connection with formation of CCCB and the affiliation of SJHSRI, Roger Williams Medical Center, RWH, and CCCB; that such entities as reconstituted would continue to apply the charitable gifts in accordance with those intentions; and to obtain court approval therefor.

363.    Notably, the *cy pres* petition in 2009 did not involve an original recipient of the charitable gift who was insolvent and sought to transfer assets to a related entity in fraud of creditors.  To the contrary, in the 2009 petition, essentially the same entities held the assets as had held them originally and creditors were in no way affected or damaged by approval of these transfers.

364.    The Superior Court approved this *cy pres* petition on December 14, 2009.

365.   On December 2, 2011, another *cy pres* petition was filed with the Superior

Court, to obtain approval for the St. Joseph Health Care Foundation's member to be

changed from SJHSRI to CCCB, for St. Joseph Health Care Foundation's name to be

changed to Charter Care Health Partners Foundation, and to permit the charitable gifts

held by St. Joseph Health Care Foundation to be distributed to SJHSRI to be used by

SJHSRI in accordance with the donors' original intentions.  As was the case with the

previous *cy pres* petition, this petition did not involve the transfer of assets from an

insolvent corporation to a related entity in fraud of creditors.  Once again, creditors were

in no way affected or damaged by approval of these transfers.

366.   The court approved this *cy pres* petition on December 13, 2011.

367.   On January 13, 2015 another *cy pres* petition (the "2015 *Cy Pres* Petition")

was filed with the Superior Court, this time by Defendants SJHSRI, RWH, and

CC Foundation as petitioners, concerning the disposition of charitable donations held by

SJHSRI and RWH.  It referred to the prior *cy pres* petitions that had been previously

approved by the Superior Court, as if the 2015 *Cy Pres* Petition was merely more of the

same.

368.   However, unlike those earlier petitions, the 2015 *Cy Pres* Petition was filed

in connection with the winding down, liquidation, and dissolution of SJHSRI and RWH,

and the transfer of approximately $8,200,000 of their assets to CC Foundation, when

SJHSRI needed all of its and RWH's funds to contribute to the Plan.  That raised

significantly different issues, since, as discussed below, nonprofit corporations in the

process of liquidation or dissolution must use all of their assets, even restricted assets,

to pay their creditors before they can transfer charitable assets to another charity.

369.    The Attorney General's Decision on May 16, 2014 approving the sale of
Fatima Hospital and Roger Williams Hospital was the genesis of the 2015 *Cy Pres*
Petition, because that Decision imposed conditions, which included "(1) the transfer of
certain of the charitable assets to the CCHP Foundation and (2) the use of certain of the
charitable assets during the Heritage Hospitals' wind down to satisfy the Outstanding
Pre and Post Closing Liabilities subject to *cy pres* approval from [the Superior Court]."

370.    Those conditions were the result of Defendants SJHSRI, RWH, CCCB,
and CC Foundation's representations to the Attorney General that SJHSRI and RWH
were in a "multi-year wind-down process," which was "typical in the dissolution of a
hospital corporation."

371.    Similarly, in the 2015 *Cy Pres* Proceeding, Defendants SJHSRI, RWH,
and CC Foundation successfully persuaded the Court to grant their Petition based on
the representation that both RWH and SJHSRI were in wind-down, stating that they
"anticipated that the Outstanding Pre and Post Closing Liabilities will be paid during the
Wind-down period of RWH and SJHSRI over the next approximately three years," and
that they "proposed that certain RWH and SJHSRI assets remain with the Heritage
Hospitals during their wind-down period to satisfy the Outstanding Pre and Post Closing
Liabilities."

372.    The resolutions of CCCB as sole member of SJHSRI and RWH also prove
that SJHSRI and RWH were in wind-down preparatory to liquidation and dissolution.
The resolutions dated as of December 15, 2014 expressly authorized the wind-down
and dissolution of SJHSRI and RWH.

373.    Having prevailed both in their application to the Attorney General and in
the 2015 *Cy Pres* Proceeding based upon representations that both RWH and SJHSRI

were in an extended wind-down process preparatory to liquidation and dissolution, Defendants SJHSRI, RWH, CCCB, and CC Foundation are judicially estopped from denying that the $8,200,000 transferred to the CC Foundation was in connection with winding down their affairs and dissolution and subject to the requirements of the Rhode Island Nonprofit Corporations Act applicable to dissolution and liquidation.

374.    R.I. Gen. Laws §§ 7-6-50, 7-6-51 & 7-6-61 obligate nonprofit corporations in the process of either voluntary dissolution or court liquidation to pay their creditors first, before any funds can be transferred to other charities under the doctrine of *cy pres* or any other rationale.

375.    Section 7-6-50 of the Rhode Island General Laws sets forth the procedure whereby a nonprofit corporation may voluntarily wind up its affairs and dissolve, and requires that notice be given to all creditors and that assets must be distributed in accordance with Section 7-6-51.

376.    Section 7-6-51 of the Rhode Island General Laws sets forth the specific order of application and distribution of assets applicable to a nonprofit corporation in voluntary dissolution, and provides that all of the nonprofit corporation's assets must be used to pay creditors, even assets subject to charitable restrictions, and even assets conveyed to the nonprofit corporation under the express condition that they be re-conveyed in the event of dissolution:

> § 7-6-51. Distribution of assets.
>
> The assets of a corporation in the process of dissolution shall be applied and distributed as follows:
>
> (1) **All liabilities and obligations of the corporation shall be paid and discharged, or adequate provision shall be made for their payment and discharge**;

(2) Assets held by the corporation upon condition requiring return, transfer, or conveyance, which condition occurs by reason of the dissolution, shall be returned, transferred, or conveyed in accordance with the requirements;

(3) Assets received and held by the corporation subject to limitations permitting their use only for charitable, religious, eleemosynary, benevolent, educational, or similar purposes, but not held upon a condition requiring return, transfer, or conveyance by reason of the dissolution, shall be transferred or conveyed to one or more domestic or foreign corporations, societies, or organizations engaged in activities substantially similar to those of the dissolving corporation, pursuant to a plan of distribution adopted as provided in this chapter or as otherwise provided in its articles of incorporation or bylaws;

(4) Any other assets shall be distributed in accordance with the provisions of the articles of incorporation or the bylaws to the extent that the articles of incorporation or bylaws determine the distributive rights of members, or any class or classes of members, or provide for distribution to others;

(5) Any remaining assets may be distributed to any persons, societies, organizations, or domestic or foreign corporations, whether for profit or nonprofit, that may be specified in a plan of distribution adopted as provided in this chapter.

[Emphasis supplied]

377.    The same order of payment applies to court-approved liquidations of nonprofit corporations.  Section 7-6-61 of the Rhode Island General Laws sets forth the "procedure in liquidation of corporation by court," and sub-section (c) essentially mirrors the above-quoted provisions of R.I. Gen. Laws §7-6-50, as follows:

(c) The assets of the corporation or the proceeds resulting from a sale, conveyance, or other disposition of the assets shall be applied and distributed as follows:

(1) All costs and expenses of the court proceedings and **all liabilities and obligations of the corporation shall be paid, satisfied, and discharged, or adequate provision shall be made for that**;

96

(2) Assets held by the corporation upon condition requiring return, transfer, or conveyance, which condition occurs because of the dissolution or liquidation, shall be returned, transferred, or conveyed in accordance with the requirements;

(3) Assets received and held by the corporation subject to limitations permitting their use only for charitable, religious, eleemosynary, benevolent, educational, or similar purposes, but not held upon a condition requiring return, transfer, or conveyance by reason of the dissolution or liquidation, shall be transferred or conveyed to one or more domestic or foreign corporations, societies, or organizations engaged in activities substantially similar to those of the dissolving or liquidating corporation as the court directs. . . .

[Emphasis supplied]

378.    Thus, whether pursuant to voluntary dissolution or court approved liquidation, the assets of a non-profit corporation must be applied first to satisfy the corporation's liabilities and obligations, and, until that is accomplished and creditors are paid in full, no assets can be transferred to anyone else, by *cy pres* petition or otherwise.

379.    However, Defendants SJHSRI, RWH, and CC Foundation intentionally frustrated enforcement of the statutory payment priorities by repeatedly misrepresenting, first to the Attorney General, and then to the court in the 2015 *Cy Pres* Proceeding, that all of their liabilities, including their pension liabilities, would be "satisfied" and "paid" from other assets.

380.    Notably, nowhere in their application to the Attorney General for approval of the 2014 Asset Sale, or in their 2015 *Cy Pres* Petition, did Defendants SJHSRI, RWH, or CCCB say that these other assets would only "partially satisfy," or "partially pay" the pension obligation, or employ similar language that would imply or even hint to

the Attorney General or the court that the funds would be insufficient to fully satisfy those liabilities.

381.    In reliance on these misrepresentations and material omissions, the court approved the 2015 *Cy Pres* Petition on April 20, 2015.

382.    On the basis of the court's order, SJHSRI, RWH, and CCCB in or about May and June 2015 transferred $8,227,916.77 to CC Foundation.

383.    From those funds, CC Foundation subsequently transferred $8,199,266.47 to the RI Foundation as follows:

| | |
|---|---|
| May 28, 2015: | $5,752,655.00 |
| May 29, 2015: | $1,974,537.44 |
| June 3, 2015: | $272,074.03 |
| Nov. 17, 2015: | $200,000.00 |

384.    Rhode Island Foundation thereafter remitted $864,846.00 to CC Foundation as follows:

| | |
|---|---|
| Dec. 15, 2017: | $174,515.00 |
| Dec. 15, 2016: | $341,945.00 |
| Dec. 15, 2017: | $348,386.00 |

385.    As of December 31, 2017, CC Foundation's fund balance at Rhode Island Foundation was $8,760,556.01, including investment returns.

386.    The April 20, 2015 Order also applied to income and capital distributions from third party trusts that SJHSRI and RWH expected to receive in the future, and required that certain of those payments should go to CC Foundation.

387.    The 2015 Cy Pres Proceeding is still pending.  As noted above, concurrently with the filing of this Complaint, Plaintiffs have or will file their motion to

intervene in that proceeding, and ask the Superior Court to vacate the April 20, 2015 order, and order that the funds transferred pursuant to the Petition be held pending the outcome of the proceeding in this Court or in the State Action.

## G.    FACTS CONCERNING SUCCESSOR LIABILITY

388.    The Prospect Entities that purchased the assets of SJHSRI all knew that SJHSRI had a defined benefit pension plan.

389.    Prior to the asset sale, these Prospect Entities intended to operate New Fatima Hospital at the same location, under the same name of Fatima Hospital.

390.    Prior to the asset sale, these Prospect Entities intended to operate New Roger Williams Hospital at the same location, under the same name of Roger Williams Hospital.

391.    These Prospect Entities also intended to identify themselves to employees, patients, and the public under the fictitious name which SJHSRI, RWH, and CCCB had operated Old Fatima Hospital and Old Roger Williams Hospital.

392.    At 10:17 a.m. on June 20, 2014, which was the day that the 2014 Asset Sale closed, CharterCARE Health Partners filed articles of amendment with the Rhode Island Secretary of State, changing its name from CharterCARE Health Partners to Chartercare Community Board.

393.    One minute later, at 10:18 a.m. on June 20, 2014, Prospect Chartercare filed a "fictitious business name statement" with the Rhode Island Secretary of State, stating that it would operate under the "fictitious name" of CharterCARE Health Partners, which was the same name under which SJHSRI, RWH, and CCCB had operated Old Fatima Hospital and Old Roger Williams Hospital from 2009 right up to the day of the closing of the 2014 Asset Sale.

394.   The Prospect Entities also knew and intended that all of SJHSRI's and RWH's employees would be transferred to the employment of the Prospect Entities as a continuation of their employment, with their starting wages and salaries based on their final wages and salaries while employed by SJHSRI and RWH, and with seniority based on their original date of hire by SJHSRI and RWH.

395.   Indeed, the Asset Purchase Agreement that was the basis for the asset sale and the approvals under the Hospital Conversions Act obligated the Prospect Entities to do just that:

> 8.2 Employment Terms Employee Benefits.
>
> The Transferred Employees shall be hired by the Company or a Company Subsidiary (as applicable) at base salaries and wages equal to their base salaries and wages as of the Closing Date. The Transferred Employees shall retain their seniority status for purposes of benefits, and their salaries or wages as of the Closing Date shall provide the base for future salary adjustments, if any, thereof. Each Transferred Employee will be treated by the Company or the Company Subsidiary (as applicable) as employed as of such individual's initial hire date at the Facilities for all purposes regarding seniority, except as otherwise required by Law or collective bargaining agreement assumed by the Company. Subject to the right to terminate any Company employee benefit plan and/or restrictions provided under any collective bargaining agreement assumed by the Company, the Company and the Company Subsidiaries as of the
>
> Closing Date will provide benefits to Transferred Employees at benefit levels substantially comparable to those provided under the Seller Plans immediately prior to Closing, including but not limited to qualified retirement plans (except that the Company and the Company Subsidiaries shall not be required to offer a defined benefit plan), vacation, sick leave, holidays, health insurance, life insurance, 401(k) plan (in lieu of similar plans that were offered by Sellers based on their tax exempt status but are not available to the Company) and policies of the Company and the Company Subsidiaries for which each Transferred Employee is eligible.

Asset Purchase Agreement § 8.2(a).

396.    As noted above, after the 2014 Asset Sale, the personnel department for the Prospect Entities continued to advise Plan participants concerning the Plan. Indeed, immediately after the 2014 Asset Sale, the same person who was in charge of that department for SJHSRI, RWH, and CCCB prior to the asset sale took over those duties for the Prospect Entities operating under the fictitious name CharterCARE Health Partners.

397.    Thus, to employees it appeared that nothing had changed with respect to their benefits, or administration of the Plan.

398.    The Asset Purchase Agreement actually defined the Prospect Entities as "successor employer[s]," at least for tax purposes:

> The Parties acknowledge and agree that each of the Company and each Company Subsidiary constitutes a "successor employer" within the meaning of Code Section 3121(a)(1) and Code Section 3306(a)(1)and the regulations thereunder for federal and state income tax and employment tax purposes.

Asset Purchase Agreement § 8.2(c).

399.    After the Department of Health and Attorney General approved the asset sale, but without informing these state agencies, the Prospect Entities demanded that employees sign an arbitration agreement prepared by the Prospect Entities.

400.    That mandatory "agreement" purported to obligate employees to arbitrate all claims arising out of their employment, arguably including even claims arising out of their previous employment by SJHSRI, and to waive their rights to proceed by class action.

401.    The Prospect Entities informed these employees that they would not be hired if they did not sign the arbitration agreement.

402.    The Prospect Entities were not permitted to compel employees to sign the arbitration agreement as a condition of their being hired, because those entities already had the contractual (and regulatory) obligation to hire the former employees of SJHSRI, RWH, and CCCB on essentially the same terms as they were previously employed, which did not include an agreement to arbitrate or any waiver of rights.

403.    However, the Prospect Entities did not inform these employees that the Prospect Entities could not make their agreement a condition of their employment.

404.    The Prospect Entities also did not inform these employees of other facts the employees needed to know in order to evaluate the requirement that they sign the arbitration agreement, including but not limited to that the employees had pre-existing and valid claims arising out of the fact that the Plan was severely underfunded, that the Prospect Entities and the other Defendants were involved in fraudulent schemes to strip assets from SJHSRI that were needed to fund the Plan and to fraudulently preserve Church Plan status for the Plan, that the employees already had the existing right to assert their claims in a class action, and that arbitration of those claims would deprive them of a meaningful remedy.

405.    The terms of the arbitration agreement itself were grossly overreaching and the rights it gave the employees were largely illusory.  For example, the agreement obligated Plan participants and "the Company" to arbitrate all claims between them, whether asserted by the employee against the company, or *vice versa*.  However, "the Company" was defined to include the following entities and individuals:

> Prospect CharterCare LLC and/or any of its related entities, holding
> companies, parents, subsidiaries, divisions, officers, shareholders,
> directors, employees, agents, vendors, contractors, doctors, patients,
> insurers, predecessors, successors, and assigns.

102

Accordingly, it purported to obligate an employee to arbitrate claims the employee had against any other employees, any doctors, any patients, and any hospital vendors or contractors. It also purported to entitle the employee to demand that all of those entities and individuals arbitrate any claims they may have against the employee, such as malpractice claims asserted by a patient against a nurse or other health care provider. Of course, those entities and individuals would not be bound by the arbitration agreement, so in practice it would be one-sided, and only apply to the employee's claims *against* those individuals and entities.

406. The demand that employees sign the arbitration agreement was itself fraudulent, and part of the fraud and the fraudulent conspiracy between and among all Defendants.

407. The Asset Purchase Agreement attempted to carve-out successor liability for the Plan, but such carve-outs are unenforceable if the requirements for successor liability are satisfied.

408. Thus, the Prospect Entities have successor liability for the Plan, both under federal common law applicable to Plan participant claims based on ERISA or, if ERISA is not applicable, under state common law of successor liability.

409. Notwithstanding the formal documentation creating a limited liability company controlled primarily by Prospect East, the Prospect Entities have repeatedly referred to the relationship between CCCB and Prospect Medical Holdings and held themselves out as joint venturers, in statements to employees, to the public, to the regulatory agencies that approved the 2014 Asset Sale, and to the court that approved the 2015 *Cy Pres* Petition. For example:

    a.    Prospect Medical Holdings's website states: "Through a joint venture agreement, Prospect became the majority owner of

CharterCARE but shares governance of the hospitals equally with CharterCARE Community Board."

b.    The cy pres petition filed on January 13, 2015 by CC Foundation, RWMC, and SJHSRI states: "On June 20, 2014, a closing on the transaction approved by the Rhode Island Department of Health ('DOH') and Rhode Island Attorney General's Office ('AG') occurred in which certain of the assets of CCCB, RWH and SJHSRI were transferred to the newly formed for-profit joint venture between CCCB and Prospect Medical Holdings, Inc. ('PMH') known as Prospect CharterCARE, LLC, and its affiliates (the 'Joint Venture')."

c.    A June 17, 2014 letter from the U.S. Department of Health and Human Services to SJHSRI states: "As described in your letter [of May 15], CharterCARE Health Partners (CCHP), the parent of SJHSRI, will enter into a joint venture arrangement with Prospect Medical Holdings, Inc. (PMH), pursuant to a September 24, 2013 arrangement that has now been approved by the Rhode Island Attorney General and the Rhode Island Department of Health.  As part of this arrangement, all operating assets held by members of the CCHP system, including SJHSRI, will be transferred to limited liability companies owned by Prospect CharterCARE, LLC, the joint venture entity. . . ."

d.    CCCB's 2013 Form 990 states: "THE BOARD OF DIRECTORS BELIEVES THAT SUFFICIENT SAFEGUARDS EXIST TO ENSURE THAT THEIR EXEMPT STATUS IS PROTECTED BOTH THROUGH THE APPOINTMENT PROVISIONS IN THE PROSPECT CHARTERCARE LLC JOINT VENTURE AGREEMENT AND CONDITIONS IMPOSED BY THE RHODE ISLAND ATTORNEY GENERAL AND THE RHODE ISLAND COMMISSIONER OF HEALTH."

e.    The March 18, 2013 Letter of Intent executed by both CCCB and Prospect Medical Holdings states: "The purpose of this letter of intent (the 'Letter') is to set forth certain non-binding understandings and certain binding agreements by and between CharterCARE Health Partners ('Seller') and Prospect Medical Holdings, Inc. ('Prospect') with respect to the creation of a joint venture ('Newco') whereby Seller will sell certain assets and operations of Seller to Newco, as more particularly described in the attached term sheet (the 'Term Sheet'), incorporated herein by reference."

f.    A May 20, 2014 email blast from CCCB's president Kenneth Belcher states: "Today Dr. Michael Fine, Director of the Department of Health, followed Friday's decision by the Attorney General and approved our Hospital Conversion[s] Act and Change in Effective Control applications.  This was the final regulatory hurdle toward

104

the successful completion of our joint venture agreement with Prospect Medical Holdings. . . . We are now prepared to plan the final closing which involves executing the financial and legal documents to make the joint venture agreement official."

410.    Insofar as Prospect Chartercare was a joint venture, Prospect East, Prospect Medical Holdings, and CCCB share the liabilities of Prospect Chartercare, and have successor liability for the Plan, both under ERISA and, if ERISA is not applicable, under state common law of successor liability and joint ventures.

## H.    FURTHER STRIPPING OF SJHSRI'S ASSETS THROUGH THE ASSET PURCHASE ON OR ABOUT JUNE 20, 2014

411.    On September 24, 2012, Prospect Medical Holdings sent a Letter of Intent to the executive leadership of CCHP proposing a transaction whereby Prospect Medical Holdings and CCHP would establish a new "joint venture" entity ("Newco") to acquire the assets of SJHSRI, RWMC, and other entities owned by CCCB.  That Letter of Intent included the provisos that in return for the asset sale, "[CCCB] shall receive a 15% membership interest in Newco," and that "the pension liability of SJHSRI as reflected on [CCCB]'s financial records will not be assumed by Newco."

412.    On March 13, 2013, the executive committee of CCCB's board of trustees convened to discuss letters of intent that had been solicited from potential suitors.  Mr. Belcher informed the committee that one of the non-Prospect suitors (LHP Hospital Group) "wanted to fully fund the pension plan."  In other words, the Plan participants would be protected.

413.    On March 14, 2013, SJHSRI's board of trustees met.  Mr. Belcher informed the board that CCCB's board had "made the recommendation to move forward with Prospect."

414.   On March 18, 2013, CCCB and Prospect Medical Holdings executed a new "LETTER OF INTENT" stating, inter alia:

> The purpose of this letter of intent (the "Letter") is to set forth certain non-binding understandings and certain binding agreements by and between CharterCARE Health Partners ("Seller") and Prospect Medical Holdings, Inc. ("Prospect") with respect to the creation of a joint venture ("Newco") whereby Seller will sell certain assets and operations of Seller to Newco, as more particularly described in the attached term sheet (the "Term Sheet"), incorporated herein by reference.
>
> *      *      *
>
> 1.      Form of Transaction
>
> a)      CharterCare Health Partners, a Rhode Island 501(c)(3) corporation ("Seller"), operates two acute care hospitals and certain related health care businesses in Providence, Rhode Island and surrounding communities (the "Business").
>
> b)      A newly established limited liability company ("Newco"), to be owned 85% by Prospect Medical Holdings, Inc. ("Prospect"), and 15% by Seller, will purchase substantially all of the assets, liabilities and operations of the Business, other than the Excluded Assets and Excluded Liabilities (the "Purchased Assets") from the Seller.
>
> *      *      *
>
> 3.      Purchase Price
>
> a)      In exchange for the Purchased Assets, Newco shall
>
> i)      Pay to Seller $45 million in cash at closing, $31 million of which will be applied to extinguish Seller's existing long-term debt and other obligations, and $14 million of which will be earmarked to strengthen the cash position of St. Joseph Health Services of Rhode Island's ("SJHSRI") pension plan;
>
> ii)      Issue to Seller 15% of the equity of Newco;
>
> *      *      *

415.    As Exhibit A to the March 18, 2013 Letter of Intent, CCHP and Prospect Medical Holdings attached a "CharterCARE Health Partners Balance Sheet" dated "1/31/13" which stated that "Pension Liability" in the amount of "89,536,553" dollars was "Retained by CharterCARE".

416.    At the time of the sale, CCCB was in essence a holding company whose assets consisted primarily of its ownership interests in SJHSRI and RWH, and whose only business was managing the operations of Fatima Hospital and Roger Williams Hospital for its subsidiaries SJHSRI and RWH.  In addition, CCCB owned all of the shares of certain other medical providers.  However, the closing on or about June 20, 2014 did not transfer ownership in CCCB or any of its subsidiaries, or any cash CCCB had retained, and provided for the transfer of the assets of, rather than the ownership interests in, the companies.

417.    As noted above, SJHSRI and RWH, not CCCB, owned the real estate and all of the assets used in operating Old Fatima Hospital and Old Roger Williams Hospital.

418.    Thus, virtually all of the personal property and real property transferred on or about June 20, 2014 was owned both historically and immediately prior to the sale by CCCB's various subsidiaries, primarily SJHSRI and RWH, and not by CCCB, such that virtually all of the actual consideration provided by the sellers came from CCCB's subsidiaries, including SJHSRI and RWH, not from CCCB.

419.    The consideration that Prospect East provided at the closing on or about June 20, 2014 included 15% of the shares of Prospect Chartercare.

420.    The fair market value of that 15% at the time of the asset sale was at least $6,640,000 according to Prospect Chartercare's own audited financials.

421.    The Asset Purchase Agreement had provided that CCCB would receive those shares, as follows:

> Sellers have designated CCHP (the "Seller Member") to be the holder of the units representing the Company's limited liability company memberships on behalf of all Sellers to be issued as partial consideration in respect of the sale by Sellers of the Purchased Assets.

422.    The consideration that the Prospect Entities provided in return for the assets included the undertaking to provide long term working capital of $50,000,000, which conferred a benefit on CCCB as 15% shareholder in the additional amount of $9,479,000, according to Prospect Chartercare's own audited financials.

423.    Thus, notwithstanding that CCCB provided virtually none of the consideration for the transaction, the parties consummated the transaction so that CCCB obtained all of the 15% interest in Prospect Chartercare, totalling a fair market value of at least $15,919,000.  SJHSRI and RWH received none of that interest, and, therefore, that valuable asset was not available to satisfy claims of Plan participants, the Plan, or any other creditors of SJHSRI.

424.    The due diligence performed by the Prospect Entities in connection with the Asset Purchase Agreement included requiring that CCCB provide consolidated financials reporting on the assets and liabilities of CCCB and its various subsidiaries, and buyers in fact received such financials prior to entering into the Asset Purchase Agreement.

425.    Accordingly, based upon those financials, at the time the Asset Purchase Agreement was entered into, all of the defendants knew that the combined estimated liabilities of the sellers, including CCCB, SJHSRI, and RWH, exceeded their combined estimated assets by approximately $30,000,000, and that the estimated liabilities of

SJHSRI alone exceeded SJHSRI's assets by over $70,000,000, all as a result of the unfunded liabilities of the Plan, such that CCCB, SJHSRI, and RWH were already insolvent when they entered into the Asset Purchase Agrement and when the 2014 Asset Sale took place.

426.    This knowledge was actually adverted to in the Asset Purchase Agreement, in which the Prospect Entities as *Buyers* made the unqualified representations and warranties that they "were not now insolvent and will not be rendered insolvent by any of the Transactions," whereas SJHSRI, RWH, and CCCB as *Sellers* made only the following *qualified* representation and warranty:

> 4.29    Solvency.  **After exclusion of Liabilities associated with the retirement plan due to their uncertainty of amount**: (i) Sellers are not now insolvent and will not be rendered insolvent by any of the Transactions; (ii) Sellers have, and immediately after giving effect to the Transactions, will have, assets (both tangible and intangible) with a fair saleable value in excess of the amount required to pay their Liabilities as they come due; and (iii) Sellers have adequate capital for the conduct of their business and discharge of their debts. . . .
>
> [Emphasis supplied]

427.    By this express exclusion of pension liabilities from the sellers' warranty of solvency, all of the parties to the transaction signaled their actual knowledge that these liabilities rendered SJHSRI, RWH, and CCCB insolvent, such that the transfer of the assets of SJHSRI, RWH, and CCCB constituted a fraudulent transfer.

428.    All of the Defendants sought and intended that the transactions would strip SJHSRI of all of its real estate and operating assets, and transfer value to CCCB in the amount of at least $15,919,000 that (they schemed) would be shielded from SJHSRI's liability to the Plan participants, including the rights of the Plan participants to have all of these assets applied to reduce the deficit in the Plan.

## CAUSES OF ACTION

## COUNT I (ERISA, MINIMUM FUNDING)

429.    Plaintiffs repeat and reallege paragraphs 1-212, 221-224, 228-235, 241-248, 271, 283, and 388-410.

430.    29 U.S.C. § 1132(a)(3), permits a fiduciary, plan participant, or beneficiary to bring a suit to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan, or to redress such violations.

431.    29 U.S.C. § 1082 establishes minimum funding standards for defined benefit plans that require employers to make minimum contributions to their plans so that each plan will have assets available to fund plan benefits if the employer maintaining the plan is unable to pay benefits out of its general assets.

432.    As the employer maintaining the plan, SJHSRI was responsible for making the contributions that should have been made pursuant to 29 U.S.C. § 1082, at a level commensurate with ERISA's requirements.

433.    SJHSRI has failed to make contributions in satisfaction of the minimum funding standards of 29 U.S.C. § 1082.

434.    By failing to make the required contributions to the Plan, SJHSRI violated 29 U.S.C. § 1082.

435.    As a result of SJHSRI's failure to fund the Plan in accordance with ERISA's minimum funding standards, Plaintiffs pensions will be lost or at least severely reduced.

436.    RWH and CCCB are jointly and severally liable for SJHSRI's failure to make the minimum contributions, because they are members of the same control group pursuant to 29 U.S.C. § 1082(b)(2), their corporate forms should be disregarded to

110

avoid fraud, and they agreed to be responsible therefore and are estopped to deny such liability.

437.    CC Foundation is also jointly and severally liable for SJHSRI's failure to make the minimum contributions, because it is a member of the same control group pursuant to 29 U.S.C. § 1082(b)(2).

438.    Prospect Chartercare, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams are the successors of SJHSRI, CCCB, and RWH, and are members of the same control group, and are liable for SJHSRI's failure to make contributions.

WHEREFORE Plaintiffs pray that the Court that judgment be entered against Defendants and request that the Court award the following relief:

A.    Certifying this action as a class action pursuant to Fed. R. Civ. P. 23;

B.    Declaring that the Plan is an employee benefit plan within the meaning of 29 U.S.C. § 1002(2), is a defined benefit plan within the meaning of 29 U.S.C. § 1002(35), and is not a Church Plan within the definition of 29 U.S.C. § 1002(33);

C.    Ordering Defendants SJHSRI, CCCB, RWH, CC Foundation, Prospect Chartercare, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams to fund the Plan in accordance with ERISA's funding requirements;

D.    Requiring Defendants SJHSRI, CCCB, RWH, CC Foundation, Prospect Chartercare, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams to make the Plan whole for all contributions that should have been made pursuant to ERISA funding standards, and

for interest and investment income on such contributions, and requiring said Defendants to disgorge any profits accumulated as a result of their fiduciary breaches;

E.      Ordering declaratory and injunctive relief as necessary and appropriate, including enjoining the Defendants from further violating the duties, responsibilities, and obligations imposed on them by ERISA, with respect to the Plan;

F.      Awarding, declaring, or otherwise providing Plaintiffs and the Class all relief under 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper, and such appropriate relief as the Court may order, including an accounting, surcharge, disgorgement of profits, equitable lien, constructive trust, reformation of the Plan to conform to Defendants' promises and assurances to participants and beneficiaries, reformation of the Plan to comply with ERISA including but not limited to the minimum funding provisions of ERISA, equitable estoppel to fund the Plan, or other remedy;

G.      Awarding to Plaintiffs' counsel attorneys' fees and expenses as provided by the common fund doctrine, 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

H.      Any other relief the Court determines is just and proper.

## COUNT II (ERISA, BREACH OF FIDUCIARY DUTY)

439.    Plaintiffs repeat and reallege paragraphs 1-212, 216-225, 234-235, 239-248, 251-252, 254-307, 312-359, 367-386, and 411-428.

440.    At all times that the Plan failed to qualify as a Church Plan, SJHSRI and CCCB were fiduciaries of the Plan under ERISA.

441.    29 U.S.C. § 1104(a)(1) provides that a fiduciary shall discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries,

112

and defraying reasonable expenses of administering the plan, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

442.   29 U.S.C. § 1109 provides, inter alia, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits the fiduciary made through the use of the plan's assets.  29 U.S.C. § 1109 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.  29 U.S.C. § 1002(9) provides that "[t]he term 'person' means an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

443.   29 U.S.C. § 1132(a)(2) permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under 29 U.S.C. § 1109.

444.   Defendants SJHSRI and CCCB's fiduciary duties included but were not limited to providing truthful and accurate information concerning the Plan and administration of the Plan, including information to help Plan participants decide whether to remain with the Plan by accepting and continuing employment with SJHSRI, and specifically whether SJHSRI was obligated to fund the Plan and was in fact funding the Plan, the extent of SJHSRI's unfunded liability under the Plan, the security of the Plan participant's benefits under the Plan, and SJHSRI's rights to terminate the Plan.

445.    Defendants SJHSRI and CCCB committed breaches of fiduciary duty, including but not limited to misrepresenting the funding status and security of the Plan, failures to fund the Plan, failures to demand that others fund the Plan, failures to administer the Plan in the best interests of its beneficiaries, failures to act honestly and loyally, and failures to act in good faith in the best interests of the Plan and its participants and with the necessary level of care.

446.    Plaintiffs have been harmed by these breaches of fiduciary duty.

WHEREFORE Plaintiffs pray that the Court that judgment be entered against Defendants SJHSRI and CCCB and request that the Court award the following relief:

A.    Certifying this action as a class action pursuant to Fed. R. Civ. P. 23;

B.    Declaring that the Plan is an employee benefit plan within the meaning of 29 U.S.C. § 1002(2), is a defined benefit plan within the meaning of 29 U.S.C. § 1002(35), and is not a Church Plan within the definition of 29 U.S.C. § 1002(33);

C.    Ordering Defendants SJHSRI and CCCB to fund the Plan in accordance with ERISA's funding requirements;

D.    Requiring Defendants SJHSRI and CCCB to make the Plan whole for all contributions that should have been made pursuant to ERISA funding standards, and for interest and investment income on such contributions, and requiring said Defendants to disgorge any profits accumulated as a result of their fiduciary breaches;

E.    Ordering declaratory and injunctive relief as necessary and appropriate, including enjoining the Defendants from further violating the duties, responsibilities, and obligations imposed on them by ERISA, with respect to the Plan;

F.    Awarding, declaring, or otherwise providing Plaintiffs and the Class all relief under 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems

114

proper, and such appropriate relief as the Court may order, including an accounting, surcharge, disgorgement of profits, equitable lien, constructive trust, reformation of the Plan to conform to Defendants' promises and assurances to participants and beneficiaries, reformation of the Plan to comply with ERISA including but not limited to the minimum funding provisions of ERISA, equitable estoppel to fund the Plan, or other remedy;

G.    Awarding to Plaintiffs' counsel attorneys' fees and expenses as provided by the common fund doctrine, 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

H.    Any other relief the Court determines is just and proper.

COUNT III (ERISA, AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY)

447.    Plaintiffs repeat and reallege paragraphs 1-212, 216-225, 234-235, 239-256, 259-307, 309-359, 367-386, 399-406, and 411-428.

448.    Defendants RWH, Prospect Chartercare, Angell, Diocesan Defendants, Prospect Medical Holdings, Prospect East, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams knowingly participated in, aided, and abetted breaches of fiduciary duty by Plan fiduciaries.

449.    29 U.S.C. § 1132(a)(3) provides that a civil action "may be brought by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;"

WHEREFORE Plaintiffs pray that the Court that judgment be entered against Defendants RWH, Prospect Chartercare, Angell, Diocesan Defendants, Prospect

Medical Holdings, Prospect East, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, and request that the Court award the following relief:

A.      Certifying this action as a class action pursuant to Fed. R. Civ. P. 23;

B.      Declaring that the Plan is an employee benefit plan within the meaning of 29 U.S.C. § 1002(2), is a defined benefit plan within the meaning of 29 U.S.C. § 1002(35), and is not a Church Plan within the definition of 29 U.S.C. § 1002(33);

C.      Ordering Defendants RWH, Prospect Chartercare, Angell, Diocesan Defendants, Prospect Medical Holdings, Prospect East, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams to fund the Plan in accordance with ERISA's funding requirements;

D.      Requiring Defendants RWH, Prospect Chartercare, Angell, Diocesan Defendants, Prospect Medical Holdings, Prospect East, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams to make the Plan whole for all contributions that should have been made pursuant to ERISA funding standards, and for interest and investment income on such contributions, and requiring Defendants to disgorge any profits accumulated as a result of their fiduciary breaches;

E.      Ordering declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants RWH, Prospect Chartercare, Angell, Diocesan Defendants, Prospect Medical Holdings, Prospect East, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams from further violating the duties, responsibilities, and obligations imposed on them by ERISA, with respect to the Plan;

F.      Awarding, declaring, or otherwise providing Plaintiffs and the Class all relief under 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper, and such appropriate relief as the Court may order, including an accounting,

116

surcharge, disgorgement of profits, equitable lien, constructive trust, reformation of the Plan to conform to Defendants' promises and assurances to participants and beneficiaries, reformation of the Plan to comply with ERISA including but not limited to the minimum funding provisions of ERISA, equitable estoppel to fund the Plan, or other remedy;

G.    Awarding to Plaintiffs' counsel attorneys' fees and expenses as provided by the common fund doctrine, 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

H.    Any other relief the Court determines is just and proper.

## COUNT IV (ERISA, DECLARATORY RELIEF)

450.    Plaintiffs repeat and reallege paragraphs 1-212.

451.    29 U.S.C. § 1132(a)(3), authorizes a fiduciary, participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

452.    As Administrator and Receiver of the Plan, the Receiver is a fiduciary entitled to relief under 29 U.S.C. § 1132(a)(3).

453.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief that the Plan is not a Church Plan within the meaning of 29 U.S.C. § 1002(33), and is thus subject to the provisions of Title I and Title IV of ERISA.

WHEREFORE, Plaintiffs demand a declaratory judgment declaring that the Plan is not a Church Plan within the meaning of 29 U.S.C. § 1002(33), and is thus subject to the provisions of Title I and Title IV of ERISA.

### COUNT V (FRAUDULENT TRANSFER, § 6-16-4(A)(1))

454.    Plaintiffs repeat and reallege paragraphs 1-212, 216-225, 228-235, 239-256, 259-307, 309-359, 367-386, and 399-406.

455.    At all relevant times Plaintiffs had "claims" against and were "creditors" of Defendants SJHSRI, RWH, and CCCB, as defined by R.I. Gen. Laws §§ 6-16-1(3) & (4), based upon said Defendants' violations of ERISA and/or obligations imposed by state law.

456.    Fraudulent transfers were made in connection with various transactions, including but not limited to the sale of all of the assets of SJHSRI, RWH, CCCB, and related entities to various Prospect Entities in connection with the 2014 Asset Sale, and to CC Foundation and by CC Foundation to RI Foundation in connection with the 2015 *Cy Pres* Proceeding, with the actual intent of SJHSRI, CCCB, and RWH as transferors to hinder, delay, or defraud their creditors, within the meaning of R.I. Gen. Laws § 6-16-4(a)(1).

457.    Those transfers are subject to avoidance to the extent necessary to satisfy Plaintiffs' claims, in accordance with R.I. Gen. Laws § 6-16-7(a)(1).

458.    Plaintiffs are entitled to attachment against all of the assets of SJHSRI, RWH, CCCB, and related entities that were transferred to various Prospect Entities, and all of the assets transferred to CC Foundation and by CC Foundation to RI Foundation pursuant to the 2015 *Cy Pres* Proceeding, in accordance with R.I. Gen. Laws § 6-16-7(a)(2).

459.    Prospect Medical Holdings, Prospect East, and Prospect Chartercare are persons for whose benefit the transfers were made within the meaning of R.I. Gen. Laws § 6-16-8(b)(1), for reasons including but not limited to the fact that Prospect Medical Holdings had a direct and beneficial interest in the 2014 Asset Sale, Prospect East owned 85% of Prospect Chartercare, and Prospect Chartercare owned 100% of Prospect Chartercare St. Joseph and Prospect Chartercare Roger Williams, and, therefore, they are also liable for the value of the assets transferred.

460.    Plaintiffs are entitled to an injunction against further disposition of the property by any of the Prospect Entities, CC Foundation, or the RI Foundation, in accordance with R.I. Gen. Laws § 6-16-7(a)(3)(i).

461.    Plaintiffs are entitled to any other relief the circumstances may require, in accordance with R.I. Gen. Laws § 6-16-7(a)(3)(iii).

462.    Upon entry of judgment on their claims, Plaintiffs are entitled to levy execution on these assets and the proceeds of these assets, in accordance with R.I. Gen. Laws § 6-16-7(b).

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment avoiding the transfers, together with a judgment of money damages against Defendants SJHSRI, RWH, CCCB, Prospect Medical Holdings, Prospect East, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, and CC Foundation, jointly and severally, plus interest and costs, and order Defendant RI Foundation to turn over to Plaintiffs all of the funds it received from CC Foundation, and any proceeds thereof, and such other and further relief as may be just.

COUNT VI (FRAUDULENT TRANSFER, §§ 6-16-4(A)(2) AND/OR 6-16-5(A))

463.    Plaintiffs repeat and reallege paragraphs 1-212, 216-225, 228-235, 239-256, 259-307, 309-359, 367-386, and 399-406.

464.    At times when Plaintiffs had "claims" against and were "creditors" of Defendants SJHSRI, RWH, and CCCB, as defined by R.I. Gen. Laws §§ 6-16-1(3) & (4), fraudulent transfers were made within the meaning of R.I. Gen. Laws §§ 6-16-4(a)(2) and/or 6-16-5(a) in connection with various transactions, including but not limited to the sale of all of the assets of SJHSRI, RWH, CCCB, and related entities to various Prospect Entities in connection with the 2014 Asset Sale, and in connection with the 2015 Cy Pres Proceeding:

    a.    within the meaning of R.I. Gen. Laws § 6-16-4(a)(2), inasmuch as transfers were made without receiving a reasonably equivalent value in exchange for the transfers, and the debtor(s) were engaged or were about to engage in a business or a transaction for which the remaining assets of the debtor(s) were unreasonably small in relation to the business or transaction, or the debtor(s) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due; and/or

    b.    within the meaning of R.I. Gen. Laws § 6-16-5(a), inasmuch as the debtor(s) made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor(s) was insolvent at that time or the debtor(s) became insolvent as a result of the transfer.

465.    Those transfers are subject to avoidance to the extent necessary to satisfy Plaintiffs' claims, in accordance with R.I. Gen. Laws §§ 6-16-7(a)(2) and/or 6-16-5(a).

466.    Plaintiffs are entitled to attachment against all of the assets of Defendants SJHSRI, RWH, CCCB, and related entities that were transferred to various Prospect Entities, and all of the assets transferred pursuant to the 2015 Cy Pres Proceeding, in accordance with R.I. Gen. Laws § 6-16-7(a)(2).

467.    Defendant Prospect Medical Holdings, Prospect East, and Prospect Chartercare are persons for whose benefit the transfers were made within the meaning of R.I. Gen. Laws § 6-16-8(b)(1), for reasons including but not limited to the fact that Prospect Medical Holdings had a direct and beneficial interest in the 2014 Asset Sale, Prospect East owned 85% of Prospect Chartercare, and Prospect Chartercare owned 100% of Prospect Chartercare St. Joseph and Prospect Chartercare Roger Williams, and, therefore, they are also liable for the value of the assets transferred.

468.    Plaintiffs are entitled to an injunction against further disposition of the property by any of the Prospect Entities, CC Foundation, or the RI Foundation, in accordance with R.I. Gen. Laws § 6-16-7(a)(3)(i).

469.    Plaintiffs are entitled to any other relief the circumstances may require, in accordance with R.I. Gen. Laws § 6-16-7(a)(3)(iii).

470.    Upon entry of judgment on their claims, Plaintiffs are entitled to levy execution on these assets and the proceeds of these assets, in accordance with R.I. Gen. Laws § 6-16-7(b).

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment avoiding the transfers, together with a judgment of money damages against Defendants SJHSRI, RWH, CCCB, Prospect Medical Holdings, Prospect East, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, and CC Foundation, jointly and severally, plus interest, costs, and order Defendant RI Foundation to turn over to Plaintiffs all of the funds it received from CC Foundation, and any proceeds thereof, and such other and further relief as may be just.

COUNT VII (FRAUD THROUGH INTENTIONAL MISREPRESENTATIONS AND OMISSIONS)

471.    Plaintiffs repeat and reallege paragraphs 1-59, 116-212, 216-225, 234, 236-359, and 365-428.

472.    Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Diocesan Defendants, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, and each of them, made intentional misrepresentations to Plaintiffs and intentionally omitted providing material information under circumstances where said Defendants had a duty to speak.

473.    Plaintiffs reasonably relied upon said Defendants' misrepresentations and omissions.

474.    Plaintiffs suffered damages thereby.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Diocesan Defendants, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

COUNT VIII (FRAUDULENT SCHEME)

475.    Plaintiffs repeat and reallege paragraphs 1-59, 116-212, 216-225, 234, 236-359, and 365-428.

476.    Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect Chartercare, Diocesan Defendants, Prospect East, Prospect Medical Holdings,

Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, and each of them, intentionally defrauded Plaintiffs.

477.    Plaintiffs relied upon Defendants' acts, practices, and courses of business that operated as a fraud upon Plaintiffs.

478.    Plaintiffs were defrauded thereby.

479.    Plaintiffs suffered damages thereby.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect Chartercare, Diocesan Defendants, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

## COUNT IX (CONSPIRACY)

480.    Plaintiffs repeat and reallege paragraphs 1-59, 116-212, 216-225, 234, 236-359, and 365-428.

481.    Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect Chartercare, Diocesan Defendants, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams participated in a conspiracy to injure the Plaintiffs, which involved the combination of two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose.

482.    As a result of this conspiracy, Plaintiffs were damaged.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a

judgment of money damages against all Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect Chartercare, Diocesan Defendants, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

<u>COUNT X (ACTUARIAL MALPRACTICE)</u>

483.    Plaintiffs repeat and reallege paragraphs 1-56, 239-252, 256, 260-265, 271, 289-297, 301-307, and 312-324.

484.    Defendant Angell undertook, for a good and valuable consideration, to provide actuarial and administrative services to the Plan which included communicating directly with Plan participants concerning the Plan and the interests of Plan participants concerning the Plan.

485.    At all times mentioned herein, Defendant Angell had a duty to Plaintiffs to conform to the standard of care exercised by the average actuary and provider of administrative services to pension plan participants holding itself out as a specialist in pension plans.

486.    Nevertheless, Defendant Angell breached its duty in that it negligently provided actuarial and administrative services to the Plan and negligently communicated directly with Plan participants concerning the Plan and the interests of Plan participants concerning the Plan.

487.    As a direct and proximate result of the negligence of Defendant Angell, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, and demand

124

judgment against Defendant Angell for damages, plus interest and costs, and such other and further relief as may be just.

COUNT XI (BREACH OF CONTRACT)

488.    Plaintiffs repeat and reallege paragraphs 1-59, 213-235, 241, 245-248, and 259-307.

489.    Plaintiffs and Defendant SJHSRI entered into one or more express or implied contracts under which Defendant SJHSRI undertook to fully fund and pay all pension benefits to which Plaintiffs were entitled, which Defendant SJHSRI breached, causing damages to Plaintiffs.

490.    The contracts between Plaintiffs and Defendant SJHSRI each contained an implied covenant of good faith and fair dealing.

491.    Defendant SJHSRI also breached this covenant, causing damages to Plaintiffs.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, and demand judgment against Defendant SJHSRI for damages, plus interest and costs.

COUNT XII (ALTER EGO)

492.    Plaintiffs repeat and reallege paragraphs 1-359, 365-428, 430-438, 440-446, 448-449, 451-453, 455-461, 464-470, 472-474, 476-479, 481-482, 484-487, and 489-491.

493.    There is a unity of interest and ownership among Defendants SJHSRI, RWH, CCCB, CC Foundation, Prospect Chartercare, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams (the "Alter

125

Ego Goup"), such that the separate personalities of the entities and their members do not exist.

494.    Observance of the corporate form would sanction a fraud, promote injustice, or result in inequity.

495.    Each of Defendants in the Alter Ego Group are directly liable to Plaintiffs on one or more claims asserted herein, and the other Defendants in the Alter Ego Group are also liable therefore as the alter egos for the Defendants directly liable to Plaintiffs.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, RWH, CCCB, CC Foundation, Prospect Chartercare, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

## COUNT XIII (DE FACTO MERGER)

496.    Plaintiffs repeat and reallege paragraphs 1-359, 365-428, 430-438, 440-446, 448-449, 451-453, 455-462, 464-470, 472-474, 476-479, 481-482, 484-487, 489-491, and 493-495.

497.    There is a continuity of ownership among Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams (the "De Facto Merger Group").

498.    Defendants SJHSRI, RWH, and CCCB have ceased ordinary business and dissolved and/or have become in essence empty shells.

126

499.    Defendants Prospect Chartercare, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams assumed liabilities ordinarily necessary for the uninterrupted continuation of the business of SJHSRI, RWH, and CCCB.

500.    There is a continuity of management, personnel, physical location, assets, and general business operation among the De Facto Merger Group.

501.    Each of Defendants in the De facto Merger Group are directly liable to Plaintiffs on one or more claims asserted herein, and the other Defendants in the De Facto Merger Group are also liable therefore.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

## COUNT XIV (JOINT VENTURE)

502.    Plaintiffs repeat and reallege paragraphs 1-359, 365-428, 430-438, 440-446, 448-449, 451-453, 455-462, 464-470, 472-474, 476-479, 481-487, 489-491, 493-495, and 497-501.

503.    There existed a joint venture between Defendants CCCB, Prospect East, and Prospect Medical Holdings (the "Joint Venturers").

504.    Each of Joint Venturers is directly liable to Plaintiffs on one or more claims asserted herein in which the Joint Venturer acted in furtherance of the joint venture, and the other Joint Venturers are also liable therefore.

127

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, and demand a judgment of money damages against Defendants CCCB, Prospect East and Prospect Medical Holdings, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

COUNT XV (Successor Liability)

505.    Plaintiffs repeat and reallege paragraphs 1-359, 365-428, 430-438, 440-446, 448-449, 451-453, 455-462, 464-470, 472-474, 476-479, 481-482, 484-487, 489-491, 493-495, 497-501, and 503-504.

506.    Both in connection with the 2014 Asset Sale and the transfer of approximately $8,200,000 to CC Foundation in connection with the 2015 *Cy Pres* Petition, there was a transfer of corporate assets for less than adequate consideration, the new companies continued the business of the transferors; both the transferors and the transferees had at least one common officer or director who was instrumental in the transfer; and the transfers rendered the transferors incapable of paying their creditors because the transferors dissolved either in fact or by law.

507.    Defendants SJHSRI, RWH, and CCCB are liable to Plaintiffs on one or more of the claims asserted herein, for which Defendants CC Foundation, Prospect Chartercare, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams are liable to Plaintiff as successors of Defendants SJHSRI, RWH, and CCCB.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants CC Foundation, Prospect

Chartercare, Prospect East, Prospect Medical Holdings, Prospect Chartercare St.

Joseph, and Prospect Chartercare Roger Williams, jointly and severally, plus interest,

costs, punitive damages, and such other and further relief as may be just.

COUNT XVI (CIVIL LIABILITY UNDER R.I. GEN. LAWS § 9-1-2 FOR VIOLATIONS OF THE
RHODE ISLAND HOSPITAL CONVERSIONS ACT)

508.    Plaintiffs repeat and reallege paragraphs 1-212, 314-365, and 378-392.

509.    Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect

Chartercare, Diocesan Defendants, Prospect East, Prospect Medical Holdings,

Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, knowingly

violated or failed to comply with one or more provision of R.I. Gen. Laws § 23-17.14-1 *et*

*seq.* or willingly or knowingly gave false or incorrect information.

510.    Said Defendants' conduct constituted crimes or offenses under R.I. Gen.

Laws § 23-17.14-30, causing injuries for which Defendants have civil liability under R.I.

Gen. Laws § 9-1-2.

511.    Plaintiffs have been damaged as a result.

WHEREFORE, Plaintiffs request that the Court certify this action as a class

action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a

judgment of money damages against Defendants SJHSRI, RWH, CCCB,

CC Foundation, Angell, Prospect Chartercare, Diocesan Defendants, Prospect East,

Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare

Roger Williams, jointly and severally, plus interest, costs, punitive damages, and such

other and further relief as may be just.

COUNT XVII (CIVIL LIABILITY UNDER R.I. GEN. LAWS § 9-1-2 FOR VIOLATIONS OF 26
U.S.C. § 7206(2))

512.    Plaintiffs repeat and reallege paragraphs 1-212, 216-225, 228-235, 239-256, 259-307, 309-359, 367-386, and 399-406.

513.    The Diocesan Defendants aided or assisted in, procured, counseled, or advised the preparation or presentation to the IRS of Defendant SJHSRI's Form 990 tax returns, the returns were false as to a material matter; and the acts of the Diocesan Defendants were willful.

514.    Said Defendants' conduct constituted crimes or offenses under 26 U.S.C. § 7206(2), causing injuries for which Defendants have civil liability under R.I. Gen. Laws § 9-1-2.

515.    Plaintiffs have been damaged as a result.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, and demand a judgment of money damages against the Diocesan Defendants, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

COUNT XVIII (LIQUIDATION PURSUANT TO R.I. GEN. LAWS §§ 7-6-60 & -61)

516.    Plaintiffs repeat and reallege paragraphs 1-359, 365-428, 430-438, 440-446, 448-449, 451-453, 455-462, 464-470, 472-474, 476-479, 481-487, 484-487, 489-491, 493-495, 497-501, 503-504, 506-507, and 509-511.

517.    Defendants SJHSRI, RWH, and CCCB are Rhode Island nonprofit corporations.

518.    Each of them has admitted in writing that the claims of Plaintiffs are due and owing, and these corporations are insolvent.

519.    Each of them should be liquidated and their assets shall be applied and distributed to pay Plaintiffs' claims pursuant to R.I. Gen. Laws §§ 7-6-51 & 7-6-61(c)(1).

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, RWH, and CCCB, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

## COUNT XIX (RHODE ISLAND LAW, BREACH OF FIDUCIARY DUTY)

520.    Plaintiffs repeat and reallege paragraphs 1-59, 116-212, 216-225, 234-235, 239-256, 259-307, 309-359, 367-386, 399-406, and 411-428.

521.    Defendants SJHSRI, CCCB, Angell, and the Diocesan Defendants all owed Plaintiffs fiduciary duties.

522.    Defendants SJHSRI, CCCB, Angell, and the Diocesan Defendants all breached their fiduciary duties to Plaintiffs, causing damages.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, CCCB, Angell, and the Diocesan Defendants, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

## COUNT XX (RHODE ISLAND LAW, AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY)

523.    Plaintiffs repeat and reallege paragraphs 1-59, 116-212, 216-225, 234-359, and 364-428.

131

524.    Defendants RWH, CC Foundation, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect East, and Prospect Medical Holdings knowingly aided, abetted, and participated in, breaches of fiduciary duty by Defendants SJHSRI, CCCB, Angell, and the Diocesan Defendants, and Defendants SJHSRI, CCCB, Angell, and the Diocesan Defendants knowingly aided, abetted, and participated in, breaches of fiduciary duty by each other, causing damages.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Diocesan Defendants, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect East, and Prospect Medical Holdings, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

## COUNT XXI (DECLARATORY JUDGMENT, LIABILITY AND TURN OVER OF FUNDS, STATE LAW)

525.    Plaintiffs repeat and reallege paragraphs 454-524.

526.    There exists an actual and legal controversy between Plaintiffs and Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Diocesan Defendants, RI Foundation, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect East, and Prospect Medical Holdings, in which Plaintiffs have an interest, concerning the causes of action asserted herein in at paragraphs 454-524.

527.    That controversy is ripe for determination, even if there are future contingencies that may determine the amount of Plaintiffs' damages.

WHEREFORE Plaintiffs demand a declaratory judgment declaring that Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Diocesan Defendants,

Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect East, and Prospect Medical Holdings, jointly and severally, are liable to Plaintiffs on the causes of action set forth against them in paragraphs 454-524 herein, and ordering Defendant RI Foundation to turn over to Plaintiffs all of the funds it received from CC Foundation, even if the exact quantum of Plaintiffs' damages cannot yet be determined due to these future contingencies.

**JURY DEMAND**

Plaintiffs demand a trial by jury on the aforementioned Counts.

Plaintiffs
By their Attorneys,

/s/ Max Wistow
Max Wistow, Esq. (#0330)
Stephen P. Sheehan, Esq. (#4030)
Benjamin Ledsham, Esq. (#7956)
Wistow, Sheehan & Loveley, PC
61 Weybosset Street
Providence, RI  02903
(401) 831-2700
(401) 272-9752 (fax)
mwistow@wistbar.com
spsheehan@wistbar.com
bledsham@wistbar.com

Dated:  June 18, 2018