# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STEPHEN DEL SESTO, AS RECEIVER
AND ADMINISTRATOR OF THE ST.
JOSEPH HEALTH SERVICES OF RHODE
ISLAND RETIREMENT PLAN; ET AL. ,

          Plaintiffs,

v.

PROSPECT CHARTERCARE, LLC; ET AL.,

          Defendants.

C.A. No. 1:18-CV-00328-S-LDA

---

### DEFENDANTS ROMAN CATHOLIC
### BISHOP OF PROVIDENCE, A CORPORATION SOLE, DIOCESAN
### ADMINISTRATION CORPORATION AND DIOCESAN SERVICE CORPORATION'S
### MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

DATED:  September 17, 2018

ROMAN CATHOLIC BISHOP OF
PROVIDENCE, A CORPORATION SOLE,
DIOCESAN ADMINISTRATION
CORPORATION and DIOCESAN SERVICE
CORPORATION

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

Howard Merten (#3171)
Eugene G. Bernardo (#6006)
Paul M. Kessimian (#7127)
Christopher M. Wildenhain (#8619)
40 Westminster Street, Suite 1100
Providence, RI  02903
(401) 861-8200
(401) 861-8210 FAX
hm@psh.com
egb@psh.com
pk@psh.com
cmw@psh.com

## TABLE OF CONTENTS

TABLE OF EXHIBITS ....................................................................................................v

PRELIMINARY STATEMENT ......................................................................................1

JOINDER IN ARGUMENTS OF OTHER DEFENDANTS ..........................................6

STANDARD OF REVIEW ............................................................................................6

ARGUMENT ..................................................................................................................7

I.  THE COMPLAINT DOES NOT SET FORTH A
    PLAUSIBLE CAUSATION CLAIM FOR ANY ACTS
    OR OMISSIONS PRIOR TO THE GREAT RECESSION IN 2008 .................7

    A.  The Actuarial Reports ...........................................................................8

    B.  Any Causal Connection Between Acts
        Or Omission Prior To 2008 Was Broken Because There
        Were Many Intervening Years of Adequate Funding And The
        Great Recession Of 2008 Constitutes A Separate Intervening Cause .................12

II. COUNT VII (FRAUD THROUGH
    INTENTIONAL MISREPRESENTATION AND
    OMISSION) MUST BE DISMISSED AGAINST THE
    DIOCESAN DEFENDANTS FOR FAILURE TO STATE A CLAIM ...........................14

    A.  Count VII Must Be Dismissed For Improper And
        Conclusory Group Pleading that Lumped The Diocesan
        Defendants Together in Violation of Rules 8(a) And 9(b) ...................................14

    B.  The Alleged Misrepresentations To
        Plan Participants In The 1970s-1990s Are Not Actionable ...................................16

    C.  Any Alleged Reliance On Any Alleged Misrepresentations
        Of Fact (Of Which There Were None) Respecting The Alleged
        "Quid Pro Quo" In The 2014 Asset Sale Was Not Justifiable
        As A Matter Of Law Because Plaintiffs (and Regulators) Had
        Notice Of The Key Facts Alleged Against The Diocesan Defendants .................18

        1.  The Alleged "Quid Pro Quo" Scheme .......................................................18

            i.  No One Hid That The Plan Was
                Underfunded In 2014; Rather It Was Public
                Knowledge That The Plan Was At Risk And That
                Risk Was A Key Driver Behind The 2014 Asset Sale..................20

ii.     The Structure Of The 2014 Asset Sale
Including That Prospect Wasn't Assuming
Any Liabilities For The Plan, Were Disclosed And Public ..........23

iii.    The Plan's Status And Intended
Future As A Church Plan Were Disclosed ....................................24

iv.    The Continued Catholicity Of
The Hospitals Following The 2014 Asset
Sale In No Way Demonstrates A Conspiracy...............................25

2.    The Disclosures Render Any
Reliance Unreasonable As A Matter Of Law ............................................26

D.    The Plaintiffs' Claim For Fraud Fails Because
the Alleged Statements In The Vatican And Health
Services Council Letters Were Not False And Were Opinions ...........................27

E.    The Alleged Misrepresentations
By The Diocesan Defendants To The
Vatican, HSC, USCCB, OCD And IRS
Could Not Have Been The Cause Of Any Harm
Suffered By Plaintiffs As A Matter of Law Because
They Were Not Made To Plaintiffs And Plaintiffs Did Not Rely On Them .........31

1.    Plaintiffs Do Not Allege That They Were The
Intended Recipients Of Purported Misrepresentations ..............................32

2.    Plaintiffs Fail To Allege Reliance
On The Statements To Third-Parties .........................................................33

F.    The Listing Of SJHSRI In The Official Catholic
Directory Was Proper And In Any Event Cannot Be
Challenged In These Circumstances; Accordingly No
Fraud Or Conspiracy Claim Can Be Based On That Inclusion ............................34

1.    The Complaint's Allegations Regarding
Listing A Subordinate Organization In The OCD ....................................35

2.    Count VII Fails Because Plaintiffs Acknowledge
That SJHSRI Was Operated In Connection With The
Diocese Of Providence And Plaintiffs Cannot Challenge
The Sufficiency Of That Connection As A Matter Of Law......................35

i.    SJHSRI's Diocesan
Connection Post-2014 Asset Sale ..................................................36

        ii.     Plaintiffs Cannot Challenge the Sufficiency
              Of The Connection Between SJHSRI And The
              Diocese Of Providence For OCD Listing Purposes......................40

III.    THE COMPLAINT DOES NOT
      PLAUSIBLY ALLEGE THAT THE DIOCESAN
      DEFENDANTS ENTERED INTO AN AGREEMENT
      FOR AN UNLAWFUL ENTERPRISE AND SO PLAINTIFFS'
      CLAIM FOR CONSPIRACY(COUNT IX) SHOULD BE DISMISSED ......................41

     A.    The Complaint Does Not Allege Facts Suggesting
         An Improper Agreement Concerning The Listing Of SJHSRI In The OCD........42

          1.    There Was Nothing Unlawful About
              The Listing Of SJHSRI In The OCD.........................................................42

          2.    Listing In The OCD And Maintaining
              Church Plan Status Are Not The Same......................................................42

          3.    Other Aspects Of The Complaint
              Undermine Plaintiffs' Claim That There Was
              An Agreement For An Illegal Undertaking Concerning The OCD..........43

     B.    The Complaint Fails To Allege Facts Suggesting An
         Illegal Agreement Concerning The 2014 Asset Sale Or
         The Bishop's Communications In Support Of That Transaction ........................47

          1.    Disclosure Of Funding/Church Plan Status
              Of the Plan, The Scope Of The 2014 Asset Sale,
              And The Continued Catholicity Of The Hospitals ...................................48

          2.    Letters to the HSC and the Vatican...........................................................48

IV.    COUNTS XVI AND XVII (CIVIL LIABILITY UNDER
      R.I. GEN. LAWS § 9-1-2) SHOULD BE DISMISSED.....................................................49

     A.    The Complaint Alleges Injuries That Were Not
         Caused "By Reason Of" The Alleged Violations Of Criminal Law ....................50

          1.    Counts XVI and XVII Rest On Allegations
              Of Events That Took Place After The Plan Was
               Allegedly Underfunded And Could Not As A Matter
              Of Law (Or Chronology) Have Caused The Alleged Underfunding.........50

          2.    The Alleged Harm To Plaintiffs Is Not
               Direct And Far Too Attenuated From The Alleged
              Criminal Violations To Constitute Proximate Causation .........................51

i.     Count XVI....................................................................51

i.     Count XVII ..................................................................52

3.     The Alleged Violations In Counts
       XVI And XVII Are Based On Alleged
       Misrepresentations To Regulators Not The
       Plaintiff, And They Cannot Be A Basis For Relief Under § 9-1-2...........53

4.     Plaintiffs Also Fail To Allege Facts Sufficient
       To Establish Proximate Cause Because There Are
       More Direct Victims Of The Alleged Crimes Who
       Have The Exclusive Right To Remedy The Alleged Violation ...............54

5.     Permitting Claims By Private
       Citizens Based On Alleged Crimes
       Against Regulators Would Create An End Run
       Around The Administrative Procedures Act And Public
       Policy Which Militates Against A § 9-1-2 Claim In This Context ..........56

B.     Count XVII Must Be Dismissed Because R.I.
       Gen. Laws § 9-1-2 Is Preempted By Federal Law
       And Would Constitute An Impermissible End Run Around
       The Lack Of Private Right Of Action Under The Internal Revenue Code...........57

1.     Rhode Island General Laws § 9-1-2 Is Preempted By Federal Law..........57

2.     Count XVII Seeks An Impermissible End Run Around The
       Lack Of Private Right Of Action Under The Internal Revenue Code.......60

V.     COUNT XIX (RHODE ISLAND LAW, BREACH OF FIDUCIARY
       DUTY) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM......................61

VI.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER ERISA .............................63

A.     Count III Should Be Dismissed As An Inappropriate Request
       For Money Damages Not Cognizable Under 29 U.S.C. § 1132(a)(3)..................63

1.     Legal Standard ............................................................63

2.     Plaintiffs' Allegations ..................................................65

3.     The Complaint Fails To Allege
       An Entitlement To Equitable Relief .......................................66

B.     Plaintiffs Fail To State
       A Claim For ERISA Equitable Estoppel .................................................68

iv

CONCLUSION...............................................................................................................................69

**TABLE OF EXHIBITS**

| Ex. # | Document | Compl. ¶¶ | Additional/Other Basis To Review On Motion to Dismiss |
|---|---|---|---|
| 1 | Actuarial Report as of July 1, 2004, for the Plan Year Ended June 30, 2005 | N/A | Public Record (Posted on Receiver's website under "Public Data" heading) |
| 2 | Actuarial Report as of July 1, 2005, for the Plan Year Ended June 30, 2006 | N/A | Public Record (Posted on Receiver's website under "Public Data" heading) |
| 3 | Actuarial Report as of July 1, 2006, for the Plan Year Ended June 30, 2007 | 231(c) | Public Record (Posted on Receiver's website under "Public Data" heading) |
| 4 | Actuarial Report as of July 1, 2007, for the Plan Year Ended June 30, 2008 | 231(c) | Public Record (Posted on Receiver's website under "Public Data" heading) |
| 5 | Actuarial Report as of July 1, 2009, for the Plan Year Ended June 30, 2010 | N/A | Public Record (Posted on Receiver's website under "Public Data" heading) |
| 6 | Actuarial Report as of July 1, 2010, for the Plan Year Ended June 30, 2011 | N/A | Public Record (Posted on Receiver's website under "Public Data" heading) |
| 7 | Actuarial Report as of July 1, 2011, for the Plan Year Ended June 30, 2012 | N/A | Public Record (Posted on Receiver's website under "Public Data" heading) |
| 8 | Actuarial Report as of July 1, 2012, for the Plan Year Ended June 30, 2013 | N/A | Public Record (Posted on Receiver's website under "Public Data" heading) |
| 9 | Chart reflecting compilation of data in Exhibits 1-8 | N/A | Compiled from data in Exhibits 1-8 |
| 10 | Excerpted Change in Effective Control Application ("CEC Application") to the R.I. Department of Health | 300, 409(f) | Public Record (filed with R.I. Department of Health) |
| 11 | Asset Purchase Agreement with Selected Exhibits | *See* Ex. 10; *see also* 142, 144, 150, 156, 174, 301, 395, 398, 407, 421, 424-426 | Public Record (filed with R.I. Department of Health, as part of CEC Application) |
| 12 | Excerpted 2009-2010 Financial Statements | *See* Ex. 10; *see also* 424 | Public Record (filed with R.I. Department of Health, as part of CEC Application) |

| Ex. # | Document | Compl. ¶¶ | Additional/Other Basis To Review On Motion to Dismiss |
|---|---|---|---|
| 13 | Excerpted 2010 Government Auditors' Reports | *See* Ex. 10; *see also* 424 | Public Record (filed with R.I. Department of Health, as part of CEC Application) |
| 14 | Excerpted 2010-2011 Financial Statements | *See* Ex. 10; *see also* 424 | Public Record (filed with R.I. Department of Health, as part of CEC Application) |
| 15 | Excerpted 2011-2012 Financial Statements | *See* Ex. 10; *see also* 424 | Public Record (filed with R.I. Department of Health, as part of CEC Application) |
| 16 | 2012-2013 Financial Statements | *See* Ex. 10; *see also* 424 | Public Record (filed with R.I. Department of Health, as part of CEC Application) |
| 17 | R.I. Attorney General's Decision Concerning Hospital Conversion Act Application | 369 | Public Record (filed decision of R.I. Attorney General) |
| 18 | 2017 Memorandum from U.S. Conference of Catholic Bishops | 108-109 | |
| 19 | January 4, 2010 Articles of Amendment to the Articles of Incorporation of St. Joseph Health Services of Rhode Island | N/A | Public Record (filed with R.I. Secretary of State) |
| 20 | Ethical and Religious Directives of the United States Conference of Catholic Bishops | 151 & n.3 | |
| 21 | September 27, 2013 Letter to the Vatican | 173-182 | |
| 22 | November 11, 2014 Email from Chancellor Reilly | 187 | |
| 23 | September 12, 2013 "Overview of the Strategic Transaction" Presentation | 167-170 | |
| 24 | Organizational Chart Concerning Corporate Structure following the 2014 Asset Sale | *See* Ex. 10 | Public Record (filed with R.I. Department of Health, as part of CEC Application) |
| 25 | February 14, 2014 Letter to the Health Services Council | 309-310 | Public Record (filed with R.I. Department of Health) |

Defendants Roman Catholic Bishop of Providence, a corporation sole ("RCB"), Diocesan Administration Corporation ("DAC") and Diocesan Service Corporation ("DSC", and collectively with RCB and DAC, the "Diocesan Defendants") respectfully submit this memorandum in support of their Motion to Dismiss.

## PRELIMINARY STATEMENT

The Diocesan Defendants express sincere sympathy for the retirees of St. Joseph Health Services of Rhode Island ("SJHSRI").  That sympathy, however, cannot cloud the conclusion that this lawsuit is a baseless attempt to undo difficult decisions made in 2014 to save the CharterCARE system from collapse for the sake of an entire state and the communities it sustained and served.  Nor does it change the inescapable conclusion that the allegations lodged against the Diocesan Defendants are patently false, implausible, conclusory and lack sufficient factual or legal basis to state a valid claim for relief.

*The Complaint mischaracterizes the role of the so-called "Diocesan Defendants."* The Complaint fails to accurately describe the role of diocesan entities and individuals concerning SJHSRI and the SJHSRI Retirement Plan (the "Plan").  Both SJHSRI and the Plan are separate legal entities with separate legal existences and responsibilities.  The named Diocesan Defendants are also separate legal entities, which the Complaint ignores.  The Diocesan Defendants had little or nothing to do with the Plan.  Further, the facts and circumstances of the Plan changed over six decades.  The Complaint itself avers that the role of the so-called Diocesan Defendants diminished and changed over time.  Yet despite that acknowledgement, the Complaint invariably speaks of the "Diocesan Defendants," collectively, without distinguishing who precisely is doing or saying what or when, or in what capacity.  That is, itself, grounds for dismissing this Complaint. *Infra* at Part II.A.

Sorting out the true roles (or non-roles) of the Diocesan Defendants requires reference to facts beyond those pled in the Complaint.  The Diocesan Defendants reserve their right to challenge and object to the purported roles of, and allegations against, the Diocesan Defendants as described in this Complaint.[1]  When used in this motion, the term "Diocesan Defendants" means the term as utilized by Plaintiffs and does not constitute an admission (even implicitly) that the Diocesan Defendants are legally responsible for—or ever did (as a factual matter)—what the Complaint alleges and what this motion must accept as true for purposes of contesting the legal sufficiency of the allegations pursuant to Rule 12(b)(6).

*Plaintiffs' Complaint hides the true cause of the Plan becoming underfunded – the Great Recession of 2008.*  The Complaint asserts that from 1995 to the present, defendants did not fund the Plan in accordance with the requirements of ERISA and the recommendations of the Plan's actuaries, with the result that the Plan became grossly underfunded. However, documents cited in the Complaint definitively show that the Plan was more than adequately funded through 2008.  They also show that the havoc wreaked by the Great Recession led to the Plan becoming underfunded, not any actions or inactions by anyone involved in the Plan.

Actuarial Reports show that the Plan assets totaled $114,718,822 in 2007, but fell to $78,260,116—a drop of $36,458,706 (or 32%)—in 2009 after the market crash.  Those same Actuarial Reports (at least all of the ones posted on Plaintiff Receiver's website) show that for years leading up to the crash, Plan assets exceeded accrued benefits at present value.  Further contradicting the allegations of the Complaint, the reported surplus was so great that Plan actuaries told Plan administrators for years that no minimum contribution was required, even

---

[1] To be clear, the Diocesan Defendants fundamentally disagree with a great many of the allegations in Plaintiffs' Complaint.  These Defendants reserve their right to deny and dispute each and every allegation in the Complaint, when and as appropriate.

when they applied ERISA funding guidelines.  Those Reports report an under-funded status and required minimum funding contributions *only after the Great Recession*.

While the Complaint ignores the global financial meltdown in 2008 (and fails to disclose the contents of documents it cites that contradict its allegations), this Court cannot and should not.  Years of adequate funding through mid-2008 break any causal chain for conduct allegedly occurring before 2008.  Further, the Great Recession constitutes a glaring intervening cause for which no defendant is responsible.  Claims based upon conduct predating 2008 must be dismissed.  *Infra* at Part I, II.B, & III.B.

*The Complaint distorts the 2014 Transaction and rips it from the historical context critical to assessing Plaintiffs' legal claims.  When viewed in proper context, the Diocesan Defendants' conduct was not fraudulent and was equally consistent with a lawful purpose and thus not actionable.*  Documents referenced in Plaintiffs' Complaint negate the Diocesan Defendants' participation in any secret scheme or conspiracy in the 2014 Asset Sale between CharterCARE Health Partners/CharterCARE Community Board ("CCCB"), SJSHRI, and Roger Williams Hospital ("RWH") on one side and various entities associated with Prospect Medical Holdings, Inc. (collectively "Prospect") on the other.  This is true whether the Complaint attempts to characterize the Diocesan Defendants' role as fraud, conspiracy or aiding and abetting other defendants.  The documents referenced in the Complaint prove that what the Complaint calls a hidden "conspiracy" was actually disclosed as part of a submission to regulators back in 2014:

- Regulators knew that the Plan was underfunded after 2008.  That fact was one of the express drivers of the proposed transaction.

- The transfer of assets away from SJHSRI to a new entity was not hidden from the regulators—it was part of the fundamental architecture of the entire "Asset Purchase."

- The Asset Purchase Agreement and Change in Effective Control applications stated expressly that liabilities for the pension system were *not* being assumed by the new hospital entities.

- The parties to the transaction, and the regulators who reviewed it, took steps to help the pension, including contributing $14 million to the Plan's assets and setting forth future mechanisms to further fund the Plan.

- Listing SJHSRI in the Official Catholic Directory ("OCD") was wholly appropriate (as discussed below) and the Asset Purchase Agreement and financial statements provided to regulators identified the Plan as a "Church Plan."

There was no conspiracy to defraud Plan participants, the regulators or anyone else.

The CCCB system was on the brink of catastrophic failure because of unsustainable losses—both operational and Plan losses.  The 2014 Transaction was proposed to accomplish a number of important goals, all of which were thoroughly discussed and vetted, including:  (1) helping the hospitals survive and preserve health care for underserved communities and hundreds of jobs; (2) preserving local control of critical health services; (3) guaranteeing substantial and continued capital infusions to help the new hospital system succeed for the long term; and (4) providing a contribution of $14 million to the Plan and establishing mechanisms for further funding to help a Plan that, at that point, everyone knew was underfunded and losing money.  Those goals appeared reasonable and laudable at the time.  To the extent the Diocesan Defendants—like other interested parties—expressed support for these goals, that cannot form the basis of a fraud or illicit conspiracy as a matter of law.  *Infra* at Part II.C-F & III.

*Because the Complaint stretches reality, the remaining fraud and conspiracy claims are irretrievably deficient.*  The Complaint points to two letters written by Bishop Tobin.  Those letters actually declared that the Plan is at "***significant risk" and at risk of "failure.***"  They were not written to the Plaintiffs and, therefore, could not have been relied upon by them to

their detriment.   Those statements were not false and, in any event, constitute expressions of opinion that are not actionable.  *Infra* at Part II.D & III.B.2.

The Complaint alleges fraud and conspiracy claims based upon the continued listing of SJHSRI in the OCD after the 2014 Asset Sale.  The Complaint's own allegations and public documents prove that SJHSRI was operated in connection with the church, rendering the listing entirely proper.  The First Amendment also bars any attempt to second-guess that conclusion.  Finally, and again, representations about the OCD were not made to Plaintiffs.  *Infra* at Part II.E-F & III.A.

Plaintiffs' claims for civil liability based on violations of state and federal criminal law under R.I. Gen. Laws § 9-1-2 fail because the Plaintiffs' alleged injury was not caused "by reason of" the commission of any underlying crime allegedly committed by the Diocesan Defendants.  Moreover, the Complaint's attempt to attach § 9-1-2 civil liability based upon an alleged fraudulent filing with the Internal Revenue Service is preempted as a matter of law.  *Infra* at Part IV.

Plaintiffs' Complaint also fails to allege any, let alone legally sufficient, facts to establish a fiduciary relationship with the Diocesan Defendants, nor does it plead facts showing a breach of any such duty that could have possibly caused the alleged harm in this case.  *Infra* at Part V.

Finally, Plaintiffs' claims for relief under ERISA against the Diocesan Defendants are barred because Plaintiffs fundamentally seek monetary damages, which is unavailable against the Diocesan Defendants as a matter of law, and attempt to use equitable estoppel to modify the Plan's terms.  *Infra* at Part VI.

## JOINDER IN ARGUMENTS OF OTHER DEFENDANTS

*The PBGC is a necessary and indispensable party.*  The Diocesan Defendants join the arguments of Angell Pension Group ("Angell") and Prospect concerning the Pension Benefit Guaranty Corporation's ("PBGC") status as a necessary and indispensable party to these proceedings.  Assuming the Court agrees that the PBGC is an indispensable party, the Court should order Plaintiffs to join the PBGC in these proceedings and, to the extent joinder is either impossible or impracticable, dismiss this action.

*Plaintiffs' state law claims are preempted by ERISA.*  The Diocesan Defendants join the arguments of Angell and Prospect that Plaintiffs' state law claims should be dismissed as preempted in the event the Court concludes that the Plan is covered by ERISA.

*Plaintiffs fail to state a claim for "fraudulent scheme."*  The Diocesan Defendants join Angell's argument that Count VIII of the Complaint (Fraudulent Scheme) should be dismissed because "fraudulent scheme" is not an independent cause of action under Rhode Island law, but duplicative of Plaintiffs' fraud and conspiracy claims.  To the extent the Court determines that fraudulent scheme is an independent cause of action, it should be dismissed for the same reasons that Plaintiffs' fraud and conspiracy claims fail.  *See infra* at Parts I-III.

## STANDARD OF REVIEW

Angell's and Prospect's briefs adequately describe the standard of review on a Rule 12(b)(6) motion and the portions of those briefs discussing the standard are adopted here.  The Diocesan Defendants do wish to highlight one aspect of that standard.  Motions to dismiss may not only consider documents referenced or summarized in a complaint but may review those documents to determine whether the allegations regarding those documents are supported within them.  *See Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 17-24 (1st

Cir. 1998) (affirming the district court's grant of a motion to dismiss after considering a trust agreement referenced to and summarized in the complaint, but not attached therein, because the Court found that the agreement did not make the defendant a fiduciary to the plaintiff, as alleged in the complaint).

## ARGUMENT

### I.   THE COMPLAINT DOES NOT SET FORTH A PLAUSIBLE CAUSATION CLAIM FOR ANY ACTS OR OMISSIONS PRIOR TO THE GREAT RECESSION IN 2008

Plaintiffs' Complaint alleges nefarious conduct as far back as 1995.  For example, Plaintiffs allege that:

- "At various times during the period from 1995 to the present, SJHSRI did not fund the Plan in accordance with the requirements of ERISA and the recommendations of the Plan's actuaries, with the result that the Plan is grossly underfunded."  Compl. ¶ 65.

- "During the period from 1995 to the present, SJHSRI and the other entities and individuals administering the Plan and communicating with Plan participants never informed Plan participants that . . . the Plan was underfunded, or that the Plan was not being funded in accordance either with ERISA or the recommendations of SJHSRI's actuaries . . . ."[2]  Id. ¶ 66

Yet documents only selectively quoted in the Complaint demonstrate that from at least 2003 through 2008, actuaries consistently reported that the Plan was more than appropriately funded. See infra at Part I.  It remained so up until the stock market crash in September 2008.  This is not surprising.  The "Great Recession" of 2008 was the most serious economic crisis in this country since the Great Depression of the 1930s.  Eclectic Props. E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 998 n.6 (9th Cir. 2014) ("We take judicial notice of the recession in the U.S. economy from December 2007 to June 2009.");  See In re Irving Tanning Co., 555 B.R. 70, 85 n.11 (Bankr. D. Me. 2016) ("A more likely culprit was the unforeseen, intervening, and

---

[2] See also Compl. ¶¶ 213-218 (alleging that splitting the Plan in 1995 was improper or nefarious); id. ¶¶ 221-225 (alleging that the so-called "Exculpatory Provisions" in the Plans were improperly hidden from the Plan participants, both before the split of the plans in 1995 and thereafter); id. ¶¶ 227-235 (alleging that SJHSRI did not adhere to funding obligations for various years, including years pre-dating the 2008 crash).

devastating impact of the recession of late 2007 through 2009, about which several Defendants testified and of which I can take judicial notice.").

A.  **The Actuarial Reports**

The Diocesan Defendants do not have complete visibility into the condition of the Plan for all of the years predating the 2008 stock market crash.[3]  They do, however, have access to the Actuarial Reports posted on Plaintiff Receiver's Public webpage for the years 2003 through 2013.[4]  Three of those reports for 2006, 2007, and 2008 are referenced in the Complaint. Compl. ¶ 231(c) & (d).[5]  Other Actuarial Reports are attached to this memorandum as Exhibits as set forth in the footnote below.[6]

Also attached as Exhibit 9 is a chart that collects the following information from each of the Actuarial Reports posted on the Receiver's website: Minimum Contribution; Maximum Contribution; Market Value of Assets; Present Value of Accrued Benefits; Assets Minus Present Value of Accrued Benefits; Annual Return on Assets; and Assets Divided by Present Value of Accrued Benefits expressed as a percentage.  The key information from that chart for the years leading up to and including the Great Recession are summarized here:

---

[3] Specifically, the Diocesan Defendants are not in possession of any actuarial reports post-dating 1995, when the Plan split off on its own.  Compl. ¶¶ 216-217.

[4] The Actuarial Reports are posted at https://www.pierceatwood.com/receivership-filings-st-joseph-health-services-rhode-island-retirement-plan, under the heading:  "Public Data Associated with this Matter."

[5] Although the Complaint cites to it in paragraph 231, the Receiver has not posted the Actuarial Report as of July 1, 2008, for the Plan Year Ended June 30, 2009.  The link that purports to lead to the 2008 report instead leads to the Actuarial Report, as of July 1, 2009.  The Actuarial Report, as of July 1, 2009, contains various look backs and collections of information from the previous plan year (i.e. from July 1, 2008 to June 30, 2009).  *See* Ex. 5 at 2, App. B (Actuarial Report as of July 1, 2009, for the Plan Year ended June 30, 2010) ("2009 Actuarial Report").  The Diocesan Defendants have drawn their information concerning the period from July 1, 2008 to June 30, 2009, from Exhibit 5.

[6] Ex. 1 (Actuarial Report as of July 1, 2004, for the Plan Year Ended June 30, 2005); Ex. 2 (Actuarial Report as of July 1, 2005, for the Plan Year Ended June 30, 2006); Ex. 3 (Actuarial Report as of July 1, 2006, for the Plan Year Ended June 30, 2007) ("2006 Actuarial Report"); Ex. 4 (Actuarial Report as of July 1, 2007, for the Plan Year Ended June 30, 2008) ("2007 Actuarial Report"); Ex. 5 (2009 Actuarial Report); Ex. 6 (Actuarial Report as of July 1, 2010, for the Plan Year Ended June 30, 2011); Ex. 7 (Actuarial Report as of July 1, 2011, for the Plan Year Ended June 30, 2012); Ex. 8 (Actuarial Report as of July 1, 2012, for the Plan Year Ended June 30, 2013).

|  | 7/1/2009 | 7/1/2008 | 7/1/2007 | 7/1/2006 | 7/1/2005 | 7/1/2004 | 7/1/2003 |
|---|---|---|---|---|---|---|---|
| **Minimum Contribution** | $1,444,178 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Recommended Maximum Contribution** | $1,624,311 | $2,118,043 | $2,151,319 | $2,052,351 | $0 | $0 | $0 |
| **Market Value of Assets** | $78,260,116 | $104,417,252 | $114,718,822 | $102,323,479 | $94,892,973 | $89,475,173 | $80,687,937 |
| **Present Value of Accrued Benefits (PVAB)** | $94,770,770 | $88,272,495 | $82,413,392 | $76,100,377 | $71,820,978 | $66,950,823 | $60,221,708 |
| **Assets minus PVAB** | (16,510, 654) | $16,144,757 | $32,305,430 | $26,223,102 | $23,071,995 | $22,524,350 | $20,466,229 |
| **Annual Return on Assets** | -20.8% | -7.4% | 16.8% | 11.7% | 10.1% | 14.9% | N/A |
| **Assets/PVAB (%)** | 82.6% | 118.3% | 139.2% | 134.5% | 132.1% | 133.6% | 1.34% |

The data in these Actuarial Reports tells a very different story than the conclusory allegations in the Complaint.  The Plan's actuaries told SJHSRI for at least six consecutive years prior to the 2008 Crash—in 2003, 2004, 2005, 2006, 2007, and 2008[7]—that the Plan's assets exceeded its accumulated liabilities, and by a substantial margin.  SJHSRI's actuaries also reported that *they applied ERISA funding guidelines* to their analysis and declared, for each of the six years from July 1, 2003 to July 1, 2008, that no minimum contribution was required.[8]

The 2007 Actuarial Report and quoted at paragraph 231(c) of the Complaint, is illustrative.  Ex. 4.  This Report stated that the Total Value of Plan Assets as of July 1, 2007 were $114,718,822.  *Id.* at 3.  By comparison, the Report also declared that the "Actuarial present value of accumulated plan benefits as of the current valuation date" was $82,413,392.  *Id.* at 4.  Plan assets thus exceeded the present value of accrued benefits by more than $32,000,000.  *See id.* at 3-4.

The 2007 Actuarial Report also discussed "Recommended Funding Levels." Specifically, it declared:

> The recommended contribution is based on the Plan's Normal Cost plus an amortization of the Plan's unfunded liability.  If the plan is projected to have no unfunded liability at the end of the Plan Year then no contribution is

---

[7] *Supra* note 5 (concerning information for the plan year from July 1, 2008 to June 30, 2009).
[8] Ex. 1 (2004 Actuarial Report) at 1-3, 13-14, 16-17; Ex. 2 (2005 Actuarial Report) at 2, 11; Ex. 3 (2006 Actuarial Report) at 2, 11; Ex. 4 (2007 Actuarial Report) at 2, 11; Ex. 5 (2009 Actuarial Report) at 11 & App. B.

> recommended.  While the Plan is a church plan, and is not subject to the funding requirements of ERISA, the current funding policy follows the ERISA guidelines without regard to the current liability calculations.

*Id.* at 11.  Having declared that they were following ERISA's funding guidelines, the actuaries then set forth a series of calculations to determine the minimum and maximum recommended contribution.  *Id.* at 13 ("Development of Contributions").  The Report then declared that the minimum contribution was "$0."[9]  *Id.* at 2.

The 2006 Actuarial Report, also quoted at paragraph 231(c) of the Complaint, similarly reported "Total Value of Plan Assets" of $102,323,479, and the "Actuarial present value of accumulated plan benefits as of the current valuation date" was $76,100,377.  Ex. 3 at 3-4.  Again, Plan assets exceeded the present value of accrued benefits by $26,000,000.  *See id.*  The 2006 Report repeated the same reference to ERISA funding requirements and reported that the minimum contribution level for that year was "$0."  *Id.* at 2.

This pattern repeats in every Report posted on the Receiver's website predating the Great Recession of 2008.  *See* Exs. 1-5 (Actuarial Reports reflecting information from 2003-2008); *see also* Ex. 9.[10]  The assets of the Plan exceeded the present value of accrued benefits and the actuaries repeatedly reported that applying ERISA funding requirements resulted in a minimum contribution level of "0."  *See id.*; *see also* Ex. 9.

---

[9] When a defined plan is overfunded, an "employer may reduce or suspend his contributions."  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 440 (1999).

[10] The 2006 and 2007 Actuarial Reports cited in the Complaint establish that the actuaries were telling SJHSRI that the Plan was adequately funded and no contributions were required.  Case law in this jurisdiction makes clear that it is appropriate for the court to consider the entire array of such reports posted on the Receiver's website as matters of public record.  *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15-16 (1st Cir. 2003) ("For one thing, matters of public record are fair game in adjudicating Rule 12(b)(6) motions."); *see also Better Homes Realty, Inc. v. Watmore*, No. 3:16-cv-01607-BEN-MDD, 2017 WL 1400065, at *2 (S.D. Cal. Apr. 18, 2017) ("[T]he screenshots of searches run on the County's Fictitious Business Name Statement website, . . . are proper subjects of judicial notice because they are public records . . . .").

That reality changes drastically as a result of the Great Recession of 2008.  In 2008, the Plan's assets fell 7.4% in the run-up to the market collapse.  Ex. 5 at 2.  By 2009, those assets cratered still further by over 20%.  *Id.*  As a result, assets went from $114,718,822 in 2007 to $78,260,116 in 2009.  *Compare* Ex. 4 at 3 *with* Ex. 5 at 2.  By 2009, the actuarial present value of accumulated benefits exceeded Plan assets.  Ex. 5 at 3-4.  Unlike the Reports for the prior six years, the 2009 Actuarial Report recommended a minimum payment and also inserted a new line in the report, "Contribution to reach 100% funding level projected to the end of the plan year."[11]  *Id.* at 2.

Tellingly, the Complaint contains a section entitled, "Defendants Knew The Plan Was Underfunded."  Compl., ¶¶ 236-256.  Each and every one of the allegations in that section, however, reference facts ***post-dating*** the 2008 collapse.  Yet, the next few paragraphs of the Complaint purport to identify "Misrepresentations to Plan Participants" dating back to the 1970s, 1980s, and 1990s.  *See, e.g.*, *id.* ¶¶ 257-259, 266-270.  The Complaint also claims that "actuaries throughout the life of the Plan annually calculated the amount of money that SJHSRI should pay into the Plan" and further that "SJHSRI routinely disregarded their recommendations . . . with the result that the Plan became more and more underfunded over time."  *Id*. ¶ 271.

Nowhere does the Complaint reference, much less attempt to square those allegations with the recommendations or conclusions in the Actuarial Reports from 2003 through 2008.  Likewise, Plaintiffs do not try to explain how any alleged misconduct in the 1970s, 1980s and 1990s (which is denied) could have plausibly or causally been the source of their harm or damages, when the Plan had positive financial funding from at least 2003 through 2008.  Nor

---

[11] As discussed *supra* note 5, the Diocesan Defendants do not have access to the Actuarial Report for the Actuarial Valuation as of July 1, 2008.

could any such conduct be causally related to the Plan's financial condition in 2017 when SJHSRI petitioned the Plan into receivership.  *Id.* ¶ 56 (discussing receivership).

The Actuarial Reports selectively cited in the Complaint show that the Plan did not "become more and more underfunded over time."  *Id.* ¶ 271; *see* Ex. 9.  It was not underfunded until the stock market crash of 2008 crippled it, along with other businesses, and retirement plans all over the globe.  *See In re Irving Tanning Co.*, 555 B.R. at 85 n.11.

**B.  Any Causal Connection Between Acts Or Omission Prior To 2008 Was Broken Because There Were Many Intervening Years of Adequate Funding And The Great Recession Of 2008 Constitutes A Separate Intervening Cause**

Each and every allegation of wrongdoing predating the stock market crash of September 2008 must be dismissed.  To establish causation, Plaintiffs must link the defendants' alleged wrongdoing to their alleged harm, which in this case is an underfunded Plan.  "[I]t is only when the total amount of funding falls below the threshold level necessary to pay beneficiaries that beneficiaries' benefits are endangered."  *Hill v. Vanderbilt Capital Advisors, LLC*, 834 F. Supp. 2d 1228, 1255 (D.N.M. 2011).  Even if one assumes that the Diocesan Defendants were somehow involved in earlier missteps or misrepresentations, such conduct could not have caused any damages for two independent and dispositive reasons.

First, for at least 6 years, the Plan's assets outstripped the present value of the accrued benefits and no minimum contribution was required to maintain that status.  *See supra* at Part I.A.  The Plan was funded.[12]  *See id*.  As a result, the causal link between alleged earlier misrepresentations or decisions and any future impact on the retirement benefits that Plan

_____

[12] Even ERISA does not require that defined benefit plans maintain full funding every year.  Instead, ERISA permits plans to make contributions designed to address any underfunding issues over time.  29 U.S.C. § 1082(c); Angell's Mem. of Law in Supp. of its Mot. to Dismiss ("Angell Brief"), ECF No. 49-1, at 6.

participants might receive was broken.[13]  *See Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).

Second, alleged misconduct predating the 2008 Great Recession had nothing to do with any harm to Plaintiffs precisely because something else—global economic calamity—caused the Plan to become "underfunded."  *See Holmes*, 503 U.S. at 268 (providing that proximate cause demands "some direct relation between the injury asserted and the injurious conduct alleged").  As an intervening force, the Great Recession cut off any liability for the Diocesan Defendants for conduct prior to 2008.  *See In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 772 F. Supp. 2d 519, 543-44 (S.D.N.Y. 2011);  *In re Irving Tanning Co.*, 555 B.R. at 85 n.11; *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-43, 348 (2005) (affirming dismissal of a claim because other factors besides misrepresentations, such as changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, taken separately or together could account for lower price.).

This failure of causation is particularly critical to the claims against the Diocesan Defendants.  Plaintiffs, themselves, affirmatively aver that "[a]s of 2009, SJHSRI had taken over the administration of the SJHSRI Plan, and SJHSRI's Finance Committee was administering the Plan and making its investment decisions."  Compl. ¶ 77; *see id.* ¶¶ 86, 89.

Those portions of Counts III, VII, VIII, IX, XIX and XX that rely upon and incorporate allegations respecting conduct or alleged misrepresentations predating September 2008 should be dismissed.

---

[13] If Plaintiffs had filed this lawsuit in 2002, the case would have been dismissed as moot in 2003 because at that time the Plan was funded and Plaintiffs could not demonstrate any "actual and imminent" threat as required to show injury-in-fact.  *See Hill*, 834 F. Supp. 2d at 1255-56.

## II.   COUNT VII (FRAUD THROUGH INTENTIONAL MISREPRESENTATION AND OMISSION) MUST BE DISMISSED AGAINST THE DIOCESAN DEFENDANTS FOR FAILURE TO STATE A CLAIM

### A.   Count VII Must Be Dismissed For Improper and Conclusory Group Pleading That Lumped The Diocesan Defendants Together In Violation Rules 8(a) And 9(b)

The Complaint must be dismissed because it abounds with group pleading contrary to Fed. R. Civ. P. 8(a)(2) and 9(b).  "To fulfill the demands of notice pleading, 'a plaintiff cannot 'lump' multiple defendants together and must 'state clearly which defendant or defendants committed each of the alleged wrongful acts.''"  *Beta Grp., Inc. v. Steiker, Greenaple, & Croscut, P.C.*, No. 15-213 WES, 2018 WL 461097, at *1 (D.R.I. Jan. 18, 2018) (discussing prohibition of group pleading in context of Fed. R. Civ. P. 8) (internal citation omitted); *see Laurence v. Wall*, C.A. No. CA08-109 ML, 2010 WL 4137444, at *2 (D.R.I. Sept. 30, 2010) (same).

This standard is especially important for claims of fraud, which are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b).  "Where multiple defendants are involved, each person's role in the alleged fraud must be particularized in order to satisfy Rule 9(b)."  *Beta Grp., Inc.*, 2018 WL 461097, at *10 (internal quotation marks omitted); *see W. Reserve Life Assururance Co. of Ohio v. Caramadre*, 847 F. Supp. 2d 329, 343 (D.R.I. 2012); 2 Moore's Federal Practice § 9.03[1][f] (2012) ("[A] claimant usually may not group all wrongdoers together in a single set of allegations.  Rather, the claimant is required to make specific and separate allegations against each defendant.").

The allegations against the Diocesan Defendants are deficient precisely because Plaintiffs make their allegations against "the Diocesan Defendants," treating the three defendants as though they were one entity.  Lumping together RCB, DAC, and DSC as the "Diocesan

Defendants," and failing to distinguish which allegations pertain to which entity, is impermissible group pleading. *See Beta Grp., Inc.*, 2018 WL 461097, at *1, *10.

In identifying the parties at the beginning of the Complaint, Plaintiffs devote single paragraphs to each of RCB, DAC, and DSC.  Compl. ¶¶ 27-29.  In paragraph 30, Plaintiffs establish the defined term "Diocesan Defendants," and thereafter never again reference independently RCB.  One paragraph references DAC and DSC tangentially, *id.* ¶ 163.[14] Otherwise Plaintiffs only refer to the three "Diocesan Defendants" through the group term. There are zero descriptions of actions taken or statements made solely by RCB, DAC, and DSC. Conversely, the Plaintiffs refer to the "Diocesan Defendants" in at least 60 paragraphs and 9 different counts.[15]  The Complaint further lumps together the Diocesan Defendants with *all* of the other defendants in at least 19 other paragraphs and one other count.[16]

This is improper and the Complaint alleges no facts to excuse this failing.  For instance, the Complaint states that Bishop Tobin was an officer of RCB, DAC, and DSC, *id.* ¶¶ 27-29, but includes no other allegations that justify treating the three corporations as though they were one entity or that the conduct alleged was undertaken by Bishop Tobin as an officer of any of those three corporate entities.  Plaintiffs' pleading deficiencies are particularly critical here because so many of the allegations are phrased in general and conclusory terms, covering decades of conduct.  *See, e.g.*, *id.* ¶¶ 216-218, 228, 257-259.  The Complaint acknowledges that the role of the "Diocesan Defendants" changed dramatically over time to the point where "as of

---

[14] Paragraph 163 quotes a statement made by the Chancellor for the Diocese of Providence in the Providence Journal.  In parentheses, Plaintiffs mention that the Chancellor is an officer for DAC and DSC.  Compl. ¶ 163.
[15] Compl. ¶¶ 57, 67, 92, 93, 106, 108, 111, 112, 116, 128, 131, 141, 142, 143, 145, 146, 151, 152, 153, 155, 156, 157, 158, 159, 160, 161, 162, 164, 165, 166, 167, 169, 176, 179, 182, 185, 190, 191, 192, 194, 195, 196, 200, 202, 203, 204, 205, 206, 208, 209, 213, 216, 217, 218, 255, 256, 260, 309, 310, 311, Claims for Relief (Count III, VII, VIII, IX, XVI, XVII, XIX, XX, XXI) (referencing the "Diocesan Defendants").
[16] Compl. ¶¶ 129, 131, 137, 150, 157, 207, 224, 292, 295, 296, 297, 299, 300, 326, 352, 404, 406, 425, 428, Claim for Relief (Count IX) (referencing all defendants).

15

A

2009 SJHSRI had taken over the administration of the [Plan]."  *Id.* ¶ 77; *see also id.* ¶ 86-89.

Group pleading denies the Diocesan Defendants the protections of Fed. R. Civ. P. 8(a)(2) and

9(b) and the Complaint should be dismissed.  *See Beta Group, Inc.*, 2018 WL 461097, at \*1, \*10.

## B.  The Alleged Misrepresentations To Plan Participants In The 1970s-1990s Are Not Actionable

Plaintiffs allege that there were certain "Misrepresentations to Plan Participants"

in the 1970s through the 1990s.  Compl. ¶¶ 257-279.  The Diocesan Defendants dispute they

made these statements.  Leaving that aside for the moment, these statements are not actionable

for three reasons.  First, for the reasons set forth *supra* at Part I.B, none of Plaintiffs' statements

concerning the state of the Plan prior to the 2008 market crash could have caused Plaintiffs'

alleged harm.  *See Dura*, 544 U.S. at 342-43; *Bendaoud v. Hodgson*, 578 F. Supp. 2d 247, 270

(D. Mass. 2008)*.

Second, the alleged misrepresentations were not factually false and merely

conveyed an intent to fund the plan in a particular manner or make certain payments to Plan

beneficiaries in the future (i.e., merely statements to do a particular thing in the future, and thus

cannot be actionable misrepresentations).[17]  An alleged misrepresentation "'must relate to

something that is a fact at the time the assertion is made in order to be a misrepresentation.  Such

facts include past events as well as present circumstances but do not include future events.'"  *St.

Paul Fire & Marine Ins. Co. v. Russo Bros., Inc.*, 641 A.2d 1297, 1299 n.2  (R.I. 1994) (quoting

Restatement (Second) *Contracts* § 159, cmt c. at 428 (1981)).  "[T]he general rule is that mere

unfulfilled promises to do a particular thing in the future do not constitute fraud in and of

---

[17] The Diocesan Defendants adopt the argument in Angell Pension Group's Memorandum of Law In Support of Its Motion Dismiss ("Angell Brief"), ECF-49-1, at 23 n.17 (noting the absurdity in asserting statements referring to lifetime benefits are fraudulent when contained in Plan participant benefit statements, when such statements continue to be made in participant benefit statements issued by Plaintiff Receiver).

themselves." *Cote v. Aiello*, 148 A.3d 537, 548 (R.I. 2016) (internal quotation marks omitted) (holding that, because a company owner's "statements regarding [the company] always revolved around the *future* disposition of the company, . . . [they] therefore could not form the basis for a claim of fraud" (emphasis in original))).

For example, Plaintiffs allege that the Plan participants were provided booklets with information concerning the Plan. *E.g.*, Compl. ¶ 267.  The 1973 edition of this booklet stated:  "The Hospital will pay the entire cost of the Plan beginning January 1, 1973 – not only your pension but also all actuarial, legal and investment expenses incurred in the administration of the Plan."[18]  *Id*.  The Complaint fails to allege facts to indicate this statement was false or that SJHSRI did not pay such costs.  Additionally, documents referenced in the Complaint prove that the Plan was adequately funded through 2008.  *See* Ex. 9; *supra* at Part I.A.

Third, Plaintiffs have not alleged any facts sufficient to establish that there was not an intent to keep promises made to the pensioners in the 1970s, 1980s, or 1990s when those alleged promises were made.  *See In re DeRosa*, 103 B.R. 382, 386 (Bankr. D.R.I. 1989). Although the Complaint is rife with alleged misrepresentations from the 1970s through 2008, it never once references the status of the Plan's funding during that entire time period.  The Receiver has records containing that data at least through 1995 because they were produced in response to a subpoena months ago.  Had they been referenced in the Complaint, the Actuarial Reports for the Plan show consistent surplus funding through 1995.  While the Court cannot consider the content of those documents on a motion to dismiss because they were not referenced

---

[18] The allegations set forth in Paragraphs 257-279 of the Complaint do not sufficiently differentiate among the defendants, and the Diocesan Defendants cannot decipher which statements, if any, Plaintiffs attribute directly to them.  The one cited here, for example, references a statement made by "the Hospital."  Compl. ¶ 267.  To the extent Plaintiffs allege any such representations were made by the Diocesan Defendants, when these statements were made and by whom are important for reasons set forth herein.

in the Complaint, it can consider that the Complaint pleads no facts about the Plan's funding when alleged promises were made decades ago. Indeed, no specific allegations of underfunding in the Complaint predate 2009. Compl. ¶¶ 236-256. Without those averments, any fraud claims based on facts before 2009 must be dismissed.

C. **Any Alleged Reliance On Any Alleged Misrepresentations Of Fact (Of Which There Were None) Respecting The Alleged "Quid Pro Quo" In The 2014 Asset Sale Was Not Justifiable As A Matter Of Law Because Plaintiffs (And Regulators) Had Notice Of The Key Facts Alleged Against The Diocesan Defendants**

1. *The Alleged "Quid Pro Quo" Scheme*

The Complaint describes a scheme in which the Diocesan Defendants allegedly plotted with other defendants to surreptitiously isolate and abandon SJHSRI's unfunded pension liability to a surviving SJHSRI shell entity that would have no operating assets. Compl. ¶¶ 116-160. The allegations are as follows: At the time of the 2014 Asset Sale, "all of the defendants knew" that the Plan was underfunded. *See, e.g., id.* ¶ 150. All of SJHSRI's assets would be transferred to a new separate company. *Id.* ¶¶ 57, 150, 156. The Plan would be left alone without any operating assets and receive "*only*" an *additional* $14 million. *Id.* ¶ 149. The Diocesan Defendants would agree to continue to maintain SJHSRI in the OCD and therefore the Plan could continue as a church plan, which meant that ERISA would not apply. *Id.* ¶¶ 155-156. In return, the Diocesan Defendants would receive Catholicity covenants that would apply to both "New" Our Lady of Fatima Hospital and "New" Roger Williams Hospital. *Id.* ¶ 155. Via this scheme, and unbeknownst to all but the schemers, the Plan participants would not have the protection of ERISA. *Id.* ¶ 156.

Plaintiffs conflate whether this scheme, or various parts of it, constitute fraud, conspiracy, or aiding and abetting on the part of the Diocesan Defendants. Accordingly, this section of the brief will examine each component of this so-called "plot" in turn and demonstrate

18

that each and every such component was revealed to the regulators, and thus the world, in the Change in Effective Control application ("CEC Application") provided to the regulators at the time of the proposed transaction.  *Infra* at Part II.C.1.i-iv.  These facts—all of them—were disclosed and public, explicitly and in several different locations.  *Id.*  Even more bizarrely (in the context of an alleged fraud or illicit conspiracy) several of them were expressly identified to the regulators, and thus the world, as the very problem driving the transaction *and* the solution to those problems.  *Id.*  Viewed in this context, the alleged fraud or conspiracy is beyond implausible, it is absurd and belied by completely legal acts and public disclosure, and more plausibly understood to have legitimate purposes.  *Stubbs v. Taft*, 149 A.2d 706, 708-09 (R.I. 1959); *see Precision Assoc., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-00052(JG)(VVP), 2015 WL 4987751, at *5 (E.D.N.Y. Aug. 19, 2015).

Further, it is axiomatic that a plaintiff cannot establish reasonable reliance on a false statement or "undisclosed" fact if the plaintiff knows the very fact he/she claims the defendant failed to disclose—or if the fact is made obvious to him/her.  *See* Restatement (Second) Torts § 541 ("The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.").  Accordingly, it is a defense to a fraud claim "that the complainant had knowledge, actual or constructive, of the actual facts[.]"[19] 37 Am. Jur. 2d *Fraud & Deceit* § 309 (2018).

---

[19] In Rhode Island, "[c]onstructive notice" ordinarily means that a person "should be held to have knowledge of a certain fact because he knows other facts from which it is concluded that he actually knew, or ought to have known, the fact in question.  Constructive notice also exists whenever it is shown that reasonable diligence would have produced actual notice."  *Conti v. Governor Dyer Coop. Mkt., Inc.*, No. 83-4400, 1986 WL 716034, at *2 (R.I. Super. Ct. May 27, 1986) (internal quotation marks omitted).

i.  No One Hid That The Plan Was Underfunded In 2014;
    Rather It Was Public Knowledge That The Plan Was At Risk
    And That Risk Was A Key Driver Behind The 2014 Asset Sale

Any suggestion that the unfunded status of the Plan[20] was hidden from the public

or regulators fails when juxtaposed with the public record.  The response to the very first

question in the CEC Application[21] submitted by Prospect Medical Holdings, Inc. to the

Department of Health, states as follows:

> Based on operating revenue alone, the combined [CCCB] hospital systems have
> reduced operating losses to approximately $3M per year. Although a significant
> improvement, these losses cannot be sustained.  Furthermore, although sufficient
> capital expenditures have been made to the facilities, the physical plants at the
> Existing Hospitals are aging and need upgrading.
>
> ***Of additional concern are pension costs (this same issue is impacting hospitals
> throughout the country).  If pension losses are taken into consideration, the
> [CCCB] system will, over the long term, incur significant losses***.

Ex. 10 at 2 (Excerpted CEC Application) (emphasis added); *see* Compl. ¶¶ 300, 409(f)

(referencing application to Department of Health).

Other references to Plan deficits abound in the CEC Application.  For example,

the CEC Application attaches the Asset Purchase Agreement ("APA") between Prospect and

CCCB, SJHSRI, and RWH.  Ex. 11 (APA).  Section 4.29 of the APA addresses the Seller's (i.e.,

CCCB, SJHSRI, and RWH's) solvency and states that it is not insolvent "***[a]fter exclusion of

Liabilities associated with the Retirement Plan due to their uncertainty of amount***[.]"  Ex. 11 §

4.29 (PCEC000044) (emphasis added); *see* Compl. ¶ 426.

---

[20] Compl. ¶¶ 259(b), 283, 311, 338.
[21] The complete Change in Effective Control Application is available through the Rhode Island Department of
Health's website at https://drive.google.com/file/d/0B9lx-sHDAL9qczFyRkVfTmpoRVk/view.

The CEC Application also attached SJHSRI's financial statements for the years 2009 through 2013.[22]  That application is referenced in the Complaint and also are public record, susceptible to judicial notice.[23]  Each of those financial statements contains several pages of notes discussing the Plan.  Each shows a negative funding status for the Plan.  The year 2010 is illustrative.  It shows the "[f]unded status of the Plan" as ($51,004,155).  Ex. 12 at PCEC001543.  The figures set forth in the reports submitted to the regulators for the other years go from ($50,871,072) in 2009, *id.*, to ($92,962,281)[24] in 2013, Ex. 16 at PCEC001297.  All of this information was affirmatively disclosed to the regulators.

The Attorney General's Decision[25] approving the transaction under the Hospital Conversion Act establishes that everyone involved understood the issue.  Compl. ¶ 369; Ex. 17 (Attorney General's Decision).  It states that the CCCB hospital system was sustaining operating losses of approximately $3 million dollars per year, "not including pension losses."  Ex. 17 at 8.  After noting that these losses raised questions about the "continued viability" of the CCCB system, the Attorney General's Decision turned to a discussion of the Plan specifically:

> Of additional concern to [CCCB] is its pension funding (an issue that is impacting many hospitals around the country).  If pension losses are taken into consideration, in fiscal year 2012, the [CCCB] system sustained losses of over $8 million dollars which are increasing without additional contributions.  Such losses cannot be sustained by [CCCB].

---

[22] Ex. 12 (Excerpted 2009-2010 Financial Statements); Ex. 13 (Excerpted 2010 Government Auditors' Reports); Ex. 14 (Excerpted 2010-2011 Financial Statements); Ex. 15 (Excerpted 2011-2012 Financial Statements); Ex. 16 (2012-2013 Financial Statements).

[23] *In re Colonial Mortg. Bankers Corp.*, 324 F.3d at 15-16 ((discussing the consideration of "matters susceptible to judicial notice" on a motion to dismiss and recognizing "the hoary tenet that a court 'may look to matters of public record in deciding a Rule 12(b)(6) motion'") (citation omitted)).

[24] The valuations in the financial statements are pursuant to accounting principles and not the actuarial standards applied in ERISA or by actuaries and used in the Actuarial Reports discussed *supra* at Part I.

[25] The Attorney General's decision is referenced in the Complaint.  Compl. ¶ 369.  It is also available on the Attorney General's website at http://www.riag.ri.gov/documents/5-16-14AGFinalDecision.pdf.

*Id.* at 9.  There can be no doubt that the regulators were told and understood that the Plan was losing significant amounts of money each year—unsustainable losses that exceeded $5 million annually.  *See id.* at 8-9 (discussing $3 million in losses to CCCB that grew in excess of $8 million when pension losses were considered).

There was, in short, no fraudulent statements or conspiracy to hide that the Plan had serious funding issues.  There was, rather, consensus amongst various constituencies that the CCCB system as a whole and the Plan, in particular, were in jeopardy and something needed to be done to help them.  *See id.* at 8-9.

Nor was there any misapprehension or conspiracy to hide the amount of money that was going to be contributed to the Plan or that this figure would not bring the Plan to full funding.  The $14 million contribution was discussed in the Attorney General's Decision.  Ex. 17 at 21.  Likewise, there was no misapprehension that, even after the contribution of $14 million to the Plan, it would not be one hundred percent funded.  Compl. ¶ 327-330, 337-339.  The parties to the transaction had made plans for further contributions to the Plan.  *Id.*  Indeed, part of the regulatory process was directed at establishing mechanisms for further/additional funding.  *Id.* ¶¶ 339, 369-370.

Further, as a matter of law, the Court must reject the Complaint's conclusory, oft-repeated predicate that all Plan participants had no idea that the Plan was underfunded.  *See, e.g.*, *Id*. ¶¶ 56, 66.  First, as mentioned above, the pension issue was raised in the very first answer in the CEC Application.  Ex. 10 at 2.  Second, the pension deficit and what was to be done with the pension deficit was discussed at various public hearings, as referenced in the Complaint.  *See, e.g.*, Compl. ¶¶ 327, 333, 352.  Third, many pensioners were surely aware that

there were issues in the funding of their pension because it had been frozen on four separate occasions leading up to the 2014 transaction.[26]

      ii.    The Structure Of The 2014 Asset Sale, Including That Prospect Wasn't Be Assuming Any Liabilities For The Plan, Was Disclosed And Public

The Complaint also alleges that the Diocesan Defendants conspired with other defendants to strip SJHSRI of all of its assets and leave the Plan's liability with SJHSRI after the 2014 Asset Sale. Compl. ¶¶ 156-157. As a threshold matter, the structure of the 2014 Asset Sale was a secret to no one. The very name of the governing agreement—Asset Purchase Agreement—screams out that this transaction is an ***asset purchase***. *See generally* Ex. 11. The structure of this deal was not lost on the regulators. *See* Ex. 17 at 20. The Attorney General's Decision declares: "As described in the Asset Purchase Agreement (APA), Prospect Medical Holdings (Prospect) through a series of subsidiaries, is acquiring substantially all of the assets of [CCCB]." *Id.*

Likewise, the APA declares that the liability for the Plan will remain with SJHSRI. Section 2.14 of the APA states:

> 2.4 Excluded Liabilities of Sellers. Notwithstanding anything herein to the contrary, the Company and/or the Company Subsidiaries are assuming only the Assumed Liabilities and are not assuming and shall not become liable for the payment or performance of any other Liability of Sellers (collectively, the "Excluded Liabilities"). The Excluded Liabilities are and shall remain Liabilities of the Sellers. Without limiting the generality of the foregoing, the term "Excluded Liabilities" includes any Liability: … (iii) that is described on Schedule 2.4 . . . .

Ex. 11 at PCEC000017.

---

[26] The notes to the SJHSRI financial statements for September 30, 2011 and 2010, submitted as part of the 2014 CEC Application, document pension freezes on October 1, 2007, October 1, 2008, September 30, 2009 and September 30, 2011. Ex. 14 at PCEC001507; *see* Compl. ¶¶ 78, 288, 298 (discussing pension freezes).

23

Schedule 2.4, "Certain Excluded Liabilities," explicitly lists **"All Liabilities related to the Retirement Plan."** *Id.* at PCEC000274 (emphasis added).  If the written description were not enough, the CEC Application contained a graphic representation of the end result of the contemplated transaction.  It showed SJHSRI off by itself, with the words "Church Plan" written underneath it:



Ex. 24 (Organizational chart concerning corporate structure following the 2014 Asset Sale) (red arrow not in original).[27]

  iii. <u>The Plan's Status And Intended Future As A Church Plan Were Disclosed</u>

The Complaint rails that the intent in this transaction was that the Plan would remain a church plan not subject to ERISA.  Compl. ¶¶ 57(d)(ii), 66, 130, 138, 141, 155-56, 307,

---

[27] The Diocesan Defendants had no role in drafting Exhibit 24 and reserve the right to contest its accuracy.  Compl. 205.

404.  It claims that defendants concealed this.  *Id.* ¶¶ 66, 276, 307.  This is untrue, as

demonstrated by documents referenced in the Complaint—documents submitted to state

regulators.  For example, Section 4.17(i) of the APA states clearly that "The Retirement Plan is a

Church Plan."  Ex. 11 at PCEC000037.  "Retirement Plan" is a defined term in the APA.  *Id.* at

PCEC000106. "Retirement Plan" means "the St. Joseph Health Services of Rhode Island

Retirement Plan."  *Id.*

The financial statements submitted with the CEC Application also explicitly

identify it as a "church plan."  Ex. 15 at PCEC001474.  The Notes to the Consolidated Financial

Statements for September 30, 2012 and 2011 state:

> SJHSRI has a defined benefit pension plan which covers substantially all of the
> SJHSRI's employees.  The Plan is a ***non-electing church plan*** under the Internal
> Revenue Service and is not subject to the participation, vesting, and provisions of
> the Internal Revenue Service code.

*Id.* (emphasis added).

Plaintiffs also allege that the Diocesan Defendants (who had nothing to do with

the process) improperly listed SJHSRI in the Official Catholic Directory ("OCD") as part of this

"quid pro quo" arrangement.  Compl. ¶ 155.  Treatment of the OCD and the deficiencies of

Plaintiffs' claims related thereto are discussed *infra* at Part II.F & III.A.

iv.   The Continued Catholicity Of The Hospitals Following
The 2014 Asset Sale In No Way Demonstrates A Conspiracy

The fact that the new entities created as part of the 2014 Asset Sale would be

subject to Catholicity requirements was disclosed in the APA, Ex. 11 at PCEC000075-

PCEC000076, PCEC000263, and referenced in the Attorney General's Decision.  Ex. 17 at 45.

The Complaint's absurd allegation is that ***if*** the Diocesan Defendants wanted Our Lady of Fatima

to remain Catholic ***then*** they would have to knuckle under to the illicit demands of the other

defendants.  Compl. ¶¶ 155-156.  Our Lady of Fatima was already under contractual restrictions to comply with various Catholicity requirements.  *See id.* ¶ 152 ("These 'Catholic identity covenants' included essentially all the rights which the Diocesan Defendants were entitled to exercise over Old Fatima Hospital.").  The Diocesan Defendants did not need to join some alleged fraudulent scheme to obtain the benefit of that bargain.  Ex. 19 at Ex. A (Articles of Amendment to Articles of Incorporation of SJHSRI).  They already had it and saying no to the deal would not divest them of those rights.  *See id.*  Certainly, this is no basis for a conspiracy claim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564-70 (2007); *Stubbs*, 142 A.2d at 708-09.

2. *The Disclosures Render Any Reliance Unreasonable As A Matter Of Law*

The public record reveals that all relevant facts concerning the funding and church plan status of the Plan, the structure of the 2014 Asset Sale, and the continued Catholicity of the hospitals were disclosed to state regulators and the public, including Plan participants.  "The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knew that it is false or its falsity is obvious to him."  Restatement (Second) Torts § 541.  This is true even if the complainant does not have actual knowledge but reasonable diligence would have produced actual notice.  *See, e.g.*, *Soft Stuff Distribs., Inc. v. Ryder Truck Rental, Inc.*, No. CCB-11-2605, 2012 WL 3111679, at *5 (D. Md. July 30, 2012) (finding fraud allegations were not sufficient to support reasonable reliance where nothing stopped plaintiff from investigating the allegedly fraudulent practice, plaintiff had at least constructive knowledge of the fact that defendant was employing the allegedly fraudulent practice, and company could have clarified the nature of the allegedly fraudulent practice); *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 982 F. Supp. 388, 397-98 (E.D. La. 1997) (granting summary judgment on fraud claim for defendant where there was no genuine dispute of material fact as to whether plaintiffs could have discovered the

26

alleged fraud through the exercise of reasonable diligence as sufficient information had been disseminated to the media concerning the product's defect to "excite plaintiffs' attention"). Accordingly, the Complaint fails to state a claim for fraud or conspiracy as regards the claims discussed herein.

### D. The Plaintiffs' Claim For Fraud Fails Because The Alleged Statements In The Vatican And Health <u>Services Council Letters Were Not False And Were Opinions</u>

In support of their fraud claims, Plaintiffs point to two letters.  Compl. ¶¶ 172-182, 309.  In those letters, Bishop Tobin affirmatively declared that the Plan was at "***significant risk***" and in danger of "***failure,***" which would be "***catastrophic***."  *See* Compl.  ¶¶ 174, 309 (emphases added).

The first letter, dated September 27, 2013, was directed to the Vatican ("Vatican Letter").  *Id.* ¶ 171-72.  That letter stated:

> "'[W]ithout [approval of] this transaction, it appears that a consistent Catholic healthcare presence in the Diocese of Providence would be gravely compromised, and ***the financial future for employees-beneficiaries of the pension plan would be at significant risk.***  I believe that the APA [Asset Purchase Agreement] between CharterCARE and Prospect will help avoid ***the catastrophic implications of such a failure***, and at the same time, enhance the quality of care at SJHSRI/Our Lady of Fatima.'"

*Id.* ¶ 174 (emphasis added).[28]

Bishop Tobin's second letter was to the Health Services Council ("HSC"), dated February 14, 2014 ("HSC Letter").  Plaintiffs allege that the Bishop wrote the HSC Letter, "pursuant to the conspiracy in which the Diocesan Defendants were participating with all of the

---

[28] Plaintiffs attempt to make much of the claim that SJHSRI's counsel suggested revisions to the draft Vatican Letter "*deleting* a reference to 'spiraling and gaping' liability, and substitut[ing] 'significant' liability[.]"  *Id.* ¶ 177.  However, none of the other above-quoted statements were changed.  *Id.* ¶ 178.  For reasons discussed *infra* at Part II.D & III.B.2, these changes made absolutely no difference to the analysis of Plaintiffs' fraud and conspiracy claims as regards these letters.

other Defendants to relieve Fatima Hospital of any liability under the Plan at the expense of the Plan participants . . . ." *Id.* ¶ 309.  The HSC Letter, like the Vatican Letter, stated that, "[w]ithout this transaction, . . . **the financial future for employee-beneficiaries of the pension plan would be at a significant risk.  I believe that this partnership will help avoid the catastrophic implications of such a failure** . . . ." *Id.*  (emphasis in complaint).

Plaintiffs allege that the HSC Letter contains misrepresentations because the Bishop knew that "the Plan was at much more than a 'significant risk'", Compl. ¶ 311, and that the Diocesan Defendants "knew that 'the proposed partnership between CharterCARE Health Partners and Prospect Medical Holdings' made pension failure much more likely, and, indeed, a virtual certainty . . . ." *Id.* ¶ 310.  They make similar allegations concerning the Vatican Letter. *Id.* ¶ 179.

*On their face, the letters are far more consistent with a lawful purpose*:  The Bishop was deeply interested in doing what he could to help a community hospital system that all agree was suffering unsustainable losses.  *See* Ex. 25 at 1-2 (HSC Letter); Ex. 21 at 1 (Vatican Letter).  He wrote a letter to a governmental authority and the Vatican in support of a transaction that was described to him—in a presentation that tracked information also provided to the regulators[29]—as the last best hope of saving that floundering hospital system.  *See* Ex. 25 at 1-2; Ex. 21 at 1-2.  He did so to help avoid the catastrophic impact closing that system would have on the system's employees, patients and especially the underserved members of the community that the system served.  *See* Ex. 25 at 1-2; Ex. 21 at 2.

*The statements in these letters are not false.*  Plaintiffs do not dispute that there was a serious risk of failure of the Plan or CCCB's system or that such failure would have been

---

[29] *Compare* Ex. 23 (September 12, 2013 "Overview of Strategic Transaction" Presentation) *with* Ex. 10 at 2 and *supra* at Part II.C.

catastrophic.  *See, e.g.*, Compl. ¶ 57(b) (describing Plan as "grossly underfunded").

Accordingly, Bishop Tobin's statements cannot be the basis for a fraud claim.  *See Laccinole v.*

*Assad*, C.A. No. 14-404 S, 2016 WL 868511 at *8 (D.R.I. Mar. 7, 2016). ("To establish a *prima*

*facie* case of fraud in Rhode Island, a plaintiff must allege . . . the defendant made a **false**

**representation**" (emphasis added)).

       *The two letters cannot form the basis of a fraud claim because the alleged false*

*statements are **opinions***.  Indeed, after quoting the language from the HSC Letter discussed

above, Compl. ¶ 309, the Complaint literally alleges that the Bishop should have formed *a*

***different opinion*** based upon what it claims he knew and the information that it claims he had.

*Compare* Compl. ¶ 309 *with id.* ¶ 310.  Paragraph 310 of the Complaint states:

> However, as explained above, rather than believing the 2014 Asset Sale would
> help avoid pension failure, Bishop Tobin personally, and, through him and other
> officials, the Diocesan Defendants, knew that "the proposed partnership between
> CharterCARE Health Partners and Prospect Medical Holdings" made pension
> failure much more likely, and, indeed, a virtual certainty, absent unanticipated and
> extremely improbable investment gains, because it would cut the link between the
> Plan and an operating hospital, and would transfer assets from SJHSRI that
> otherwise would be available to help fund the Plan.

Compl. ¶ 310; *see id.* ¶¶ 180-182, 311 (making similar assertions concerning Vatican Letter).

This paragraph is astonishing on many levels.  First, every fact in paragraph 310 from which

Plaintiffs assert that the Bishop should have known that "pension failure" was "a virtual

certainty" was also known to the public and the regulators.  *See supra* at Part II.C.  How then,

can the Bishop—or more accurately the Diocesan Defendants—be held liable for fraud or

conspiracy for failing to form what Plaintiffs (now) consider to be the appropriate conclusions,

when regulators and experts with training and expertise ultimately reached the same conclusion

and approved the transaction?  *See, e.g.*, Ex. 17 at 20, 53 (discussing Attorney General's

retention of experts).  This claim is outrageous.

29

Second, the Complaint is alleging that the Bishop's ***opinion*** was wrong.  *Id.*  An

opinion—whether right or wrong or modified by a sufficiently severe adjective in the eyes of the

Plaintiffs or their counsel now (in hindsight)—does not a fraud claim make.  *See St. Paul Fire &*

*Marine Ins. Co.*, 641 A.2d at 1299 n.2 ("The general rule is that a misrepresentation should take

the form of an expression of fact and not the offering of an opinion or estimate."); *see also*

*Siemens Fin. Servs., Inc. v. Stonebridge Equip. Leasing, LLC*, 91 A.3d 817, 822 (R.I. 2014)

(Accordingly, "matter[s] of opinion, estimate, or judgment may not be the subject of

misrepresentation claims" (internal quotation omitted)).[30]  Neither does disagreement about the

speaker having reached the wrong opinion.

Third, the opinions in these paragraphs are actually predictions about future

events and what is likely or unlikely to happen.  *See* Compl. ¶ 309; *see id.* ¶¶ 172-182

(discussing similar language in Vatican Letter).  As a matter of law, a fraud claim based on an

opinion on how future events will play out cannot constitute a misrepresentation.  *Siemens*, 91

A.3d at 822.  An alleged misrepresentation "'must relate to something that is a fact at the time

the assertion is made in order to be a misrepresentation.  Such facts include past events as well as

present circumstances but do not include future events.'"  *St. Paul Fire & Marine Ins. Co.*, 641

A.2d at 1299 fn. 2 (quoting Restatement (Second) *Contracts* § 159, comment c. at 428 (1981));

*see also Hogan v. E. Enter./Boston Gas*, 165 F. Supp. 2d 55, 64-65 (D. Mass. 2001) (holding that

statement about whether an office would remain open and expressing doubt as to the employer's

future financial resources were "simply not factually verifiable" at the time they were made, and

the employee could not have reasonably relied on them); *Seimans*, 91 A.3d at 819-20, 823

(rejecting claim based upon equipment lessor's proposed business plan because "any forecasts of

---

[30] Although the Rhode Island Supreme Court applied Massachusetts law in *St. Paul Fire & Marine Ins. Co.*, it found
that there was no conflict between Massachusetts and Rhode Island law on this issue.  641 A.2d at 1299 n.2.

the future performance of the imaging center" constituted an opinion, estimate or judgment and could not "form the basis of a misrepresentation claim or defense").[31]

   *Moreover, Plaintiffs' allegation that the Diocesan Defendants misrepresented the extent to which the Plan was underfunded by changing the description of the plan's liability from "spiraling and gaping" to "significant" in the final version of the Vatican Letter is irrelevant.* *See* Compl. ¶¶ 173, 177, 255, 311.  Bishop Tobin's statements that the Plan was at a "significant" risk *indisputably and strongly* declares that an important problem exists.  *See id.* The Complaint's attempt to base a fraud or conspiracy claim on the Bishop's choice of adjectives must be rejected.  *Id.* ¶¶ 177-179, 310.  These types of statements simply cannot be the basis for a fraud claim as a matter of law.  *See Poley v. Bender,* 347 P.2d 696, 699 (Ariz. 1959) (stating that "[i]t is obvious that the indefinite adjectives 'good', 'sufficient', and 'proper', are . . . too vague to be taken as anything other than reflections of the opinion of the speaker"); *see also Hogan*, 165 F. Supp. 2d at 65 (stating that, "[w]ith the use of the indefinite term 'much,' there is no way the . . . the truth of that statement" could be verified").

### E.  The Alleged Misrepresentations By The Diocesan Defendants To The Vatican, HSC, USCCB, OCD And IRS Could Not Have Been The Cause Of Any Harm Suffered By Plaintiffs As A Matter of Law Because They Were Not Made To Plaintiffs And Plaintiffs Did Not Rely On Them

   The Complaint fails to state a claim for fraud because the alleged misrepresentations to *the Vatican, the HSC, the U.S. Conference of Catholic Bishops* ("USCCB")*, the OCD, and the IRS*[32] could not have been the cause of any harm suffered by

---

[31] The *Siemens* Court applied Massachusetts law, but noted that it did "not perceive a conflict" with Rhode Island law.  *See* 91 A.3d at 820 n.4.

[32] Plaintiffs' specific allegations concerning the Diocesan Defendants' alleged false statements regarding the OCD are discussed in detail *infra* at Part II.F.

*Plaintiffs* as a matter of law.[33]  None of the alleged misrepresentations were made to Plaintiffs or the Plan participants, and Plaintiffs have not alleged that they were the intended recipients of the information conveyed by the various Diocesan Defendants to the Vatican, the HSC, the USCCB, the OCD or the IRS.  Furthermore, Plaintiffs have not alleged that they actually relied on any of these statements.

1. *Plaintiffs Do Not Allege That They Were The*
   <u>*Intended Recipients Of Purported Misrepresentations*</u>

Fraud claims based on statements to persons other than the plaintiff claiming to have been defrauded generally do not lie, unless the plaintiff was an intended recipient of the misrepresentation.  *Lifespan/Physicians Prof'l Servs. Org., Inc. v. Combined Ins. Co. of Am.*, 345 F. Supp. 2d 214, 226 (D.R.I. 2004) (noting that a "third party . . . *who is intended as a recipient* of the information and who foreseeably relies on such information is entitled to recovery if he or she does indeed rely.'" (emphasis added and internal quotation omitted)).[34]

Plaintiffs have not alleged any facts to show that the alleged misrepresentations attributed to the Diocesan Defendants were received by and intended to deceive Plaintiffs. Plaintiffs allege that the "misrepresentations and omissions" in the Vatican Letter "were included because Defendants SJHSRI, RWH, CCCB, and the Diocesan Defendants, ***all understood that Vatican approval was required for the transaction to proceed, and knew or were told that that the Vatican must approve specifically the 'pension restructuring.'***"  Compl. ¶ 182 (emphasis added).  Thus, Plaintiffs are alleging the Diocesan Defendants intended to deceive the ***Vatican***—

---

[33] Compl. ¶¶ 172-182 (Vatican Letter); *id.* ¶¶ 309-310 (HSC Letter); *id.* ¶¶ 194-196 (representations to the USCCB and OCD); *id.* ¶¶ 200-204 (representations to the OCD and IRS).

[34] *See also* 37 Am. Jur. 2d *Fraud & Deceit* § 281 ("Particular rules, however, may limit who is entitled to relief . . . such as . . . that the party seeking redress be the party the fraud was intended to deceive.[] That is, the fraud must have been directed toward the person bringing the fraud claim in the sense that this was the person intended to act upon it.").

not Plaintiffs.  *See id.*

Similarly, with respect to the HSC Letter, Plaintiffs allege that, "pursuant to the conspiracy in which the Diocesan Defendants were participating with all of the other Defendants to relieve Fatima Hospital of any liability under the Plan at the expense of the Plan participants, ***Bishop Tobin personally wrote to the Health Services Council to lobby in favor*** of regulatory approval of the for-profit hospital conversion[.]"  *Id.* ¶ 309 (emphasis added).  Again, Plaintiffs are alleging intent to deceive the ***HSC***—not Plaintiffs.  *Id.*

This is also true with respect to the alleged false statements to the USCCB, OCD and IRS.  Plaintiffs allege that the Diocesan Defendants "knew that continuing to list SJHSRI in the Catholic Directory was misrepresenting ***to the U.S. Conference of Bishops, the editors of the Catholic Directory, and the IRS***, that SJHSRI continued to be 'operated, supervised, or controlled by or in connection with the Roman Catholic Church.'"  *Id.* ¶ 194 (emphasis added).  Plaintiffs further allege that, "[t]hese false claims were material in that they ***hindered or had the potential for hindering the IRS's efforts*** to monitor and verify Defendant SJHSRI's tax liability."  *Id.* ¶ 201.  Plaintiffs do not, however, allege that they were the intended recipients of these purported misrepresentations.

Nowhere in the Complaint do Plaintiffs allege that the Diocesan Defendants intended to deceive Plaintiffs or Plan participants with any of these statements to third-parties.  *See Gorbey*, 849 F. Supp. 2d at 166.  Accordingly, their fraud claims should be dismissed.

2.   *Plaintiffs Fail To Allege Reliance On The Statements To Third-Parties*

Moreover, Plaintiffs have failed to allege that they or Plan Participants knew of, let alone relied on, the purported statements to the Vatican, HSC, USCCB, OCD, or IRS.  Failing to do so is fatal to Plaintiffs' fraud claim.  *See E. Providence Loan Co. v. Ernest*, 236 A.2d 639,

33

642 (R.I. 1968) ("It is also fundamental . . . that a plaintiff must present evidence which shows he or she was induced to act 'because of the reliance upon the alleged false representation."). *Gorbey ex. Rel. Maddox v. Am. Journal of Obstetrics & Gynecology*, 849 F. Supp. 2d 162, 166 (D. Mass. 2010), is particularly instructive.  There, the court denied the plaintiffs' motion to amend their complaint to add a claim for fraud.  *Id.*  The court reasoned: "Plaintiffs here do not allege that they relied or acted upon any alleged misrepresentation but rather that third parties so relied and acted which, in turn, resulted in plaintiffs' injury." *Id.* "Plaintiffs point to no case," the court added, "in support of a theory that third-party reliance on fraud is cognizable under Massachusetts law." *Id.*  Rhode Island law recognizes no such action either.[35]

### F.   The Listing Of SJHSRI In The Official Catholic Directory Was Proper And In Any Event Cannot Be Challenged In These Circumstances; Accordingly No Fraud Or Conspiracy Claim Can Be Based On That Inclusion

The Complaint alleges that the Diocesan Defendants agreed to maintain the Plan as a church plan by listing SJHSRI in the OCD.  Specifically, Plaintiffs claim that SJHSRI should not have appeared in the OCD because it was not "operated, supervised or controlled by or in connection with the Roman Catholic Church . . . ."  Compl. ¶ 71(c).  Plaintiffs cannot sustain Count VII on this ground because (1) SJHSRI was, in fact, supervised and controlled *in connection* with the Church and (2) Plaintiffs cannot challenge the sufficiency of the Diocesan Defendants' determination on this score as a matter of constitutional law.

---

[35] *See Siemens*, 91 A.3d at 820 n.4 (addressing fraud claim and observing, "we do not perceive a conflict between the relevant substantive law of Massachusetts, where defendants contend the misrepresentations were made, [or] Rhode Island, where the imaging center was located"); *St. Paul Fire & Marine Ins. Co.*, 641 A.2d at 1300 n.2 (applying Massachusetts fraud law, but noting that there was no conflict with Rhode Island law).

34

1.  *The Complaint's Allegations Regarding*
    *Listing a Subordinate Organization In The OCD*

Each year, the IRS issues a Group Ruling determination letter to the USCCB

pertaining to the group tax-exempt status of the USCCB and its subordinate organizations.  *Id.* ¶

102.  The IRS accepts listing of a subordinate organization in the OCD as confirmation that the

organization falls within the USCCB's group exemption.  *Id.* ¶ 104.  The Complaint alleges that

to be included under the USCCB group exemption letter the listed organization must be

"operated, supervised, or controlled by or in connection with the Roman Catholic Church . . . ."

*Id.* ¶ 103.  The Diocese of Providence is responsible for assessing the eligibility for OCD listing

within its geographic bounds.  *Id.* ¶ 106.

2.  *Count VII Fails Because Plaintiffs Acknowledge That SJHSRI Was*
    *Operated In Connection With The Diocese Of Providence And Plaintiffs*
    *Cannot Challenge The Sufficiency Of That Connection As A Matter of Law*

The Complaint fails to plausibly allege that the Diocesan Defendants' listing of

SJHSRI in the OCD was fraudulent due to a purported lack of connection between SJHSRI and

the Diocese of Providence.  Rather, based on records capable of judicial notice, documents

referenced in the Complaint, and Plaintiffs' allegations, the opposite is true.

The Complaint focuses on the purported lack of diocesan control over the

corporate governance of SJHSRI, Compl. ¶¶ 89-92, rather than the lack of a diocesan *connection*

in the operation of SJHSRI.  A connection, however, is all that is required according to the

USCCB's Group Ruling determination letter.  Ex. 18 at 2 (2017 Memo from USCCB) (providing

that the USCCB's Group Ruling determination letter from the IRS applies to "the agencies and

instrumentalities and educational, charitable, and religious institutions operated, supervised or

controlled by **or** *in connection* with the Roman Catholic Church in the United States . . . ."

(emphasis added)).  Although Plaintiffs assert that SJHSRI had no *connection* with the Diocese

of Providence, Compl. ¶¶ 159, they fail to plead sufficient facts to support the claim (and in fact plead sufficient facts establishing there was a connection).

       i.    <u>SJHSRI's Diocesan Connection Post-2014 Asset Sale</u>

Following the June 2014 Asset Sale, SJHSRI retained a tangible connection with the Roman Catholic Church and specifically, the Diocese of Providence. SJHSRI's amended articles of incorporation, dated January 4, 2010, provide that RCB is the Class B member of SJHSRI. Ex. 19 at Ex. A (Articles of Amendment to Articles of Incorporation of SJHSRI) ("The corporation [SJHSRI] shall have two classes of members . . . . The Class B member shall be the Roman Catholic Bishop of Providence, a body politic and corporation sole, or its designee."). These articles, as amended, are on file with the Rhode Island Secretary of State and remain extant. *Id.*

As Class B member, RCB possessed specific controls over the conduct of SJHSRI, even in wind-down, to prevent the diminishment of SJHSRI's Catholicity and its continued adherence to the USCCB's Ethical and Religious Directives for Catholic Health Care Services (the "ERDs"). *Id.* at Ex. A (Articles of Amendment). For example, RCB held veto power over "any amendment to the Articles of Incorporation, bylaws, or other governing documents of SJHSRI that adversely affected or diminished the Catholicity of the corporation or causes or permits" certain prohibited medical procedures such as abortion. *Id.* Likewise, RCB had authority to prohibit any amendment to SJHSRI's governing documents relating to the ERDs or "the performance of Prohibited Procedures [like abortion] at the corporation." *Id.* Accordingly, even after the 2014 Asset Sale, SJHSRI continued to be operated *in connection with* the Diocese of Providence. SJHSRI's listing in the OCD, therefore, was not fraudulent. *See Cote*, 148 A.3d at 548.

Plaintiffs try to sever this connection by referencing statements to the press by diocesan personnel following the petitioning of the Plan into receivership.  Compl. ¶¶ 163-164. For example, the Complaint quotes the following:

> "St. Joseph Health Services of Rhode Island is not a diocesan entity. The pension plan was adopted, sponsored, operated, managed and funded by SJHSRI, an independent corporation, and not by the Diocese of Providence. Changes over the last decade, including the formation of CharterCARE Health Partners, sharply reduced diocesan involvement in SJHSRI and the hospitals. And upon the 2014 transaction with Prospect, that involvement essentially ended."

*Id.* ¶ 163; *see id.* ¶ 164.  Such statements are easily squared with the continued ties between SJHSRI and the Church as a matter of law and corporate form.  From the perspective of managing the day-to-day business of SJHSRI and administering the Plan, the Church's role was admittedly quite limited to non-existent.  Likewise, RCB's right to enforce Catholicity and the ERDs, Ex. 19 at Ex. A, when SJHSRI no longer operated a hospital was less significant.  But this does not render meaningless the Church's continuing right to keep SJHSRI from using its resources in a manner that would diminish its Catholicity or its adherence to the ERDs.  The ERDs, for example, state: "Catholic health care institutions are not to provide abortion services, even based upon the principle of material cooperation."[36]  Ex. 20 at 18 (ERDs).    Thus, even though SJHSRI had ceased to operate a hospital, if as part of winding up its affairs, SJHSRI sought to change its governing documents to permit the use of corporate resources to support abortion providers, the Church could have stopped SJHSRI from doing so.  *See* Ex. 19 at Ex. A. Consequently, there was certainly a connection in the eyes of the Church and there was nothing,

---

[36] The ERDs provide:
> [C]ooperation is *material* if the one cooperating neither shares the wrongdoer's intention in performing the immoral act [in the example above, abortion] nor cooperates by directly participating in the act as a means to some other end, but rather contributes to the immoral activity in a way that is causally related but not essential to the immoral act itself."

Ex. 20 at 24 (emphasis in original).

therefore, false in the post-2014 Asset Sale listing of SJHSRI in the OCD.  *See id.*  Count VII

should be dismissed.  *See Cote*, 148 A.3d at 548; *see also Laccinole*, 2016 WL 868511 at *8.

Having disregarded these connections with SJHSRI, the Complaint goes on to

confuse the OCD listing inquiry with that for church plan qualification.  Compl. ¶¶ 71(c), 131,

142, 159, 204-205.  That is, Plaintiffs attempt to test the decision to list SJHSRI in the OCD

against the standard chosen by a federal appeals court for assessing whether an organization is

"controlled by or associated with a church" for the purposes of the church plan analysis.  *Id.* ¶

88.  The Court should reject this conflation.  The two standards are not the same.  *Infra* at Part

III.A.2.

Plaintiffs' appear to rely on the factors set out in *Lown v. Continental Casualty*

*Co.*, 238 F.3d 543, 548 (4th Cir. 2003), to argue that SJHSRI was not controlled by or associated

with a church for the purposes of their church plan and OCD qualification arguments.  Compl. ¶

88 (quoting *Lown* factors); *see also id.* ¶¶ 89-92 (alleging purported lack of Diocesan control or

association).  The *Lown* factors ask: (1) "whether the religious institution plays any official role

in the governance of the organization"; (2) "whether the organization receives assistance from

the religious institution"; and (3) "whether a denominational requirement exists for any

employee or patient/customer of the organization."  238 F.3d at 548.

Plaintiffs' reliance on *Lown* as a standard for OCD inclusion is improper.  First,

the USCCB does not suggest strict adherence to *Lown* or anything approaching the *Lown* factors.

*See* Ex. 18.  Rather, the USCCB sets out no such "test" for deciding whether a subordinate

organization seeking listing in the OCD has a sufficient connection to the Roman Catholic

Church.  *Id.*  The decision instead rests with the local dioceses.  *See id.; see also Overall v.*

*Ascension*, 23 F. Supp. 3d 816, 832-33 (E.D. Mich. 2014) (identifying decisions as to challenges to "a church's polity, administration, and community" as beyond judicial inquiry).

Second, assuming the *Lown* factors have any relevance at all to the OCD listing question, *Lown* hardly represents a consensus standard, even in the church plan setting.  Instead, *Lown* has been criticized as out of step with ERISA's own definition of "associated with a church," which provides: "an organization . . . is associated with a church . . . if it shares common religious bonds and convictions with that church . . . ."  29 U.S.C. § 1002(33)(C)(iv); *see Medina v. Catholic Health Initiatives (Medina II)*, 877 F.3d 1213, 1224 (10th Cir. 2017).  As the U.S. Court of Appeals for the Tenth Circuit explained in *Medina II*:

> Setting aside their uncertain derivation, the *Lown* factors cannot be the exclusive means of determining whether an organization is "associated with a church."  This is because the *Lown* factors are much narrower than the broad language of the definition in § 1002(33)(C)(iv).  Under the statute, to be "associated with a church," a corporation need only share "common religious bonds and convictions with that church or convention or association of churches."  The statute imposes no denominational requirements, corporate governance requirements, or funding requirements.  Thus, an organization could share "common religious bonds and convictions" with a church while satisfying none of the *Lown* factors.  Because the *Lown* factors are narrower than the statutory language, satisfying the *Lown* factors may *suffice* to establish that an organization is associated with a church.  But an organization does not *need* to satisfy the *Lown* factors in order to be associated with a church.

877. F3d at 1224 (emphases in original).  This Court, therefore, should decline to follow *Lown* and defer to the wide discretion afforded to local dioceses by the USCCB and—to the extent church plan "association" standards are relevant at all to this inquiry—the broader definition of "association" under 29 U.S.C. § 1002(33)(C)(iv) and dismiss Count VII.

    ii.    Plaintiffs Cannot Challenge The Sufficiency Of The Connection
          Between SJHSRI And The Diocese Of Providence For OCD Listing Purposes

Plaintiffs' begrudgingly acknowledge SJHSRI's continued diocesan connection, but strive to minimize it as "moot" after the 2014 Asset Sale. Compl. ¶ 90. Plaintiffs miss the mark.

For OCD listing purposes, if there is a connection between SJHSRI and the Diocese of Providence (and there is), then Plaintiffs cannot challenge the sufficiency of that connection as a matter of law. The First Amendment precludes judicial inquiry into "a church's polity, administration and community." *See Overall*, 23 F. Supp. 3d at 832 (citing *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976)). Plaintiffs' challenge to the sufficiency of SJHSRI's connection to the Diocese of Providence for the purposes of listing in the OCD, therefore, must fail.

In *Overall*, the court ruled that the First Amendment barred the plaintiff's argument contesting the sufficiency of a defendant hospital's connection with the Church (in the context of a church plan challenge). *See id.* at 832-33. The Court reasoned that, even assuming the plaintiff's "allegations are true, this argument regarding religious orthodoxy is prohibited by the Constitution because the First Amendment creates a protected zone for churches to decide these issues of religious doctrine free from government intrusion." *Id.* at 832 (internal quotation marks omitted). "This protected zone includes: (1) a church's law and doctrine; (2) a church's religious mission, and (3) a church's polity, administration, and community." *Id.* Here, as in *Overall*, Plaintiffs challenge SJHSRI's connection with the Diocese of Providence and the determination that this connection was sufficient to list SJHSRI in the OCD. *See id.* This represents an improper challenge to the Diocese of Providence's assessment of "who is within [its] religious community." *See id.*; *see also Medina v. Catholic Health Initiatives (Medina I)*,

147 F. Supp. 3d 1190, 1202 (D. Colo. 2015) (reasoning similarly as to a challenge of a Catholic

hospital's "common religious bonds" with a church).  As such, Count VII should be dismissed.

## III.   THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT THE DIOCESAN DEFENDANTS ENTERED INTO AN AGREEMENT FOR AN UNLAWFUL ENTERPRISE AND SO PLAINTIFFS' CLAIM FOR CONSPIRACY (COUNT IX) SHOULD BE DISMISSED

To plead a claim for civil conspiracy under Rhode Island law, "evidence must be

produced from which a party may reasonably infer the joint assent of the minds of two or more

parties to the prosecution of the unlawful enterprise."  *Stubbs*, 149 A.2d at 708-09 (internal

quotation omitted); *see Smith v. O'Connell*, 997 F. Supp. 226, 241 (D.R.I. 1998).  "Disconnected

circumstances, any one of which or all of which are just as consistent with a lawful purpose as

with an unlawful undertaking, are insufficient to establish a conspiracy."  *Stubbs*, 149 A.2d at

708-09.  Rather, the "evidence must do more than raise a suspicion.  It must lead to belief."  *Id.*

Civil conspiracy, moreover, "is not an independent basis of liability," and therefore "requires a

valid underlying intentional tort theory."  *Fogarty v. Palumbo*, 163 A.3d 526, 543 (R.I. 2017)

(internal citation and quotation marks omitted)).

The factual underpinnings of Plaintiffs' "quid pro quo" fraud and conspiracy

claims against the Diocesan Defendants were discussed at length, *supra* at Part II.C, and those

sections are incorporated here to the extent that they apply equally to any analysis of the

conspiracy claims.  Having failed to allege any cognizable fraud, Plaintiffs' conspiracy claims

must also fail.  *Fogarty*, 163 A.3d at 543.  This section will address legal deficiencies in Count

IX not previously discussed.

**A. The Complaint Does Not Allege Facts Suggesting
An Improper Agreement Concerning The Listing Of SJHSRI In The OCD**

1. *There Was Nothing Unlawful About
The Listing Of SJHSRI In The OCD*

Plaintiffs contend that the Diocesan Defendants conspired with other defendants to maintain the Plan as a church plan by fraudulently listing SJHSRI in the OCD, following the sale of SJHSRI's hospital assets to Prospect.  Compl. ¶¶ 71(c), 131, 142, 159, 204-205.  As discussed in detail *supra* at Part II.F, there was nothing false about SJHSRI's listing in the OCD following the 2014 Asset Sale given the continuing connection between SJHSRI and the Church.  Accordingly, there was no "intentional tort" that the Diocesan Defendants' agreed to prosecute to support a conspiracy claim.  *See Fogarty*, 163 A.3d at 543.  Count IX should be dismissed.

2. *Listing In The OCD And Maintaining Church Plan Status Are Not The Same*

As discussed *supra* at Part II.F.2, the Complaint improperly conflates listing in the OCD with the ability of the Plan to remain a church plan.  *Id.* ¶¶ 71(c), 131, 142, 159, 204-205.  The power to list an organization in the OCD is ***not*** equal to the power to maintain that organization's pension plan as a church plan.  The Complaint admits as much.

Plaintiffs allege that a pension plan of a non-church organization controlled by or associated with a church must be maintained by an organization that has a principal purpose of administering or funding the plan and is also controlled by or associated with a church.[37]  *Id.* ¶ 72.  There is no requirement for a principal purpose organization for listing in the OCD.  *Compare* 29 U.S.C. § 1002(33)(A) & C(ii)(II) (defining church plan under ERISA); Compl. ¶ 72 (describing principal purpose organization requirement for church plan status) *with* Ex. 18 (describing OCD listing considerations, without reference to principal purpose organization

---

[37] For the purposes of this motion to dismiss, the Diocesan Defendants take no position as to whether SJHSRI had a principal purpose organization and over what time period.

element).  Accordingly, even under Plaintiffs' own alleged facts, the Diocesan Defendants—

assuming that they had any role in this determination—could not maintain the Plan as a church

plan simply by listing SJHSRI in the OCD.

   3.  *Other Aspects Of The Complaint Undermine Plaintiffs' Claim That*
       *There Was An Agreement For An Illegal Undertaking Concerning The OCD*

        On top of the improper conflation between qualifying for listing in the OCD and

attaining church plan status, the Complaint also undercuts Plaintiffs' contention that the

Diocesan Defendants engaged in any sort of illegal agreement concerning the OCD to render the

Diocesan Defendants' conduct inconsistent with lawful purposes.  Plaintiffs assert that it is an

annual responsibility to make submissions concerning the OCD, Compl. ¶¶ 106-110, and that

SJHSRI had a history of listing in the OCD prior to 2015, *id.* ¶ 111.  There was nothing out of

the ordinary then with the continued listing of SJHSRI in the OCD after the 2014 Asset Sale.

Any "agreement" between the Diocesan Defendants and others to fraudulently list SJHSRI in the

OCD is belied, moreover, by Plaintiffs' claim that Chancellor Reilly—alleged to have been

intimately involved in those dealings—challenged the ability of SJHSRI to remain in the OCD

mere months after the 2014 Asset Sale.  *Compare id.* ¶¶ 143-161, 166-168 *with id.* ¶ 187.

Rather, Chancellor Reilly's November 11, 2014 email was consistent with (and representative

of) the Chancellor performing the function as gatekeeper to the OCD, so that no organization

would be listed improperly.[38]  Ex. 22 (November 11, 2014 Email from Chancellor Reilly); *see*

*Stubbs*, 149 A.2d at 708-09.

---

[38] The Complaint mischaracterizes Chancellor Reilly's November 11, 2014 email to so great a degree that it is barely recognizable.  Ex. 22 (November 11, 2014 Email from Chancellor Reilly).  The Chancellor's comment that "Fatima and SJHSRI are not eligible for listing" in the OCD was *not* an admission that SJHSRI was not controlled or connected with the Diocese of Providence, but driven by the Chancellor's then-held belief that SJHSRI was now owned by the for-profit Prospect.  If Prospect owned SJHSRI, Chancellor Reilly warned, this would jeopardize SJHSRI's place in the OCD.  *See id.* ("Except in exceptional circumstances, the USCCB group exemption policies and the IRS rules for public charities would not permit an organization owned by a *for-profit* to continue to be listed

43

Likewise, documents within the public record and referenced in the Complaint indicate that the meetings/presentations to the "Diocesan Defendants Attendees"[39] in August 2013 and to the Diocesan Finance Council in September 2013 respectively were far more consistent with lawful business dealings than an unlawful plot against the Plan and its participants.  Plaintiffs allege:

> Defendants SJHSRI, RWH, CCCB, the Prospect Entities, and the Diocesan Defendants all knew that the Diocese of Providence's power to delete SJHSRI from the Catholic Directory gave the Diocese a complete veto over the asset sale, because claiming that the Plan was a Church Plan, although unlawful, was a requirement by SJHSRI, RWH, CCCB, and the Prospect Entities for the sale to proceed, as expressly set forth in the Overview of the Strategic Transaction shared with the Diocesan Defendants on August 14, 2013.

Compl. ¶ 204.  Plaintiffs are correct in one respect: RCB (though not the "Diocesan Defendants") did hold a "complete veto over the asset sale."  *Id.*  But, that authority had nothing to do with the "power to delete SJHSRI from" the OCD, *id.*, and everything to do with the legal authority afforded to RCB in SJHSRI's governing documents.  Ex. 19 at Ex. A.  That is, the Amended Articles of Incorporation for SJHSRI expressly grant RCB a veto over "the sale, mortgaging, or leasing of any real or personal property of the corporation with a value in excess of the canonical threshold then in effect[.]"  *Id.* at Ex. A ¶ D(i).  As such, for any significant asset sale to go through, SJHSRI, CCCB, RWH, and Prospect would need to seek RCB's approval as a pure matter of corporate governance.  *Id.*

Additionally, the presentation at the September 12, 2013 meeting to the Diocesan Finance Council—which was allegedly identical to the August 13, 2014 presentation, save for

---

in the Directory" (emphasis added)); *see also* Ex. 18 at 2-3 (discussing public charity requirement for fitting within USCCB's group ruling).
[39] By "Diocesan Defendants Attendees," Plaintiffs mean Bishop Tobin, Chancellor Reilly, and Monsignor Theroux. Compl. ¶ 143.

deletion of references to "Attorney-Client Privilege" and a title change[40])—does not reflect an

offer directed at the Diocesan Defendants, let alone the "quid pro quo" described in the

Complaint.  Ex. 23 (Sept. 12, 2013 "Overview of Strategic Transaction" Presentation).  Nor does

the presentation suggest any affirmative obligation specific to the Diocesan Defendants relative

to the Plan.  *See Id.* at 11.  This is not surprising because the presentation, as Plaintiffs

acknowledge, was originally a "Presentation to the Board of Directors," referring to the Boards

of Trustees for SJHSRI, CCCB, and RWH.  Compl ¶ 145.  The presentation makes no reference

to the OCD, let alone an agreement on the part of the Diocesan Defendants to list SJHSRI

therein.  *See* Ex. 23.  Rather, it describes in detail the various covenants agreed to between

Prospect, CCCB, SJHSRI, and RWH.  *See id.* at 3-4, 9-10.  The Diocesan Defendants were not

signatories to the APA.  *See* Ex. 11 at PCEC000089-PCEC000092.

   The presentation, moreover, does not list "requirements" on the part of the

Diocesan Defendants, but "Requirements of the post-Closing structure of CCHP":

> ## Requirements of the post-Closing structure of CCHP
> &ndash; Maintain the retirement plan of St. Joseph Health Services of
>  Rhode Island as a "Church Plan"
> &ndash; Maintain an organization to &ndash;
>   &bull; enforce the post-closing covenants of Prospect and Newco; and
>   &bull; hold the membership (ownership) interest in Newco

*See id.* at 11.  Although "maintain the retirement plan of St. Joseph Health Services of Rhode

Island as a 'Church Plan'" appears beneath the "Requirements" heading, this hardly represents a

"quid pro quo" to the Diocesan Defendants.  *See id*.  The other "requirement" describes the need

to "Maintain an organization to enforce the post-closing covenants of Prospect and Newco" and

"hold the membership (ownership) interest in Newco" (an apparent reference to the entity that

---

[40] Compl. ¶ 167.

would become Defendant Prospect East).  *See id.*  From the face of the document therefore, this is simply a list of two of the conditions of the agreement between *Prospect*, *CCCB*, *SJHSRI*, and *RWH*, and not a conspiracy with the Diocesan Defendants.  This makes sense when the presentation is viewed as originally drafted for the purposes of the Boards of Trustees of SJHSRI, CCCB, and RWH; not the Diocesan Defendants' alleged (and non-existent) power to maintain the Plan as a church plan by listing SJHSRI in the OCD.[41]  Compl. ¶ 145; *see Twombly*, 550 U.S. at 564-70; *Stubbs*, 149 A.2d at 708-09.

*Stubbs* is instructive.  In *Stubbs,* the Rhode Island Supreme Court considered whether the plaintiffs, heirs of an alleged victim of a conspiracy to deprive the victim of an inheritance, asserted sufficient facts to support the conclusion of law that there was a conspiracy. 149 A.2d at 707.  The Court held that a conspiracy claim must include facts that, if proved, would "lead to belief" of a conspiracy.  *Id.* at 709.  Alleging "[d]isconnected circumstances any of which . . . are just as consistent with a lawful purpose as with an unlawful undertaking are insufficient to establish a conspiracy."  *Id.* at 708-09.  Observing that the plaintiffs had only alleged that the defendant had appointed others to positions of trust and asked the court to infer the defendant's involvement in a conspiracy against the alleged victim as a result of the purported harm that befell her, the court deemed this a bridge too far.  *Id.*  Rather, the court concluded that the plaintiffs did not allege facts supporting the elements of conspiracy.  *Id.*

Similar concerns exist here.  When considered in light of the applicable law, the public record, and the documents referenced within the Complaint, and the Complaint itself,

---

[41] Plaintiffs' allegations concerning the receipt of $638,838.25 in proceeds from the 2014 Asset Sale do not change the analysis. Compl. ¶ 211. SJHSRI had previously borrowed that money, through the Inter-Parish Loan Fund. Compl. ¶ 208. This payment, therefore, was hardly an improper "kickback," but simply in satisfaction of a preexisting debt to a lender.  Indeed, virtually all debts of CCCB, SJHSRI, and RWH were paid off as part of the closing of the 2014 Asset Sale.  *See* Ex. 17 at 20-21 (discussing general allocations of payments under the APA).

Plaintiffs fail to cast the Diocesan Defendants' dealings with SJHSRI *et al.* concerning the OCD as "an unlawful undertaking." *Stubbs*, 149 A.2d at 708-09.  As a matter of law, the Diocesan Defendants' could not maintain the Plan as a church plan by listing SJHSRI in the OCD.  *See supra* at Part III.A.2.  Moreover, when taken in fuller context and divorced of Plaintiffs' spin, the Complaint describes circumstances that "are just as consistent with a lawful purpose." *Stubbs*, 149 A.2d at 708-09.  Like the *Stubbs* plaintiffs, Plaintiffs here ask this Court to infer the Diocesan Defendants' involvement in the conspiracy essentially because they were both the gatekeeper of the OCD and had authority to veto the 2014 Asset Sale (although not for the reasons Plaintiffs ascribe).  Such alleged circumstances are insufficient to establish a conspiracy. *See id.*; *see also Precision Assoc.,* 2015 WL 4987751, at *5 (dismissing antitrust conspiracy claim where defendant was subject of regulatory inquiry because it was "not plausible that the antitrust regulators would have offered leniency to a defendant that continued to actively participate in the conspiracy").

### B. The Complaint Fails To Allege Facts Suggesting An Illegal Agreement Concerning The 2014 Asset Sale Or The Bishop's Communications In Support Of That Transaction

The Complaint does not allege sufficient facts to establish any sort of illegal agreement as it concerns the funding/church plan status of the Plan, the structure of the 2014 Asset Sale, the adoption of Catholicity rules at "New" Our Lady of Fatima Hospital and "New" Roger Williams Hospital, or the Bishop's Letters to the Vatican or HSC.  Plaintiffs try to place the trappings of a conspiracy on a transaction that was on full display to the public, and heavily vetted by two state regulators that received substantial facts concerning the present and future of the Plan.  *See supra* at Part II.C.  They do so largely by assuming bad intent and using conclusory and pejorative word choice throughout the Complaint, not by alleging particular

facts.  No claim for conspiracy can plausibly lie in such circumstances.  *See Twombly*, 550 U.S. at 564-70; *Stubbs*, 142 A.2d at 708-09; *see also Eclectic Props. E., LLC. V. Marcus & Millichip Co.*, 751 F.3d 990, 994 (9th Cir. 2014) (dismissing complaint for failing to contain adequate factual allegations to plausibly infer that the defendants specifically intended to defraud).

1. *Disclosure Of Funding/Church Plan Status Of The Plan, The Scope*
   *Of The 2014 Asset Sale, And The Continued Catholicity Of The Hospitals*

As discussed in detail *supra* at Part II.C, the funding and church plan status of the Plan, the scope of the 2014 Asset Sale, and the continued catholicity of the hospitals was publicly disclosed, as was the fact that the Plan's status was a prime motivator for the 2014 Asset Sale.  There was no predicate wrong, therefore, to support a conspiracy claim.  *See Fogarty*, 163 A.3d at 543.

2. <u>*Letters To The HSC And The Vatican*</u>

Plaintiffs describe the letter to the HSC as written by the Bishop "pursuant to the conspiracy in which the Diocesan Defendants were participating with all of the other Defendants to relieve Fatima Hospital of any liability under the Plan at the expense of the Plan participants."  Compl. ¶ 309.  They make similar allegations concerning the Bishop's letter to the Vatican.  *Id.* ¶ 311.  On their face, both letters are far more consistent with a lawful purpose:  the Bishop was deeply interested in doing what he could to help a community hospital system that all agree was suffering unsustainable losses.  *See supra* at Part II.C.

Plaintiffs are completely unconstrained and need not balance the many critically important interests that were at play in this decision: whether that hospital system would survive? whether the system would have access to sufficient capital to succeed?  where and how healthcare would be delivered, if at all, to the underserved populations that had used that hospital

system for decades?  *See generally* Ex. 25 at 1-2 (reflecting Bishop Tobin's consideration of such interests); Ex. 21 at 1-2 (same).

With the benefit of hindsight, Plaintiffs (now) may not like the deal that was ultimately adopted, nor the support expressed by the Bishop (and many others) in connection with that decision.  Such retrospective disagreement does not mean that the Diocesan Defendants had assented to the prosecution of an unlawful enterprise.  Rather, it is far more consistent with a lawful purpose and furtherance of interests described here.  *Stubbs*, 149 A.2d at 708-09; *see Twombly*, 550 U.S. at 564-70.  Plaintiffs must show more than a business deal that went contrary to their present tastes for some economic or non-fraudulent reasons.  *Eclectic Props. E.*, 751 F.3d at 997.  Courts must also consider an "obvious alternative explanation" for defendants behavior.  *Id.* at 996 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)).  Measured against these standards, Plaintiffs fraudulent conspiracy claims fall short as a matter of law.

## IV.  COUNTS XVI AND XVII (CIVIL LIABILITY UNDER R.I. GEN. LAWS § 9-1-2) SHOULD BE DISMISSED

In Counts XVI and XVII of the Complaint, Plaintiffs allege that the Diocesan Defendants violated two criminal statutes (one state, one federal) and should, therefore, be subject to civil liability under R.I. Gen. Laws § 9-1-2.  Compl. ¶¶ 508-515.  R.I. Gen. Laws § 9-1-2 requires that Plaintiffs' alleged injuries be caused "by reason of" the alleged violation of the underlying criminal law.  Courts have construed "by reason of" to require direct and proximate causation between the alleged injury and the alleged violation of law.  Plaintiffs' claims of violations of the Hospital Conversion Act ("HCA") and the Internal Revenue Code ("IRC"), as alleged, could not have "caused" Plaintiffs' alleged injuries as a matter of law.

**A.  The Complaint Alleges Injuries That Were Not
    <u>Caused "By Reason Of" The Alleged Violations Of Criminal Law</u>**

1.  *Counts XVI and XVII Rest On Allegations Of Events That
    Took Place After The Plan Was Allegedly Underfunded And Could Not
    <u>As A Matter Of Law (Or Chronology) Have Caused The Alleged Underfunding</u>*

Rhode Island General Laws § 9-1-2 provides that "[w]henever any person shall suffer any injury to his or her person, reputation, or estate *by reason of* the commission of any crime or offense, he or she may recover his or her damages for the injury in a civil action against the offender." (Emphasis added).  This requires both actual and proximate causation.  *Kelly v. Marcantonio*, 187 F.3d 192, 203 n.8 (1st Cir. 1999).  "The plain language of the statute thus requires a causal connection between the alleged crime and the claimed injury." *Kelly*, 187 F.3d at 203 n.8.  The Complaint fails to establish this causal connection because the Diocesan Defendants' alleged violations of the HCA and the IRC occurred *after* Plaintiffs' alleged injury.

The only facts described in the Complaint that could constitute a violation of the HCA are alleged to have occurred in 2014.  *See* Compl. ¶ 195.  Additionally, Plaintiffs only plead that the Diocesan Defendants aided in preparing two Form 990 tax returns that contained false information.  *Id.* ¶¶ 198-199.  Those two tax returns were for tax years ranging from October 1, 2014 to September 30, 2015[42] and October 1, 2015 to September 30, 2016.  *Id.*  However, Plaintiffs allege that the Plan was underfunded long before any violations of law alleged in Counts XVI and XVII.  *Id.* ¶ 256.  Indeed, the Complaint explicitly states that the alleged violations of the HCA and IRC were designed to cover up the unfunded liability of the Plan.  *Id.* ¶¶ 207, 311

---

[42] The Complaint states that the Form 990 which was filed on August 16, 2016 was "for the tax year from October 1, 2014 to September 30, 2014." Compl. ¶ 198.  The Diocesan Defendants assume that the tax year end date contains a typographical error and should have read "September 30, *2015*", as opposed to 2014.

Actions occurring after an injury has already occurred cannot be the cause of that injury: "to the extent plaintiff-appellants are asserting a claim under § 9–1–2 for an alleged cover-up, their claim also fails because of the lack of any nexus between the alleged cover-up and the injuries (and damages) that they claim." *Kelly*, 187 F.3d at 203 n.8.  Here, the alleged cover-up of a previously underfunded pension could not have caused the underfunding.  *Id.*; *see Smith v. O'Connell*, 997 F. Supp. 226, 241 (D.R.I. 1998).

2.   *The Alleged Harm To Plaintiffs Is Not Direct And Far Too Attenuated From The Alleged Criminal Violations To Constitute Proximate Causation*

Rhode Island General Laws § 9-1-2 requires that a plaintiff's injury be caused "*by reason of*" the commission of a crime.  (Emphasis added).  The Rhode Island Superior Court has interpreted this provision to require proximate causation between the criminal conduct and the injury alleged and further equates the proximate cause requirement and the language "by reason of" to both the state and federal civil RICO statutes.  *Cortellesso v. Cortellesso*, NO. P.C. 95-457, 1997 WL 839911, at *8 (R.I. Super. Apr. 29, 1997) ("this Court reads 'by reason of' in G.L. 7-15-4(c) and 9-1-2 to mean 'proximately caused by.'").

Turning to that guiding law, the cause required "by reason of" must be a "*direct relation* between the injury asserted and the injurious conduct alleged."  *Holmes*, 503 U.S. at 268 (emphasis added).  "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient."  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 271, 274).  Moreover, "'[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.'" *Holmes*, 503 U.S. at 271 (internal quotations omitted).

i.   Count XVI

In *Holmes*, the defendant's fraudulent stock-manipulation scheme directly harmed stockbrokers by causing the prices of stock they owned to plummet.  *Id.* at 262-63.  After the

51

stockbrokers' failure, the plaintiff, an insurer standing in the shoes of the stockbrokers' creditors, brought suit alleging that the defendant conspired in a fraudulent scheme causing injury to the creditors.  *Id.* at 262.  The Court held that "the link [wa]s too remote between the stock manipulation alleged and the [creditor]s' harm, being purely contingent on the harm suffered by the [stockbrokers]," and, therefore, plaintiffs failed to demonstrate proximate cause.  *Id.* at 271.  The Court further stated that the creditors and their insurer were "secondary victims" who were "injured only indirectly," and, consequently, were "not proper plaintiffs."  *Id.* at 274.  Thus, if the causal chain from a defendant's acts to a plaintiff's injury requires a court to "go beyond the first step," the chain is too long to establish proximate causation.  *Id.* at 271.

Applying *Holmes*, Plaintiffs could, at most, be "injured only indirectly" by alleged violations of the HCA.  *Id.* at 274.  The underlying statutes prohibit misrepresentations to state regulators.  Compl. ¶¶ 509, 513-14.  The statutes themselves define whom they exclusively protect and it is not the Plaintiffs.  If Plaintiffs were harmed as a result of the alleged violations somewhere down the line, then they are, at most, "secondary victims," because the Court would be required to look "beyond the first step" to reach their harm, which is "purely contingent" on violating the statutes.  *See Holmes*, 503 U.S. at 271, 274.

ii.    Count XVII

Plaintiffs' § 9-1-2 claim premised on aiding and abetting the filing of a false tax return with the IRS (Count XVII) fails for the same reasons as Count XVI.  *Supra* at Part IV.A.2.i.  There is no link between the direct victim and the Plaintiffs on this claim.  The allegedly false tax returns submitted to the IRS did not cause the underfunded pension—the alleged underlying crime and harm are unconnected.  Instead, Plaintiffs' theory is that the conduct constituting the alleged crime against the IRS (inclusion of SJHSRI in the OCD) also—

52

separate and apart from the allegedly fraudulent tax return—led to Plaintiffs' injury by allowing

SJHSRI to claim church plan status under ERISA.  Compl. ¶ 190.  However, if the causal chain

does not run through the victim of the crime (the IRS), then Plaintiffs' harm cannot be linked to

the offense (and is only tangentially related to the underlying crime).  This is insufficient.  *In re*

*McNulty*, 597 F.3d 344, 352 (6th Cir. 2010).

      Furthermore, a finding of "direct" injury requires "that the harm to the victim be

closely related to the conduct *inherent to the offense*."  *Id.* (emphasis added).  The underfunding

of a pension plan is in no way inherent to the offense of filing a false tax return.  *See id.*  Count

XVII should be dismissed.

      3.   *The Alleged Violations In Counts XVI And XVII Are*
                *Based On Alleged Misrepresentations To Regulators*
                <u>*Not The Plaintiff, And They Cannot Be A Basis For Relief Under § 9-1-2*</u>

      Where the alleged criminal violation is of a statute prohibiting misrepresentations

to a regulator—and not the plaintiffs—harm to those plaintiffs cannot have been caused "by

reason of" the underlying violation.  *Hemi Grp.*, 559 U.S. at 10.  In *Hemi Group*, New York City

sued an out of state cigarette seller for failing to file customer lists with the State of New York,

in violation of state law.  *Id.* at 6.  The City claimed that the business' failure to file its customer

report constituted mail fraud and allowed the business' customers to evade City excise taxes,

thereby causing lost revenue for the City.  *Id.*  The Court held, in reversing a denial of a motion

to dismiss, that the City could not show proximate cause, because the business' fraudulent

conduct was directed at a third-party—the State of New York—and the City was only indirectly

injured as a result.  *Id.* at 9-11.  The Court refused to extend civil liability "to situations where

the defendant's fraud on the third party (the State) has made it easier for a fourth party (the

taxpayer) to cause harm to the plaintiff (the City)."  *Id.* at 11.  Here, Plaintiffs ask the Court to

impose liability "where the defendant's [alleged misrepresentation] on the third party (the [IRS])

has made it easier for a fourth party ([SJHSRI]) to cause harm to the plaintiff[s]."  *Id.*

4.  *Plaintiffs Also Fail To Allege Facts Sufficient To Establish*
    *Proximate Cause Because There Are More Direct Victims Of The*
    <u>*Alleged Crimes Who Have The Exclusive Right To Remedy The Alleged Violation*</u>

Courts have held that where "those directly injured . . . could be counted on to

bring suit for the law's vindication" plaintiff's claims based on "by reason of" causation should

be dismissed.  *Holmes*, 503 U.S. at 273.  "The requirement of a direct causal connection is

especially warranted where the immediate victims of an alleged . . . violation can be expected to

vindicate the laws by pursuing their own claims."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S.

451, 458-60 (2006) (granting motion to dismiss where plaintiff-storeowner alleged that the

defendants filed fraudulent tax returns with the State of New York to allow them to lower their

prices and gain competitive advantage over the plaintiff, as "[t]he direct victim of this conduct

was the State of New York, not [the plaintiff] and it was the State that was being defrauded and

the State that lost tax revenue as a result").  This principle is based, in part, on a policy

determination that "[i]f the allegations are true, the State can be expected to pursue appropriate

remedies" and "[t]here is no need to broaden the universe of actionable harms to permit . . . suits

by parties who have been injured only indirectly."  *Id.* at 460.

The alleged direct victims here (the state regulators and the IRS) are perfectly

capable of pursuing appropriate remedies under their regulatory and statutory authority, without

broadening the universe of civil actions to indirect victims. 26 U.S.C. § 7206; R.I. Gen. Laws §

23-17.14-30; *see Anza*, 547 U.S. at 460.  As the direct victims, the government actors are better

suited to vindicate the law.  *Anza*, 547 U.S. at 460; *see also Fortunet Inc. v. Gametech Ariz.*

*Corp.*, No. 206-CV-00393, 2008 WL 5083812, at *1-6 (D. Nev. Nov. 26, 2008) (holding that

plaintiff's claim that a company making and selling gaming devices without a Nevada gaming license caused alleged lost sales and revenue for plaintiff failed for lack of proximate cause because "a more direct victim of the alleged wrongful conduct [the Nevada Gaming Control Board and Commission] exists that can be counted on to vindicate Nevada's gaming laws").

Similarly, here, the HCA and the IRC are comprehensive statutory schemes, which govern the conduct that Plaintiffs allege violated those schemes.  State regulators and the IRS are "well suited to address any such violations."  Accordingly, if those laws must be vindicated, the direct victims—not Plaintiffs—are the proper parties to do so.  *Anza*, 547 U.S. at 460; *see James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 404 (7th Cir. 2006) (holding that plaintiff's claim for damages caused by defendants' bid-rigging scheme that defrauded the Wisconsin Department of Transportation (WisDOT) was properly dismissed because "WisDOT is fully capable of pursuing appropriate remedies" and, therefore, plaintiff "has not shown that its injuries were proximately caused by the bid-rigging scheme").

Furthermore, not only are the direct victims of the alleged crimes capable of vindicating the law, the HCA and the IRC provide that ***only*** those direct victims have a right to seek remedies.  The HCA provides no private right of action and, instead, grants to the Attorney General and the Director of the Department of Health the exclusive right "to take corrective action necessary to secure compliance under this chapter."  R.I. Gen. Laws § 23-17.14-30.  Additionally, 26 U.S.C. § 7206 provides no private right of action for violations of that section.  *See, e.g.*, *I-Remiel Azariah: Ibn Yahweh v. Shelby Cty. Gen. Sessions Court*, No. 12-3073-JDT-CGC, 2014 WL 1689297, at *8 (W.D. Tenn. Apr. 29, 2014) ("Section 7206 is a criminal statute prohibiting fraud and false statements under the Internal Revenue Code and grants no explicit private right of action."); *see also Rezner v. Baverische Hypo-Und Vereinsbank AG*, 630 F.3d

866, 873-74 (9th Cir. 2010) (holding that fraud on the IRS and filing a false tax return cannot be used as a basis for civil liability because the IRS is the direct victim of those crimes, not a private plaintiff suing under RICO for tax fraud, and holding "that [plaintiff] cannot show proximate causation based on [defendant]'s fraud against the United States");  *United States v. Credit Suisse AG*, No. 1:14CR188, 2014 WL 5026739, at *2-4 (E.D. Va. Sept. 29, 2014) (finding that defendant's crime of filing of false tax returns did not proximately cause movant's injuries even if movant was also defrauded as part of the same scheme, because movant's "alleged harm is too attenuated from the offense of conviction").[43]

5. *Permitting Claims By Private Citizens Based On Alleged Crimes Against Regulators Would Create An End Run Around The Administrative Procedures Act And Public Policy Which Militates Against A § 9-1-2 Claim In This Context*

Strong public policy reasons also compel strict adherence to the proximate cause jurisprudence discussed above to dismiss claims brought by private citizens based on alleged misrepresentations to regulators in the context of administrative proceedings.  If R.I. Gen. Laws § 9-1-2 and proximate cause could be stretched to establish a cognizable claim by private citizens for alleged misrepresentations in such proceedings, it would deal a devastating blow to that statutory framework and the finality of decisions obtained pursuant to the Administrative Procedures Act.  *See* R.I. Gen. Laws § 42-35-1 *et seq.*

That act governs "*all* agency proceedings and *all* proceedings for judicial review or civil enforcement of agency action."  R.I. Gen. Laws § 42-35-1.1 (emphasis added).  The act sets forth the law and procedure that must be followed whenever an administrative body reviews

---

[43] The movant in *Credit Suisse* brought his motion under the Crime Victims' Rights Act of 2004, 18 U.S.C. § 3771, seeking the right to speak at the defendant's sentencing.  2014 WL 5026739, at *1.  In order to fit the definition of "crime victim" under that act, a party must demonstrate that he was "directly and proximately harmed as a result of the commission of a Federal offense."  18 U.S.C. § 3771(e)(2).  This is the same requirement for a claim of liability under R.I. Gen. Laws § 9-1-2.  *Cortellesso*, 1997 WL 839911, at *7-9 (requiring a "direct relation" and "proximate causation" for a claim under R.I. Gen. Laws § 9-1-2).

a matter and whenever there are any allegations of wrongdoing or an erroneous decision as a result of that administrative review.  *Id.* § 42-35-1 *et seq*.  Moreover, the act sets forth the limited scope of judicial review of all matters involving administrative proceedings.  *Id.* § 42-35-15.

If a cause of action such as the one pressed here with respect to the HCA were allowed to proceed, any aggrieved party—or indeed as here, any aggrieved bystander—to an administrative proceeding could collaterally attack the regulator's decision by alleging some misstatement in the administrative record.  The case could proceed, as Plaintiffs intend here, without any participation by the regulator and without a full review of the administrative record.  Such a claim could be based—like the one here—upon an alleged misrepresentation respecting just one aspect of one factor amongst hundreds that a regulator must consider and balance in making its decision.  The concept of proximate cause exists to set limits on the scope of just this type of lawsuit and claimant.

### B. Count XVII Must Be Dismissed Because R.I. Gen. Laws § 9-1-2 Is Preempted By Federal Law And Would Constitute An Impermissible End Run Around The Lack Of A Private Right Of Action Under The Internal Revenue Code

Count XVII asserts a claim under a state statute (R.I. Gen. Laws § 9-1-2) and calls for the imposition of civil liability based solely on an alleged violation of federal law (26 U.S.C. § 7206(2)).  Compl. ¶¶ 513-514.  This argument, however, must fail, because the use of R.I. Gen. Laws § 9-1-2 to enforce the IRC impermissibly conflicts with federal law and is preempted.  Additionally, R.I. Gen. Laws § 9-1-2 cannot, create a private right of action under a federal statute that does not itself provide such a right.

#### 1. *Rhode Island General Laws § 9-1-2 Is Preempted By Federal Law*

Without a clear intent by Congress to preempt state law, a presumption against preemption generally exists in cases involving a field traditionally governed by the states. *See*

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  However, "[p]olicing fraud against federal agencies is hardly 'a field which the States have traditionally occupied.' . . . such as to warrant a presumption against finding federal pre-emption of a state-law cause of action."  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (internal citation omitted).  "To the contrary," the U.S. Supreme Court has observed, "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."[44]  *Id.*  Thus, there exists "no presumption against pre-emption" in such cases.  *Id.* at 347-48.  Therefore, the burden falls upon Plaintiffs to show that federal law does not preempt R.I. Gen. Laws § 9-1-2's attempt to police fraud against a federal agency.  *See Buckman*, 531 U.S. at 347.  This is a burden that they cannot carry.

In *Buckman*, the Supreme Court set forth the framework for determining whether a state law claim for fraud on a federal agency could stand, or whether it "conflict[ed] with, and [was] therefore impliedly pre-empted by, federal law." 531 U.S. at 348.  In that case, the plaintiffs were patients who purportedly sustained injuries resulting from the use of orthopedic bone screws.  *Id.* at 343.  The plaintiffs alleged that the defendant made fraudulent representations to the Food and Drug Administration ("FDA") in order to obtain approval to market the screws.  *Id.*  After determining that no presumption against preemption existed for state law "fraud-on-the-FDA" claims, the Court examined several factors in determining that a conflict existed between the state and federal laws.  *Id.*  First, the Court stated that:

> The conflict stems from the fact that the federal statutory scheme amply
> empowers the FDA to punish and deter fraud against the Administration, and that
> this authority is used by the Administration to achieve a somewhat delicate

---

[44] There are other areas of unique federal concern, in which the States are not permitted to act. For example, States may not punish perjury that occurred in federal courts.  *Thomas v. Loney*, 134 U.S. 372, 375 (1890).  Additionally, like perjury in a federal court, "a State has no legitimate interest in enforcing a federal scheme" against "fraud in a federal administrative process." *Arizona v. United States*, 567 U.S. 387, 430 (2012) (Scalia, J., concurring in part and dissenting in part).

balance of statutory objectives. The balance sought by the Administration can be skewed by allowing fraud-on-the-FDA claims under state tort law.

*Id.* at 348. The Court went on to say that:

> State-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives. As a practical matter, complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants-burdens not contemplated by Congress . . . . Would-be applicants may be discouraged from seeking . . . approval of devices with potentially beneficial off-label uses for fear that such use might expose the manufacturer or its associates (such as petitioner) to unpredictable civil liability.

*Id.* at 350.  The Court also reasoned that fraud-on-the-FDA claims would increase the administrative burdens on the FDA due to increased disclosures and submissions by applicants from fear of civil lawsuits by private citizens.  *Id.* at 351. Thus, a conflict existed because of the additional burdens to both the regulator and the regulated as a result of state claims, along with the strong potential that these claims would disrupt the "delicate balance of statutory objectives" administered by the federal agency if regulated entities were subject to fifty inconsistent state tort regimes.[45]  *Id.* at 350-51.

        This claim is a state-law-fraud-on-the-IRS claim and *Buckman* applies.  Compl. ¶¶ 197- 200.  Allowing the claim to proceed here would have the detrimental effects of frustrating the administrative efficiencies associated with group rulings that the IRS has established under its statutory and regulatory authority.  *See* IRS Publication 4573, Group Exemptions ("Group exemptions are an administrative convenience for both the IRS and organizations with many affiliated organizations.").  If these state law claims were permitted,

---

[45] This Court has followed the *Buckman* decision in holding that a plaintiff's claims for fraud on the FDA were preempted. *Koch v. I-Flow Corp.*, 715 F. Supp. 2d 297, 305 (D.R.I. 2010). Additionally, state law "fraud-on-the-agency" claims have been dismissed where the fraud was committed against other federal agencies. *See Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1208 (9th Cir. 2002) (fraud-on-the EPA); *Offshore Serv. Vessels, L.L.C. v. Surf Subsea, Inc.*, No. CIV.A. 12-1311, 2012 WL 5183557, at *3 (E.D. La. Oct. 17, 2012) (fraud-on-the-Coast Guard); *see also Morgan v. Brush Wellman, Inc.*, 165 F. Supp. 2d 704, 722 (E.D. Tenn. 2001) (applying *Buckman* to the Department of Energy).

non-profit entities (at least in Rhode Island) would be forced "to satisfy not only the standards imposed by that agency under federal law, but also the potentially heterogeneous standards" propounded by Rhode Island in order to avoid liability for statements made to the IRS. *See Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1207 (9th Cir. 2002).

Moreover, as was the case when the Ninth Circuit applied *Buckman* to the Environmental Protection Agency ("EPA"), "Congress has afforded the [IRS] substantial enforcement powers under [the IRC] that enable [the IRS] to make a measured response to suspected fraud against it." *Nathan Kimmel*, 275 F.3d at 1205-06. In affirming the dismissal of a state law claim for fraud against the EPA, the Ninth Circuit, went on to say that "[i]n particular," it was "troubled that an applicant's disclosures under" [federal law], although not challenged by the EPA (the very agency empowered by Congress to enforce [that federal law]), may be judged illegal under state law." *Id.* at 1207. This concern is no less troubling for the IRS in this case and especially true given that the IRC grants Plaintiffs no private right of action. *I-Remiel Azariah: Ibn Yahweh*, No. 12-3073-JDT-CGC, 2014 WL 1689297, at *8; *see Offshore Serv. Vessels, L.L.C. v. Surf Subsea, Inc.*, No. CIV.A. 12-1311, 2012 WL 5183557, at *13 (E.D. La. Oct. 17, 2012) (Where "the statutory enforcement provisions noticeably 'do[ ] not provide a private right of action for damages' . . . plaintiffs' claims are an improper attempt to supplement the express remedies provided by federal law.").

   2.  *Count XVII Seeks An Impermissible End Run*
       *Around The Lack Of Private Right Of Action Under The Internal Revenue Code*

As stated above, Count XVII is an attempt by Plaintiffs to bring a private right of action to enforce a federal law that does not permit private enforcement. *Levy v. World Wrestling Entm't, Inc.*, No. CIV.A.308-01289(PCD), 2009 WL 455258, at *2 (D. Conn. Feb. 23, 2009) ("[T]here is no private action to enforce the tax code."). Where a federal statute provides

for no private right of action, plaintiffs cannot utilize a state law to do that which the federal law does not allow.  *Astra USA, Inc. v. Santa Clara Cty., Cal.*, 563 U.S. 110, 117-19 (2011). "Recognition of any private right of action for violating a federal statute . . . must ultimately rest on congressional intent to provide a private remedy."  *Id.* at 117 (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102 (1991)).  "The absence of a private right to enforce the statutory . . . obligations would be rendered meaningless if [plaintiffs] could overcome that obstacle by suing to enforce" the federal statute under state law.  *Astra USA*, 563 U.S. at 118.

The dangerous implications of allowing state law to operate this way are manifest: "[r]ecognizing [a plaintiff's] right to proceed in court could spawn a multitude of dispersed and uncoordinated lawsuits. . . .  With [the federal agency] unable to hold the control rein, the risk of conflicting adjudications would be substantial."  *Id.* at 120.  Therefore, such claims must be dismissed whether a creature of state statutory or common law.  *Id; see Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (where "no private right of action exists under the relevant [federal] statute, the plaintiffs' efforts to bring their claims as state common-law claims are clearly an impermissible 'end run' around the [federal statute].");  *see also Cooper v. Charter Commc'ns Entertainments I, LLC*, 760 F.3d 103, 110 n.6 (1st Cir. 2014) (holding similarly); *Brissenden v. Time Warner Cable of New York City*, 25 Misc. 3d 1084, 1091 (N.Y. Sup. Ct. 2009) (A "plaintiff cannot use [a state statute] to circumvent the lack of private right of action under [a] federal statute.").

## V.    COUNT XIX (RHODE ISLAND LAW, BREACH OF FIDUCIARY DUTY) MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM

Plaintiffs' common law breach of fiduciary duty claim under Rhode Island law must be dismissed because Plaintiffs fail to allege sufficient facts to establish that the Diocesan Defendants are fiduciaries.  Plaintiffs' allegations that the Diocesan Defendants are fiduciaries

are limited and conclusory in nature.  Compl. ¶¶ 521-522.  Plaintiffs only make two directly

related allegations: (1) "Defendants SJHSRI, CCCB, Angell, and the Diocesan Defendants all

owed Plaintiffs fiduciary duties;" and (2) "Defendants SJHSRI, CCCB, Angell, and the Diocesan

Defendants all breached their fiduciary duties to Plaintiffs, causing damages."  *Id.*  These wholly

conclusory allegations must be disregarded under *Iqbal*.  556 U.S. at 678 ("[t]hreadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to

defeat a Rule 12(b)(6) motion).

Plaintiffs have pled no factual allegations that would establish a fiduciary

relationship between the Diocesan Defendants and the Plaintiffs or the pensioners.  Under Rhode

Island law, an essential element of a breach of fiduciary duty claim is "the existence of a

fiduciary duty."  *Chain Store Maint., Inc. v. Nat'l Glass & Gate Service, Inc.*, No. PC 01-3522,

2004 WL 877599, at *13 (R.I. Super. Ct. April 21, 2004); *see Prob. Court of City of Warwick ex

rel. Lawton v. Bank of Am., N.A.*, 813 F. Supp. 2d 277, 301 (D.R.I. 2011) (stating that, "[t]o

prevail on this claim, Plaintiffs must show that the Bank owed them a fiduciary duty").  "A

fiduciary duty arises when the facts show a special relationship of trust and confidence that

requires a fiduciary to act in the other party's best interest, rather than in its own best interest."

*Fraioli v. Lemcke*, 328 F. Supp. 2d 250, 267 (D.R.I. 2004) (citing *Vanwest v. Modland Nat'l Life

Ins. Co.*, 98-76, 2000 WL 343019293, at *3 (D.R.I. Mar. 27, 2000)).  "Factors that demonstrate

the existence of a fiduciary relationship include 'the acting of one person for another; the having

and exercising of influence over one person by another; the inequality of the parties; and the

dependence of one person on another.'"  *Chain Store*, 2004 WL 877599, at *13 (quotation

omitted).

Plaintiffs do not allege *when* each or any of the Diocesan Defendants owed a

fiduciary duty or *how* or *why* they each owed such a duty.  Given the allegations in the Complaint of the "diminished or non-existent roles of Bishop Tobin and the Diocese" in 2009, such allegations are especially important.  Compl. ¶ 89; *see id.* ¶ 205.  The Complaint is completely devoid of any allegations concerning facts that would support the existence of a fiduciary relationship.  *See Santucci v. Citizens Bank of R.I.*, 799 A.2d 254, 255-58 (R.I. 2002) (affirming judgment disposing of breach of fiduciary duty claim where plaintiffs "did not set forth specific facts to support their assertion that [defendant] owed a fiduciary duty to [plaintiff]").  To underscore this point, nowhere in the 527 paragraph Complaint do Plaintiffs use the word "trust," "influence," "confidence" or "dependence" in any allegations pertaining to the Diocesan Defendants.[46]  Count XIX should be dismissed.

## VI.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER ERISA

### A.  Count III Should Be Dismissed As An Inappropriate Request For Money Damages Not Cognizable Under 29 U.S.C. § 1132(a)(3)

Assuming the Plan is an ERISA plan, Plaintiffs have also failed to state a plausible claim under 29 U.S.C. § 1132(a)(3) because the relief they seek (the payment of money to fund the Plan) is not within the scope of that provision.

#### 1.  *Legal Standard*

Section 1132(a)(3) authorizes lawsuits "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan."  The U.S. Supreme Court has explained that "the term 'equitable relief' in § [1132(a)(3)] is limited to 'those categories of relief that were *typically* available in equity' during

---

[46] Moreover, even if Plaintiffs sufficiently alleged facts establishing a fiduciary relationship, unless they can establish one *after 2009*, Plaintiffs claim for breach of fiduciary still fails as a matter of law because the assets of the Plan exceeded the present value of the accrued benefits up until the economic crash in 2008.  *See supra* at Part I.

the days of the divided bench (meaning, the period before 1938 when courts of law and equity

were separate)." *Montanile v. Bd. of. Trs. Of Nat'l Elevator Indus. Health Benefit Plan*, 136 S.

Ct. 651, 657 (2016) (emphasis in original) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256

(1993)).  "[L]egal remedies—even legal remedies that a court of equity could sometimes

award—are not 'equitable relief' under § [1132(a)(3)]."  *Id.* at 661.  Suits for money damages,

therefore, are not cognizable.  *See Mertens*, 508 U.S. at 255; *see also Great-W. Life & Annuity*

*Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (holding suits "to impose personal liability" on

defendant and "compel the defendant to pay a sum of money to the plaintiff" not proper under §

1132(a)(3)); *Drinkwater v. Metro. Life Ins. Co.*, 846 F.2d 821, 824 (1st Cir. 1988) ("Other

appropriate equitable relief should be interpreted to mean what it says—declaratory or injunctive

relief, not compensatory and punitive damages.").

       Rather, "[e]quitable remedies are, as a general rule, directed against some specific

thing; they give or enforce a right to or over some particular thing . . . rather than a right to

recover a sum of money generally out of the defendant's assets."  *Montanile*, 136 S.Ct. at 658-59

(internal quotation marks and citation omitted); *see also Depot, Inc. v. Caring for Montanans,*

*Inc.*, No. CV 16-74-M-DLC, 2017 WL 3687339, at *5 (D. Mont. Feb. 14, 2017) ("Under

*Montanile* . . . a party cannot recover in equity unless the funds have been maintained in a

segregated account").  A § 1132(a)(3) plaintiff, therefore, "must seek not to impose personal

liability on the defendant, but to restore to the plaintiff particular funds or property in the

defendant's possession."  *Knudson*, 534 U.S. at 214.  Where the defendant either spends funds on

untraceable items or commingles funds with other monies—§ 1132(a)(3) ***does not permit*** the

plaintiff to proceed against the defendant's general assets.  *See Montanile*, 136 S. Ct. at 655

("We hold that, when a participant dissipates the whole settlement on nontraceable items, the

[plaintiff] cannot bring a suit to attach the [defendant's] general assets under § [1132(a)(3)] because the suit is not one for 'appropriate equitable relief.'"); *Depot, Inc.*, 2017 WL 3687339, at *5 (observing that § 1132(a)(3) liability does not attach where funds have been spent or commingled).

2. *Plaintiffs' Allegations*

Although Plaintiffs style Count III as seeking "equitable relief," the facts as pled reveal that Plaintiffs request money damages to make up a funding deficiency, a remedy unavailable against the Diocesan Defendants.  Specifically, Plaintiffs ask this Court to order the Diocesan Defendants:

- "to fund the Plan in accordance with ERISA's funding requirements," Compl. (Count III, C);

- "make the Plan whole for all contributions that should have been made pursuant to ERISA funding standards, and for interest and investment income on such contributions," *Id.* (Count III, D);

- "disgorge any profits accumulated as a result of their fiduciary breaches"; *Id.* (Count III, D);

- "order declaratory and injunctive relief as necessary and appropriate, including enjoining . . . Diocesan Defendants . . . from further violating the duties, responsibilities, and obligations imposed on them by ERISA, with respect to the Plan;"  *Id.* (Count III, E).

On top of that, Plaintiffs ask the Court to award, declare, or otherwise provide:

> "all relief under 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper, and such appropriate relief as the Court may order, including an accounting, surcharge, disgorgement of profits, equitable lien, constructive trust, reformation of the Plan to conform to Defendants' promises and assurances to participants and beneficiaries, reformation of the Plan to comply with ERISA including but not limited to the minimum funding provisions of ERISA, equitable estoppel to fund the Plan, or other remedy;"

*Id.* (Count III, F).

3.   _The Complaint Fails To Allege An Entitlement To Equitable Relief_

The Complaint does not allege facts to indicate that the requested relief is "appropriate equitable relief" under § 1132(a)(3).  It alleges that the Plan has tens of millions of dollars in unfunded liability, Compl. ¶ 314-15; it does **not** allege that the Diocesan Defendants currently possess or retain specific monies or property from the Plan or the alleged fiduciary breaches; nor do they allege that the Diocesan Defendants are ERISA fiduciaries.[47]  Compl. ¶¶ 440-446 & Wherefore Clause (identifying only SJHSRI and CCCB as ERISA fiduciaries).

U.S. Supreme Court precedent forecloses efforts to collect money damages by simply using equitable buzzwords.  In _Knudson_, the Court refused a benefit plan insurer's efforts to seek reimbursement from a plan participant's settlement with a tortfeasor, where the settlement funds had gone to the participant's attorneys and a restricted trust.  534 U.S. at 208-09, 213-14.  Because the participant never held the settlement funds, the Court ruled that the insurer was seeking legal, as opposed to equitable relief.  The Court reasoned: "Almost invariably . . .  suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money . . . are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty."  _Knudson_, 534 U.S. at 210.

---

[47]A person is an ERISA fiduciary to the extent
> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  Plaintiffs do not allege that the Diocesan Defendants held such authority at the time of the purported fiduciary breaches. If anything, they allege the opposite: "the Diocesan Defendants share responsibility for the 2014 Asset Sale and the retention of the Plan by an insolvent SJHSRI, not because they controlled SJHSRI (_which they did not_), but because they participated" in the conspiracy.  Compl. ¶ 205 (emphasis added).

Similarly, in *Mertens*, the Supreme Court rejected a § 1132(a)(3) claim against a non-fiduciary to make up a funding deficiency, where the non-fiduciary allegedly assisted a breach of fiduciary duty.  508 U.S. at 253, 261-63.  The Court reasoned that the plaintiffs did not "seek a remedy traditionally viewed as equitable, such as an injunction or restitution."  *Mertens*, 508 U.S. at 255.  Instead, the Court observed that "[a]lthough they often dance around the word, what petitioners in fact seek is nothing other than compensatory *damages*—monetary relief for all losses their plan sustained as a result of the alleged breach of fiduciary duties."  *Id.* (emphasis in original).  Such relief, however, was not cognizable under § 1132(a)(3).  *Id.* at 257.

Lower courts have heeded the Supreme Court's holdings and do not tolerate such semantic subterfuge as a means of expanding the relief available under § 1132(a)(3) to reach money damages.  *See, e.g.*, *Todisco v. Verizon Commc'ns, Inc.*, 497 F.3d 95, 99-100 (finding that equitable estoppel cannot be a basis to provide plaintiff with benefits due under the terms of a plan under § 1132(a)(3), as it smacks of legal relief); *Laurent v. Pricewaterhouse Coopers LP,* 06-CV-2280 (JPO), 2017 WL 3142067 at *9 (S.D.N.Y. Jul. 24, 2017) (holding that claim for surcharge[48] was at bottom seeking monetary compensation for loss resulting from breach of duty and is barred as outside of the relief authorized by § 1132(a)(3)).

Plaintiffs' § 1132(a)(3) claim fails for the same reasons as those in *Knudson* and *Mertens*.  *See Knudson*, 534 U.S. at 214, 221; *Mertens*, 508 U.S. at 255.  Like the claims in those cases, the Complaint's request for an order to "fund the Plan" consistent with ERISA is detached from any specific property purportedly held by the Diocesan Defendants and instead represents a claim for money damages.  *See Knudson*, 534 U.S. at 214, 221; *Mertens*, 508 U.S. at 255.

---

[48] Surcharge, moreover, is not available for the additional reason that Plaintiffs do not allege that the Diocesan Defendants were ERISA fiduciaries.  *Depot, Inc.*, 2017 WL 3687339, at *4-5; *see supra* note 47.

The Complaint's reference to the receipt of wholly separate loan proceeds allegedly received by the Diocesan Defendants from the 2014 Asset Sale does not change the analysis.  Compl. ¶ 211.  Plaintiffs do not allege that the Diocesan Defendants still possess these particular funds in segregated accounts or that they are traceable to a particular asset.  *See Depot Inc.*, 2017 WL 3687339, at *5.  The law is clear.  The Complaint fails to allege any facts or circumstances justifying equitable relief.  *See Montanile*, 136 S.Ct. at 658-59.  Accordingly, this Court should dismiss Count III.

### B.  Plaintiffs Fail To State A Claim For ERISA Equitable Estoppel

The First Circuit has not officially resolved whether equitable estoppel is available under ERISA.  *Guerra-Delgado v. Popular, Inc.*, 774 F.3d 776, 782 (1st Cir. 2014); *Tetrault v. Reliance Standard Life Ins. Co.*, 769 F.3d 49, 58 (1st Cir. 2014).  To the extent that equitable estoppel is a viable ERISA remedy in the First Circuit, however Plaintiffs fail to fit their § 1132(a)(3) claim within its limited bounds.

Assuming equitable estoppel is available at all under § 1132(a)(3), the First Circuit has held that estoppel cannot modify an ERISA plan, but is only available where the representation at issue interprets an ambiguous plan provision.  *Guerra-Delgado*, 774 F.3d at 782 ("We have in the past assumed that any such claim under ERISA is necessarily limited to statements that *interpret* the plan and cannot extend to statements that would *modify* the plan." (emphasis in original)).  "Two reasons," the *Guerra-Delgado* Court explained, "support this limitation."  *Id.*  "First, because an ERISA plan must be 'established and maintained pursuant to a written instrument,' a plan cannot be modified orally."  *Id.* (internal citations and quotation marks omitted).  As such, "it would be inherently unreasonable to rely on an oral statement purporting to modify the plan."  *Id.*  "Second," the court added, "ERISA plans must 'provide a

procedure for amending [the] plan,' and modifications made in contravention of the plan's stated procedure violate that requirement." *Id.* (brackets in original) (internal quotation marks and citations omitted).  "It would be unreasonable," therefore, "to rely on an informal statement that departed from that procedure."  *Id.*

The Complaint does not fit within these narrow parameters.  Plaintiffs do not identify ambiguous plan provision(s) or make any effort to connect representations/omissions with such provisions.  Rather, they expressly seek to use equitable estoppel to write out exculpatory provisions and avoid clear funding obligation disclaimers in various iterations of the Plan.  Compl. ¶¶ 220-224.  This is nothing less than an attempt to use estoppel to modify the Plan.  First Circuit precedent precludes such a result.  *See Livick v. The Gillette Co.*, 524 F.3d 24, 31 (1st Cir. 2008) (rejecting estoppel claim and noting as "we have previously explained, a plan beneficiary might reasonably rely on an informal statement interpreting an *ambiguous* plan provision; if the provision is clear, however, an informal statement in conflict with it is in effect purporting to *modify* the plan term, rendering any reliance on it inherently unreasonable.").  Thus, assuming the Plan is an ERISA plan, Plaintiffs fail to state a claim for equitable estoppel under § 1132(a)(3).  *Guerra-Delgado*, 774 F.3d at 782; *Livick*, 524 F.3d at 31.  This Court, therefore, should dismiss Count III to the extent it seeks equitable estoppel.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the Diocesan Defendants' Motion to Dismiss.

Respectfully Submitted,

ROMAN CATHOLIC BISHOP OF
PROVIDENCE, A CORPORATION SOLE,
DIOCESAN ADMINISTRATION
CORPORATION and DIOCESAN SERVICE
CORPORATION


By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP


/s/ Howard Merten
_____
Howard Merten (#3171)
Eugene G. Bernardo (#6006)
Paul M. Kessimian (#7127)
Christopher M. Wildenhain (#8619)
40 Westminster Street, Suite 1100
Providence, RI  02903
(401) 861-8200
(401) 861-8210 FAX
hm@psh.com
egb@psh.com
pk@psh.com
cmw@psh.com


## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of September 2018, the foregoing document has been filed
electronically through the Rhode Island ECF system, is available for viewing and downloading,
and will be sent electronically to the counsel who are registered participants identified on the
Notice of Electronic Filing.

/s/ Howard Merten
_____

3370937.7/1444-35