UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STEPHEN DEL SESTO, AS RECEIVER AND  :
ADMINISTRATOR OF THE ST. JOSEPH      :
HEALTH SERVICES OF RHODE ISLAND      :
RETIREMENT PLAN; GAIL J. MAJOR;      :
NANCY ZOMPA; RALPH BRYDEN;           :
DOROTHY WILLNER; CAROLL SHORT;       :
DONNA BOUTELLE; and EUGENIA          :
LEVESQUE,                            :
                                     :
       Plaintiffs          :
       v.                  :   C.A. NO.:1:18-CV-00328-WES-LDA
                                     :
PROSPECT CHARTERCARE, LLC;           :
CHARTERCARE COMMUNITY BOARD; ST.     :        Jury Trial Demanded
JOSEPH HEALTH SERVICES OF RHODE      :
ISLAND; PROSPECT CHARTERCARE         :
SJHSRI, LLC; PROSPECT CHARTERCARE    :        Class Action
RWMC, LLC; PROSPECT EAST HOLDINGS,   :
INC.; PROSPECT MEDICAL HOLDINGS,     :
INC.; ROGER WILLIAMS HOSPITAL;       :
CHARTERCARE FOUNDATION; THE RHODE    :
ISLAND COMMUNITY FOUNDATION;         :
ROMAN CATHOLIC BISHOP OF             :
PROVIDENCE; DIOCESAN                 :
ADMINISTRATION CORPORATION;          :
DIOCESAN SERVICE CORPORATION; and    :
THE ANGELL PENSION GROUP, INC.,      :
                                     :
       Defendants.         :


**FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

Plaintiffs .................................................................................................................... 1

Defendants................................................................................................................. 2

Jurisdiction and Venue.............................................................................................. 7

Class Action Allegations ........................................................................................... 9

    A.   Numerosity .................................................................................................. 9

    B.   Commonality................................................................................................ 9

    C.   Typicality.................................................................................................... 11

    D.   Adequacy ................................................................................................... 12

    E.   Rule 23(b)(1) Requirements ..................................................................... 12

    F.   Rule 23(b)(2) Requirements ..................................................................... 13

    G.   Rule 23(b)(3) Requirements ..................................................................... 13

Related Proceedings................................................................................................ 14

Overview .................................................................................................................. 15

Facts ........................................................................................................................ 18

    A.   Concerning That the Plan is Subject to ERISA ....................................... 18

        1.   Exemption for Church Plans .............................................................. 18

        2.   The Plan Did Not Satisfy the "Principal-Purpose" Requirement..........22

        3.   SJHSRI Was Not a Church Plan Because It Was Not "Controlled by or Associated with a Church or a Convention or Association of Churches" .............25

        4.   SJHSRI Was Not a Tax Exempt Organization at Least as of the 2014 Asset Sale ..........................................................................................27

        5.   Fraudulent Inclusion of SJHSRI in the Catholic Directory .................31

    B.   SJHSRI's Obligations Under the Plan ..................................................... 55

    C.   Defendants Knew the Plan Was Underfunded ......................................... 62

    D.   Misrepresentations to Plan Participants .................................................. 68

    E.   Fraudulent Misrepresentations and Omissions to State Regulators............ 92

    F.   Misleading the State Court in Connection with *Cy Pres* Proceedings ...................... 116

    G.   Facts Concerning Successor Liability........................................................ 123

    H.   Further Stripping of SJHSRI's Assets Through the Asset Purchase on or about June 20, 2014.................................................................................. 131

Causes of Action...................................................................................................... 136

    COUNT I (ERISA, Minimum Funding) ................................................................ 136

    COUNT II (ERISA, Breach of Fiduciary Duty) .................................................... 139

    COUNT III (ERISA, Aiding and Abetting Breaches of Fiduciary Duty) .............................. 142

    COUNT IV (ERISA, Declaratory Relief)............................................................... 144

i

COUNT V (Fraudulent Transfer, § 6-16-4(a)(1)) ............................................... 144

COUNT VI (Fraudulent Transfer, §§ 6-16-4(a)(2) and/or 6-16-5(a)) ..................... 146

COUNT VII (Fraud through Intentional Misrepresentations and Omissions) .................... 149

COUNT VIII (Fraudulent Scheme) ............................................................... 150

COUNT IX (Conspiracy) ........................................................................ 150

COUNT X (Actuarial Malpractice) ............................................................... 151

COUNT XI (Breach of Contract) ................................................................ 152

COUNT XII (Alter Ego) ........................................................................ 153

COUNT XIII (De Facto Merger) ................................................................. 154

COUNT XIV (Joint Venture) .................................................................... 155

COUNT XV (Successor Liability) ............................................................... 156

COUNT XVI (Civil Liability Under R.I. Gen. Laws § 9-1-2 for Violations of the Rhode
   Island Hospital Conversions Act) ........................................................ 157

COUNT XVII (Civil Liability under R.I. Gen. Laws § 9-1-2 for Violations of 26 U.S.C.
   § 7206(2)) ............................................................................. 157

COUNT XVIII (Civil Liability under R.I. Gen. Laws § 9-1-2 for Violations of R.I. Gen.
   Laws § 11-18-1) ....................................................................... 158

COUNT XIX (Civil Liability under R.I. Gen. Laws § 9-1-2 for Violations of R.I. Gen.
   Laws § 11-41-4) ....................................................................... 159

COUNT XX (Liquidation pursuant to R.I. Gen. Laws §§ 7-6-60 & -61) ............................ 160

COUNT XXI (Rhode Island Law, Breach of Fiduciary Duty) ...................................... 161

COUNT XXII (Rhode Island Law, Aiding and Abetting Breaches of Fiduciary Duty) ......... 161

COUNT XXIII (Declaratory Judgment, Liability and Turn Over of Funds, State Law
   Claims) ............................................................................... 162

JURY DEMAND ................................................................................. 163

<u>**P**LAINTIFFS</u>

1.      The St. Joseph Health Services of Rhode Island Retirement Plan (the "Plan") is a defined benefit retirement plan based in Rhode Island with over 2,700 participants.

2.      Plaintiff Stephen Del Sesto is a resident of East Providence, Rhode Island. He brings this action on behalf of the Plan and all of the Plan participants, in his capacity as Receiver for and Administrator of the Plan.  He was appointed by the Rhode Island Superior Court in the case captioned *St. Joseph Health Services of Rhode Island, Inc. v. St. Josephs Health Services of Rhode Island Retirement Plan, as amended*, PC-2017-3856 (the "Receivership Proceeding").

3.      Plaintiff Gail J. Major resides in Cranston, Rhode Island and is a participant in the Plan.  She brings this action in her individual capacity and on behalf of all other Plan participants.

4.      Plaintiff Nancy Zompa resides in Cranston, Rhode Island and is a participant in the Plan.  She brings this action in her individual capacity and on behalf of all other Plan participants.

5.      Plaintiff Ralph Bryden resides in North Scituate, Rhode Island and is a participant in the Plan.  He brings this action in his individual capacity and on behalf of all other Plan participants.

6.      Plaintiff Dorothy Willner resides in Cranston, Rhode Island and is a participant in the Plan.  She brings this action in her individual capacity and on behalf of all other Plan participants.

7.      Plaintiff Caroll Short resides in Smithfield, Rhode Island and is a participant in the Plan.  She brings this action in her individual capacity and on behalf of all other Plan participants.

8.      Plaintiff Donna Boutelle resides in Johnston, Rhode Island and is a participant in the Plan.  She brings this action in her individual capacity and on behalf of all other Plan participants.

9.      Plaintiff Eugenia Levesque resides in West Greenwich, Rhode Island and is a participant in the Plan.  She brings this action in her individual capacity and on behalf of all other Plan participants.

10.     The Plaintiffs who bring this action both in their individual capacity and on behalf of all other Plan participants are referred to collectively as the "Proposed Class Representatives."

<u>DEFENDANTS</u>

11.     Defendant PROSPECT CHARTERCARE, LLC ("Prospect Chartercare") is a limited liability company organized and existing under the laws of the State of Rhode Island, with its principal office in Los Angeles, California.  Directly, and through its 100% owned subsidiaries PROSPECT CHARTERCARE SJHSRI, LLC[1] and PROSPECT CHARTERCARE RWMC, LLC,[2] Prospect Chartercare owns and operates health care

---

[1] Not to be confused with St. Joseph Health Services of Rhode Island which until the 2014 Asset Sale owned and operated Fatima Hospital.  St. Joseph Health Services of Rhode Island is controlled by the nonprofit corporation CharterCARE Community Board, not the for-profit Prospect Chartercare.

[2] Not to be confused with the corporation Roger Williams Hospital that owned and operated Roger Williams Hospital prior to the 2014 Asset Sale, which is owned or controlled by CharterCARE Community Board, not Prospect Chartercare.  Flow charts setting forth the relationships of certain Defendants and other entities, before the 2014 Asset Sale and as a result of the 2014 Asset Sale, are attached hereto at Tab 1.

facilities in Rhode Island, including but not limited to two hospitals, Roger Williams Hospital and Our Lady of Fatima Hospital ("Fatima Hospital"), having acquired them in connection with an asset sale that closed on June 20, 2014 (the "2014 Asset Sale"). Prospect Chartercare currently has two members.

12.     One member of Prospect Chartercare, holding a 15% ownership interest, is Defendant CharterCARE Community Board ("CCCB"), an entity organized and existing under the laws of the State of Rhode Island as a non-profit corporation, with its principal office in Providence, Rhode Island.  Prior to the 2014 Asset Sale, CCCB was known as CharterCARE Health Partners, or CCHP.

13.     The other member of Prospect Chartercare, holding the remaining 85% ownership interest, is Defendant Prospect East Holdings, Inc. ("Prospect East"), a for-profit corporation organized and existing under the laws of the State of Delaware with a principal office and place of business in Los Angeles, California.  Prospect East is the wholly owned subsidiary of Defendant Prospect Medical Holdings, Inc.

14.     Defendant Prospect Medical Holdings, Inc. ("Prospect Medical Holdings") is a corporation organized and existing under the laws of the State of Delaware with a principal office and place of business in Los Angeles, California.  Prospect Medical Holdings owns all of the shares of Prospect East.

15.     Defendant St. Joseph Health Services of Rhode Island ("SJHSRI") is an entity organized and existing under the laws of the State of Rhode Island as a non-profit corporation, with its principal office in Providence, Rhode Island.

16.     Prior to the 2014 Asset Sale, SJHSRI owned Fatima Hospital.  Since then, SJHSRI no longer operates a hospital or otherwise provides health care.  Instead, SJHSRI's business consists of defending lawsuits and workers' compensation claims,

collecting certain debts and receivables, paying or settling certain liabilities which were
excluded from the 2014 Asset Sale, and, until the Receiver was appointed,
administering the Plan.

17.     Defendant Roger Williams Hospital ("RWH") is an entity organized and
existing under the laws of the State of Rhode Island as a non-profit corporation, with its
principal office in Providence, Rhode Island.  RWH is the survivor of a merger in 2010
with Roger Williams Medical Center, and has sometimes done business under that
name.

18.     Prior to the 2014 Asset Sale, RWH owned the hospital it operated under
the name of Roger Williams Hospital.  Upon the sale, RWH ceased operating a hospital
or otherwise providing medical care, and existed only to provide funds to SJHSRI and
possibly other individuals and entities (but did not provide funds to the Plan), defend
lawsuits and workers' compensation claims, collect certain debts and receivables, and
pay or settle certain liabilities which were excluded from the 2014 Asset Sale.

19.     At all relevant times CCCB was the ostensible parent company of both
SJHSRI and RWH, although, as discussed below, the separate corporate statuses of
CCCB, SJHSRI, and RWH must be disregarded to prevent fraud.

20.     Defendant PROSPECT CHARTERCARE SJHSRI, LLC ("Prospect
Chartercare St. Joseph") is a limited liability company organized and existing under the
laws of the State of Rhode Island with its principal office in Los Angeles, California.
Prospect Chartercare St. Joseph has owned Fatima Hospital since the 2014 Asset Sale.
The sole member of Prospect Chartercare St. Joseph is Prospect Chartercare.

21.     Defendant PROSPECT CHARTERCARE RWMC, LLC ("Prospect
Chartercare Roger Williams") is a limited liability company organized and existing under

4

the laws of the State of Rhode Island with its principal office in Los Angeles, California. Prospect Chartercare Roger Williams has owned Roger Williams Hospital since the 2014 Asset Sale.  The sole member of Prospect Chartercare Roger Williams is Prospect Chartercare.

22.     As used herein, "Old Fatima Hospital" refers to Fatima Hospital when it was owned and operated by SJHSRI, and "New Fatima Hospital" refers to Fatima Hospital since June 20, 2014 when it has been owned and operated by Prospect Chartercare St. Joseph.  "Old Roger Williams Hospital" refers to Roger Williams Hospital when it was owned and operated by RWH, and "New Roger Williams Hospital" refers to Roger Williams Hospital since June 20, 2014 when it has been owned and operated by Prospect Chartercare Roger Williams.

23.     SJHSRI, CCCB, RWH, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East have contractually, publically, and repeatedly described the ownership and operation of New Fatima Hospital and New Roger Williams Hospital as a joint venture between Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East and Defendant CCCB and they must be treated as joint venturers.

24.     Defendant CharterCARE Foundation ("CC Foundation") is an entity organized and existing under the laws of the State of Rhode Island as a non-profit corporation, with its principal office in North Providence, Rhode Island.  It was formerly named CharterCare Health Partners Foundation.  Its sole member is CCCB.

5

25.     Defendant Rhode Island Community Foundation, d/b/a Rhode Island Foundation ("RI Foundation"), is an entity organized and existing under the laws of the State of Rhode Island as a non-profit corporation, with its principal office in Providence, Rhode Island.  RI Foundation holds and invests funds on behalf of CC Foundation to which Plaintiffs claim to be entitled, and is named herein solely as a stakeholder of property claimed by Plaintiffs, so that Plaintiffs may be accorded complete relief.  When Defendant RI Foundation is intended to be referred to herein it is always specifically identified by name, and statements generally referencing "Defendants," "all of the Defendants," or "all of the other Defendants," do not refer to Defendant RI Foundation unless Defendant RI Foundation is referred to by name.

26.     The Roman Catholic Bishop of Providence ("Corporation Sole") is a corporation sole, created by an act of the Rhode Island General Assembly entitled *An Act to Create the Roman Catholic Bishop of Providence, and His Successors, a Corporation Sole*, with its principal office in Providence, Rhode Island.  Since May 31, 2005, Bishop Thomas Tobin was the President and Chief Executive Officer of Corporation Sole.  He was acting within the scope of his employment by Defendant Corporation Sole with respect to all of his actions and omissions alleged herein.

27.     Diocesan Administration Corporation ("Diocesan Administration") is an entity organized and existing under the laws of the State of Rhode Island as a non-profit corporation, with its principal office in Providence, Rhode Island.  It aids in administering the affairs of the Roman Catholic Diocese of Providence ("Diocese of Providence") and was instrumental in various matters alleged herein concerning the Diocese of Providence.  Since May 31, 2005, Bishop Tobin was the President and Chief Executive Officer of Diocesan Administration.  He was acting within the scope of his employment

6

by Defendant Diocesan Administration with respect to all of his actions and omissions alleged herein.

28.     Diocesan Service Corporation ("Diocesan Service") is an entity organized and existing under the laws of the State of Rhode Island as a non-profit corporation, with its principal office in Providence, Rhode Island.  It aids in administering the affairs of and services provided by the Diocese of Providence and was instrumental in various matters alleged herein concerning the Diocese of Providence.  Since May 31, 2005, Bishop Tobin was the President and Chief Executive Officer of Diocesan Service.  He was acting within the scope of his employment by Defendant Diocesan Service with respect to all of his actions and omissions alleged herein.

29.     The Angell Pension Group, Inc. ("Angell") is a corporation organized and existing under the laws of Rhode Island with its principal office in East Providence, Rhode Island.  Since 2005, Angell provided actuarial services in connection with the Plan, and, at least since 2011, Angell provided administrative services which included dealing directly with and advising Plan participants, initially on behalf of and as agents for SJHSRI and CCCB, and later on behalf of and as agents for SJHSRI, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East.

JURISDICTION AND VENUE

30.     Plaintiffs brings this Complaint under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a) and (e)(1), as some of the claims asserted herein are founded on violations of Sections 502(a)(1)(A), 502(a)(1)(B), 502(a)(2), 502(a)(3) & 503 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and on federal common law such as estoppel in favor of participants and beneficiaries to enforce

7

benefits promises, even where those promises may not be included in a written plan. Although SJHSRI operated the Plan as if it qualified for exemption from ERISA as a "church plan," Plaintiffs base their ERISA claims on factual allegations that prove that the requirements for the exemption upon which SJHSRI relied were not met, on many different levels and at various different times.  Accordingly, the Plan and various entities involved with the Plan became and continue to be subject to ERISA.

31.     In addition, Plaintiffs assert various state law claims that arise out a common nucleus of operative facts as the claims based on ERISA, over which the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  Some of those state law claims are within the concurrent jurisdiction of the federal courts and the state courts and, therefore, are not preempted under ERISA.

32.     Plaintiffs assert other state law claims that may be pre-empted if the Court determines that the Plan was covered by ERISA at the times those claims arose.  Since the issue of whether the Plan was covered by ERISA will be disputed, Plaintiffs plead those claims in the alternative.  The Court also has supplemental jurisdiction over those alternative state law claims pursuant to 28 U.S.C. § 1367(a), even if it is ultimately determined that the Plan was not governed by ERISA.

33.     Venue in the District of Rhode Island is proper under 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action is situated, in Rhode Island. Venue in the District of Rhode Island is also proper under 29 U.S.C. § 1132, in that the Plan is administered and certain breaches concerning the Plan took place in Rhode Island.

34.     All of the Defendants have sufficient minimum contacts with and are subject to the personal jurisdiction of the Court.

## <u>CLASS ACTION ALLEGATIONS</u>

35.     The Proposed Class Representatives bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following class of persons similarly situated: All participants or beneficiaries of the Plan (the "Class").  The Receiver joins in the application of the Proposed Class Representatives that they be appointed class representatives, and that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23.

36.     Excluded from the Class are any high-level executives at SJHSRI or at the other Defendants, or any employees who have responsibility or involvement in the administration of the Plan, or who are subsequently determined to be fiduciaries of the Plan, or who knowingly participated in any of the wrongful acts described herein.

## A.     NUMEROSITY

37.     The exact number of Class members is unknown to the Proposed Class Representatives at this time, but may be readily determined from records maintained by Defendants in conjunction with records obtained by the Receiver.  The number of Plan beneficiaries is estimated to exceed 2,700.  Upon information and belief, many, if not all, of those persons are likely members of the Class, and thus the Class is so numerous that joinder of all members is impracticable.

## B.     COMMONALITY

38.     The issues regarding liability in this case present common issues of law and fact, with answers that are common to all members of the Class, including but not

9

limited to (1) whether and/or when the Plan became subject to ERISA, and if so, whether violations of ERISA have occurred; (2) the determination of Defendant SJHSRI's obligations and the Plan participants' rights under the Plan, and whether those obligations were breached and those rights violated; (3) the determination of whether all of the Defendants committed fraud; (4) the determination of whether all of the Defendants engaged in a civil conspiracy; (5) the determination of whether all of the Defendants aided and abetted fraud; (6) whether the transfers of assets in connection with the 2014 Asset Sale and/or 2015 *Cy Pres* Proceeding constitute fraudulent transfers; (7) whether Defendants violated the Hospital Conversions Act in connection with obtaining regulatory approval of the 2014 Asset Sale; (8) whether Corporation Sole, Diocesan Administration, and Diocesan Service aided and abetted the filing of a false tax return in connection with their agreement to continue to list SJHSRI in the Catholic Directory after the 2014 Asset Sale; (9) whether Defendants owe or owed fiduciary duties to participants of the Plan, either under ERISA or state law; and (10) issues of successor liability.

39.    The issues regarding the relief are also common to the members of the Class as the relief will include, but are not limited to (1) equitable relief ordering Defendants to fund the Plan, for the benefit of all Plan beneficiaries; (2) a judgment avoiding the transfers in connection with the 2014 Asset Sale and 2015 *Cy Pres* Proceeding; (3) a declaration that the Plan is subject to ERISA; and (4) awarding to Plaintiffs' counsel attorneys' fees and expenses as provided by the common fund doctrine, 29 U.S.C. § 1132(g), and/or other applicable doctrine.

C.   TYPICALITY

40.     The Proposed Class Representatives' claims are typical of the claims of the other members of the Class, because their claims arise from the same events, practices and/or courses of conduct, including, but not limited to, Defendants' treatment of the Plan as exempt from ERISA, Defendants' transfers of assets in connection with the 2014 Asset Sale and/or 2015 *Cy Pres* Proceeding, Defendants' misrepresentations to Plan beneficiaries, Defendants' misrepresentations to regulators in connection with the approval of the 2014 Asset Sale, and Defendants' fraudulent schemes to defraud Plaintiffs.  The Proposed Class Representatives' claims are also typical, because all Class members are similarly affected by Defendants' wrongful conduct.

41.     The Proposed Class Representatives' claims are also typical of the claims of the other members of the Class because, to the extent the Proposed Class Representatives seek equitable or declaratory relief, it will affect all Class members equally.  Specifically, the equitable relief sought includes but is not limited to requiring Defendants to make the Plan whole for all contributions that should have been made pursuant to ERISA funding standards, reformation of the Plan to correspond to Defendants' representations and promises in connection therewith, and for interest and investment income on such contributions.  The declaratory relief sought will address Defendants' obligations to all Plan participants.

42.     Defendants do not have any defenses unique to the Proposed Class Representatives' claims that would make the Proposed Class Representatives' claims atypical of the remainder of the Class.

11

**D.     ADEQUACY**

43.     The Proposed Class Representatives will fairly and adequately represent and protect the interests of all members of the Class.

44.     The Proposed Class Representatives do not have any interests antagonistic to or in conflict with the interests of the Class.

45.     Defendants have no unique defenses against the Proposed Class Representatives that would interfere with Plaintiffs' representation of the Class.

46.     The Proposed Class Representatives have engaged counsel (a) with extensive experience in complex litigation, (b) who have already devoted hundreds of hours and secured and reviewed approximately one million pages of documents in investigating those claims, and (c) with the approval of the Rhode Island Superior Court, represent the Receiver whose interests are identical to the interests of the Proposed Class Representatives.

**E.     RULE 23(B)(1) REQUIREMENTS**

47.     The requirements of Rule 23(b)(1)(A) are satisfied, because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

48.     The requirements of Rule 23(b)(1)(B) are satisfied, because adjudications of these claims by individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede the ability of other members of the Class to protect their interests.

12

## F.   RULE 23(B)(2) REQUIREMENTS

49.     Class action status is also warranted under Rule 23(b)(2), because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## G.   RULE 23(B)(3) REQUIREMENTS

50.     If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under (b)(3) is appropriate, because questions of law or fact common to members of the Class predominate over any questions affecting only individual members.  The common issues of law or fact that predominate over any questions affecting only individual members include, but are not limited to: (1) whether and/or when the Plan became subject to ERISA, and if so, whether violations of ERISA have occurred; (2) the determination of Defendant SJHSRI's obligations and the Plan participants' rights under the Plan, and whether those obligations were breached and those rights violated; (3) the determination of whether all of the Defendants committed fraud; (4) the determination of whether all of the Defendants engaged in a civil conspiracy; (5) the determination of whether all of the Defendants aided and abetted fraud; (6) whether the transfers of assets in connection with the 2014 Asset Sale and/or 2015 Cy Pres Proceeding constitute fraudulent transfers; (7) whether Defendants violated the Hospital Conversions Act in connection with obtaining regulatory approval of the 2014 Asset Sale; (8) whether Corporation Sole, Diocesan Administration, and Diocesan Service aided and abetted the filing of a false tax return in connection with their agreement to continue to list SJHSRI in the Catholic Directory after the 2014 Asset Sale; (9) whether

Defendants owe or owed fiduciary duties to participants of the Plan, either under ERISA or state law; and (10) issues of successor liability.

51.     A class action is superior to the other available methods for the fair and efficient adjudication of this controversy, because:

A.     Individual Class members do not have an interest in controlling the prosecution of these claims in individual actions rather than a class action, because the equitable and declaratory relief sought by any Class member will either inure to the benefit of the Plan or affect each class member equally;

B.     Individual members also do not have any interest in controlling the prosecution of these claims because the monetary relief that they could seek in any individual action is identical to the relief that is being sought on their behalf herein;

C.     This litigation is properly concentrated in this forum, where most or all Defendants are headquartered and/or located, where Plaintiffs are located or live, and where the Receivership Proceeding concerning the Plan is already pending; and

D.     There are no difficulties managing this case as a class action.

RELATED PROCEEDINGS

52.     Concurrently with the filing of the initial Complaint, Plaintiffs filed a parallel proceeding in the Rhode Island Superior Court (the "State Action"), asserting the state law claims made herein, but solely for the purposes of protecting Plaintiffs from the possible expiration of any time limitations during the pendency of the proceeding in this Court, should the Court for any reason decline to exercise supplemental jurisdiction over those state law claims.  That State Action has been stayed pending the resolution of the proceeding in this Court.

53.     Plaintiffs also sought and were granted leave to intervene in a case that is currently pending in the Rhode Island Superior Court entitled *In re: CHARTERCARE HEALTH PARTNERS FOUNDATION, ROGER WILLIAMS HOSPITAL and ST. JOSEPH HEALTH SERVICES OF RHODE ISLAND*, C.A. No. KM-2015-0035 (the "2015 *Cy Pres* Proceeding"), in which Plaintiffs ask the state court to order that Defendants CC Foundation and RI Foundation hold the approximately $8,200,000 (and any proceeds thereof) that was transferred from SJHSRI and RWH pursuant to the order of the court in that proceeding, so as to protect Plaintiff's claims against those funds and preserve the *status quo* pending the determination of the merits of those claims in this Court or in the State Action, and to vacate the state court's order entered April 20, 2015 pursuant to which these assets were transferred to CC Foundation and the RI Foundation.

O<small>VERVIEW</small>

54.     This case concerns a defined benefit retirement plan that is insolvent in the sense that its assets (excluding any recoveries on the claims asserted herein) are exceeded by its liabilities, with 2,729 participants, consisting of hospital nurses and other hospital workers who, after many years of dedicated service to their patients and SJHSRI, learned in August of 2017 that the Plan had not been adequately funded.  The disclosure occurred when the Plan was placed into receivership by SJHSRI, with the request that the Rhode Island Superior Court approve a virtually immediate 40% across-the-board reduction in benefits.

55.     The harm to the Plan participants' pensions is the product of (at least) four separate but related factual scenarios and schemes:

15

a.  For nearly fifty years SJHSRI used the Plan as a marketing tool to hire and retain employees, and promised employees and prospective employees that SJHSRI made 100% of the necessary contributions and that they had no investment risk, leading them to mistakenly but justifiably conclude that SJHSRI was making the necessary contributions and their pensions were safe;

b.  For most of at least the past ten years, SJHSRI stopped making necessary contributions with the result that the Plan was grossly underfunded, but SJHSRI and  Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East, Angell, CCCB, RWH, Corporation Sole, Diocesan Service, and Diocesan Administration, acting at various times, conspired to conceal it from Plan participants through fraudulent misrepresentations and material omissions regarding the Plan;

c.  For many years SJHSRI and Defendants CCCB and RWH secretly sought a means to terminate the Plan without exposing SJHSRI's substantial operating assets and charitable funds to lawsuits by Plan participants for benefits, including in December of 2012 when SJHSRI considered unilaterally terminating the Plan and paying benefits only to employees who were already retired, which would have deprived over 1,800 other Plan participants of any pension whatsoever, but reconsidered because SJHSRI feared that the excluded Plan participants would bring a successful class action that would end up costing SJHSRI more than it would save by terminating the Plan;

d.  Beginning in 2011, SJHSRI and Defendants CCCB and RWH, later joined by Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East, Angell, Corporation Sole, Diocesan Service, and Diocesan Administration, put into operation a scheme to transfer SJHSRI's operating assets, cash, and most of its expected future charitable income to entities controlled by SJHSRI's parent company, intending that such assets thereby would be out of reach of a suit by the Plan participants, and then terminate the Plan.  This scheme had four key stages:

i.  First, in connection with the 2014 Asset Sale, SJHSRI and related entities engaged in the fraudulent transfer of SJHSRI's operating assets to the control of a for-profit limited liability company, leaving SJHSRI with the insolvent pension plan and no operating assets, in return for SJHSRI's parent company getting a 15% stake in the for-profit company that they thought would be safe from the claims of Plan participants, and made fraudulent misstatements and

16

material omissions concerning the Plan to the state regulatory agencies whose approval was required for the transfer to go forward.

ii.  Next, to evade federal law imposing liability on control groups and successors under ERISA, SJHSRI and Defendants CCCB, RWH, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East conspired with Corporation Sole, Diocesan Administration, and Diocesan Service to falsely claim that the Plan continued to qualify as a "church plan," which if true would have exempted it from ERISA. This claim violated federal tax laws and ERISA.

iii.  Then, to secure cash which should have gone to bolster the Plan, SJHSRI's parent company over the last four years stripped at least $8,200,000 in charitable assets from SJHSRI and its other subsidiary, and either spent or put the money in a foundation it controlled. This was accomplished by misleading the Rhode Island Superior Court in 2015 into approving these wrongful and fraudulent transfers under the doctrine of *cy pres*.

iv.  Finally, having accomplished their goal of stripping SJHSRI of virtually all value, SJHSRI and its affiliates sought to wash their hands of the problem they created, and put the Plan into receivership in August of 2017 and asked the state court to reduce SJHSRI's liabilities to Plan participants by 40% on the grounds that SJHSRI had insufficient assets to fund the Plan.

56.   Defendants SJHSRI, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East, Angell, CCCB, RWH, CC Foundation, Corporation Sole, Diocesan Service, and Diocesan Administration violated ERISA, committed fraud, breached their contractual obligations, violated their duty of good faith and fair dealing, and/or otherwise acted wrongfully. As a result, they must be required to compensate losses to the Plan and remedy such violations, including returning all assets improperly diverted from the Plan, and to otherwise fully fund the Plan.

17

57.     Defendants SJHSRI, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East, CCCB, CC Foundation, and RWH also ran afoul of Rhode Island laws prohibiting fraudulent conveyances.  The remedies for those violations include that Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, CC Foundation, and Prospect East must turn over to the Plan and its participants the entirety of the assets they acquired in the 2014 Asset Sale or the 2015 *Cy Pres* Proceeding, with no credit or offset for what they paid for those assets, or for the improvements that they may have made on the facilities.  In other words, the Plaintiffs are entitled to judgment awarding them these assets, including but not limited to New Fatima Hospital and New Roger Williams Hospital, or ordering that these properties and other assets be sold and awarding Plaintiffs the proceeds from the sale up to the amount necessary to fully fund the Plan on a termination basis and ensure the pensions of all Plan participants.

<u>FACTS</u>

A.     CONCERNING THAT THE PLAN IS SUBJECT TO ERISA

        1.     Exemption for Church Plans

58.     The vast majority of defined benefit pension plans are subject to and required to comply with ERISA.

59.     The requirements under ERISA include the obligations to make the minimum contributions to the plan required by ERISA, to inform plan participants if the employer was not making those minimum contributions, and to pay premiums to the Pension Benefit Guaranty Corporation ("PBGC") for insurance coverage to protect participants against insolvency of the plan.

18

60.     Moreover, entities which purchase the assets of an ERISA plan sponsor, and which continue to carry on essentially the same business at the same location and with the same employees, have liability for the plan under the doctrine of successor liability, which cannot be avoided by the parties' express exclusion of the pension liability from the asset sale.

61.     However, certain pension plans established and/or operated by churches or qualified church-controlled organizations are exempt from ERISA (hereinafter "Church Plan" or "Church Plans"), provided they comply with the terms of the exemption.  So too most governmental plans are exempted from ERISA.

62.     Although even Church Plans may elect to be covered under ERISA, at a meeting on December 5, 1984 of the Retirement Board for the predecessor to the Plan (the members present were Bishop Gelineau, Msg. Kenneth A. Angell, Paul Devlin, Paul Keating, and A. Edward Azevedo), the Retirement Board disregarded their fiduciary duties to the Plan and rejected a proposal to make that election, because the Board saw no benefit to SJHSRI in protecting employees and other Plan participants by making the election, and wished to avoid the annual premium to the PBGC, which at that time they believed was $15,000 per year.

63.     At various times during the period from 1995 to the present, SJHSRI did not fund the Plan in accordance with the requirements of ERISA and the recommendations of the Plan's actuaries, including but not limited to 2010, 2011, 2012, 2013, 2014, 2015, and 2016, with the result that the Plan is grossly underfunded.

64.     During the period from 1995 to the present, SJHSRI and the other entities and individuals administering the Plan and communicating with Plan participants at no time informed Plan participants that they claimed that the Plan was not subject to

19

ERISA, that the Plan was underfunded, or that the Plan was not being funded in accordance either with ERISA or the recommendations of SJHSRI's actuaries, with the result that all Plan participants who were not aiding and abetting Defendants or otherwise participating in the conspiracy were taken completely by surprise when that was disclosed in connection with the filing of the Receivership Proceeding in August of 2017.

65.     As discussed below, there came a time when the Plan no longer qualified as a Church Plan, but SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East, Corporation Sole, Diocesan Administration, and Diocesan Service all fraudulently conspired to misrepresent that the Plan remained qualified as a Church Plan, in violation of federal tax laws and ERISA, as part of their scheme to avoid successor liability of Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, and to shield New Fatima Hospital from liability for the Plan.

66.     Thus, the determination of whether and when the Plan ceased to qualify as a Church Plan is essential to determining the rights of the parties herein.

67.     The definition of "Church Plan" is set forth in 26 U.S.C. § 1002(33)(A)&(C) as follows:

> (A) The term "church plan" means a plan established and maintained (to the extent required in clause (ii) of subparagraph (B)) for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26.

> *       *       *

> (C) For purposes of this paragraph--

20

(i) A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

(ii)  The term employee of a church or a convention or association of churches includes—

(I)   a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, regardless of the source of his compensation;

(II)   an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of title 26 and which is controlled by or associated with a church or a convention or association of churches; and

(III)   an individual described in clause (v).

(iii)   A church or a convention or association of churches which is exempt from tax under section 501 of title 26 shall be deemed the employer of any individual included as an employee under clause (ii).

(iv)   An organization, whether a civil law corporation or otherwise, is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches.

68.    As discussed below, the Plan did not qualify as a Church Plan for various reasons based on events that occurred at various times: (a) beginning in 2009; (b) continuing through the 2014 Asset Sale; and (c) culminating with the Plan being put into receivership in August of 2017.

69.    More specifically,

a.   at various times since 2009, the Plan did not qualify as a Church Plan because the Plan was not maintained by a qualifying "principal-purpose" organization;

b.   at various times since 2009, and certainly by the 2014 Asset Sale and the Plan being put into receivership in August of 2017, the Plan did not qualify as a Church Plan because SJHSRI was no longer "controlled by or associated with a church or a convention or association of churches;" and

c.   at various times since 2009, and certainly after the 2014 Asset Sale and the Plan being put into receivership in August of 2017, the Plan did not qualify as a Church Plan because SJHSRI was no longer entitled to tax exempt status under the group exemption issued to the United States Conference of Catholic Bishops, and, therefore, was no longer properly included in the Catholic Directory because it was no longer "operated, supervised or controlled by or in connection with the Roman Catholic Church in the United States."

## 2. The Plan Did Not Satisfy the "Principal-Purpose" Requirement

70.    Under 29 U.S.C. § 1002 (33)(c)(i), a pension plan that includes employees of non-church entities cannot qualify as a Church Plan unless (a) the Plan was "maintained by an organization, the principal purpose of which is the administration or funding of a plan for the provision of retirement or welfare benefits or both…," *and* (b) the principal-purpose organization is controlled by or associated with a church.

71.    In addition, under 29 U.S.C. § 1002 (33)(c)(ii)(II), any non-church entity that employs plan participants must be "controlled by or associated with a church or a convention or association of churches" or the plan loses its status as a Church Plan.

72.    The prototypical "principal-purpose" organization is a church benefits board that administers a plan whose participants include employees of non-church agencies controlled by or associated with the church.

73.    The requirement that the plan must be maintained by a "principal-purpose" organization serves to ensure that the obligations of the organization responsible for

22

administering or funding the pension plan are to the plan, not to interests or responsibilities that are or may be adverse to the interests of the plan.

74.    The separate requirement that the "principal-purpose" organization itself must be controlled by or associated with a church maintains the close connection between the organization administering or funding the plan and the church, upon which the special exemption from ERISA for Church Plans is based.

75.    As of 2009, SJHSRI had taken over the administration of the SJHSRI Plan, and SJHSRI's Finance Committee was administering the Plan and making its investment decisions.  At the same time, SJHSRI's Finance Committee was managing the operating hospitals' finances and managing other non-Plan matters, demonstrating that the Finance Committee was not a principal-purpose organization.

76.    In August 27, 2009, SJHSRI sent out notices to plan participants saying that SJHSRI had decided to freeze the Plan.  These notices were signed by "Plan Administrator, St. Joseph Health Services of Rhode Island."  SJHSRI owned and operated Old Fatima Hospital, and, therefore, was not and could not have been a principal-purpose organization.

77.    In 2011, SJHSRI's Board of Trustees itself amended the Plan.  Whereas prior amendments had been signed by SJHSRI's Retirement Board, the 2011 amendment was effectuated by SJHSRI's Board of Trustees, evidencing the lack of a principal-purpose organization.  Indeed, the 2011 SJHSRI Plan stated:

> The Employer shall be the Plan Administrator, hereinafter called the Administrator and named fiduciary of the Plan . . . .

SJHSRI was operating a fully functional hospital and, therefore, was not a "principal-purpose organization" devoted principally to administering or funding the Plan.

23

78.     On April 29, 2013, Bishop Tobin issued a Resolution ratifying the 2011 amendment of the Plan and also (*inter alia*) ratifying the following:

> That the Board of Trustees of St. Joseph Health Services of Rhode Island is the Retirement Board with respect to the Plan and acts on behalf of St. Joseph Health Services of Rhode Island as the Plan Administrator of the Plan;
>
> That the Board of Trustees of St. Joseph Health Services of Rhode Island has the authority, pursuant to the terms of the Plan, to appoint a committee to act on its behalf with respect to administrative matters related to the Plan; and
>
> That the Board of Trustees of St. Joseph Health Services of Rhode Island has appointed the Finance Committee of CharterCARE Health Partners to act on its behalf with respect to administrative matters relating to the Plan.

79.     This Resolution thus confirmed that SJHSRI's Board of Trustees was the Retirement Board.  The Board of Trustees was primarily responsible for direction of all of the activities of SJHSRI, including the operation of Old Fatima Hospital, and, therefore, was not a principal-purpose organization.  Moreover, the Board of Trustees delegated administration of the Plan to the wholly-secular CCCB Finance Committee, which directed financial matters for CCCB, including management of Old Fatima Hospital and Old Roger Williams Hospital, and, therefore, was not controlled by or associated with any church, and was not a principal-purpose organization.

80.     After the closing of the 2014 Asset Sale, SJHSRI's Board of Trustees and the CCCB Finance Committee ceased any administration of the Plan.  By resolution dated December 15, 2014, CCCB caused SJHSRI to delegate "the administration, management and potential wind-down" of the Plan to SJHSRI's president and to one of SJHSRI's attorneys, "each acting alone."  Neither of these individuals was an organization, much less a principal-purpose organization, or associated with a church.

24

81.     In August 2017, SJHSRI petitioned the Plan into receivership in the Receivership Proceeding.  The Receiver is acting on behalf of the Rhode Island Superior Court.  Accordingly, the Receiver is not controlled by or associated with any church.

### 3.     SJHSRI Was Not a Church Plan Because It Was Not "Controlled by or Associated with a Church or a Convention or Association of Churches"

82.     As noted, under 29 U.S.C. § 1002 (33)(c)(ii)(II), a non-church entity that employs plan participants must be "controlled by or associated with a church or a convention or association of churches," or the plan does not qualify as a Church Plan.

83.     This requirement maintains the close connection between the employer and the church, upon which the special exemption from ERISA for Church Plans is based.

84.     An organization is "controlled" by a church when, for example, a religious institution appoints a majority of the organization's officers or directors. 26 C.F.R. § 1.414(e)–1(d)(2) (2000).  Since 2009, the majority of SJHSRI's directors and all of its officers were appointed by CCCB, which is a completely secular non-profit organization. Accordingly, at least since 2009 SJHSRI has not been "controlled by… a church," and, therefore, since 2009 SJHSRI has not qualified as a Church plan on that basis.

85.     To be "associated with a church," the organization must share "common religious bonds and convictions with that church or convention or association of churches." 29 U.S.C. § 1002(33)(C)(iv).

86.     In deciding whether an organization shares such common bonds and convictions with a church, three factors bear primary consideration:

    a.      whether the religious institution plays any official role in the governance of the organization;

    b.      whether the organization receives assistance from the religious institution; and

    c.      whether a denominational requirement exists for any employee or patient/customer of the organization.

87.     Starting in 2011, SJHSRI has filed its Form 990 with the IRS stating that CCCB was SJHSRI's "sole member."  This confirms the diminished or nonexistent roles of Bishop Tobin and the Diocese of Providence in SJHSRI's governance after the 2009 merger.

88.     Upon the conclusion of the 2014 Asset Sale, the Diocese of Providence had no meaningful role in the governance of SJHSRI.  To the contrary, the only rights it had concerned the "Catholicity" of SJHSRI's operation of the hospital and provision of health care.  Since SJHSRI no longer operated a hospital or otherwise provided health care as a result of the 2014 Asset Sale, that role was rendered completely moot.

89.     By resolution dated December 15, 2014, SJHSRI's bylaws were amended to eliminate even Bishop Tobin's nominal role in the appointment of directors or officers of SJHSRI.

90.     Upon the conclusion of the 2014 Asset Sale, SJHSRI received no assistance whatsoever from Corporation Sole, Diocesan Administration, and Diocesan Service in particular or from the Roman Catholic Church in general.

91.     Indeed, as discussed below, rather than rendering assistance to SJHSRI, Corporation Sole, Diocesan Administration, and Diocesan Service in connection with the 2014 Asset Sale required SJHSRI to pay nearly $640,000 on a loan which should have been forgiven, and used $100,000 of that sum to fund a separate pension plan for clergy.

26

92.     SJHSRI had no denominational requirement for any employee, patient, or customer of the hospital even when it operated Old Fatima Hospital, and certainly had no such requirement after the 2014 Asset Sale.

93.     Thus, SJHSRI was not "controlled by or associated with a church or a convention or association of churches," and, therefore, the Plan was not a Church Plan.

**4.     SJHSRI Was Not a Tax Exempt Organization at Least as of the 2014 Asset Sale**

94.     Pursuant to 29 U.S.C. § 1002 (33)(A)(ii), a church-controlled entity cannot be a "qualified church-controlled organization" unless it qualifies as a tax-exempt organization "under section 501 of Title 26."

95.     The only exemption "under section 501 of Title 26" for which SJHSRI might have qualified was under 26 U.S.C. § 501(c)(3), which applies to organizations that are "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes…."  The most common purposes for qualification under 26 U.S.C. § 501(c)(3) is for the organization to avoid the obligation to pay income tax and so that donations to such entities are tax deductible, but it has the separate significance of being a requirement for organizations that are controlled by or associated with a church, that seek to have their pension plans exempted from ERISA as Church Plans.

96.     All entities that claim 501(c)(3) status must first obtain recognition of that status by the Internal Revenue Service ("IRS"), with limited exceptions that were not applicable to SJHSRI.

97.     IRS recognition can be obtained in either of two ways.  The entity can apply directly to the IRS and receive recognition, or the entity can claim exemption

27

under a group ruling issued by the IRS to a central organization, which provides an exemption for the central organization and for subordinate organizations under the central organization's supervision or control for whom the central organization claims the exemption.

98.    The central organization (not the IRS) determines in the first instance which organizations are included as subordinates under its group ruling, in accordance with IRS regulations.  That determination, however, is only *prima facie*, and does not conclusively establish either that the central organization properly claimed exempt status for a particular subordinate organization, or that the subordinate organization in fact is qualified as tax exempt.

99.    SJHSRI has never obtained its own tax exemption ruling from the IRS. Thus, the Plan cannot be a Church Plan if SJHSRI cannot claim exemption under a group ruling.

100.    Beginning in 1946, and re-issued each year thereafter, the IRS has approved a group exemption for the central organization presently known as the United States Conference of Catholic Bishops ("U.S. Conference of Bishops"), and certain subordinate organizations for whom the U.S. Conference of Bishops claims the exemption.

101.    The requirements for a subordinate organization to qualify under this group exemption include that the entity must be "operated, supervised, or controlled by or in connection with the Roman Catholic Church" in each year for which the exemption is claimed.

102.    Rather than requiring proof each year that a particular entity satisfies this requirement, the IRS accepts listing of the entity in an annual publication entitled *The*

*Official Catholic Directory* ("Catholic Directory") as *prima facie* proof of this qualification on a year-by-year basis.

103.    The Catholic Directory contains diocesan entries, confirmed and approved by each diocese on an annual basis, for each subordinate organization that is "operated, supervised, or controlled by or in connection with the Roman Catholic Church," and entitled to exemption under the group ruling issued to the U.S. Conference of Bishops.

104.    Defendants Corporation Sole, Diocesan Administration, and Diocesan Service are responsible to provide accurate and complete information to the Catholic Directory concerning subordinate organizations in the Diocese of Providence that are "operated, supervised, or controlled by or in connection with the Roman Catholic Church" that claim exemption under the group ruling issued to the U.S. Conference of Bishops.

105.    Each year the U.S. Conference of Bishops reminds dioceses of their obligation to every year ensure that all entries pertaining to subordinate organizations in their diocese are kept current and accurate.

106.    Each year, the incumbent Bishop and Chancellor for the Diocese of Providence (acting on behalf of Defendants Corporation Sole, Diocesan Administration, and Diocesan Service) receives a memorandum from the U.S. Conference of Bishop's Office of General Counsel, concerning the IRS group exemption for that year.  Each year the memorandum attaches the latest private letter ruling from the IRS and explains as follows:

> The latest ruling reaffirms the exemption from federal income tax under Section 501(c)(3) of the Internal Revenue Code of "the agencies and instrumentalities and educational, charitable, and religious institutions

29

operated, supervised or controlled by or in connection with the Roman Catholic Church in the United States, its territories or possessions appearing in the Official Catholic Directory for [that year]"

[Quoting the IRS Private Letter Ruling]

107.    The memorandum also explains the responsibilities of diocesan officials as follows:

Diocesan officials who compile OCD information to send to the OCD publisher **are responsible for the accuracy of such information**.  They must ensure that only qualified organizations are listed, that organizations are listed under their correct legal names, *that organizations that cease to qualify are deleted promptly*, and that newly-qualified organizations are listed as soon as possible.

[Bolding in the original and italics supplied]

108.    Each year the Catholic Directory has required Defendants Corporation Sole, Diocesan Administration, and Diocesan Service to certify in writing that there were no changes for each subordinate organization that pertained to the Diocese.

109.    At all relevant times until 2015, Defendants Corporation Sole, Diocesan Administration, and Diocesan Service listed SJHSRI in the Catholic Directory as a subordinate organization that was "operated, supervised, or controlled by or in connection with the Roman Catholic Church" in the Diocese of Providence, as a "hospital."

110.    In and since 2015, Defendants Corporation Sole, Diocesan Administration, and Diocesan Service have listed SJHSRI in the Catholic Directory as a subordinate organization that was "operated, supervised, or controlled by or in connection with the Roman Catholic Church" in the Diocese of Providence, as a "miscellaneous" entity.

111.    At least since the 2014 Asset Sale, which included the transfer of all of SJHSRI's operating assets, SJHSRI was *not* "operated, supervised, or controlled by or

in connection with the Roman Catholic Church," either in the Diocese of Providence or anywhere else.

112.    Accordingly, SJHSRI was no longer entitled to come under the group exemption issued to the U.S. Conference of Bishops, and pursuant to federal law should have been deleted and removed from the Catholic Directory by Defendants Corporation Sole, Diocesan Administration, and Diocesan Service, effective on June 20, 2014, when the closing of the Asset Sale occurred, or at least prior to the issuance of the 2015 Catholic Directory.

113.    Accordingly, SJHSRI was no longer a "qualified church-controlled organization," because it no longer qualified as a church-controlled tax-exempt organization "under section 501 of Title 26."  As a result, the Plan was no longer a Church Plan, and, therefore, was no longer exempt from ERISA.

### 5.    Fraudulent Inclusion of SJHSRI in the Catholic Directory

114.    At all relevant times, Defendants SJHSRI, CCCB, RWH, CC Foundation, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East, and Angell, knew that if the Plan ceased to qualify as a Church Plan, it would become subject to ERISA.

115.    For example, at a meeting of the SJHSRI Board of Trustees on January 15, 2009, chaired by Bishop Tobin, Bishop Tobin was informed by SJHSRI President John Fogarty that if the Diocese severed its association with SJHSRI, SJHSRI would have to administer the Plan under ERISA, "or identify a new religious sponsor for the plan, allowing it to remain a church plan."

31

116.    Beginning in 2011, the trustees and executive management of SJHSRI, RWH, and CCCB decided to seek substantial outside capital.

117.    From the outset of their deciding to seek outside capital, the board of trustees and executive management of SJHSRI, CCCB, and RWH placed a great deal of importance on retaining as much "local control" of the hospitals as possible and keeping existing management in place.  For them, "local control" meant control by many of the same individuals who had been controlling Defendants SJHSRI, RWH, and CCCB, prior to the 2014 Asset Sale.

118.    By the end of 2011, they authorized management to solicit offers from entities that invested in and/or operated hospitals in Rhode Island and across the United States, and to advise those entities that their goals included retaining significant local control of the hospitals, and keeping existing management in place.

119.    One entity they solicited was LHP Hospital Group, Inc. ("LHP"), a for-profit corporation that operated five hospitals outside of Rhode Island.

120.    In 2012, LHP responded to the solicitation with a letter of intent that set forth terms of a proposed joint venture, under which LHP would pay $33,000,000 to pay off SJHSRI and RWH's bonded indebtedness, pay an additional $72,000,000 to fund the Plan, and commit an additional approximately $50,000,000 for future capital improvements and network expansion.

121.    The $72,000,000 figure was based upon Defendant Angell's estimate that the unfunded status of the Plan in 2011 was $72,000,000.  In 2012 that estimate changed to approximately $86,000,000, which initially caused concern regarding the sufficiency of the payment proposed by LHP.  However, in 2013 that estimate was

reduced to approximately $73,000,000 based upon high returns earned on pension assets in the interim.

122.    The Trustees and executive management of SJHSRI, CCCB, and RWH did not favor LHP's insistence on applying so much capital to pay off the unfunded pension liability.  They wanted to allocate more of the purchase money for other purposes, instead of fulfilling their obligations to the Plan participants by choosing a buyer or joint-venturer who would adequately fund the Plan.

123.    Accordingly, the trustees and executive management of SJHSRI, CCCB, and RWH chose not to pursue a transaction with LHP, and to continue their search for outside capital.

124.    On March 18, 2013, and after some negotiations, Defendant Prospect Medical Holdings signed a Letter of Intent that proposed a joint venture to operate Fatima Hospital and Roger Williams Hospital with Defendant CCCB, that involved Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East paying off SJHSRI's and RWH's bonded indebtedness of approximately $31,000,000, paying $14,000,000 into the Plan, committing $50,000,000 over four years for capital projects and network development, and funding annual asset depreciation in the amount of $10,000,000.

125.    However, the $14,000,000 contribution to the Plan would only reduce SJHSRI's unfunded liabilities for the Plan to approximately $59,000,000.  The Letter of Intent stipulated that liability for the Plan would remain with SJHSRI, and, therefore, that Fatima Hospital under the operation of its new owners would be relieved of these unfunded liabilities.  Accordingly, the parties had to determine if there was a way that they could make it appear lawful for SJHSRI to retain that liability and Prospect

33

Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East could avoid that liability.

126.   Defendant Prospect Medical Holdings, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect East, SJHSRI, CCCB, RWH, Corporation Sole, Diocesan Administration, and Diocesan Service knew Defendants Corporation Sole, Diocesan Administration, Diocesan Service, and the Diocese of Providence listed SJHSRI in the Catholic Directory and that SJHSRI treated the Plan as a Church Plan.

127.   Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East, SJHSRI, CCCB, RWH, Corporation Sole, Diocesan Administration, and Diocesan Service knew that if the Plan ceased to qualify as a Church Plan, it would become subject to ERISA, and, in that event, a company that took over the operations of Fatima Hospital would have successor liability for the Plan.

128.   Accordingly, Prospect Medical Holding's proposal was conditioned upon the transaction being structured to make it appear lawful for liability for the Plan to remain with SJHSRI and for it to continue to be claimed to be a Church Plan, to avoid the imposition on Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East of successor liability for the Plan under ERISA.

129.   That condition required the cooperation of Corporation Sole, Diocesan Administration, and Diocesan Service in continuing to allow SJHSRI to claim tax exempt status under the group ruling issued to the U.S. Conference of Bishops, by continuing to list SJHSRI in the Catholic Directory as an entity that was "operated, supervised, or

34

controlled by or in connection with the Roman Catholic Church" in the Diocese of
Providence, even though Defendant Prospect Chartercare, Prospect Chartercare St.
Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect
East, SJHSRI, CCCB, RWH, Corporation Sole, Diocesan Administration, and Diocesan
Service knew that was false.

130.   SJHSRI had other options that would have fully funded the Plan.  One
option was the outright sale of the hospital, for which SJHSRI would have received a
purchase price sufficient to fund the Plan.

131.   However, that conflicted with the goals of the board of trustees and
executive management of SJHSRI, CCCB, and RWH of retaining as much "local
control" of the hospitals as possible and keeping existing management in place.

132.   Another option was to affiliate with a company such as LHP that was
willing to fully fund the Plan.  However, that conflicted with the goals of the board of
trustees and executive management of SJHSRI, CCCB, and RWH to allocate more of
the purchase money for other purposes.

133.   The board of trustees and executive management of SJHSRI, CCCB, and
RWH chose to proceed with a transaction that did not necessitate fully funding the Plan.

134.   The board of trustees and executive management of SJHSRI, CCCB, and
RWH decided to proceed with the proposal from Prospect Medical Holdings.

135.   Defendants Prospect Chartercare, Prospect Chartercare St. Joseph,
Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East,
SJHSRI, CCCB, RWH, Corporation Sole, Diocesan Administration, and Diocesan
Service were fully aware of the lack of *bona fides* for the claim that the Plan would be a
Church Plan after SJHSRI sold all its operating assets.

136.    On May 28, 2013, when the strategy to keep Church Plan status was being discussed between and among SJHSRI, CCCB, RWH, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, a representative of Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East (Ellen Shin) had the following question, which was to be discussed with Darlene Souza and other representatives of SJHSRI, RWH, and CCCB in a "due diligence call re employee benefit plans" on May 30, 2013:

> If SJHSRI becomes a shell corporation, how will the plan remain a church plan?  Will the diocese assume control of the corporation?  How will the corporation remain in the Official Catholic Directory?

137.    CCCB (through Darlene Souza) also posed this same question to Jeff Bauer of Angell on May 28, 2013 and described it as "the multi-million dollar question".

138.    These questions were raised at the level of the Executive Committee of CCCB's Board of Trustees (the board members present included Edwin Santos, Kenneth Belcher, Elaine Jones, Donald McQueen, and Sheri Smith) on July 25, 2013. At that meeting the question was asked "[w]ill the Bishop want to continue to sponsor the pension," the members of the committee and staff (consisting of Michael Conklin, Kim O'Connell, and Debra Spicuzza) discussed the "impact if Diocese/Bishop does not support" the proposed sale of assets, and it was noted that "no [Diocesan] sponsorship is a problem, especially with [the] pension plan."  The committee members acknowledged the need "to keep Church Plan status rather than ERISA," and that they were "trying to come up with a structure" for "a non-profit, church sponsored entity," which would create "no additional liability to [the] Bishop."

36

139.    Expressing concern over committing to the asset sale with Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East without this issue being resolved, CCCB's Chief Executive Officer Kenneth Belcher raised the possibility at this July 25, 2013 meeting of signing the asset sale agreement but making it " 'subject to' if Bishop signs off on the pension piece."  He also "discussed concerns that [also] may be raised by the Vatican," whose approval of the transaction was required by Corporation Sole, Diocesan Administration, and Diocesan Service.

140.    The conclusion of this meeting of the Executive Committee was to share the current version of the asset purchase agreement ("Asset Purchase Agreement") with Bishop Tobin, Corporation Sole, Diocesan Administration, and Diocesan Service, and seek their support and agreement to maintaining SJHSRI in the Catholic Directory, prior to SJHSRI, RWH, and CCCB signing the Asset Purchase Agreement.

141.    On August 14, 2013, counsel for SJHSRI, CCCB, and RWH (including at least Keith Anderson), together with CCCB "senior leadership" (including at least Kenneth Belcher and Edwin Santos) met at the offices of Corporation Sole, Diocesan Administration, and Diocesan Service to obtain their cooperation.  That meeting was also attended by Bishop Tobin, Rev. Timothy Reilly (the Chancellor of the Diocese of Providence), and Msgr. Paul Theroux (who was a member of the Diocesan Finance Council).  Bishop Tobin, Rev. Timothy Reilly, and Msgr. Paul Theroux  attended and participated in the meeting in their individual capacity and on behalf of Defendants Corporation Sole, Diocesan Administration, and Diocesan Service.

142.    Counsel for SJHSRI, CCCB, and RWH (including at least Keith Anderson) brought the current version of the Asset Purchase Agreement to the meeting.  That draft

37

(and the final version actually signed by the parties) provided for the sale of all of the operating assets of SJHSRI, including ownership of Fatima Hospital.  It also included the requirement that SJHSRI would retain liability for the Plan, and that the new owners and operators of New Fatima Hospital would have no obligations to the Plan.

143.    Counsel for SJHSRI, CCCB, and RWH (including at least Keith Anderson) also brought to the meeting on August 14, 2013 with Bishop Tobin, Rev. Timothy Reilly, and Msgr. Paul Theroux a document on the joint letterhead of counsel and CCCB, entitled "Overview of the Strategic Transaction with Prospect Medical Holdings, Inc., Presentation to the Board of Directors," referring to the Board of Trustees for SJHSRI, CCCB, and RWH.

144.    The latter document contained the legend "Privileged and Confidential: Attorney-Client Communication."  Nevertheless, counsel for SJHSRI, CCCB, and RWH (including at least Keith Anderson) showed it to Bishop Tobin, Rev. Timothy Reilly, and Msgr. Paul Theroux and went over it with them.

145.    That document outlined the salient details of the 2014 Asset Sale, whereby SJHSRI, CCCB, and RWH would sell "substantially all of their assets to Prospect CharterCARE LLC ('Newco')."  In return, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East would pay cash of $45,000,000, commit to contribute $50,000,000 over four years for "physician network development and capital projects," and "fund depreciation in the amount of $10,000,000 per year."

146.    The document noted that Defendant CCCB would receive "a 15% ownership (membership) interest in Newco."

38

147.    The very first page of the presentation noted that only $14 million of the

sales proceeds would be paid into "the Church-sponsored retirement plan (the 'Church

Plan")."

148.    At this time, Defendants SJHSRI, RWH, CCCB, Prospect Chartercare,

Prospect Medical Holdings, Prospect East, Prospect Chartercare St. Joseph, Prospect

Chartercare Roger Williams, Corporation Sole, Diocesan Service, and Diocesan

Administration knew that SJHSRI's unfunded liability for the Plan was approximately

$73,000,000.  Thus, they knew that the Asset Purchase Agreement contemplated

leaving SJHSRI an unfunded liability for the Plan of approximately $59,000,000, and

that SJHSRI would have no operating assets.

149.    The document then detailed certain promises that would be made to the

Corporation Sole, Diocesan Administration, and Diocesan Service as part of the

transaction, which were described as follows:

Catholic identity covenants of Prospect and Newco

-    Our Lady of Fatima Hospital and other legacy SJHSRI facilities will
      be operated in compliance with the ERDs[3]

-    Roger Williams Medical Center and its facilities will not engage in
      prohibited activities

      -    Abortion

      -    Euthanasia

      -    Physician-assisted suicide

-    Any hospital or facility acquired or established after Closing must
      comply with restrictions on prohibited activities

-    The Bishop has a direct right to enforce the Catholicity covenants

[3] Ethical and Religious Directives for Catholic Health Care Services.

- CCHP intends to propose that the Bishop may require a name change of Our Lady of Fatima Hospital and other legacy SJHSRI facilities if he is unsuccessful in enforcing the covenants

150.   These "Catholic identity covenants" included essentially all the rights which Corporation Sole, Diocesan Administration, and Diocesan Service, and the Diocese of Providence, were entitled to exercise over Old Fatima Hospital and Old Roger Williams Hospital, SJHSRI, and RWH, since 2009 when SJHSRI and RWH became part of CCCB.  Thus, notwithstanding the 2014 Asset Sale, Corporation Sole, Diocesan Administration, and Diocesan Service were offered the promise that New Fatima Hospital and New Roger Williams Hospital would remain as Catholic as Old Fatima Hospital and Old Roger Williams Hospital had been before the asset sale.

151.   In other words, the "deal" they were offered was that Defendants Corporation Sole, Diocesan Administration, and Diocesan Service would transfer to the new hospitals the "Catholicity" and associated controls that they had previously enjoyed over Old Fatima Hospital, Old Roger Williams Hospital, SJHSRI, and RWH, and New Fatima Hospital would be freed from the unfunded liabilities of the Plan, at the expense of the Plan and the Plan participants.

152.   Indeed, shortly after the closing of the 2014 Asset Sale, Bishop Tobin, individually and in his capacity as President of Corporation Sole, Diocesan Administration, and Diocesan Service, extolled the advantages of the arrangement in precisely those terms, except that he failed to disclose that these advantages were at the expense of Plan participants:

> For all intents as purposes, Fatima Hospital will retain its Catholicity, and that is guaranteed by contract now.  It's not just an aspiration, it's guaranteed by contract that the Catholic identity is still under the supervision of the local bishop and that in all of its ministries and external signs Fatima Hospital will be as Catholic as it has ever been.

40

153.    This "Overview of the Strategic Transaction" that counsel reviewed with Bishop Tobin, Rev. Timothy Reilly, and Msgr. Paul Theroux during the meeting on August 14, 2013, then laid out the *quid pro quo* for freeing New Fatima Hospital from the unfunded liabilities of the Plan, and granting these extensive and perpetual "Catholic identity covenants" for New Fatima Hospital and New Roger Williams Hospital. Defendants SJHSRI, RWH, and CCCB, through their counsel, informed Bishop Tobin, Rev. Timothy Reilly, and Msgr. Paul Theroux at this meeting that it was a "requirement" of the parties to the Asset Purchase Agreement that Defendants Corporation Sole, Diocesan Administration, and Diocesan Service "[m]aintain the retirement plan of St. Joseph Health Services of Rhode Island as a 'Church Plan'."

154.    Thus, if they wanted the transaction to go forward, Defendants Corporation Sole, Diocesan Administration, and Diocesan Service were required to agree (a) to SJHSRI being left with no operating assets; (b) to SJHSRI nevertheless retaining responsibility for the Plan and the unfunded liability of approximately $59,000,000; and (c) to the Plan appearing to remain a Church Plan exempt from the requirements of ERISA.

155.    Defendants Corporation Sole, Diocesan Administration, Diocesan Service, SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Medical Holdings, Prospect East, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams understood that the consequences for the Plan participants would be that (a) there would no longer be an operating hospital supporting the Plan, (b) the entity supporting the Plan would have no operating assets, and (c) the Plan participants would not have the protections of ERISA, including insurance provided by the PBGC, if SJHSRI was unable to pay the benefits to which the Plan participants were entitled under the Plan.

41

156.    As further discussed below, SJHSRI's only "Catholic" attribute was through its operation of Fatima Hospital.  Thus, Defendants Corporation Sole, Diocesan Administration, and Diocesan Service knew that by agreeing to the proposed asset sale they were giving up any control over, association, or connection with SJHSRI.

157.    Thus, although they would have no connection with SJHSRI, the requirement was that Defendants Corporation Sole, Diocesan Administration, and Diocesan Service had to include SJHSRI in the Catholic Directory.

158.    All of the attendees at this meeting understood that continuing to list SJHSRI in the Catholic Directory would be a misrepresentation, and an unlawful evasion of tax law and ERISA, because Defendants Corporation Sole, Diocesan Administration, Diocesan Service would not control or be associated with SJHSRI after the closing of the 2014 Asset Sale.

159.    At this meeting on August 14, 2013 (and again on several later occasions as discussed below), Defendants Corporation Sole, Diocesan Administration, and Diocesan Service agreed to continue to list SJHSRI in the Catholic Directory.

160.    There can be no dispute over the fact that after the 2014 Asset Sale, the Diocese and Defendants Corporation Sole, Diocesan Administration, and Diocesan Service had no connection with SJHSRI.  In fact, after the Plan was placed in receivership in August of 2017, Defendants Corporation Sole, Diocesan Administration, and Diocesan Service contended that their complete lack of connection with SJHSRI excused them from any responsibility for, or liability in connection with, the insolvency of the Plan.

161.    For example, after the Plan was put into receivership in August 2017 as allegedly insolvent, the Chancellor for the Diocese Msg. Timothy Reilly (on behalf of

Defendants Corporation Sole, Diocesan Administration and Diocesan Service) stated

the following in a Providence Journal op-ed:

> St. Joseph Health Services of Rhode Island is not a diocesan entity. The
> pension plan was adopted, sponsored, operated, managed and funded by
> SJHSRI, an independent corporation, and not by the Diocese of
> Providence. Changes over the last decade, including the formation of
> CharterCARE Health Partners, sharply reduced diocesan involvement in
> SJHSRI and the hospitals. And upon the 2014 transaction with Prospect,
> that involvement essentially ended.

162.   Another spokesperson for Defendants Corporation Sole, Diocesan

Administration, and Diocesan Service, Carolyn E. Cronin, made a similar claim in a

statement to the press after the Plan was put into receivership:

> Once the hospitals were sold, even the Bishop's very limited role at
> SJHSRI -- maintaining Catholicity at the hospitals -- was mooted by the
> fact that SJHSRI no longer owned or ran any hospitals.

163.   Later in the day on August 14, 2013, counsel for SJHSRI, CCCB, and

RWH (including at least Keith Anderson and William O'Gara) attended a meeting of the

Executive Committee of CCCB's Board of Trustees (the members present included

Edwin Santos, Kenneth Belcher, Elaine Jones, Donald McQueen, Daniel Ryan, and

Sheri Smith), and advised the committee (and staff including Michael Conklin, Kim

O'Connell, Darlene Souza, and Debra Spicuzza) of the results of his meeting with

Bishop Tobin, Rev. Timothy Reilly, and Msgr. Paul Theroux, and assured them that

Defendants SJHSRI, CCCB, RWH, and Defendants Corporation Sole, Diocesan

Administration, and Diocesan Service had a "common understanding," and that Bishop

Tobin in particular (individually and on behalf of Defendants Corporation Sole, Diocesan

Administration, and Diocesan Service) was "comfortable."

164.    On September 11, 2013, the Diocesan Chancellor Msg. Reilly contacted counsel for SJHSRI, CCCB, and RWH (Keith Anderson) and stated that the "our Diocesan Finance Council and College of Consultors also need to consent to the act of alienation," and asked counsel (Keith Anderson) to provide them with the Overview of the Strategic Transaction that counsel (Keith Anderson) had shared with Defendants Corporation Sole, Diocesan Administration, and Diocesan Service on August 14, 2013, because "[t]he Bishop thinks it would be a concise and helpful overview for the council members."

165.    Counsel for SJHSRI, CCCB, and RWH (Keith Anderson) promised to send it to  Chancellor Reilly the next day, after deleting the references to "Attorney-Client Privilege."  The next day counsel followed through and sent it to the Chancellor, addressing the document as "[f]or the Bishop of the Roman Catholic Diocese of Providence, Rhode Island."  The document set forth exactly the same bargain, of (a) only $14,000,000 going to fund the Plan, (b) SJHSRI retaining liability for the Plan, (c) Fatima Hospital having no further responsibility for the Plan, and (d) CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East agreeing to the same extensive "Catholic identity covenants" controlling their operation of New Fatima Hospital and New Roger Williams Hospital, all in return for Corporation Sole, Diocesan Administration, and Diocesan Service agreeing to "maintain the retirement plan of St. Joseph Health Services of Rhode Island as a 'Church plan.' "

166.    On September 17, 2013 the Diocesan Finance Council and College of Consultors met to decide whether to vote in favor of alienation of the assets of SJHSRI pursuant to the proposed asset sale.  Bishop Tobin, Chancellor Reilly, and Monseigneur

Theroux attended as members of both, with Bishop Tobin as Chairman.  Bishop Tobin also acted in his capacity as President of Corporation Sole, Diocesan Administration, and Diocesan Service.

167.    They requested that CCCB Chairman Belcher attend the meeting *alone*, without counsel or any other representatives of any of the parties other than Defendants Corporation Sole, Diocesan Administration, and Diocesan Service, and he complied.

168.    At the meeting, Mr. Belcher went over with Corporation Sole, Diocesan Administration, Diocesan Service, Diocesan Finance Council and the College of Consultors the presentation from counsel for SJHSRI, CCCB, and RWH (including at least Keith Anderson) which set forth the trade of cutting Fatima Hospital loose from the Plan and extensive "Catholic identity covenants" applicable to both hospitals, in return for the "requirement" that the Diocese and Corporation Sole, Diocesan Administration, and Diocesan Service "maintain the retirement plan of St. Joseph Health Services of Rhode Island as a 'Church plan'."

169.    The Diocesan Finance Council and the College of Consultors approved the transaction.  Defendants Corporation Sole, Diocesan Administration, and Diocesan Service controlled the Diocesan Finance Council and the College of Consultors, and knew that such approval was both improper and unlawful.

170.    On September 18, 2013, Chancellor Reilly provided counsel for SJHSRI, CCCB, and RWH (including at least Keith Anderson) with a draft of Bishop Tobin's proposed letter to the Secretary of the Congregation for the Clergy in Rome requesting approval for the 2014 Asset Sale, and sought counsel's "comments/suggestions" concerning the letter.

171.   Bishop Tobin's draft letter to the Vatican purported to summarize the transaction.  It recounted the "merger" of SJHSRI and RWH into CCCB in 2009, and stated that "[s]hortly thereafter, in the wake of the global economic downturn, CharterCARE soon began to experience the need for increased capital and was confronted with a **spiraling and gaping unfunded liability within its employee-pension system**" (emphasis supplied).  The draft noted that the proposed sale would apply "approximately $14 million to fund the Church-sponsored employee pension plan."

172.   Bishop Tobin then stated that "without [approval of] this transaction, it appears that a consistent Catholic healthcare presence in the Diocese of Providence would be gravely compromised, and the financial future for employees-beneficiaries of the pension plan would be at significant risk.  I believe that the APA [Asset Purchase Agreement] between CharterCARE and Prospect will help avoid the catastrophic implications of such a failure, and at the same time, enhance the quality of care at SJHSRI/Our Lady of Fatima."

173.   Finally, the draft letter concluded with Bishop Tobin stating that "[i]t is my sincere hope that Your Excellency will understand the important role of this alienation for the faithful of the Diocese of Providence, and the thousands of patients, employees, and pensioners of SJHSRI."

174.   The draft letter did not refer to or otherwise disclose Defendants Corporation Sole, Diocesan Administration, and Diocesan Service's undertaking to "[m]aintain the retirement plan of St. Joseph Health Services of Rhode Island as a 'Church Plan'," which would have been impossible to justify given that SJHSRI would no longer operate as a hospital or have any connection to the Diocese of Providence or Defendants Corporation Sole, Diocesan Administration, and Diocesan Service.

46

175.    Counsel for SJHSRI, CCCB, and RWH (Keith Anderson) revised the draft by *deleting* the reference to "spiraling and gaping" liability, and substituted "significant" liability, stating that he preferred the revision "**in the event this letter was ever subject to discovery in a civil lawsuit**" (emphasis added).

176.    Counsel for SJHSRI, CCCB, and RWH (Keith Anderson) left untouched, however, all of the other statements quoted above, including that $14 million would "fund the Church-sponsored employee pension plan," that without Vatican approval of the asset sale, "the financial future for employees-beneficiaries of the pension plan would be at significant risk," and that such approval "will help avoid the catastrophic implications" of failure of the pension plan.

177.    Defendants Corporation Sole, Diocesan Administration, Diocesan Service, SJHSRI, RWH, and CCCB knew that these statements were at best misleading if not simply false.  They knew that even after the $14 million contribution, the Plan would remain seriously underfunded, and the financial future of the pensioners would be at much more than merely "significant risk."  They knew that approval of the alienation would not avoid the "catastrophic implications" of that failure.  To the contrary, they knew that such approval would increase the risk of such failure by depriving SJHSRI of operating income it needed to meet its obligations under the Plan, and hindering if not completely frustrating the Plan participants' rights to demand contributions by or recover damages from an asset-holding and income-generating hospital.

178.    Bishop Tobin did not disclose in his letter to the Vatican that the proposed asset sale increased the probability of the Plan failing.  Instead Bishop Tobin, intentionally and with intent to deceive, omitted that information and, in effect, said the opposite, that approval of the asset sale was actually necessary to secure the Plan.

47

179.    On September 27, 2013, Bishop Tobin signed his letter as altered by counsel for SJHSRI, CCCB, and RWH and sent it to the Vatican.  In so doing, Bishop Tobin acted individually and in his capacity as President of Defendants Corporation Sole, Diocesan Administration, and Diocesan Service.  He also acted in furtherance of the conspiracy that included those entities and Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East, and Angell.

180.    These misrepresentations and omissions concerning the Plan in the Bishop's letter to the Vatican were included because Defendants SJHSRI, RWH, CCCB, Corporation Sole, Diocesan Administration, and Diocesan Service all understood that Vatican approval was required for the transaction to proceed, and knew or were told that that the Vatican must approve specifically the "pension restructuring."

181.    On November 15, 2013, there was a meeting of the CCCB Investment Committee.  Committee members who were present included Marshall Raucci, Jr., Kenneth Belcher, Rev. Kenneth Sicard, William Loehning, and Charles Maynard.  Also present were staff members Michael Conklin, Addy Kane, Kathleen Moore, and Darlene Souza, and guests Michael Ancell, Karen Chandor, and Christopher Cozzoni.  As part of a discussion concerning the Plan, Chief Executive Officer Belcher informed them that "Bishop Thomas Tobin has signed off on the Plan, and the proposal has been sent to the Vatican for approval."

182.    Vatican approval was obtained in early 2014, along with other necessary approvals, and the asset sale closed on June 20, 2014, whereupon ownership of Fatima Hospital was transferred from SJHSRI to Prospect Chartercare St. Joseph and

48

ownership of Roger Williams Hospital was transferred from RWH to Prospect Chartercare Roger Williams.

183.    In conformity with the "strategic plan" to which Defendants SJHSRI, CCCB, RWH, Corporation Sole, Diocesan Administration, and Diocesan Service had agreed prior to the closing of the asset sale, SJHSRI was not deleted from the 2014 Catholic Directory immediately after the 2014 Asset Sale, although it should have been.

184.    As the next step in that plan, counsel for SJHSRI, CCCB, and RWH contacted the Diocese in late 2014 to ensure that SJHSRI would be included in the Catholic Directory for the coming year, 2015.

185.    However, on November 11, 2014, Diocesan Chancellor Reilly e-mailed one or more representatives of Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East (including at least Otis Brown) and admitted that "Fatima and SJHSRI are not eligible for listing at this time."  He noted that "[r]ecently, the USCCB has instituted more formalized and rigorous policies and procedures, with increased expectations for the local Dioceses, in light of stricter IRS scrutiny of group rulings."  Moreover, the Chancellor observed that it was not a matter that could be handled discreetly out of public view, since "[t]he Prospect-CharterCARE merger has been major state news, and most in the local community are aware that a for-profit entity is now the parent company of Fatima and SJHSRI."

186.    The response of the representative (Otis Brown) of Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East was to e-mail Chancellor Reilly and Monsignor Theroux on December 2, 2014, with copies to SJHSRI and CCCB, stating that if

49

SJHSRI were not listed in the Catholic Directory, that would "mean that the SJHS[RI] pension would no longer be treated as a church plan."

187.    In the same e-mail, the representative (Otis Brown) for Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East noted that the reason he was also addressing the e-mail to Monsignor Theroux was "due to his intimate knowledge of the situation and his role as chairman of the Prospect CharterCARE SJHSRI LLC Board of Directors."  As noted above, Msgr. Theroux also was a member of the Diocesan Finance Council, and had been present on several occasions when Bishop Tobin agreed to maintain SJHSRI in the Catholic Directory in return for Catholic identity covenants applicable to the hospitals and Fatima Hospital being relieved of liability to fund the Plan.

188.    On December 23, 2014, counsel for SJHSRI (Hans Lundsten) sent an e-mail to counsel for Corporation Sole, Diocesan Administration, and Diocesan Service, which he copied to representatives of Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East (including at least Otis Brown) and Angell, that reminded everyone of the consequences of Corporation Sole, Diocesan Administration, and Diocesan Service not listing SJHSRI in the Catholic Directory:

> SJHSRI believes that if it is not included in the 2015 issue of the directory that the pension plan will no longer qualify as a church plan and that **the loss of that status will require that they immediately notify the applicable governmental authorities that the plan is currently underfunded**.

> [Emphasis supplied]

189.    In response, Corporation Sole, Diocesan Administration, and Diocesan Service on December 31, 2014 again improperly agreed that SJHSRI would remain in the Catholic Directory for 2015, under the continuing "sponsorship" of the Diocese of Providence.

190.    On or about January 1, 2015, Corporation Sole, Diocesan Administration, and Diocesan Service contacted the editors of the Catholic Directory and saw to it that SJHSRI remained listed in the Catholic Directory for 2015, under the "miscellaneous" activities of the Diocese of Providence.

191.    That listing was repeated in the 2016 and 2017 editions of the Catholic Directory, the latter being the most recent edition as of June 2018.

192.    Defendants Corporation Sole, Diocesan Administration, Diocesan Service, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East knew that continuing to list SJHSRI in the Catholic Directory was misrepresenting to the U.S. Conference of Bishops, the editors of the Catholic Directory, and the IRS, that SJHSRI continued to be "operated, supervised, or controlled by or in connection with the Roman Catholic Church."

193.    Nevertheless, since 2014, Corporation Sole, Diocesan Administration, and Diocesan Service have continued to certify to the editors of the Catholic Directory that there were no changes concerning SJHSRI, and, therefore, that SJHSRI continued under the sponsorship of the Diocese.

194.    The contact person that Corporation Sole, Diocesan Administration, and Diocesan Service listed in the Catholic Directory for SJHSRI for 2015 and every year since, Otis Brown, throughout that period has been an agent for Prospect Chartercare,

51

Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East with no connection to SJHSRI.

195.    The IRS was never notified that SJHSRI no longer was entitled to tax exempt status under the group ruling the IRS issued to the U.S. Conference of Bishops, as it should have been, and SJHSRI thereafter continued to file informational nonprofit organization returns to the IRS that it was no longer entitled to file, and failed to file income tax returns that it was required to file.

196.    Specifically, Defendant SJHSRI on or about August 16, 2016, filed with the IRS a "Return of Organization Exempt From Tax," Form 990, that falsely claimed that SJHSRI had tax exempt status under 26 U.S.C. § 501(c)(3) for the tax year from October 1, 2014 through September 30, 2014.

197.    Defendant SJHSRI on or about August 10, 2017, filed with the IRS a "Return of Organization Exempt From Tax," Form 990, that falsely claimed that SJHSRI had tax exempt status under 26 U.S.C. § 501(c)(3) for the tax year from October 1, 2015 through September 30, 2016.

198.    Corporation Sole, Diocesan Administration, and Diocesan Service knew that their agreeing to continue to list SJHSRI in the Catholic Directory would enable Defendant SJHSRI to file these false returns, and knew and expected that Defendant SJHSRI in fact would file these false returns.

199.    These false claims were material in that they hindered or had the potential for hindering the IRS's efforts to monitor and verify Defendant SJHSRI's tax liability.

200.    Corporation Sole, Diocesan Administration, and Diocesan Service aided and abetted SJHSRI's filing of these false tax returns in violation of 26 U.S.C. § 7206(2), which states as follows:

52

Any person who—

\*      \*      \*

(2) Aid or assistance.--Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document…

\*      \*      \*

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

201.    Corporation Sole, Diocesan Administration, and Diocesan Service aided or assisted in, procured, counseled, or advised the preparation or presentation of these tax returns, the returns were false as to a material matter, and the acts of Corporation Sole, Diocesan Administration, and Diocesan Service were willful.

202.    Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, Corporation Sole, Diocesan Administration, and Diocesan Service all knew that the power of Corporation Sole, Diocesan Administration, and Diocesan Service to delete SJHSRI from the Catholic Directory gave Corporation Sole, Diocesan Administration, and Diocesan Service a complete veto over the asset sale, because claiming that the Plan was a Church Plan, although unlawful, was a requirement by SJHSRI, RWH, CCCB, and Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East for the sale to proceed, as expressly set forth in the Overview of the

Strategic Transaction shared with Corporation Sole, Diocesan Administration, and Diocesan Service on August 14, 2013.

203.    Thus, Corporation Sole, Diocesan Administration, and Diocesan Service share responsibility for the 2014 Asset Sale and the retention of the Plan by an insolvent SJHSRI, not because they controlled SJHSRI (which they did not), but because they participated in a conspiracy with all of the other Defendants to fraudulently and falsely claim Church Plan status for the Plan, in an attempt to free Fatima Hospital from the unfunded liabilities on the Plan at the expense of the Plan participants, without which the 2014 Asset Sale to Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East would not have been consummated and the Plan participants would not have been injured.

204.    Corporation Sole, Diocesan Administration, and Diocesan Service chose to prefer their interest in having New Fatima Hospital operated under the Catholic identity covenants, and having New Fatima Hospital freed of approximately $59,000,000 in liabilities, over the interests of the Plan participants in their hard-earned pensions.

205.    The purpose for improperly including SJHSRI in the Catholic Directory was to enable SJHSRI to falsely assert that the Plan was a Church Plan, in assist SJHSRI and  Defendants RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East, Angell, Corporation Sole, Diocesan Administration, and Diocesan Service in their fraudulent scheme to avoid liability for the Plan, and to keep hidden the grossly underfunded status of the Plan.

206.    Another inducement for Corporation Sole, Diocesan Administration, and Diocesan Service improperly agreeing to retain SJHSRI in the Catholic Directory was that if the asset sale went forward, Corporation Sole, Diocesan Administration, and Diocesan Service would receive nearly $640,000 in repayment of a loan from the Inter-Parish Loan Fund.

207.    SJHSRI had previously requested that the loan be forgiven, since it concerned improvements by SJHSRI to a property that Corporation Sole, Diocesan Administration, and Diocesan Service continued to own after the 2014 Asset Sale, and which had benefitted from the improvements.

208.    It was the decision of Bishop Tobin (individually and as President of Corporation Sole, Diocesan Administration, and Diocesan Service) to deny SJHSRI's request that the loan should be forgiven.

209.    In connection with the 2014 Asset Sale, the Inter-Parish Loan Fund received proceeds of $638,838.25 from the proceeds of the sale of SJHSRI's assets.

210.    On August 22, 2014, Bishop Tobin directed that $100,000 of this amount be transferred to the Priests' Retirement Fund instead of the SJHSRI Plan, thereby favoring priests over Plan participants, and that the balance be applied towards a Diocesan Line of Credit.

## B.    SJHSRI's Obligations Under the Plan

211.    From 1965 to 1995, SJHSRI's employees participated in the pension plan that Corporation Sole, Diocesan Administration, and Diocesan Service established for the employees of the Diocese of Providence (the "Diocesan Plan").

212.    Prior to January 1, 1973, SJHSRI's employees were required to contribute to the Diocesan Plan 2% of the first $4,800 of their annual earnings, and 4% of their

annual earnings in excess of $4,800.  As of January 1, 1973, employees were not required (or permitted) to make contributions to the Plan.

213.    The Plan documents at all relevant times included both a Trust and a highly-technical and lengthy separate instrument that purported to set forth the terms of the Plan.  During the period from 1965 through 1995, the Plan was part of the Diocesan Plan, and was amended or restated at least ten times.

214.    In 1995, in connection with the tenth restatement of the Diocesan Plan, SJHSRI, Corporation Sole, Diocesan Administration, and Diocesan Service took certain steps to unilaterally remove SJHSRI employees from the Diocesan Plan, which up to then had covered both the employees of SJHSRI and the lay employees of the Diocese of Providence.

215.    At the same time SJHSRI, Corporation Sole, Diocesan Administration, and Diocesan Service established and/or caused SJHSRI to establish a separate plan for SJHSRI, without obtaining the agreement of or even providing notice to the Plan participants or SJHSRI's employees.

216.    Up until then, the assets of the Diocesan Plan allocable to the lay employees of the Diocese and to the employees of SJHSRI were co-mingled in the same investment accounts.  In 1995, a portion of the assets of the Diocesan Plan was allocated to the employees of SJHSRI and transferred to separate accounts to fund the Plan.  Thereafter, the funds were kept segregated.  This enabled Corporation Sole, Diocesan Administration, and Diocesan Service to fund the Diocesan Plan as they saw fit, while SJHSRI was not funding the Plan.  Another purpose and effect of the split was to insulate the pension benefits of the lay employees of the Diocese from the claims of the employees of SJHSRI.

56

217.    Following its separation from the Diocesan Plan, the Plan was unilaterally revised by SJHSRI on three occasions, in 1999, 2011, and 2016.

218.    The various iterations of the Plan contain different provisions (the "Exculpatory Provisions") that were inserted so as to enable arguments regarding the construction of the Plan that would make any funding obligation illusory and which would constitute a fraud on the Plan participants.

219.    The Exculpatory Provisions so construed are ineffective, for various reasons, including, but not limited to, that (a) they contradict the reasonable expectations of Plan participants, (b) they are contrary to representations made over many years to Plan participants upon which Plan participants relied to their detriment such that Defendants are estopped from relying on such provisions, (c) they violate the obligation of good faith and fair dealing, and (d) they generally represent an unconscionable fraud on Plan participants.

220.    The Exculpatory Provisions so construed also contradict statements that SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East made to various Rhode Island state agencies to obtain their approval for the 2014 Asset Sale and to the Rhode Island Superior Court in 2015 to obtain the court's approval of the transfer of approximately $8,200,000 from SJHSRI and RWH to CC Foundation.

221.    These statements acknowledged both that it was SJHSRI's "liability" and "obligation" to fund the Plan, but also represented that SJHSRI had the intent and means to "satisfy" that obligation.  Having succeeded in obtaining those approvals based upon the those representations, SJHSRI, RWH, CCCB, CC Foundation, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger

Williams, Prospect Medical Holdings, and Prospect East are judicially estopped from contending otherwise, and from enforcing the Exculpatory Provisions insofar as they would relieve SJHSRI of any such liability, since to allow them to use those provisions for that purpose would reward a fraud on both the Rhode Island Attorney General and the Rhode Island Superior Court.

222.    Moreover, insofar as the Exculpatory Provisions if so construed would have the effect of relieving Defendant SJHSRI from liability to fully fund the Plan or pay the promised retirement benefits, then Defendants SJHSRI, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East breached their fiduciary obligations to disclose that material information to the Plan participants, including, but not limited to, the information that Defendant SJHSRI contended that it was not obligated to fund, and, in fact, was not funding the Plan.  All of these Defendants also aided and abetted those breaches of fiduciary duties by other Defendants, such that in addition to breaching their fiduciary duties, Defendants SJHSRI, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East also aided and abetted in the breach of fiduciary duties by others.

223.    The very existence of the Exculpatory Provisions, however, evidences that at the time they were making promises to Plan participants to fund the Plan, Defendants SJHSRI, RWH, CCCB, Corporation Sole, Diocesan Administration, and Diocesan Service believed they were not legally required to keep their promises, and were entitled to not fund the Plan.  Thus the promises constituted intentionally false statements of

material fact in that they misrepresented the states of mind, opinions, and intentions of these Defendants.

224.   All of the various iterations of the Plan have in common the fact that they were never given to Plan participants.  In other words, Plan participants were never provided with a copy of the Plan documents, either at any time during the applicability of the Diocesan Plan or, subsequently, when the Plan for SJHSRI employees was separately established.

225.   Notwithstanding the Exculpatory Provisions, SJHSRI's obligation to properly fund the Plan was acknowledged in the annual financial statements for SJHSRI prepared by different auditors through the years.

226.   For example, since 2006, all of SJHSRI's annual (both audited and unaudited) financial statements have listed the unfunded portion of Plan obligations as a liability on the balance sheet for SJHSRI, and reduced the net assets of SJHSRI by that amount.

227.   In addition, the financial statements repeatedly referred to SJHSRI's policy to make annual contributions to fund the Plan, and to determine the amount of the contributions as if the Plan were subject to the funding obligations of ERISA.  For example:

     a.   SJHSRI's financial statements for the fiscal years ending September 30, 1985, September 30, 1986, and September 30, 1987, stated that "[t]he Hospital makes annual contributions to the Plan equal to the amount accrued for pension expense;"

     b.   SJHSRI's financial statements for the fiscal years ending September 30, 1992, September 30, 1993, September 30, 1994, September 30, 1995, September 30, 1996, and September 30, 1997, stated that "[t]he Hospital's policy is to fund pension costs accrued which are within the guidelines established by ERISA;"

    c.    SJHSRI's financial statements for the fiscal years ending September 30, 2001, and September 30, 2002, stated that "[t]he Corporation's policy is to fund at least the minimum amount required under ERISA guidelines;" and

    d.    SJHSRI's financial statements for the fiscal years ending September 30, 2003, September 30, 2004, September 30, 2005, and September 30, 2006, stated that "[a]lthough the plan is not subject to ERISA, the Corporation's policy is to fund at least the minimum amount required under the ERISA guidelines."

228.    These financial statements all were expressly approved by the SJHSRI's Board of Trustees, SJHSRI's management, and SJHSRI's auditors.

229.    Even in years when SJHSRI's annual financial statements did not expressly acknowledge that it was SJHSRI's policy to fund the Plan under ERISA guidelines, those financial statements never disclosed that SJHSRI had not adhered to its oft-stated policy to fund the Plan under ERISA guidelines.

230.    Similarly, the annual reports that Angell and Angell's predecessor actuaries provided to SJHSRI concerning the actuarial status of the Plan repeatedly acknowledged both that SJHSRI was liable to fully fund the Plan and that SJHSRI's policy was to make contributions to the Plan as if it were subject to ERISA.  For example:

    a.    In the Actuarial Valuations of the Plan as of July 1, 1995, July 1, 1996, July 1, 1997, July 1, 1998, and July 1, 1999, Watson Worldwide[4] stated that "[s]ince this a church plan it is not subject to the minimum funding requirements of ERISA.  However, it is the Hospital's funding policy to follow the ERISA guidelines each year in determining the contribution requirement.  This funding policy will ensure that sufficient assets are available to plan participants to pay retirement benefits;"

    b.    In the Actuarial Valuations of the Plan as of July 1, 2000, July 1, 2001, and July 1, 2002, Aon Employee Benefits Consulting[5]

---

[4] Watson Worldwide were the actuaries at the time.

[5] Aon Employee Benefits Consulting were the actuaries at the time.

stated that "[w]hile the Plan is a church plan, and is not subject to the funding requirements of ERISA, the current funding policy follows the ERISA guidelines.  Therefore, the minimum contribution level has been determined as the amount that would be required by ERISA in the absence of church plan status;"

c.   In the Actuarial Valuations of the Plan as of July 1, 2006 and July 1, 2007, Angell stated that "[w]hile the Plan is a church plan, and is not subject to the funding requirements of ERISA, the current funding policy follows the ERISA guidelines without regard to the current liability calculations;" and

d.   In the Actuarial Valuations of the Plan as of July 1, 2008, and for each year thereafter, Angell stated that "[w]hile the Plan is a church plan, and is not subject to the funding requirements of ERISA, the current funding policy follows the ERISA guidelines without regard to the current liability calculations or Pension Protection Act of 2006 modifications."[6]

231.   In December 2009, and after review and consultation with SJHSRI, Moody's Investor Services affirmed its rating of SJHSRI's Series 1999 bonds.  In its rating statement issued on December 2, 2009, Moody's noted the Plan had been frozen and stated: "[w]hile there is no required funding by ERISA, the need to fund adequately the pension is an obligation of the hospital."

232.   Other statements that Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Medical Holdings, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, and Prospect East made to state regulators in connection with obtaining approval for the 2014 asset sale also represented that Defendants SJHSRI, RWH, and CCCB were obligated by the Plan to make necessary contributions.

233.   For example, in response to an official query concerning how the Plan would be operated after the asset sale, Defendants SJHSRI, RWH, and CCCB,

---

[6] The caveat for "the current liability calculations or Pension Protection Act of 2006 modifications" is irrelevant, since neither the then current liability calculations nor the Pension Protection Act of 2006 modifications eliminated or even affected the ERISA guidelines for funding.

Prospect Chartercare, Prospect Medical Holdings, Prospect Chartercare St. Joseph,

Prospect Chartercare Roger Williams, and Prospect East stated on April 15, 2014 as

follows:

> Response: The pension liability will remain in place post transaction.
> Subsequent to the $14 Million contribution to the Plan upon transaction,
> **future contributions to the Plan will be made based on recommended**
> **annual contribution amounts as provided by the Plan's actuarial**
> **advisors**. Moving forward, the investment portfolio of the plan will be
> monitored by the Investment Committee of the Board of Trustees.
>
> [Emphasis supplied]

234.    Similarly, SJHSRI management and its boards repeatedly acknowledged

that SJHSRI's policy was to make contributions to the Plan as if it were subject to

ERISA, and that is was a "fiduciary obligation" of board members to see to it that the

Plan was properly funded.  For example:

> a.    SJHSRI Chief Financial Officer John Flynn on September 5, 1996
> advised Edward Groden of Watson Worldwide that the SJHSRI
> Finance Committee wanted to "[a]dopt an approach [to the Plan]
> that will allow for a consistent method over time to adequately
> fund the plan, taking into consideration the Hospital's ability to
> make the necessary contributions and **ensuring the Finance**
> **Committee and the Retirement Board that they will meet their**
> **fiduciary responsibility for providing adequate funding**"
> [emphasis supplied]; and
>
> b.    SJHSRI's Human Resources Department disseminated as
> authoritative a history of the Plan captioned "St. Joseph Health
> Services of Rhode Island Retirement Plan History," which stated
> that "[t]he Corporation's policy is to fund pension costs accrued
> that are within the guidelines of ERISA."

## C.    DEFENDANTS KNEW THE PLAN WAS UNDERFUNDED

235.    On May 12, 2008, SJHSRI and RWH entered into a "MEMORANDUM OF

UNDERSTANDING" that agreed in principle to their merger.

236.    Officials from RWH evaluated SJHSRI's pension liability in connection with the merger that ultimately took place in 2009, which also was approved by the R.I. Department of Health and Attorney General under the Hospital Conversions Act. According to the minutes for a meeting of the executive committee of the RWH's Board of Trustees on October 23, 2008, the estimated underfunding for the Plan as of September 20, 2008 was $29 million.

237.    As of February 2, 2009, SJHSRI and RWH entered into a Health Care System Affiliation and Development Agreement among Roger Williams Hospital and Roger Williams Medical Center, and St. Joseph Health Services of Rhode Island and Roman Catholic Bishop of Providence (the "SJHSRI-RWH Affiliation Agreement").  The SJHSRI-RWH Affiliation Agreement provided that "CharterCare Health Partners" (later re-named CharterCare Community Board and referred to herein as CCCB) would be formed and would completely control RWH and would control SJHSRI on all matters except certain religious issues.

238.    On July 9, 2009, Angell informed SJHSRI, RWH, and CCCB that the estimated unfunded benefit obligation as of July 1, 2009 was approximately $60,000,000 and would increase over the next four years even if SJHSRI contributed an additional $8.7 million over that period.

239.    On March 15, 2011, the Finance, Audit and Compliance Committee of the Board of Directors for CCCB met to discuss, *inter alia*, the shortfall in the Plan's funding, and the following discussion took place amongst members of the committee (including Daniel Ryan, Kenneth Belcher, Edwin Santos, and Donald McQueen), CCCB staff (including Michael Conklin, Addy Kane, Kathleen Moore, David Ragosta, Darlene

Souza, George Curtis, and Barbara O'Neil), and Jeffrey Bauer (President and Chief

Executive Officer of Defendant Angell):

> Mr. McQueen asked how much the Hospital would need to fund into the
> Plan to carry it to term.  Mr. Bauer indicated approximately $50M would be
> needed. . . .
>
> Mr. Stiles asked what was happening in the public sector.  Were there any
> modifications available that should be looked at in order to minimize the
> Hospital's liability?  **Mr. Bauer indicated that any modifications to the
> Plan would be difficult because it is a protected benefit and cannot
> be changed**.
>
> [Emphasis supplied]

240.    Other communications between Angell and SJHSRI also informed

SJHSRI management and directors of the extent of the Plan's unfunded status.  For

example, in 2010, Angell advised SJHSRI that SJHSRI should make a "recommended

maximum contribution" of $1,624,311 to the Plan, or at least a "minimum contribution" of

$1,444,178, and advised that a contribution of $21,314,085 was needed to reach a

100% funding level.

241.    The term "minimum contribution" referred to the minimum contribution

amount determined under Internal Revenue Service rules that can be paid by plans

subject to ERISA without incurring a penalty.  For plans that are underfunded, it typically

includes at least two components: (a) a "target normal cost' that is based on plan

expenses and the expected benefit payout over the coming year; and (b) a shortfall

amortization charge, which is a sum necessary to return the plan to fully-funded status

over a period of years.

242.    The term "recommended maximum contribution" referred to the maximum

contribution that SJHSRI could deduct from federal income taxes if it were a for-profit

corporation.

64

243.    The term "100% funding level," or, indeed, any percentage funding level, is a term of art that Angell intended and SJHSRI understood is based on the assumption that the Plan would continue for years, which at many times was an intentionally false assumption as discussed below, and also is based upon an assumed future rate of return on pension plan assets.  In addition, in accordance with actuarial standards, customs, and practices, a "funding level" percentage applies only at the point in time the estimate is made, must be based solely on the pension plan's existing liabilities, not pension liabilities incurred after that date, and is subject to possibly drastic change if investment returns actually realized were less than the assumed rate of return on which the estimate was based.

244.    SJHSRI disregarded the 2010 recommendation and made no contribution.

245.    In 2011, Angell advised SJHSRI that SJHSRI should make a "recommended maximum contribution" of $1,626,074 to the Plan, or at least a "minimum contribution" of $1,433,706, and advised that a contribution of $22,426,204 was needed to reach a 100% funding level.  SJHSRI disregarded the recommendation and made no contribution.

246.    In 2012, Angell advised SJHSRI that SJHSRI should make a "recommended maximum contribution" of $1,793,075 to the Plan, or at least a "minimum contribution" of $1,480.468, and advised that a contribution of $13,690.720 was needed to reach a 100% funding level.  SJHSRI disregarded the recommendation and made no contribution.

247.    In 2013, Angell advised SJHSRI that SJHSRI should make a "recommended maximum contribution" of $3,056,708 to the Plan, or at least a "minimum contribution" of $2,144,292, and advised that a contribution of $25,081,206

65

was needed to reach a 100% funding level.  SJHSRI disregarded the recommendation and made no contribution.

248.    On or about December 2, 2013, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East (through Barbara Groux) requested that Angell provide them with an updated estimate of the amount of unfunded benefits if the Plan were terminated.

249.    On December 10, 2013, Angell advised that the updated estimate of the amount of unfunded benefits if the Plan were terminated was over $98,000,000.  The reason this was so much higher than the sum needed to reach a 100% funding level in 2013 was that the termination liability would be paid by SJHSRI's purchase of annuities from an insurance company to fund those benefits, which would cost much more than if SJHSRI continued to operate the Plan and the Plan earned the assumed rate of return of 7.75%.

250.    On December 13, 2013, Christopher Cozzoni, who was a principal in Mercer (US) Inc., the company that was managing the Plan's portfolio assets on behalf of SJHSRI, informed CCCB Chief Financial Officer Conklin that "the Plan's funded status on a current market basis [of 4.6%] is around 50%," and that this funding level was more reliable than the finding level of over 90% that Angell had calculated based on an assumed rate of return of 7.75%.

251.    The market rate to which the Mercer representative referred was the rate that single employer defined benefit plans (such as the Plan) that are governed by ERISA are required to use.  The Mercer representative noted that Angell was using a higher estimated rate of return because the Plan's purported Church Plan status

66

relieved them of the obligation to use the market rate of return, and that using the higher rate of return in determining the Plan's funding level had the effect of greatly increasing the Plan's funding level over what it would have been under ERISA.

252.    Angell prepared revised calculations and met with Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East on or about January 8, 2014 and shared with them the facts concerning the unfunded status of the Plan and the cost of terminating the Plan and purchasing annuities.  This meeting was attended by persons including Jeff Bauer, Kenneth Belcher, Michael Conklin, Barbara Groux, Peter Karlson, Brenda Ketner, Darleen Souza, and David Ward.

253.    In connection with the sale of its subsidiaries' assets to Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East discussed below, Defendant CCCB submitted to Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East consolidated financial statements on behalf of CCCB, SJHSRI, and RWH, stating that the unfunded liability on the pension was $91,036,390 as of April 30, 2013.

254.    Corporation Sole, Diocesan Administration, and Diocesan Service were also fully familiar with the extent to which the Plan's liabilities were unfunded.  Indeed, as noted above, in September of 2013, Bishop Tobin had described the pension as "a spiraling and gaping unfunded liability."

255.    Thus, prior to and at the time of the 2014 Asset Sale, CCCB, SJHSRI, RWH, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East, Corporation Sole, Diocesan

Administration, Diocesan Service, and Angell all had actual knowledge of the full extent of the Plan's unfunded liabilities.

**D.    MISREPRESENTATIONS TO PLAN PARTICIPANTS**

256.    SJHSRI used the Plan to hire and retain skilled employees.  Indeed, in October 1990, SJHSRI's actuary Watson Worldwide made a presentation to the SJHSRI board noting that "recruiting and retention of employees" was the first purpose of the Plan.

257.    It is equally clear that SJHSRI's policy to follow ERISA guidelines was dictated by competitive reasons.  For example, in 1977, SJHSRI changed the Plan so that the amount of benefits was based on a percentage of the employees' last salaries prior to retirement, comparable to what was required by ERISA, after conducting a survey of seven other competitor hospitals that had conformed their Plans to include this requirement.  Charles L. Commander on behalf of Watson Worldwide in a letter to the President of SJHSRI on February 4, 1983 noted that "[t]he plan for the most part is consistent with the spirit of ERISA, primarily for competitive reasons."

258.    SJHSRI management and directors were informed on numerous occasions that SJHSRI's employees did not understand the provisions of the Plan.  For example:

      a.    In a memorandum to SJHSRI Controller Paul Beaudoin on February 3, 1997, Watson Worldwide offered to update the employee booklet on the Plan.  Watson Worldwide dealt directly with Plan participants and made presentations to them concerning the Plan.  Nevertheless, they stated that "[i]t is our understanding that employees do not understand or know very much about the Plan."  Management declined to update the booklet.

      b.    On February 2, 1990, SJHSRI's Vice President for Human Resources David DeJesus asked for authority to provide Plan

68

participants with an annual statement that would contain the information that ERISA requires for annual plan statements. SJHSRI never provided Plan participants with such information, which would have included disclosing the unfunded status of the Plan.

c.      At a meeting of the Investment Committee of the CCCB Board of Trustees on May 4, 2012, after board members were informed that SJHSRI was not required by ERISA to make contributions to the Plan, one board member asked whether Plan participants "truly understood the funding status of the Plan and the impact of the Plan being a Church Plan (non ERISA)."  The response by CCCB President and Chief Executive Officer Belcher was that he "believed that staff are aware and that this subject was discussed at employee forums."  However, this information was never mentioned in any written presentation to any employees and there is no evidence it was ever even orally conveyed at any employee forums or to any employees or other Plan participants at any other occasion.

259.    In contrast to the extremely difficult, obscure, and technical language set forth in Plan documents, SJHSRI, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect Chartercare, and Angell made or provided statements to Plan participants, on different occasions, in many different contexts, over many years, and using plain language, that assured Plan participants that the Plan was an earned benefit of their employment, that the contributions necessary to properly fund the Plan were being made, that it was management's policy, practice and duty to do so, and that SJHSRI and not the Plan participants bore the risk of Plan assets not earning expected returns or incurring investment losses.

260.    The Plan participants relied upon those statements to their detriment.

261.    Moreover, these assurances created a general understanding and commonly held belief amongst employees and retirees that SJHSRI had undertaken to fully fund the Plan and to assume any investment risk associated with Plan investments, and created a culture of trust and reliance that influenced even those employees and

69

retirees who cannot recall specific communications, that cumulatively informed the reasonable expectations of Plan participants, such that detrimental reliance is presumed and proof of individualized reliance on specific representations is not necessary.

262.    Third parties such as SJHSRI's employee unions also relied upon these communications.  SJHSRI's employee unions also acted on behalf of Plan participants, and, therefore, the unions' reliance was reliance by Plan participants.

263.    These communications took many forms.  They included descriptions of the Plan in detailed booklets, less-detailed handouts and tri-fold pamphlets specific to the Plan, employee handbooks, presentations ("PowerPoints") used in slideshows, and memoranda and letters from SJHSRI management to employees.

264.    In addition, SJHSRI and its agents and representatives (including Defendant Angell) communicated with specific employees concerning the Plan and a specific employee's benefits through various letters and statements as described below.

265.    A detailed booklet entitled "Retirement Plan for Employees of the Diocese of Providence," issued prior to 1973, described the pension benefits being provided to the employees of SJHSRI as of January 1, 1973 and stated:

> It is the desire of the diocese, its parishes and institutions, to make provision for its employees in retirement.  Indeed, we have always had a sympathetic concern for the welfare of our employees and are confident that this implementation of that concern will provide the necessary sense of security and peace of mind that all envision.
>
> *        *        *
>
> Q.    What does the Diocese contribute?
>
> A.    The Diocese contributes the entire cost of the benefits you have earned prior to the adoption of the Retirement Plan.  The Diocese will also contribute an additional amount which, when added to your contributions,

will meet the cost of benefits you will earn during the remaining years of
your employment.

\*       \*       \*

Q.      How will my Retirement Benefit be paid?

A.      You will receive a check each month beginning on your retirement
date and terminating with the payment preceding your death.

266.   Another detailed booklet, entitled Saint Joseph's Hospital Retirement Plan

(1973 edition) stated:

This booklet has been prepared to inform you about your Saint Joseph's
Hospital Retirement Plan.

\*       \*       \*

One of the most important sources of your income will be our Retirement
Plan . . . .

\*       \*       \*

HIGHLIGHTS OF THE PLAN

The Hospital will pay the entire cost of the Plan beginning January 1,
1973.

\*       \*       \*

COST OF THE PLAN

5.      Do I make any contributions to the Plan?

No.  The Hospital will pay the entire cost of the Plan beginning January 1,
1973 – not only your pension but also all actuarial, legal and investment
expenses incurred in the administration of the Plan.

267.   On or about February 6, 1978, SJHSRI's then President A. Edward

Azevedo sent a memorandum to employees, urging them not to unionize and describing

the benefits SJHSRI already provided through the Diocesan Plan.  This memorandum

contrasted the Hospital's pension benefits with what SJHSRI characterized as "vague

promises" of union organizers and stated:

> Know the facts when someone asks you to sign a union authorization
> card.  The union organizer makes vague promises, but the facts are that
> your Hospital has, on a regular basis, increased your wages and improved
> your benefits.
>
> For example, during the past five years, the following improvements have
> been made by the Hospital:
>
> *        *        *
>
> Pension Plan – Improved from contributory to non-contributory effective
> January 1973.  Plan improved again effective January 1977; **Hospital
> pays full cost of the plan**.
>
> [Emphasis supplied]

268.    Another detailed booklet, entitled "RETIREMENT PLAN ST JOSEPH

HOSPITAL Providence/North Providence, Rhode Island (1982 Edition)" contains the

following statement, in question and answer format:

> WHO WILL PAY FOR MY BENEFITS?
>
> The Hospital pays the entire cost of your benefits earned after 1972 and
> before 1965.  You and the Hospital shared the cost between 1965 and
> 1972.
>
> **Each year independent actuaries calculate the amount of money
> which the Hospital will pay to the Plan Trustee.  This money is then
> set aside and invested to provide each eligible employee with a
> pension at retirement**.
>
> [Emphasis supplied]

The preface to the booklet was a letter to employees signed by then-SJHSRI President

Azevedo, which concluded with the "hope that this Plan will be evidence of our personal

interest in your welfare, not only while actively in our employ but after you retire to enjoy

the rewards of a long and productive life."

269.    Similar language was included in the next edition of that booklet, captioned "St. Joseph Hospital Retirement Plan Providence/North Providence, Rhode Island (1986 Edition)", which stated:

> The St. Joseph Hospital Retirement Plan was established to help you make your retirement years economically more secure.  Since its inception in 1965, the Hospital has made many improvements to the Plan.  The most recent improvements became effective on July 1, 1985.
>
> The Hospital pays the entire cost of the Plan and no contributions are required by you.
>
> Your Retirement Plan will give you a lifetime monthly income when you become eligible to retire.  In addition, the Plan may provide benefits to your spouse or beneficiary after your death.
>
> *        *        *
>
> WHO PAYS FOR MY BENEFITS?
>
> **The Hospital pays the entire cost of your benefits.  Each year independent actuaries calculate the amount of money which the Hospital will pay to the Plan Trustee.  This money is then set aside and invested to provide each eligible employee with a pension at retirement.**
>
> [Emphasis Supplied]

270.    As already noted, however, although actuaries throughout the life of the Plan annually calculated the amount of money that SJHSRI should pay into the Plan, based upon the contribution requirements of ERISA and the Plan, SJHSRI routinely disregarded their recommendations and in many years chose to make no annual contributions whatsoever, with the result that the Plan became more and more underfunded over time.  Defendants SJHSRI, RWH, and CCCB never informed Plan participants that the earlier assurances that the Plan was being funded in accordance with the recommendations of the Plan's actuaries were no longer true.

73

271.   The highlighted language was repeated in a subsequent revision of that booklet in 1988 and draft revisions in 1993, 1995, 1996, and 1999.  It appears that SJHSRI stopped revising that booklet but continued to use it over time.  During the period it was in use, SJHSRI never omitted or in any way contradicted this language.

272.   Prior to 1995, the Diocese's Retirement Board sent terminated or retiring employees of SJHSRI documents entitled "STATEMENT OF INFORMATION FOR TERMINATED EMPLOYEES WITH VESTED RIGHTS".  For example, one such form dated January 15, 1994 stated:

> According to our records, your service with St. Joseph Hospital prior to your termination of employment on 12/3/92 entitles you to a benefit at age 65 from the Diocese of Providence Retirement Plan – St. Joseph Hospital (the "Plan").  The amount of this benefit is $192.42 per month commencing on 4/1/2020 and **payable to you for as long as you live**.

> [Emphasis supplied]

273.   From time to time SJHSRI offered seminars or made presentations to Plan participants to explain their benefits, and in the process assured Plan participants that they could rely on their pensions.  For example, on November 15 & 16, 1995, and again on March 4, 1998, SJHSRI, through Dan Hanlon and Phyllis Cabral of SJHSRI's human resource department, and SJHSRI's actuary and direct representative with Plan participants, Ed Groden and Gail Cohen of Watson Worldwide, showed Plan participants a PowerPoint that stated that "[c]omputations [are] made annually to ensure assets are sufficient to meet current and expected future benefit obligations," without disclosing that in fact SJHSRI disclaimed any obligation to follow the funding recommendations that were the product of those computations.

274.   On October 24, 1996, SJHSRI's President and Chief Executive Officer sent a letter to employees of SJHSRI, which stated that he was "particularly pleased

74

about the Pension Plan improvements," but neglected to disclose the fact that SJHSRI employees were no longer part of the Diocesan Plan.

275.   That same letter claimed that the Plan available to SJHSRI employees "is as good or better than those of many other organizations in the region," without disclosing that, unlike the case with the defined benefit plans of most organizations, SJHSRI claimed that the Plan was not governed by ERISA, and thus would not have insurance coverage against insolvency provided by the PBGC.

276.   From time to time thereafter, SJHSRI, the then-incumbent Bishop acting on behalf of Defendants Corporation Sole, Diocesan Administration, and Diocesan Service, communicated with SJHSRI employees concerning the Plan in terms that falsely reassured Plan participants that the Bishop and Diocese of Providence had ongoing involvement in the Plan.

277.   For example, a handout was provided to Plan participants, entitled "RETIREMENT PLAN HIGHLIGHTS," that purported to summarize the Plan as of January 1, 1998 (three years after the split off of the Plan from the Diocesan Plan), and referred to the Bishop's and Diocese's ongoing involvement in the Plan:

> Who administers the Plan?
>
> The Roman Catholic Bishop of Providence has appointed a Retirement Board to administer the Plan.  The Board will establish rules and regulations for the administration of the Plan, and will be responsible for resolving any disputes concerning Plan operation.
>
> Who administers the Retirement Fund?
>
> The Diocese has established a Trust Fund with Fleet Investment Services. The Trustee of the Fund will hold, invest, and distribute the money in accordance with the terms and provisions of the Plan and Trust Agreement.

The statement that Plan assets were held in a trust established by the Diocese was intentionally false and deceptive, since in connection with the separation of the two plans in 1995, a new trust was established by SJHSRI, but SJHSRI did not inform Plan participants of the separation, much less that only a portion of the Diocesan Plan assets were transferred to the new trust for the Plan alone.

278.    That handout also stated in part:

Retirement is a time in life we all look forward to with great anticipation, a time when we have the opportunity to do the things we most enjoy. Maybe you have your sights set on traveling across the country?  Or perhaps spending time with the grandchildren?  But whether your retirement plans involve relaxing on the beach—or on the golf course—one thing's for certain: *You'll need money to achieve them.*

That's why St. Joseph Health Services of Rhode Island offers the Retirement Plan to all eligible employees.  **The Retirement Plan is designed to help you meet your retirement savings goals by providing you with a monthly annuity during retirement.  And the best part of all is you contribute nothing for this benefit—it's paid for completely by the Hospital.**  In this way, your Retirement Plan benefit is an important part of your total retirement income.  And when combined with your Social Security benefit and your personal savings, this benefit can provide the financial security you need to follow through on your retirement plans.

\*        \*        \*

*Retirement Payment Options*

What are the payment options?

**You may choose a Life Annuity option, which provides you a fixed monthly payment throughout your lifetime.**  Or you may choose one of four Joint and Survivor options (100%, 75%, 66 2/3%, or 50%), which pay a reduced monthly payment throughout your lifetime, and continue payments to your beneficiary after you die.

You may also choose a Ten-Year Guarantee option, which provides at least 120 guaranteed monthly payments (for a total of ten years) to you and your beneficiary.

[Italics in the original and bolded emphasis supplied]

279.   A pamphlet provided to Plan participants, entitled "Questions And Answers About The St. Joseph Health Services Retirement Plan," and dated "Effective 7/1/2001", stated *inter alia*:

Q:   What forms of payment are available to me?

A:   The normal form of payment is a life annuity.  **Under this form of payment, you will receive your monthly pension payments for as long as you live.**  All pension payments stop when you die.

[Emphasis added]

280.   From time to time, SJHSRI provided statements to Plan participants discussing and quantifying their Plan benefits.  Thousands of these statements stated *inter alia*:

St. Joseph Health Services of Rhode Island is pleased to give you this statement showing your estimated benefits in the Retirement Plan as of [insert date].  **Your pension benefit is an important part of your future retirement income**, along with Social Security, your 403(b) savings, and your other personal savings.  You automatically become a participant in the plan once you have completed 12 months of employment and worked at least 1,000 hours.  Some key features of this plan are:

•      Simplicity—Participation in the plan is automatic.  You do not have to enroll or do anything until you retire.

•      Security—Benefits are paid from a secure trust fund.

•      **Company Paid—The plan is entirely paid for by St. Joseph Health Services of RI.  There is no cost to you.**

\*        \*        \*

SUMMARY OF PLAN PROVISIONS:

77

St. Joseph Health Services of Rhode Island Retirement Plan provides you with:

a)    **A monthly income payable for life when you retire**, in addition to your Social Security benefits.

b)    The right to retire as early as age 55 if you have completed at least 5 years of continuous service.

c)    The right to future pension benefits if you leave the Hospital after 5 or more years of continuous service.

d)    Death benefits payable to your surviving spouse or beneficiary if you die while still employed after completing 5 years of continuous service.

**The Hospital pays the entire cost of the plan.**  In addition, the Hospital pays into the Social Security System an amount equal to what you pay.

[Emphasis added]

281.    Similarly, in September of 2003, SJHSRI provided employees with a handout entitled "Understanding Your St. Joseph Health Services of Rhode Island Pension Statement," which set forth the following as "Pension Basics":

Pension Basics

Simple

-    Participation is automatic

Secure

-    Assets in trust fund

-    **No investment risk to you**

Valuable

-    Hospital pays the entire cost

-    Non-contributory Defined Benefit (DB) Plan

-    Rewards long service employees

78

[Emphasis supplied]

282.    However, the grossly underfunded status of the Plan is due in large part to SJHSRI's choosing not to fund the Plan when it was necessary to do so because the Plan did not meet investment targets, or, indeed, incurred substantial investment losses. In other words, SJHSRI in fact placed the "investment risk" on Plan participants, contrary to the representation that they bore "no investment risk," and notwithstanding that, unlike participants in a defined contribution plan who exercise at least some control over their retirement investments, Plan participants were completely powerless to control investment risk in that it was solely SJHSRI, CCCB, or the Retirement Board, who determined how the Plan assets would be invested, without consultation with Plan participants or even advising them of the allocation of Plan assets, investment returns obtained on Plan assets, or the unfunded status of the Plan.  Defendants SJHSRI, RWH, and CCCB made these false statements with actual knowledge they were false, with the intent to deceive Plan participants, and Plan participants were thereby deceived to their detriment.

283.    Other handouts and similar communications containing the same or substantially equivalent language as that of the handouts quoted in paragraphs 264-281 were provided to Plan participants on other occasions, all as part of the process of hiring and retaining employees.

284.    From time to time, SJHSRI provided employee handbooks to its employees.  One dated "April, 2004," stated *inter alia*:

Pension Plan

Regular full-time and regular part-time employees are eligible to participate in the SJHSRI pension plan.  If an Employee is paid for 1,000 hours or more per retirement plan year he/she will enter the Plan on the

first of the calendar month following the first anniversary of the employee's employment.  **Pension Plan is fully paid by the Hospital.**  Vesting is after 5-years of Continuous Service.  To help you estimate your potential benefit at retirement, pension statements are distributed annually.

[Emphasis supplied]

285.   Beginning in 2009, SJHSRI also administered a defined contribution plan (a "403(b) Savings Plan"), which gave employees the right to make pre-tax contributions and to control their investments.  With that plan, SJHSRI on or about July 9, 2007, provided a handout which answered the question "is there ever a time when benefits can be lost or denied" by stating:

The value of your account depends on the value of Plan investment.  This is why your account must be invested carefully.

With respect to the defined benefit plan, which is the Plan involved in this case, however, SJHSRI never told Plan participants that their benefits could be "lost" or diminished if the Plan assets suffered investment losses.  To the contrary, as noted above, SJHSRI affirmatively represented that, under the defined benefit plan, there is "[n]o investment risk to you."

286.   The explanation of the 403(b) Savings Plan also stated:

The Company reserves the right, of course, to amend the Plan or to discontinue contributions to it.  No amendment can reduce the amount in your account or eliminate any of the benefit form options offered in the Plan.  **If the Company permanently discontinues contributions to the Plan, you will be notified** and you will become 100% vested in your account.

[Emphasis supplied]

No such disclosure was made in connection with the Plan.

287.   On January 28, 2011 SJHSRI through Darlene Souza prepared a PowerPoint presentation to one of the employees' unions, the Federation of Nursing

and Health Care Professionals ("FNHCP"), seeking union approval for a plan to freeze SJHSRI's defined benefit plan and substitute a defined contribution plan going forward for all employees belonging to FNHCP.  This presentation stated that the proposed freeze was necessary to protect the assets of the Plan.  However, management represented in the PowerPoint that the defined benefits earned on the years of service already performed "will not be affected."

288.   As noted above, Angell agreed to act on behalf of SJHSRI in dealing directly with Plan participants, and Angell also worked with Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East in crafting presentations and dealt directly with employees of Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East at New Fatima Hospital informing them of their rights under the Plan.

289.   As such, Angell owed both the Plan and Plan participants the duty to exercise reasonable care and the duty to make accurate and not misleading disclosures concerning the Plan.

290.   However, Angell never informed Plan participants of the Plan's underfunded status or the fact that SJHSRI was not making necessary contributions. To the contrary, Angell's statements to Plan participants implied and in many cases directly represented that their pension benefits were secure.

291.   For example, Angell continued to provide individual Plan participants with statements that set forth specific projected lifetime benefits, which Angell and all of the other Defendants knew could not be relied upon.

292.    On April 29 & 30, 2014, shortly before the sale of Fatima Hospital was approved, representatives of Angell (including at least Mary Pat Moran), SJHSRI, RWH, and CCCB (including at least Darlene Souza) again participated in PowerPoint Presentations to SJHSRI employees intended to reassure them that the sale of the hospital to Prospect Medical would not affect their pension benefits.  In those presentations, the employees were shown a PowerPoint presentation which informed them that the terms of agreement for SJHSRI's joint venture with CCCB and Prospect Medical "includes a $14 Million contribution to the Pension Plan to stabilize plan assets," and were shown a sample final benefit statement that again acknowledged that "[y]our pension benefit is an important part of your future retirement income," and reassured them that "[t]he Hospital pays the entire cost of the Plan," with payment options that included annuity payments for life.

293.    Defendants Angell (including at least Mary Pat Moran), SJHSRI, RWH, and CCCB (including at least Darlene Souza) knew this was grossly misleading and false on multiple levels.

294.    At that time, Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East already knew that the $14 million contribution was not even remotely sufficient "to stabilize plan assets," but nevertheless chose to falsely state that it was their opinion that it would stabilize plan assets. Although expression of matters of opinion may not in all circumstances constitute false statements of material fact, they do when, as here, the speakers are intentionally misrepresenting their opinions, and intentionally offering opinions they do not in fact hold, and, in other words, are misrepresenting their own states of mind.  These

82

misrepresentations and omissions constituted false statements of material fact by Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East.

295.   Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East also knew that the statement that "the Hospital pays the entire cost of the Plan" was also false and deceptive, on at least two levels. "[T]he entire cost of the Plan" includes funding the Plan, and, therefore, the statement was false because no one was funding the Plan.  Moreover, given the timing of the presentation (two months before the closing) and the purpose to reassure employees concerning the effect of the 2014 Asset Sale on their pension benefits, the employees reasonably concluded that the "Hospital" referred to was New Fatima Hospital under the ownership and operation of Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East. Indeed, after the 2014 Asset Sale, SJHSRI was no longer a hospital.  That also was known to be false since all of the Defendants knew that neither New Fatima Hospital nor Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East accepted any obligations under the Plan, and that instead they had drafted the documents so that the obligations would belong to SJHSRI which no longer would have any operating assets and whose restricted assets and expected income would be grossly insufficient to fund the Plan.

296.   Moreover, Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams,

83

Prospect Medical Holdings, and Prospect East already knew that the Plan, which this PowerPoint presentation referred to as an "important part of [the Plan participants'] future retirement income" was grossly underfunded, and the option to choose annuity payments for life was illusory if not an outright lie, because Plan assets would run out long before most of the Plan participants or their designated beneficiaries would have passed away.

297.    Many of SJHSRI's employees were members of another union, the United Nurses & Allied Professionals ("UNAP"), under a collective bargaining agreement that entitled them to pension benefits.  In connection with the 2014 Asset Sale, Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East sought UNAP's agreement to a freeze on the accrual of pension benefits upon the closing of the asset sale.  These Defendants offered the $14 million contribution to the Plan as an inducement for UNAP and its members to agree to the freeze on the accrual of pension benefits, and UNAP and its members agreed to the freeze in return for that contribution, in return for the assurance that the $14 million contribution would "stabilize" the Plan, and the promise that the Plan would be funded thereafter in accordance with the recommendations of the Plan's actuaries.  In these negotiations, these Defendants knew and understood that UNAP was acting on behalf of the Plan participants who belonged to the union.

298.    Beginning in August 2013 and continuing thereafter, Christopher Callaci of UNAP had discussions with representatives from Prospect Medical, including Thomas Reardon and Von Crockett, regarding the potential acquisition by Prospect Medical or its subsidiaries of the Fatima and Roger Williams Hospitals and the impact of such

acquisition on UNAP's members.  He also had such discussions with representatives from CCCB, including Kenneth Belcher, Darleen Souza, and Michael Conklin, inasmuch as CCCB's subsidiaries would be selling those hospitals.  All of these individuals and entities were seeking the support of UNAP for the potential acquisition.

299.   In those discussions, Mr. Callaci was told that the plan if the acquisition transaction closed, was that responsibility for the Plan would stay with CCCB and its subsidiaries, and that the Pension Plan benefits would be frozen, but Mr. Callaci was assured that $14 million would be paid into the Plan in connection with the closing, and thereafter CCCB and its subsidiaries would make the annual actuarially recommended contributions to the Pension Plan.

300.   On September 8, 2013, Mr. Callaci received a bar graph prepared by Defendant Angell on behalf of SJHSRI, RWH, and CCCB, which was dated "9/6/2013" and titled "St. Joseph Health Services of Rhode Island Retirement Plan Comparison of Funding Percentage of Present Value of Accrued Benefit".  This graph depicted the "Funding Percentage (MVA/AAL)" over the coming twenty years for the Pension Plan based on two contribution scenarios: "Recommended Contribution Only" and the scenario Mr. Callaci was assured would be followed, "$14M Contribution and then Recommended".

301.   The bar graph indicated that even as of July 1, 2032, the Pension Fund would remain more than 70% funded under the "$14M Contribution and then Recommended" contributions scenario.

302.   Defendant Angell prepared a second graph, also dated "9/4/2013", for Defendants SJHSRI, RWH, and CCCB.  It depicts the same two scenarios as in the first graph but adds a third scenario "$14M Contribution and then $0".  According to this third

85

scenario, the Pension Fund would be 0% funded by July 1, 2032.  This was the
scenario that Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare,
Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect
Medical Holdings, and Prospect East actually intended to follow, since they have made
no contributions to the Plan since 2014.

303.    Mr. Callaci was not shown the second graph, or otherwise informed that
no contributions would be made to the Pension Fund after the $14 million contribution.
If he had known that no contributions would be made to the Pension Fund after the $14
million contribution in connection with the closing of the 2014 Asset Sale, UNAP would
not have supported that transaction, and UNAP would not have written a letter to the
Rhode Island Department of Health expressing support for the transaction.

304.    At that time, Defendants SJHSRI, RWH, CCCB, Angell, Prospect
Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams,
Prospect Medical Holdings, and Prospect East already knew that the $14 million
contribution was not even remotely sufficient to stabilize plan assets, and that the Plan
assets would run out many years before most of the Plan participants' rights to benefits
were satisfied.

305.    Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare,
Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect
Medical Holdings, and Prospect East made these misrepresentations and omitted this
material information because they knew that such disclosure would create so much
negative publicity and outcry that the applications to the Department of Health and the
Attorney General for approval of the asset sale without fully funding the Plan would be
denied or at the very least would be in serious jeopardy.

306.   On August 12, 2014, nearly two months after Prospect Chartercare, and Prospect Chartercare St. Joseph took over ownership and operation of New Fatima Hospital, Defendant Angell (through Mary Pat Moran) sought instructions from Prospect Chartercare (through Brenda Ketner) as to how Angell should respond to Plan participants who were seeking information concerning the solvency of the plan. Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East had attempted to structure the 2014 Asset Sale to avoid any obligations by Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East under the Plan, and the Asset Purchase Agreement expressly stated that responsibility for the Plan after the asset sale closed would remain with SJHSRI.  Thus, Angell was seeking instruction from Prospect Chartercare concerning the information to provide to Plan participants, even though Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East claimed to have no liability for the Plan.

307.   Brenda Ketner of Prospect Chartercare passed this inquiry on to Darleen Souza and Susan Desmarais of Prospect Chartercare, and acknowledged the deceitful course of conduct they were pursuing by stating that "I think the less 'formal' communication on this the better."

308.   With the agreement and support of Ms. Souza and Ms. Desmarais, Brenda Ketner instructed Angell not to provide Plan participants with the information they were seeking concerning the solvency of the Plan.  Moreover, with the agreement and support of Ms. Souza and Ms. Desmarais, Brenda Ketner instructed Angell to tell

Plan participants that "while we [Angell] can't speak to the future solvency of the plan, we can share that the plan administrators review the annual recommended funding as advised by the plan's actuaries each year.  There is also an investment committee that reviews and monitors the plan on an ongoing basis."

309.    Both Angell (at least through Mary Pat Moran) and Prospect Chartercare (at least through Brenda Ketner, Darleen Souza, and Susan Desmarais) knew that this statement was false, incomplete and misleading, and intended to mislead.  They knew they could very well "speak to the future [in]solvency of the plan," because their own calculations predicted that the Plan would not have sufficient funds to pay Plan participants the benefits to which they were entitled, and knew that SJHSRI for years had been disregarding Angell's funding recommendations and making no contributions, and that once the asset sale went through, SJHSRI would have insufficient funds to make the actuarial-recommended contributions even if it wanted to.  Thus, it was an intentionally fraudulent and material omission for Angell to fail to disclose to Plan participants that Angell knew the Plan was grossly underfunded, and that SJHSRI for years had been disregarding Angell's funding recommendations and making no contributions, while at the same time reassuring Plan participants that "plan administrators review the annual recommended funding as advised by the plan's actuaries each year," and that [t]here is also an investment committee that reviews and monitors the plan on an ongoing basis."

310.    Angell accepted and followed these instructions.

311.    Based upon its knowledge that the Plan was grossly underfunded, and that SJHSRI for years had been disregarding Angell's funding recommendations and making no contributions, and Angell's role in dealing directly with Plan participants and

answering questions concerning the Plan and their benefits, Angell had the affirmative duty to disclose those facts to all of the Plan participants, and its failure to do so constituted intentionally fraudulent omissions of material facts to each and every Plan participant.

312.    Angell played a key role in the common fraud and conspiracy between and among Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect Chartercare, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, both in Angell's role in providing actuarial calculations and in Angell's role in dealing directly with Plan participants.  Actuaries are assumed (and required) to be ethical and honest third party professionals.  By performing these services, Angell gave Plan participants, state regulators, and SJHSRI's employee unions false assurances that the Plan was being properly funded and that necessary disclosures were being made to Plan participants.  Angell's actions were undertaken for an unlawful purpose of facilitating the common fraud and cover-up.

313.    Even after the 2014 Asset Sale, Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East monitored the underfunded status of the Plan, by having consultants review Angell's actuarial reports and conduct their own actuarial analyses, which confirmed to Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East that if anything the Plan was becoming more underfunded.  For example, in early 2016, Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East

89

had the Plan's funding status evaluated by BCG Pension Risk Consultants, Inc., who provided them with a report confirming that the plan remained grossly underfunded.

314.   Moreover, even after the 2014 Asset Sale, including at least on or about June 23, 2017, Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, at least through their representative Von Crockett, communicated with Defendants SJHSRI, RWH, and CCCB, through those Defendants' representative Richard Land, and urged Defendants SJHSRI, RWH, and CCCB to take steps to terminate the Plan and deprive the Plan participants of pension benefits, such as by Defendants SJHSRI, RWH, and CCCB filing for bankruptcy, or by their placing the Plan into a state court receivership to obtain a court order significantly reducing the benefits of Plan participants.

315.   On or about April 13, 2016, nearly two years after the asset sale, Angell worked with SJHSRI, CCCB, and Prospect Chartercare to prepare and make another PowerPoint presentation, this time at New Fatima Hospital, to former-employees of SJHSRI who were now employed at New Fatima Hospital, concerning the Plan and the rights of Plan participants, which again acknowledged that "[y]our pension benefit is an important part of your future retirement income," and again reassured them that "[t]he Hospital pays the entire cost of the Plan," with payment options that included annuity payments for life.

316.   These Defendants knew that the "Hospital," which for nearly two years had been owned and operated by Prospect Chartercare and its subsidiary Prospect Chartercare St. Joseph, claimed it had no obligations whatsoever to Plan participants. Moreover, Defendants SJHSRI, RWH and CCCB had already decided to put the Plan

into receivership and ask for a severe cut in benefit payments to all Plan participants, and were merely allowing time to pass in order to obscure the connection between the 2014 Asset Sale and the receivership, so that the inevitable firestorm of employee shock and anger and negative publicity that would be generated by the receivership would not be linked to the current operations of New Fatima Hospital and New Roger Williams Hospital.

317.   An earlier internal draft of the April 13, 2016 PowerPoint presentation stated that the Plan was a "Church Plan" and, therefore, that the Plan participants' benefits were not protected under ERISA.  However, as part of a long history of concealment from the Plan participants, and in order to continue to deceive Plan participants, this disclosure was deleted by Defendants Angell, SJHSRI, CCCB, and Prospect Chartercare, and did not appear in the presentation actually given.  Indeed, the Plan participants were never informed that the Plan was purported to be a Church Plan, or that the Plan participants' benefits were not protected under ERISA.

318.   It was never "public knowledge," and Plan participants were never told that the Plan was being administered as a Church plan, or that the Plan participants' benefits were not protected under ERISA, or that Defendants SJHSRI, RWH, and CCCB reserved the right not to make recommended contributions to the Plan, and in fact in many years did not make recommended contributions to the Plan.  Defendants SJHSRI, RWH, and CCCB had the obligation to disclose this information, both as fiduciaries and in order to make the information they did disclose not misleading, and breached this duty and such omissions were material and intentionally deceptive. Moreover, this fraud by Defendants SJHSRI, RWH, and CCCB is imputed to Defendants CC Foundation, Angell, Prospect Chartercare, Corporation Sole, Diocesan

Administration, Diocesan Service, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams with whom they participated in a common fraud and conspiracy.

E.     FRAUDULENT MISREPRESENTATIONS AND OMISSIONS TO STATE REGULATORS

319.    In 2014 Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, with the support of Defendant Angell, sought and obtained approval from the Rhode Island Department of Health and the Rhode Island Attorney General to convert Fatima Hospital and Rogers Williams Hospital into for-profit operations.

320.    On February 14, 2014, pursuant to the conspiracy in which Corporation Sole, Diocesan Administration, and Diocesan Service were participating with Defendants SJHSRI, RWH, CCCB, and Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, to relieve Fatima Hospital of any liability under the Plan at the expense of the Plan participants, Bishop Tobin (acting individually and as President of Corporation Sole, Diocesan Administration, and Diocesan Service) personally wrote to the Health Services Council to lobby in favor of regulatory approval of the for-profit hospital conversion:

> I write on behalf of the proposed partnership between CharterCARE Health Partners and Prospect Medical Holdings. . . .
>
> *      *      *
>
> The Diocese of Providence is grateful to CharterCARE for all it has done to preserve the healing ministry of SJHSRI/Our Lady of Fatima Hospital, all within very difficult financial circumstances.  However, without this

transaction, it appears that a consistent Catholic health care presence in the Diocese of Providence would be gravely compromised, **and the financial future for employee-beneficiaries of the pension plan would be at a significant risk.  I believe that this partnership will help avoid the catastrophic implications of such a failure**, and at the same time, enhance the quality of care at SJHSRI/Our Lady of Fatima.

[Emphasis added]

321.   However, as explained above, rather than believing the 2014 Asset Sale would help avoid pension failure, Bishop Tobin personally, and, through him and other officials, Defendants Corporation Sole, Diocesan Administration, and Diocesan Service, knew that "the proposed partnership between CharterCARE Health Partners and Prospect Medical Holdings" made pension failure much more likely, and, indeed, a virtual certainty, absent unanticipated and extremely improbable investment gains, because it would cut the link between the Plan and an operating hospital, and would transfer assets from SJHSRI that otherwise would be available to help fund the Plan.

322.   Thus Defendants Corporation Sole, Diocesan Administration, and Diocesan Service knew that the Plan was at much more than a "significant risk." Indeed, as noted above, in the draft letter written to papal authorities in September of 2013, only six months earlier, discussed above, Bishop Tobin had described the pension as "a spiraling and gaping unfunded liability."  He removed that reference from the final version of that letter because he was warned that the letter may be "subject to discovery in a civil lawsuit," and substituted "significant" for "spiraling and gaping." Thus, Defendants Corporation Sole, Diocesan Administration, and Diocesan Service, not only were fully aware of the extent of the unfunded liability, they also took steps to understate and conceal it.

93

323.   Angell acted as CCCB's and SJHSRI's consultant in connection with the application for regulatory approval of the conversion of Fatima Hospital, Roger Williams Hospital, and other health care facilities into for-profit entities.

324.   On April 9, 2014, CCCB provided Angell with a document prepared by the Rhode Island Attorney General's office, consisting of questions to be answered in connection with that application, and asked for Angell's assistance in answering the following question:

> Please provide:
>
> *        *        *
>
> b.  documentation as to the determination that $14 m will stabilize the plan and a description and any written information of the understanding with employee representatives with respect to the freezing and the funding of the plan;

325.   Previously, on December 20, 2013, Brian Corbett of Angell had provided CCCB and SJHSRI (through Darlene Souza and Michael Conklin) with calculations which demonstrated that if $14,000,000 was contributed to the Plan, and assuming a future rate of return of 7.75%, the Plan would run out of funds in 2034, at a time when it would still have over $99 million in unpayable liabilities to Plan participants.  Angell authorized the recipients to share the calculations with "Ken Belcher and any other party who would benefit from this analysis."

326.   On March 27, 2014, Angell updated its calculations based on a slightly higher value of the Plan assets at the beginning of 2014, which projected that even with the $14,000,000 contribution, the Plan would run out of funds in 2036, at a time when it would still have over $98 million in liabilities to Plan participants.  To illustrate the consequences if the 7.75% rate of return proved to be too high, Angell also provided an

alternative calculation, in which Angell assumed a lower rate of return of 5.75% rather that 7.75%, under which the Plan would run out of assets six years earlier in 2030, with additional unpayable liabilities to Plan participants.

327.    Indeed, if the 5.75% rate of return were utilized, the Plan would have been only 66% funded even in 2014 even with the contribution of $14,000,000.

328.    As noted above, moreover, the market discount rate in early 2014 that single employer benefit plans were required to use under ERISA was 4.6%, which if utilized would have produced an even lower funding level.

329.    On April 7, 2014, Darlene Souza on behalf of SJHSRI, RWH, and CCCB, informed Barbara Groux of Prospect Medical Holdings that following their meeting with Angell on January 8, 2014, she had obtained Angell's calculations showing that if $14 million was contributed to the Plan in 2014 but there were no subsequent contributions, the Plan would run out of money in 2036, even if the Plan investments earned a 7.75% annual return throughout that period.

330.    On April 10, 2014, however, CCCB and SJHSRI through Brenda Ketner asked Angell to modify that calculation for submission to the Attorney General and the Department of Health.  The requested modification was that Angell utilize only the higher projected rate of return of 7.75%, delete all the calculations post-2014, and "simply show only the stabilization effect [in 2014] of the incoming $14M to the plan with no other information shown."

331.    An employee of Angell (Brian Corbett) spoke to the CCCB representative who had requested the modification, and was told that CCCB "wants to show the projection of the funded status after the $14M contribution for 2014," in order to

"highlight the 'stabilization' of the Plan."  That employee passed this information on to other Angell employees (at least David Ward, Albert Krayter, and Sonja Baron).

332.    Angell (through at least these named employees) knew it was thereby being asked to present the 2014 funding level in isolation, for purposes of demonstrating Plan stabilization to the Attorney General and the Department of Health. Angell also knew (through at least these named employees) that such a presentation would be false and misleading, because the complete calculation demonstrated that the $14,000,000 contribution would *not* "stabilize" the Plan, since the complete calculation showed that, notwithstanding that contribution, the Plan would run out of money in 2036 with over $98,000,000 in liabilities to Plan participants even at the high assumed rate of return of 7.75%, or in 2030 with the rate of return of 5.75%.

333.    Angell (through at least these named employees) agreed to disregard both of its prior calculations and on April 11, 2014 provided SJHSRI, RWH, and CCCB with the requested new calculation, knowing and intending they would give the calculation to the Rhode Island Department of Health and the Rhode Island Attorney General in support of the application for approval of the asset sale, which was done on or about April 14, 2018.  Prior to providing it to the Rhode Island Department of Health and the Rhode Island Attorney General, Defendants SJHSRI, CCCB, and RWH shared that calculation with Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East and informed them it would be delivered to the Rhode Island Department of Health and the Rhode Island Attorney General on behalf of Defendants SJHSRI, CCCB, RWH, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East.  That new calculation

purported to show that the immediate effect of the $14 million contribution would be to increase the funding percentage of the Plan to 94.9%, and deleted the calculations which demonstrated that the Plan nevertheless would run out of money in either 2030 or 2036 depending on the estimated rate of return.  The submission of this new calculation with that deletion was grossly and intentionally deceptive.

334.    That calculation also did not disclose that the funding percentage of 94.9% was based on assumed investment returns that SJHSRI, RWH, CCCB, Angell, and Defendants Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East knew were nearly 70% above market rates of return (*i.e.*, Angell's projected rate of return of 7.75% was over 68% greater than the market rate of 4.6%).

335.    In addition, Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East knew that the calculation did not disclose the fact that the use of any funding level percentage as a measure of the Plan's funding progress was contrary to and deviated from the standards of actuarial practice, that according to those standards the funding progress of a pension plan should not be reduced to a funding percentage at a single point in time, or that pension plans should have a strategy in place to attain and maintain a funded status of 100% or greater over a reasonable period of time, not merely at a single point in time.

336.    These misrepresentations and omissions concerning the Plan's funding level were made with an intent to deceive and succeeded in deceiving both the Rhode Island Department of Health and the Rhode Island Attorney General in approving the asset sale, and to prevent SJHSRI's employee unions, the general public, and Plan

participants from learning of the grossly underfunded status of the Plan.  These misrepresentations and omissions constituted intentionally false statements of material fact by Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East.

337.    Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East had a pre-existing duty to make full disclosure of all material facts in connection with the applications for regulatory approval, but even if that were not the case, the statements they made concerning the Plan and related issues put the burden on them to disclose all material facts, and made their omissions and half-truths actionable as fraud.

338.    The applicants seeking regulatory approval for the 2014 Asset Sale included SJHSRI, RWH, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East.  They all participated in a common fraud and conspiracy to deceive state regulators, the general public, SJHSRI's employee unions, SJHSRI's employees, and all other Plan participants in order to proceed with the 2014 Asset Sale, in which they were aided and abetted by their co-conspirators Defendants Angell, CC Foundation, Corporation Sole, Diocesan Administration, and Diocesan Service.  Accordingly, the actions of any of them in furtherance of their common fraud and conspiracy are imputed to them all.

339.    On February 21, 2014, the Department of Health sent a list of questions to counsel for SJHSRI, RWH, and CCCB, and to counsel for Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect

98

Medical Holdings, Prospect East, and other subsidiaries of Prospect Medical Holdings. On March 7, 2014, counsel for SJHSRI, RWH, and CCCB and counsel for Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East, and other subsidiaries of Prospect Medical Holdings co-signed and sent the Department of Health a letter enclosing their clients' responses to the Department of Health's question.  Those responses were signed and attested to be "complete, accurate, and correct" by CCCB CEO Kenneth Belcher and Prospect Medical Holdings CEO Sam Lee, and repeated the question and responded, as follows:

> c.   Please identify to what extent, if any, this purchase price will be used by CharterCARE for community benefit versus paying off debts.
>
> Response:   The use of the sale proceeds as described is [sic] Section (b) above will benefit the community in three ways:
>
> *        *        *
>
> **b.   The use of $14M to strengthen the St. Joseph Pension Plan will be of significant benefit to the community as it will assure that the pensions and retirement of many former employees, who reside in the community, are protected**.
>
> [Emphasis supplied]

340.   In fact, Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East knew this statement was false and misleading, and that the contribution of the $14,000,000 to the Plan would not "assure" that the benefits of the Plan participants were "protected", even according to the calculations that Angell shared with all of those other Defendants.  This response constituted an intentionally false statement of material fact by Defendants SJHSRI, RWH, CCCB,

Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, in which they were aided and abetted by their co-conspirators Defendants Angell, CC Foundation, Corporation Sole, Diocesan Administration, and Diocesan Service.

341.   On April 8, 2014, CCCB President and Chief Executive Officer Belcher testified at a public hearing held before the Project Review Committee of the Rhode Island Department of Health as part of the approval process.  He testified on behalf of all of the applicants for approval, including SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, at a time when he had already accepted the offer to act as the Chief Executive Officer of the new hospitals.  The meeting was also attended by Thomas Reardon on behalf of Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East.  Mr. Belcher was asked to address three questions raised by a recent report on SJHSRI by Moody's Investor Services.  The third question related to Moody's' concern over the funded status of employee retirement accounts, including the Plan.  Mr. Belcher testified as follows:

> MR. BELCHER: . . . But the third part was on the pension fund, and the impact on the pension fund with this -- and I think you know we shared information up-front is that at the time of the closing we'll be putting millions of dollars into the pension fund which will bring it to a level of roughly 91 and a half percent funding which is above the safe level that you need for sort of a quote safe level.  So all of this really helps stabilize the pension fund as well.

342.   Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East thereby intentionally misled the state regulators by the

statement that a funding level of 91.5% "is above the safe level," in order to obtain
regulatory approval and to mislead Plan participants concerning the funded status of the
Plan.  As discussed above, it is never proper to use a funding level on a single date to
measure the health of a pension plan, but it especially inappropriate when the plan
sponsor is selling all of its operating assets, because the plan sponsor will lack the
means to make up the underfunding.  In that context, even if the projected rate of return
of 7.75% were reasonable (which it was not), and were actually achieved over time, a
funding level of 91.5% would practically guarantee pension plan failure, since it would
denote insufficient funds to meet plan obligations even if all of the future assumptions
upon which the funding level is based perform exactly as assumed, including thirty to
forty years of investment returns.  Thus, this testimony constituted intentionally false
statements of material fact by Defendants SJHSRI, RWH, CCCB, Prospect Chartercare,
Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect
Medical Holdings, and Prospect East, and their co-conspirators Defendants Angell, CC
Foundation, Corporation Sole, Diocesan Administration, and Diocesan Service.

343.   On April 11, 2014, Darlene Souza of CCCB reminded Brenda Ketner and
Brenda Almeida of CCCB that the Attorney General was also asking Supplemental
Question S3-48, as follows:

> S3-48 Will the pension liability remain in place – how much, and what is
> the plan going forward to fund the liability?

Brenda Almeida immediately forwarded the reminder to David Ward and Peter Karlson
of Angell, thereby keeping Angell informed of the role that the pension was playing in
the approval process.

344.    On April 15, 2014, Defendant SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East responded to the Attorney General and answered that question as follows:

> Response: The pension liability will remain in place post transaction. Subsequent to the $14 Million contribution to the Plan upon transaction, **future contributions to the Plan will be made based on recommended annual contribution amounts as provided by the Plan's actuarial advisors**. Moving forward, the investment portfolio of the plan will be monitored by the Investment Committee of the Board of Trustees.

> [Emphasis supplied]

345.    When that statement was made, however, Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East knew that it was their intention not to make any future contributions, and, therefore, that "future contributions to the Plan" would *not* "be made based on recommended annual contribution amounts as provided by the Plan's actuarial advisors."  This response constituted intentionally false statements of material fact by Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East.  Moreover, although Defendant CC Foundation was not one of the applicants, it participated in the application in that it offered to receive SJHSRI and RWH's "restricted" assets that could not be transferred to the for-profit entities that would be owning and operating New Fatima Hospital and New Roger Williams Hospital, and as soon as the 2014 Asset Sale took place, CC Foundation accepted former members of CCCB's board of trustees as directors for CC Foundation, all at a time when CC Foundation knew that the application was replete

with false statements of material fact by the actual applicants, Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, of which Defendants SJHSRI, RWH, and CCCB were actual affiliates of CC Foundation (CCCB was CC Foundation's sole member and also controlled SJHSRI and RWH).

346.   Indeed, in spite of this representation, in the more than four years since that statement was made, not a single penny has been contributed to the Plan other than the $14,000,000 contribution which they made to secure regulatory approval for the 2014 Asset Sale, contrary to the recommendations of the Plan's actuarial advisors.

347.   On or about May 2, 2014, SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East submitted to the Attorney General another calculation that Angell had prepared which purported to show the effect on future pension liabilities of specific future annual contributions ranging from $600,000 to $1,390,000 made over the next thirty-five years.

348.   However, SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East knew these specific projected future annual contributions would not be made.

349.   Moreover, the estimated future contributions ranging from $600,000 to $1,390,000 made over the next thirty-five years were not "recommended contributions" that would be sufficient to maintain Plan solvency.  Instead Angell took instruction from SJHSRI, RWH, and CCCB as to the amounts to be inserted, which were much less that Angell's actuarial "recommended contributions."  As a result, even if those estimated

future contributions ranging from $600,000 to $1,390,000 were in fact made, they would be insufficient to fund the Plan past 2044, when the Plan would still have estimated liabilities of over $40,000,000, even if the Plan earned the assumed rate of return of 7.75%.  Indeed, at an estimated rate of return of 5.75%, the Plan would run out of money in 2032, with remaining liabilities of at least $80,000,000.

350.    The Project Review Committee held a public hearing on May 6, 2014. During the testimony of the Department of Health's expert concerning the Plan, CCCB Chief Financial Officer Michael Conklin interrupted, and testified, on behalf of SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, that the "recommended contributions going forward" to fund the Plan were $600,000 per year, which he assured the Committee would be paid out of SJHSRI's expected $800,000 annual income from outside trusts, and profit sharing paid to CCCB in connection with its 15% share in Prospect Chartercare.  At this time Michael Conklin had already accepted the offer to act as the Chief Financial Officer for the new hospitals.

351.    Mr. Conklin on behalf of SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East thereby misrepresented that SJHSRI's expected future income was $800,000, when in fact it was less than $200,000, and suggested that CCCB's profit-sharing in Prospect Chartercare would provide additional funds, when no profit sharing was anticipated for the indefinite future.  To date CCCB has yet to receive any profit sharing whatsoever.

352.    Mr. Conklin on behalf of SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect

Medical Holdings, and Prospect East also misrepresented that the projected annual contribution of $600,000 was an actuarial "recommended contribution," when in fact it was a number made up out of whole cloth by SJHSRI, RWH, and CCCB, and was much below the recommendations of the Plan actuary.

353.   Mr. Conklin also did not disclose that SJHSRI, RWH, and CCCB had no intention of making any of those contributions.

354.   These public misrepresentations and material omissions were made on behalf of Defendants SJHSRI, CCCB, RWH, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East in order to fraudulently secure regulatory approval and to deceive Plan participants concerning the funded status of the Plan, and the state regulators and the Plan participants were in fact deceived.  These misrepresentations and omissions constituted false statements of material fact by Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, and their co-conspirators Defendants Angell, CC Foundation, Corporation Sole, Diocesan Administration, and Diocesan Service.

355.   The Project Review Committee accepted these false assurances, but was aware that even those assurances were based upon assumed investment rates of return, and if the investment returns on Plan assets were lower than anticipated, higher annual contributions would be needed to make up the difference.  The Committee referred to this possibility as the "investment risk" of the Plan, and at the hearing on May 6, 2014 asked CCCB President and Chief Executive Officer Belcher "who's bearing the investment risk going forward?"  He replied on behalf of SJHSRI, RWH, CCCB,

Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger

Williams, Prospect Medical Holdings, and Prospect East as follows:

> MR. BELCHER:     Heritage Hospitals [referring to SJHSRI and RWH].  It
> stays with the old CharterCare [referring to CCCB, SJHSRI, and RWH].

> MR. SGOUROS:     Heritage Hospitals, and so if the investment returns
> don't match up to the predictions, who's on the hook?

> MR. BELCHER:     The old hospitals, the old CharterCARE.  We have
> that responsibility.

This testimony constituted false statements of material fact by Defendants SJHSRI,

RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect

Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, and their

co-conspirators Defendants Angell, CC Foundation, Corporation Sole, Diocesan

Administration, and Diocesan Service.  As discussed above, in order to successfully

deceive state regulators and Plan participants, Defendants SJHSRI, RWH, CCCB,

Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger

Williams, Prospect Medical Holdings, and Prospect East fraudulently misrepresented

the intentions of SJHSRI, RWH, and CCCB, whom they knew never intended to support

the Plan, and SJHSRI, RWH, and CCCB have made no contributions whatsoever to the

Plan.

356.    Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect

Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical

Holdings, and Prospect East also chose to conceal the unfunded status of the Plan out

of concern that such disclosure would be seized upon by a competitor that was asking

that the Department of Health to delay the proposed asset sale.  Indeed, at the same

public hearing on May 6, 2014, a representative of that competitor strongly objected to

the terms of the asset sale proposed by Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, and repeated his client's request that the Committee delay acting upon the application until his client's counter-proposal could be fully considered.

357.   The Attorney General did not immediately accept the assurances that there would be sufficient income following the asset sale to adequately fund the Plan. Instead, representatives of the Attorney General asked for proof of legal authority for RWH's assets to be used for that purpose.

358.   On May 8, 2014 counsel for SJHSRI, RWH, and CCCB provided the Attorney General with a resolution purportedly approved by RWH's Board of Trustees stating, *inter alia*:

> WHEREAS   As part of its retained assets, RWMC has $6,666,874 in Board Designated Funds ("the RWMC Board Designated Funds") that may be used for any purpose at the discretion and direction of the RWMC Board of Trustees;
>
> *          *          *
>
> RESOLVED  The RWMC Board of Trustees approves and directs use of the RWMC Board Designated Funds to satisfy the SJHSRI liabilities at close and any potential future funding and expenses relating to the SJHSRI pension plan, and any surplus shall be transferred to the CCHP Foundation.

359.   They e-mailed a copy of the resolution to the Attorney General's office (with cc to counsel for Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East) and stated:

> Finally, attached is the Roger Williams Medical Center (RWMC) Board of Trustees Resolution authorizing the use of the RWMC Board Designated Funds to satisfy the St. Joseph Health Services of Rhode Island (SJHSRI) liabilities at close and any potential future funding and expenses related to the SJHSRI pension plan, and any surplus shall be transferred to the CCHP Foundation.

360.   However, SJHSRI, RWH, and CCCB never intended that any part of RWH's "Board Designated Funds" would ever be contributed to the Plan, and, indeed, none have been.  They also knew that even $6,666,874 would be insufficient to meaningfully reduce the unfunded liability, such that there was not even a remote chance there would be any surplus left over to transfer to CC Foundation after that liability was paid.

361.   Instead of meaning what it says, this resolution evidences SJHSRI, RWH, and CCCB's willingness to tell regulators what they wanted to hear, even if it meant misrepresenting their intended funding sources and manipulating the board of trustees of affiliated companies.  In fact, in December 2014, soon after the closing of the asset sale, the board of trustees of RWH was replaced with individuals who were already planning to put the Plan into Receivership.  This submission constituted false statements of material fact by Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, and their co-conspirators Defendants Angell, CC Foundation, Corporation Sole, Diocesan Administration, and Diocesan Service.

362.   A crucial fact not disclosed to either the Department of Health or the Attorney General was that *for years prior to the asset sale*, management at CCCB, RWH, and SJHSRI had been searching for a way to abandon the grossly underfunded Plan to the detriment of Plan participants, while at the same time protecting the assets

108

of SJHSRI from the claims of Plan participants. This omission constituted an unlawful failure to disclose a material fact by Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, and their co-conspirators Defendants Angell, CC Foundation, Corporation Sole, Diocesan Administration, and Diocesan Service.

363. For example, on January 2, 2012, the Chairman of the Investment Committee for CCCB's Board of Trustees informed CCCB's head of Personnel, Darlene Souza, and CCCB's Chief Financial Officer Conklin, that the Board of Trustees and management must consider the option of terminating the Plan and distributing the assets with a *pro rata* reduction in benefits.

364. On December 31, 2012, Ms. Souza emailed Mr. Conklin and CCCB's Chief Executive Officer Belcher, wished them a "Happy New Year," and then advised them of what she called the "potentially good news" that, according to her reading of the Plan documents, they could "terminate the plan without a solvency issue," and:

- deprive 1,798 (out of a total of 2,852) Plan participants of any benefit whatsoever,

- pay benefits to an additional 744 Plan participants of only 88% of what they were due;

- pay full benefits only to the remaining 1,054 Plan participants who had already reached normal retirement age; and

- improve SJHSRI's balance sheet by over $29,000,000 by eliminating its liability for the unfunded portion of the Plan.

365. However, in the same email, Ms. Souza advised Messrs. Conklin and Belcher that there was a downside to the Plan termination, which was that other hospitals with supposed Church Plans had attempted to terminate their plans just as

she was proposing, but those hospitals had been sued in class actions, and one of those cases had a pending settlement that obligated the hospital to pay a significant amount of the unfunded benefits, notwithstanding its alleged Church Plan status.

366.    Accordingly, Ms. Souza warned that if SJHSRI terminated the Plan and distributed reduced benefits, "we are exposed to a class action lawsuit" by the Plan participants who received no benefits, which could expose SJHSRI to "$30-$35m" as damages, which "would potentially erode the $29m fiscal savings" resulting from eliminating SJHSRI's funding liability by termination of the Plan.

367.    On June 20, 2013, the CCCB Board discussed the possibility of seeking a "Special Master" for the Plan.

368.    In December 2013, the Executive Committee of the CCCB Board (the present board members included Edwin Santos, Sheri Smith, Joseph DiStefano, Daniel Ryan, Kenneth Belcher, and Donald McQueen), together with staff (including at least Kim O'Connell and Darleen Souza), discussed putting the Plan into receivership.

369.    Thus, notwithstanding the strategic delay in doing so, the scheme to abandon the Plan was already in the works when SJHSRI, RWH, and CCCB assured the Project Review Committee on April 8, 2014 and May 6, 2014 that the "recommended" annual contributions to the Plan would be made and that SJHSRI, RWH, and CCCB were "on the hook" if the projected returns on investment did not materialize.

370.    Instead of representing their genuine intention, these statements were part of the conspiracy by Defendants Prospect Chartercare, CCCB, SJHSRI, RWH, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect East, Prospect Medical Holdings, Chartercare Foundation, Corporation Sole, Diocesan

110

Administration, Diocesan Service, and Angell, to obtain approval from the Attorney

General and the Department of Health through false assurances, and to also thereby

deceive the unions, and of the general public (including Plan participants) who attended

or followed reports of the hearing.

371.    In furtherance of that conspiracy, CCCB President and Chief Executive

Officer Belcher and Thomas M. Reardon (president of Prospect Medical East) made a

statement which the Providence Journal on May 12, 2014 published as an op-ed, which

stated:

> The development and pursuit of innovation in health delivery should not
> come at the cost of one of the most cherished values in Rhode Island
> health care - that of local control. We are pleased that our proposal will
> assure preservation of local governance, as our joint venture board will
> have equal representation from CharterCare and Prospect with a local
> board chair, with real veto powers.

372.    This statement was materially false and intentionally deceptive, because

under the Amended & Restated Limited Liability Company Agreement of Prospect

Chartercare, LLC, previously agreed to in form by CCCB and Prospect Chartercare,

Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect

Medical Holdings, and Prospect East, deadlocks between CCCB-appointed directors

and Prospect-appointed directors for some of the most significant board-level decisions

were to be resolved by allowing the decisions of Prospect-appointed board members to

prevail.  These statements constituted false statements of material fact by Defendants

SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph,

Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East,

and their co-conspirators Defendants Angell, CC Foundation, Corporation Sole,

Diocesan Administration, and Diocesan Service.

111

373.    On the same day that Mr. Belcher's statement appeared in the Providence

Journal, CCCB emailed it to all of the employees of CCCB, SJHSRI, and RWH, stating,

"[w]e want to share the following op-ed that appeared in today's Providence Journal."

The same mailing assured all employees that "Prospect and CharterCARE equally

share seats on the new company's eight-member governing board," withholding the

critical information that although the number of seats were shared equally, the seats

filled by Prospect East had the power to make some of the most significant corporate

decisions against the wishes of the directors chosen by CCCB, and certainly without

disclosing that the 2014 Asset Sale was merely a step in the scheme to shield Fatima

Hospital from liability on the Plan, and to strip assets from SJHSRI that were needed to

satisfy its pension obligations to those same employees.  These misrepresentations and

omissions constituted false statements of material fact by Defendants SJHSRI, RWH,

CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare

Roger Williams, Prospect Medical Holdings, and Prospect East and their co-

conspirators Defendants Angell, CC Foundation, Corporation Sole, Diocesan

Administration, and Diocesan Service.

374.    In addition to falsely reassuring the public and their own employees on the

issue of local control, SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect

Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical

Holdings, and Prospect East also misled state regulators concerning the degree of local

control that CCCB would have after the 2014 Asset Sale.

375.    On May 2, 2014, SJHSRI, RWH, CCCB and Prospect Chartercare,

Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect

Medical Holdings, and Prospect East, through their counsel, responded to the following question of the Rhode Island Attorney General:

> Question: Please describe the governance structure of the new hospital after conversion, including a description of how members of any board of directors, trustees or similar type group will be chosen.

376.   Defendants responded in pertinent part as follows:

> Response:
>
> An overview of the governance structure for Prospect CharterCARE, LLC is as follows:
>
> Prospect CharterCARE, LLC will have a Board of Directors.
>
> Prospect CharterCARE, LLC's Board of Directors will have half of its members selected by and through PMH's ownership in Prospect CharterCARE, LLC and the other half of the members will be selected by and through CCHP's ownership Prospect CharterCARE, LLC.
>
> The Board of Directors will be responsible for determining the patient Care, strategic, and financial goals policies and objectives of Prospect CharterCARE, LLC.
>
> \*       \*       \*
>
> Prospect CharterCARE, LLC's Board of Directors will be structured as follows: (i) eight (8) members; (ii) fifty (50%) percent of its members will be appointed by PMH; and (iii) fifty (50%) percent of its members will be appointed by CCHP. The purpose of the structure is to ensure a strong local presence and mission. The Board of Directors will include at least one physician representative.
>
> The Board of Directors will be responsible for determining the patient care, strategic, and financial goals, policies and objectives of Prospect CharterCARE, LLC. **The issues that the Board of Directors will address will require a majority vote of those Directors appointed by PMH, and a majority vote of those Directors appointed by CCHP.**
>
> [Emphasis supplied]

377.    The statement that "[t]he issues that the Board of Directors will address will require a majority vote of those Directors appointed by PMH, and a majority vote of those Directors appointed by CCHP" was also materially false, for the same reason that some of the most significant decisions were to be resolved by allowing Prospect-appointed board members' decisions to prevail.  These misrepresentations and omissions constituted false statements of material fact by Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, and their co-conspirators Defendants Angell, CC Foundation, Corporation Sole, Diocesan Administration, and Diocesan Service, regarding, *inter alia*, "the governance structure of the new hospital(s) after conversion."

378.    The 2014 Asset Sale itself injured Plaintiffs in many ways, including that it attempted to insulate their employer and their employer's assets from liability under the Plan.

379.    Those injuries included the fraudulent transfer from Defendants SJHSRI and RWH to their related entity Defendant CC Foundation of approximately $8,200,000 that should have been deposited into the Plan.  This fraudulent scheme had two parts. First Defendants SJHSRI, RWH, CCCB, CC Foundation, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East conspired to persuade the Rhode Island Attorney General to disregard the mandatory requirements of the Hospital Conversions Act, and second, Defendants SJHSRI, RWH, and CC Foundation misled the Court into approving this transfer in the 2015 C Pres Proceedings as detailed below.

380.    R.I. Gen. Laws § 23-17.14-22 states on pertinent part as follows:

114

§ 23-17.14-22. Distribution of proceeds from acquisition – Selection and establishment of an **independent foundation**.

(a) In the event of the approval of a hospital conversion involving a not-for-profit corporation and a for-profit corporation results in a new entity as provided for in § 23-17.14-7(c)(25)(i), it **shall be required** that the proceeds from the sale and any endowments, restricted, unrestricted and specific purpose funds shall be transferred to a charitable foundation operated by a board of directors.

(b) The presiding justice of the superior court **shall have the authority** to:

(1) Appoint the initial board of directors.

(2) Approve, modify, or reject proposed bylaws and/or articles of incorporation provided by the transacting parties and/or the initial board of directors.

[Emphasis supplied]

381.    However, Defendants SJHSRI, RWH, CCCB, CC Foundation, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East requested and the Rhode Island Attorney General agreed that this statute would be ignored, notwithstanding that its provisions are mandatory, such that failure to follow its provisions would violate the statute.  Defendants SJHSRI, RWH, CCCB, CC Foundation, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East made that request because Defendants SJHSRI, RWH, CCCB, CC Foundation wanted the money to go CC Foundation, of which CCCB was the sole member, and not an "independent foundation," and wanted to name the board of directors for that foundation, instead of the directors being named by the Presiding Justice of the Superior Court.

**F.    MISLEADING THE STATE COURT IN CONNECTION WITH *CY PRES* PROCEEDINGS**

382.    In November of 2009, SJHSRI, CCCB, and RWH filed a petition with the Rhode Island Superior Court, asking the court to approve certain changes affecting charitable donations pursuant to the statutory and common law doctrine of *cy pres*.

383.    The doctrine of *cy pres* is intended to be used in appropriate circumstances to allow charitable donations to be applied to a similar purpose when the original recipient of the donations is no longer able to fulfill that purpose.

384.    In the 2009 proceedings, the specific purpose of the *cy pres* petition was to inform the court that the original recipients of the charitable gifts had been reconstituted in connection with formation of CCCB and the affiliation of SJHSRI, Roger Williams Medical Center, RWH, and CCCB; that such entities as reconstituted would continue to apply the charitable gifts in accordance with those intentions; and to obtain court approval therefor.

385.    Notably, the *cy pres* petition in 2009 did not involve an original recipient of the charitable gift who was insolvent and sought to transfer assets to a related entity in fraud of creditors.  To the contrary, in the 2009 petition, essentially the same entities held the assets as had held them originally and creditors were in no way affected or damaged by approval of these transfers.

386.    The Superior Court approved this *cy pres* petition on December 14, 2009.

387.    On December 2, 2011, another *cy pres* petition was filed with the Superior Court, to obtain approval for the St. Joseph Health Care Foundation's member to be changed from SJHSRI to CCCB, for St. Joseph Health Care Foundation's name to be changed to Charter Care Health Partners Foundation, and to permit the charitable gifts held by St. Joseph Health Care Foundation to be distributed to SJHSRI to be used by

116

SJHSRI in accordance with the donors' original intentions.  As was the case with the previous *cy pres* petition, this petition did not involve the transfer of assets from an insolvent corporation to a related entity in fraud of creditors.  Once again, creditors were in no way affected or damaged by approval of these transfers.

388.    The court approved this *cy pres* petition on December 13, 2011.

389.    On January 13, 2015 another *cy pres* petition (the "2015 *Cy Pres* Petition") was filed with the Superior Court, this time by Defendants SJHSRI, RWH, and CC Foundation as petitioners, concerning the disposition of charitable donations held by SJHSRI and RWH.  It referred to the prior *cy pres* petitions that had been previously approved by the Superior Court, as if the 2015 *Cy Pres* Petition was merely more of the same.

390.    However, unlike those earlier petitions, the 2015 *Cy Pres* Petition was filed in connection with the winding down, liquidation, and dissolution of SJHSRI and RWH, and the transfer of approximately $8,200,000 of their assets to CC Foundation, when SJHSRI needed all of its and RWH's funds to contribute to the Plan.  That raised significantly different issues, since, as discussed below, nonprofit corporations in the process of liquidation or dissolution must use all of their assets, even restricted assets, to pay their creditors before they can transfer charitable assets to another charity.

391.    The Attorney General's Decision on May 16, 2014 approving the sale of Fatima Hospital and Roger Williams Hospital was the genesis of the 2015 *Cy Pres* Petition, because that Decision imposed conditions, which included "(1) the transfer of certain of the charitable assets to the CCHP Foundation and (2) the use of certain of the charitable assets during the Heritage Hospitals' wind down to satisfy the Outstanding Pre and Post Closing Liabilities subject to *cy pres* approval from [the Superior Court]."

117

392.    Those conditions were the result of Defendants SJHSRI, RWH, CCCB, and CC Foundation's representations to the Attorney General that SJHSRI and RWH were in a "multi-year wind-down process," which was "typical in the dissolution of a hospital corporation."

393.    Similarly, in the 2015 *Cy Pres* Proceeding, Defendants SJHSRI, RWH, and CC Foundation successfully persuaded the Court to grant their Petition based on the representation that both RWH and SJHSRI were in wind-down, stating that they "anticipated that the Outstanding Pre and Post Closing Liabilities will be paid during the Wind-down period of RWH and SJHSRI over the next approximately three years," and that they "proposed that certain RWH and SJHSRI assets remain with the Heritage Hospitals during their wind-down period to satisfy the Outstanding Pre and Post Closing Liabilities."

394.    The resolutions of CCCB as sole member of SJHSRI and RWH also prove that SJHSRI and RWH were in wind-down preparatory to liquidation and dissolution. The resolutions dated as of December 15, 2014 expressly authorized the wind-down and dissolution of SJHSRI and RWH.

395.    Having prevailed both in their application to the Attorney General and in the 2015 *Cy Pres* Proceeding based upon representations that both RWH and SJHSRI were in an extended wind-down process preparatory to liquidation and dissolution, Defendants SJHSRI, RWH, CCCB, and CC Foundation are judicially estopped from denying that the $8,200,000 transferred to the CC Foundation was in connection with winding down their affairs and dissolution and subject to the requirements of the Rhode Island Nonprofit Corporations Act applicable to dissolution and liquidation.

396.    R.I. Gen. Laws §§ 7-6-50, 7-6-51 & 7-6-61 obligate nonprofit corporations in the process of either voluntary dissolution or court liquidation to pay their creditors first, before any funds can be transferred to other charities under the doctrine of *cy pres* or any other rationale.

397.    Section 7-6-50 of the Rhode Island General Laws sets forth the procedure whereby a nonprofit corporation may voluntarily wind up its affairs and dissolve, and requires that notice be given to all creditors and that assets must be distributed in accordance with Section 7-6-51.

398.    Section 7-6-51 of the Rhode Island General Laws sets forth the specific order of application and distribution of assets applicable to a nonprofit corporation in voluntary dissolution, and provides that all of the nonprofit corporation's assets must be used to pay creditors, even assets subject to charitable restrictions, and even assets conveyed to the nonprofit corporation under the express condition that they be re-conveyed in the event of dissolution:

> § 7-6-51. Distribution of assets.
>
> The assets of a corporation in the process of dissolution shall be applied and distributed as follows:
>
> (1) **All liabilities and obligations of the corporation shall be paid and discharged, or adequate provision shall be made for their payment and discharge**;
>
> (2) Assets held by the corporation upon condition requiring return, transfer, or conveyance, which condition occurs by reason of the dissolution, shall be returned, transferred, or conveyed in accordance with the requirements;
>
> (3) Assets received and held by the corporation subject to limitations permitting their use only for charitable, religious, eleemosynary, benevolent, educational, or similar purposes, but not held upon a condition requiring return, transfer, or conveyance by reason of the dissolution, shall

119

be transferred or conveyed to one or more domestic or foreign corporations, societies, or organizations engaged in activities substantially similar to those of the dissolving corporation, pursuant to a plan of distribution adopted as provided in this chapter or as otherwise provided in its articles of incorporation or bylaws;

(4) Any other assets shall be distributed in accordance with the provisions of the articles of incorporation or the bylaws to the extent that the articles of incorporation or bylaws determine the distributive rights of members, or any class or classes of members, or provide for distribution to others;

(5) Any remaining assets may be distributed to any persons, societies, organizations, or domestic or foreign corporations, whether for profit or nonprofit, that may be specified in a plan of distribution adopted as provided in this chapter.

[Emphasis supplied]

399.    The same order of payment applies to court-approved liquidations of

nonprofit corporations.  Section 7-6-61 of the Rhode Island General Laws sets forth the

"procedure in liquidation of corporation by court," and sub-section (c) essentially mirrors

the above-quoted provisions of R.I. Gen. Laws §7-6-50, as follows:

(c) The assets of the corporation or the proceeds resulting from a sale, conveyance, or other disposition of the assets shall be applied and distributed as follows:

(1) All costs and expenses of the court proceedings and **all liabilities and obligations of the corporation shall be paid, satisfied, and discharged, or adequate provision shall be made for that**;

(2) Assets held by the corporation upon condition requiring return, transfer, or conveyance, which condition occurs because of the dissolution or liquidation, shall be returned, transferred, or conveyed in accordance with the requirements;

(3) Assets received and held by the corporation subject to limitations permitting their use only for charitable, religious, eleemosynary, benevolent, educational, or similar purposes, but not held upon a condition requiring return, transfer, or conveyance by

120

reason of the dissolution or liquidation, shall be transferred or conveyed to one or more domestic or foreign corporations, societies, or organizations engaged in activities substantially similar to those of the dissolving or liquidating corporation as the court directs. . . .

[Emphasis supplied]

400.   Thus, whether pursuant to voluntary dissolution or court approved liquidation, the assets of a non-profit corporation must be applied first to satisfy the corporation's liabilities and obligations, and, until that is accomplished and creditors are paid in full, no assets can be transferred to anyone else, by *cy pres* petition or otherwise.

401.   However, Defendants SJHSRI, RWH, and CC Foundation intentionally frustrated enforcement of the statutory payment priorities by repeatedly misrepresenting, first to the Attorney General, and then to the court in the 2015 *Cy Pres* Proceeding, that all of their liabilities, including their pension liabilities, would be "satisfied" and "paid" from other assets.

402.   Notably, nowhere in their application to the Attorney General for approval of the 2014 Asset Sale, or in their 2015 *Cy Pres* Petition, did Defendants SJHSRI, RWH, or CCCB say that these other assets would only "partially satisfy," or "partially pay" the pension obligation, or employ similar language that would imply or even hint to the Attorney General or the court that the funds would be insufficient to fully satisfy those liabilities. The individuals who made these false and misleading misrepresentations and omissions were most immediately the same set of lawyers who acted on behalf of all of Defendants SJHSRI, RWH, and CC Foundation in the *Cy Pres* proceedings, which also indicated CCCB's total control over CC Foundation.  They also included Donald McQueen, who was purporting to act as the chairman of CC

Foundation, and who had direct, personal knowledge of the grossly underfunded status of the Plan from his prior membership in CCCB's board of trustees, in which he was a member of the executive committee and the finance, audit, and compliance committee. These misrepresentations and omissions were in furtherance of the common fraud and conspiracy of Defendants SJHSRI, RWH, CCCB, Angell, Corporation Sole, Diocesan Service, Diocesan Administration, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East to conceal the underfunded status of the Plan and to put assets beyond the reach of Plan participants.  As such, these misrepresentations and omissions constituted false statements of material fact by Defendants SJHSRI, RWH, CCCB, Angell, Corporation Sole, Diocesan Service, Diocesan Administration, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East.

403.    In reliance on these misrepresentations and material omissions, the court approved the 2015 *Cy Pres* Petition on April 20, 2015.

404.    On the basis of the court's order, SJHSRI, RWH, and CCCB in or about May and June 2015 transferred $8,227,916.77 to CC Foundation.

405.    From those funds, CC Foundation subsequently transferred $8,199,266.47 to the RI Foundation as follows:

| | |
|---|---|
| May 28, 2015: | $5,752,655.00 |
| May 29, 2015: | $1,974,537.44 |
| June 3, 2015: | $272,074.03 |
| Nov. 17, 2015: | $200,000.00 |

122

406.    Rhode Island Foundation thereafter remitted $864,846.00 to CC Foundation as follows:

Dec. 15, 2017:       $174,515.00

Dec. 15, 2016:       $341,945.00

Dec. 15, 2017:       $348,386.00

407.    As of December 31, 2017, CC Foundation's fund balance at Rhode Island Foundation was $8,760,556.01, including investment returns.

408.    The April 20, 2015 Order also applied to income and capital distributions from third party trusts that SJHSRI and RWH expected to receive in the future, and required that certain of those payments should go to CC Foundation.

409.    The 2015 Cy Pres Proceeding is still pending.  As noted above, Plaintiffs have been permitted to intervene in that proceeding, and ask the Superior Court to vacate the April 20, 2015 order, and order that the funds transferred pursuant to the Petition be held pending the outcome of the proceeding in this Court or in the State Action.

G.    FACTS CONCERNING SUCCESSOR LIABILITY

410.    Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East purchased the assets of SJHSRI knowing that SJHSRI had a defined benefit pension plan.

411.    Prior to the asset sale, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East intended to operate New Fatima Hospital at the same location, under the same name of Fatima Hospital.

123

412.   Prior to the asset sale, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East intended to operate New Roger Williams Hospital at the same location, under the same name of Roger Williams Hospital.

413.   Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East also intended to identify themselves to employees, patients, and the public under the fictitious name which was the same name under which SJHSRI, RWH, and CCCB had operated Old Fatima Hospital and Old Roger Williams Hospital.

414.   At 10:17 a.m. on June 20, 2014, which was the day that the 2014 Asset Sale closed, CharterCARE Health Partners filed articles of amendment with the Rhode Island Secretary of State, changing its name from CharterCARE Health Partners to Chartercare Community Board.

415.   One minute later, at 10:18 a.m. on June 20, 2014, Prospect Chartercare filed a "fictitious business name statement" with the Rhode Island Secretary of State, stating that it would operate under the "fictitious name" of CharterCARE Health Partners, which was the same name under which SJHSRI, RWH, and CCCB had operated Old Fatima Hospital and Old Roger Williams Hospital from 2009 right up to the day of the closing of the 2014 Asset Sale.

416.   Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East also knew and intended that all of SJHSRI's and RWH's employees would be transferred to the employment of Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and/or Prospect East as a

124

continuation of their employment, with their starting wages and salaries based on their final wages and salaries while employed by SJHSRI and RWH, and with seniority based on their original date of hire by SJHSRI and RWH.

417.   Indeed, the Asset Purchase Agreement that was the basis for the asset sale and the approvals under the Hospital Conversions Act obligated Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East to do just that:

> 8.2 Employment Terms Employee Benefits.
>
> The Transferred Employees shall be hired by the Company or a Company Subsidiary (as applicable) at base salaries and wages equal to their base salaries and wages as of the Closing Date. The Transferred Employees shall retain their seniority status for purposes of benefits, and their salaries or wages as of the Closing Date shall provide the base for future salary adjustments, if any, thereof. Each Transferred Employee will be treated by the Company or the Company Subsidiary (as applicable) as employed as of such individual's initial hire date at the Facilities for all purposes regarding seniority, except as otherwise required by Law or collective bargaining agreement assumed by the Company. Subject to the right to terminate any Company employee benefit plan and/or restrictions provided under any collective bargaining agreement assumed by the Company, the Company and the Company Subsidiaries as of the
>
> Closing Date will provide benefits to Transferred Employees at benefit levels substantially comparable to those provided under the Seller Plans immediately prior to Closing, including but not limited to qualified retirement plans (except that the Company and the Company Subsidiaries shall not be required to offer a defined benefit plan), vacation, sick leave, holidays, health insurance, life insurance, 401(k) plan (in lieu of similar plans that were offered by Sellers based on their tax exempt status but are not available to the Company) and policies of the Company and the Company Subsidiaries for which each Transferred Employee is eligible.

Asset Purchase Agreement § 8.2(a).

418.   As noted above, after the 2014 Asset Sale, the personnel department for Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East continued to advise Plan participants concerning the Plan.  Indeed, immediately after the 2014 Asset Sale, the same person who was in charge of that department for SJHSRI, RWH, and CCCB prior to the asset sale took over those duties for Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East operating under the fictitious name CharterCARE Health Partners.

419.   Thus, to employees it appeared that nothing had changed with respect to their benefits, or administration of the Plan.

420.   The Asset Purchase Agreement actually defined Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East as "successor employer[s]," at least for tax purposes:

> The Parties acknowledge and agree that each of the Company and each Company Subsidiary constitutes a "successor employer" within the meaning of Code Section 3121(a)(1) and Code Section 3306(a)(1)and the regulations thereunder for federal and state income tax and employment tax purposes.

Asset Purchase Agreement § 8.2(c).

421.   After the Department of Health and Attorney General approved the asset sale, but without informing these state agencies, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East demanded that employees sign an arbitration agreement prepared by Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East.

422.   That mandatory "agreement" purported to obligate employees to arbitrate all claims arising out of their employment, arguably including even claims arising out of their previous employment by SJHSRI, and to waive their rights to proceed by class action.

423.   Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East informed these employees that they would not be hired if they did not sign the arbitration agreement.

424.   Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East were not permitted to compel employees to sign the arbitration agreement as a condition of their being hired, because those entities already had the contractual (and regulatory) obligation to hire the former employees of SJHSRI, RWH, and CCCB on essentially the same terms as they were previously employed, which did not include an agreement to arbitrate or any waiver of rights.

425.   However, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East did not inform these employees that Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East could not make their agreement a condition of their employment.

426.   Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East also did not inform these employees of other facts the employees needed to know in order to evaluate the requirement that they sign the arbitration agreement, including but not

limited to that the employees had pre-existing and valid claims arising out of the fact that the Plan was severely underfunded, that Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East and the other Defendants were involved in fraudulent schemes to strip assets from SJHSRI that were needed to fund the Plan and to fraudulently preserve Church Plan status for the Plan, that the employees already had the existing right to assert their claims in a class action, and that arbitration of those claims would deprive them of a meaningful remedy.

427.    The terms of the arbitration agreement itself were grossly overreaching and the rights it gave the employees were largely illusory.  For example, the agreement obligated Plan participants and "the Company" to arbitrate all claims between them, whether asserted by the employee against the company, or *vice versa*.  However, "the Company" was defined to include the following entities and individuals:

> Prospect CharterCare LLC and/or any of its related entities, holding companies, parents, subsidiaries, divisions, officers, shareholders, directors, employees, agents, vendors, contractors, doctors, patients, insurers, predecessors, successors, and assigns.

Accordingly, it purported to obligate an employee to arbitrate claims the employee had against any other employees, any doctors, any patients, and any hospital vendors or contractors.  It also purported to entitle the employee to demand that all of those entities and individuals arbitrate any claims they may have against the employee, such as malpractice claims asserted by a patient against a nurse or other health care provider. Of course, those entities and individuals would not be bound by the arbitration agreement, so in practice it would be one-sided, and only apply to the employee's claims *against* those individuals and entities.

128

428.   The demand that employees sign the arbitration agreement was itself fraudulent, and part of the fraud and the fraudulent conspiracy between and among all Defendants.

429.   The Asset Purchase Agreement attempted to carve-out successor liability for the Plan, but such carve-outs are unenforceable if the requirements for successor liability are satisfied.

430.   Thus, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East have successor liability for the Plan, both under federal common law applicable to Plan participant claims based on ERISA or, if ERISA is not applicable, under state common law of successor liability.

431.   Notwithstanding the formal documentation creating a limited liability company controlled primarily by Prospect East, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East have repeatedly referred to the relationship between CCCB and Prospect Medical Holdings and held themselves out as joint venturers, in statements to employees, to the public, to the regulatory agencies that approved the 2014 Asset Sale, and to the court that approved the 2015 *Cy Pres* Petition.  For example:

   a.   Prospect Medical Holdings's website states: "Through a joint venture agreement, Prospect became the majority owner of CharterCARE but shares governance of the hospitals equally with CharterCARE Community Board."

   b.   The cy pres petition filed on January 13, 2015 by CC Foundation, RWMC, and SJHSRI states: "On June 20, 2014, a closing on the transaction approved by the Rhode Island Department of Health ('DOH') and Rhode Island Attorney General's Office ('AG') occurred in which certain of the assets of CCCB, RWH and SJHSRI were

transferred to the newly formed for-profit joint venture between CCCB and Prospect Medical Holdings, Inc. ('PMH') known as Prospect CharterCARE, LLC, and its affiliates (the 'Joint Venture')."

c.    A June 17, 2014 letter from the U.S. Department of Health and Human Services to SJHSRI states: "As described in your letter [of May 15], CharterCARE Health Partners (CCHP), the parent of SJHSRI, will enter into a joint venture arrangement with Prospect Medical Holdings, Inc. (PMH), pursuant to a September 24, 2013 arrangement that has now been approved by the Rhode Island Attorney General and the Rhode Island Department of Health.  As part of this arrangement, all operating assets held by members of the CCHP system, including SJHSRI, will be transferred to limited liability companies owned by Prospect CharterCARE, LLC, the joint venture entity. . . ."

d.    CCCB's 2013 Form 990 states: "THE BOARD OF DIRECTORS BELIEVES THAT SUFFICIENT SAFEGUARDS EXIST TO ENSURE THAT THEIR EXEMPT STATUS IS PROTECTED BOTH THROUGH THE APPOINTMENT PROVISIONS IN THE PROSPECT CHARTERCARE LLC JOINT VENTURE AGREEMENT AND CONDITIONS IMPOSED BY THE RHODE ISLAND ATTORNEY GENERAL AND THE RHODE ISLAND COMMISSIONER OF HEALTH."

e.    The March 18, 2013 Letter of Intent executed by both CCCB and Prospect Medical Holdings states: "The purpose of this letter of intent (the 'Letter') is to set forth certain non-binding understandings and certain binding agreements by and between CharterCARE Health Partners ('Seller') and Prospect Medical Holdings, Inc. ('Prospect') with respect to the creation of a joint venture ('Newco') whereby Seller will sell certain assets and operations of Seller to Newco, as more particularly described in the attached term sheet (the 'Term Sheet'), incorporated herein by reference."

f.    A May 20, 2014 email blast from CCCB's president Kenneth Belcher states: "Today Dr. Michael Fine, Director of the Department of Health, followed Friday's decision by the Attorney General and approved our Hospital Conversion[s] Act and Change in Effective Control applications.  This was the final regulatory hurdle toward the successful completion of our joint venture agreement with Prospect Medical Holdings. . . . We are now prepared to plan the final closing which involves executing the financial and legal documents to make the joint venture agreement official."

432.    Insofar as Prospect Chartercare was a joint venture, Prospect East,

Prospect Medical Holdings, and CCCB share the liabilities of Prospect Chartercare, and

have successor liability for the Plan, both under ERISA and, if ERISA is not applicable, under state common law of successor liability and joint ventures.

## H.   FURTHER STRIPPING OF SJHSRI'S ASSETS THROUGH THE ASSET PURCHASE ON OR ABOUT JUNE 20, 2014

433.   On September 24, 2012, Prospect Medical Holdings through its CEO Sam Lee sent a Letter of Intent to the executive leadership of CCHP (consisting of Kenneth Belcher and Edwin Santos) proposing a transaction whereby Prospect Medical Holdings and CCHP would establish a new "joint venture" entity ("Newco") to acquire the assets of SJHSRI, RWMC, and other entities owned by CCCB.  That Letter of Intent included the provisos that in return for the asset sale, "[CCCB] shall receive a 15% membership interest in Newco," and that "the pension liability of SJHSRI as reflected on [CCCB]'s financial records will not be assumed by Newco."

434.   On March 13, 2013, the executive committee of CCCB's board of trustees (present were Edwin Santos, Kenneth Belcher, Joseph DiStefano, Elaine Jones, Donald McQueen, Daniel Ryan, and Sheri Smith) convened with staff (consisting of Otis Brown, Michael Conklin, Kim O'Connell, and Darleen Souza) to discuss letters of intent that had been solicited from potential suitors.  Mr. Belcher informed the committee and other attendees that one of the non-Prospect suitors (LHP Hospital Group) "wanted to fully fund the pension plan."  In other words, the Plan participants would be protected.

435.   On March 14, 2013, SJHSRI's board of trustees met (present were Msg. Theroux, Rev. Robert Forcier, Kenneth Belcher, Leslie Martineau, Joseph Mazza, Ellen McCarty, Roberto Ortiz, Nancy Rogers, and Joseph Samartano with guests Michael Conklin, Patricia Nadle, and Kimberly O'Connell).  Mr. Belcher informed the board that CCCB's board had "made the recommendation to move forward with Prospect."

131

436.    On March 18, 2013, CCCB (through Kenneth Belcher and Edwin Santos) and Prospect Medical Holdings (through CEO Sam Lee) executed a new "LETTER OF INTENT" stating, inter alia:

> The purpose of this letter of intent (the "Letter") is to set forth certain non-binding understandings and certain binding agreements by and between CharterCARE Health Partners ("Seller") and Prospect Medical Holdings, Inc. ("Prospect") with respect to the creation of a joint venture ("Newco") whereby Seller will sell certain assets and operations of Seller to Newco, as more particularly described in the attached term sheet (the "Term Sheet"), incorporated herein by reference.
>
> *        *        *
>
> 1.    Form of Transaction
>
> a)    CharterCare Health Partners, a Rhode Island 501(c)(3) corporation ("Seller"), operates two acute care hospitals and certain related health care businesses in Providence, Rhode Island and surrounding communities (the "Business").
>
> b)    A newly established limited liability company ("Newco"), to be owned 85% by Prospect Medical Holdings, Inc. ("Prospect"), and 15% by Seller, will purchase substantially all of the assets, liabilities and operations of the Business, other than the Excluded Assets and Excluded Liabilities (the "Purchased Assets") from the Seller.
>
> *        *        *
>
> 3.    Purchase Price
>
> a)    In exchange for the Purchased Assets, Newco shall
>
> i)    Pay to Seller $45 million in cash at closing, $31 million of which will be applied to extinguish Seller's existing long-term debt and other obligations, and $14 million of which will be earmarked to strengthen the cash position of St. Joseph Health Services of Rhode Island's ("SJHSRI") pension plan;
>
> ii)    Issue to Seller 15% of the equity of Newco;
>
> *        *        *

132

437.    As Exhibit A to the March 18, 2013 Letter of Intent, CCHP and Prospect Medical Holdings attached a "CharterCARE Health Partners Balance Sheet" dated "1/31/13" which stated that "Pension Liability" in the amount of "89,536,553" dollars was "Retained by CharterCARE".

438.    At the time of the sale, CCCB was in essence a holding company whose assets consisted primarily of its ownership interests in SJHSRI and RWH, and whose only business was managing the operations of Fatima Hospital and Roger Williams Hospital for its subsidiaries SJHSRI and RWH.  In addition, CCCB owned all of the shares of certain other medical providers.  However, the closing on or about June 20, 2014 did not transfer ownership in CCCB or any of its subsidiaries, or any cash CCCB had retained, and provided for the transfer of the assets of, rather than CCCB's ownership interests in, the companies.

439.    As noted above, SJHSRI and RWH, not CCCB, owned the real estate and all of the assets used in operating Old Fatima Hospital and Old Roger Williams Hospital.

440.    Thus, virtually all of the personal property and real property transferred on or about June 20, 2014 was owned both historically and immediately prior to the sale by CCCB's various subsidiaries, primarily SJHSRI and RWH, and not by CCCB, such that virtually all of the actual consideration provided by the sellers came from CCCB's subsidiaries, including SJHSRI and RWH, not from CCCB.

441.    The consideration that Prospect East provided at the closing on or about June 20, 2014 included 15% of the shares of Prospect Chartercare.

442.    The fair market value of that 15% at the time of the asset sale was at least $6,640,000 according to Prospect Chartercare's own audited financials.

443.    The Asset Purchase Agreement had provided that CCCB would receive those shares, as follows:

> Sellers have designated CCHP (the "Seller Member") to be the holder of the units representing the Company's limited liability company memberships on behalf of all Sellers to be issued as partial consideration in respect of the sale by Sellers of the Purchased Assets.

444.    The consideration that Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East provided in return for the assets included the undertaking to provide long term working capital of $50,000,000, and ordinary working capital of $10,000,000 per year, which conferred a benefit on CCCB as 15% shareholder in the additional amount of $9,479,000, according to Prospect Chartercare's own audited financials.

445.    Thus, notwithstanding that CCCB provided virtually none of the consideration for the transaction, the parties consummated the transaction so that CCCB obtained all of the 15% interest in Prospect Chartercare, totaling a fair market value of at least $15,919,000.  Although it was and should have been their property, SJHSRI and RWH kept none of that interest, and, therefore, that valuable asset was not available to satisfy claims of Plan participants, the Plan, or any other creditors of SJHSRI.

446.    In addition to improperly diverting at least $15,919,000 from the creditors of RWH and SJHSRI, Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East agreed to place unreasonable conditions and restrictions on alienability on the 15% interest in Prospect Chartercare in the hands of

Defendant CCCB, to further improperly protect that asset from the creditors of RWH and SJHSRI.

447.    The due diligence performed by Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East in connection with the Asset Purchase Agreement included requiring that CCCB provide consolidated financials reporting on the assets and liabilities of CCCB and its various subsidiaries, and buyers in fact received such financials prior to entering into the Asset Purchase Agreement.

448.    Accordingly, based upon those financials, at the time the Asset Purchase Agreement was entered into, all of the defendants knew that the combined estimated liabilities of the sellers, including CCCB, SJHSRI, and RWH, exceeded their combined estimated assets by approximately $30,000,000, and that the estimated liabilities of SJHSRI alone exceeded SJHSRI's assets by over $70,000,000, all as a result of the unfunded liabilities of the Plan, such that CCCB, SJHSRI, and RWH were already insolvent when they entered into the Asset Purchase Agreement and when the 2014 Asset Sale took place.

449.    This knowledge was actually adverted to in the Asset Purchase Agreement, in which Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East as *Buyers* made the unqualified representations and warranties that they "were not now insolvent and will not be rendered insolvent by any of the Transactions," whereas SJHSRI, RWH, and CCCB as *Sellers* made only the following *qualified* representation and warranty:

> 4.29    Solvency.    **After exclusion of Liabilities associated with the retirement plan due to their uncertainty of amount**: (i) Sellers are not now insolvent and will not be rendered insolvent by any of the

135

Transactions; (ii) Sellers have, and immediately after giving effect to the Transactions, will have, assets (both tangible and intangible) with a fair saleable value in excess of the amount required to pay their Liabilities as they come due; and (iii) Sellers have adequate capital for the conduct of their business and discharge of their debts. . . .

[Emphasis supplied]

450.    By this express exclusion of pension liabilities from the sellers' warranty of solvency, all of the parties to the transaction signaled their actual knowledge that these liabilities rendered SJHSRI, RWH, and CCCB insolvent, such that the transfer of the assets of SJHSRI, RWH, and CCCB constituted a fraudulent transfer.

451.    All of the Defendants sought and intended that the transactions would strip SJHSRI of all of its real estate and operating assets, and transfer value to CCCB in the amount of at least $15,919,000 that (they schemed) would be shielded from SJHSRI's liability to the Plan participants, including the rights of the Plan participants to have all of these assets applied to reduce the deficit in the Plan.

## CAUSES OF ACTION

### COUNT I (ERISA, MINIMUM FUNDING)

452.    Plaintiffs repeat and reallege paragraphs 1-210, 218-223, 227-234, 240-247, 270, 282, and 410-432.

453.    29 U.S.C. § 1132(a)(3), permits a fiduciary, plan participant, or beneficiary to bring a suit to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan, or to redress such violations.

454.    29 U.S.C. § 1082 establishes minimum funding standards for defined benefit plans that require employers to make minimum contributions to their plans so

that each plan will have assets available to fund plan benefits if the employer maintaining the plan is unable to pay benefits out of its general assets.

455.   As the employer maintaining the plan, SJHSRI was responsible for making the contributions that should have been made pursuant to 29 U.S.C. § 1082, at a level commensurate with ERISA's requirements.

456.   SJHSRI has failed to make contributions in satisfaction of the minimum funding standards of 29 U.S.C. § 1082.

457.   By failing to make the required contributions to the Plan, SJHSRI violated 29 U.S.C. § 1082.

458.   As a result of SJHSRI's failure to fund the Plan in accordance with ERISA's minimum funding standards, Plaintiffs pensions will be lost or at least severely reduced.

459.   RWH and CCCB are jointly and severally liable for SJHSRI's failure to make the minimum contributions, because they are members of the same control group pursuant to 29 U.S.C. § 1082(b)(2), their corporate forms should be disregarded to avoid fraud, and they agreed to be responsible therefore and are estopped to deny such liability.

460.   CC Foundation is also jointly and severally liable for SJHSRI's failure to make the minimum contributions, because it is a member of the same control group pursuant to 29 U.S.C. § 1082(b)(2).

461.   Prospect Chartercare, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams are the successors of SJHSRI, CCCB, and RWH, and are members of the same control group, and are liable for SJHSRI's failure to make contributions.

137

WHEREFORE Plaintiffs pray that the Court that judgment be entered against Defendants SJHSRI, CCCB, RWH, Prospect Chartercare, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, and request that the Court award the following relief:

A.      Certifying this action as a class action pursuant to Fed. R. Civ. P. 23;

B.      Declaring that the Plan is an employee benefit plan within the meaning of 29 U.S.C. § 1002(2), is a defined benefit plan within the meaning of 29 U.S.C. § 1002(35), and is not a Church Plan within the definition of 29 U.S.C. § 1002(33);

C.      Ordering Defendants SJHSRI, CCCB, RWH, Prospect Chartercare, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams to fund the Plan in accordance with ERISA's funding requirements;

D.      Requiring Defendants SJHSRI, CCCB, RWH, Prospect Chartercare, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams to make the Plan whole for all contributions that should have been made pursuant to ERISA funding standards, and for interest and investment income on such contributions, and requiring said Defendants to disgorge any profits accumulated as a result of their fiduciary breaches;

E.      Ordering declaratory and injunctive relief as necessary and appropriate, including enjoining the Defendants from further violating the duties, responsibilities, and obligations imposed on them by ERISA, with respect to the Plan;

F.      Awarding, declaring, or otherwise providing Plaintiffs and the Class all relief under 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper, and such appropriate relief as the Court may order, including an accounting,

surcharge, disgorgement of profits, equitable lien, constructive trust, reformation of the

Plan to conform to Defendants' promises and assurances to participants and

beneficiaries, reformation of the Plan to comply with ERISA including but not limited to

the minimum funding provisions of ERISA, equitable estoppel to fund the Plan, or other

remedy;

G.     Awarding to Plaintiffs' counsel attorneys' fees and expenses as provided

by the common fund doctrine, 29 U.S.C. § 1132(g), and/or other applicable doctrine;

and

H.     Any other relief the Court determines is just and proper.

### COUNT II (ERISA, BREACH OF FIDUCIARY DUTY)

462.   Plaintiffs repeat and reallege paragraphs 1-210, 214-224, 232-234, 238-

247, 250-251, 253-318, 319-381, 389-408, and 433-451.

463.   At all times that the Plan failed to qualify as a Church Plan, SJHSRI and

CCCB were fiduciaries of the Plan under ERISA.

464.   29 U.S.C. § 1104(a)(1) provides that a fiduciary shall discharge his/her

duties with respect to a plan solely in the interest of the participants and beneficiaries,

and defraying reasonable expenses of administering the plan, and with the care, skill,

prudence, and diligence under the circumstances then prevailing that a prudent man

acting in a like capacity and familiar with such matters would use in the conduct of an

enterprise of a like character and with like aims.

465.   29 U.S.C. § 1109 provides, inter alia, that any person who is a fiduciary

with respect to a plan and who breaches any of the responsibilities, obligations, or

duties imposed on fiduciaries by ERISA shall be personally liable to make good to the

plan any losses to the plan resulting from each such breach, and to restore to the plan

any profits the fiduciary made through the use of the plan's assets.  29 U.S.C. § 1109

further provides that such fiduciaries are subject to such other equitable or remedial

relief as a court may deem appropriate.  29 U.S.C. § 1002(9) provides that "[t]he term

'person' means an individual, partnership, joint venture, corporation, mutual company,

joint-stock company, trust, estate, unincorporated organization, association, or

employee organization."

466.    29 U.S.C. § 1132(a)(2) permits a plan participant, beneficiary, or fiduciary

to bring a suit for relief under 29 U.S.C. § 1109.

467.    Defendants SJHSRI and CCCB's fiduciary duties included but were not

limited to providing truthful and accurate information concerning the Plan and

administration of the Plan, including information to help Plan participants decide

whether to remain with the Plan by accepting and continuing employment with SJHSRI,

and specifically whether SJHSRI was obligated to fund the Plan and was in fact funding

the Plan, the extent of SJHSRI's unfunded liability under the Plan, the security of the

Plan participant's benefits under the Plan, and SJHSRI's rights to terminate the Plan.

468.    Defendants SJHSRI and CCCB committed breaches of fiduciary duty,

including but not limited to misrepresenting the funding status and security of the Plan,

failures to fund the Plan, failures to demand that others fund the Plan, failures to

administer the Plan in the best interests of its beneficiaries, failures to act honestly and

loyally, and failures to act in good faith in the best interests of the Plan and its

participants and with the necessary level of care.

469.    Plaintiffs have been harmed by these breaches of fiduciary duty.

WHEREFORE Plaintiffs pray that the Court that judgment be entered against

Defendants SJHSRI and CCCB and request that the Court award the following relief:

A.      Certifying this action as a class action pursuant to Fed. R. Civ. P. 23;

B.      Declaring that the Plan is an employee benefit plan within the meaning of

29 U.S.C. § 1002(2), is a defined benefit plan within the meaning of 29 U.S.C.

§ 1002(35), and is not a Church Plan within the definition of 29 U.S.C. § 1002(33);

C.      Ordering Defendants SJHSRI and CCCB to fund the Plan in accordance

with ERISA's funding requirements;

D.      Requiring Defendants SJHSRI and CCCB to make the Plan whole for all

contributions that should have been made pursuant to ERISA funding standards, and

for interest and investment income on such contributions, and requiring said Defendants

to disgorge any profits accumulated as a result of their fiduciary breaches;

E.      Ordering declaratory and injunctive relief as necessary and appropriate,

including enjoining the Defendants from further violating the duties, responsibilities, and

obligations imposed on them by ERISA, with respect to the Plan;

F.      Awarding, declaring, or otherwise providing Plaintiffs and the Class all

relief under 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems

proper, and such appropriate relief as the Court may order, including an accounting,

surcharge, disgorgement of profits, equitable lien, constructive trust, reformation of the

Plan to conform to Defendants' promises and assurances to participants and

beneficiaries, reformation of the Plan to comply with ERISA including but not limited to

the minimum funding provisions of ERISA, equitable estoppel to fund the Plan, or other

remedy;

G.      Awarding to Plaintiffs' counsel attorneys' fees and expenses as provided

by the common fund doctrine, 29 U.S.C. § 1132(g), and/or other applicable doctrine;

and

141

H.      Any other relief the Court determines is just and proper.

COUNT III (ERISA, AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY)

470.    Plaintiffs repeat and reallege paragraphs 1-210, 214-224, 232-234, 238-255, 258-318, 320-381, 389-408, 421-428, and 433-451.

471.    Defendants RWH, Prospect Chartercare, Angell, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect Medical Holdings, Prospect East, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams knowingly participated in, aided, and abetted breaches of fiduciary duty by Plan fiduciaries.

472.    29 U.S.C. § 1132(a)(3) provides that a civil action "may be brought by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;"

WHEREFORE Plaintiffs pray that the Court that judgment be entered against Defendants RWH, Prospect Chartercare, Angell, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect Medical Holdings, Prospect East, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, and request that the Court award the following relief:

A.      Certifying this action as a class action pursuant to Fed. R. Civ. P. 23;

B.      Declaring that the Plan is an employee benefit plan within the meaning of 29 U.S.C. § 1002(2), is a defined benefit plan within the meaning of 29 U.S.C. § 1002(35), and is not a Church Plan within the definition of 29 U.S.C. § 1002(33);

C.      Ordering Defendants RWH, Prospect Chartercare, Angell, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect Medical Holdings, Prospect

East, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams to fund the Plan in accordance with ERISA's funding requirements;

      D.      Requiring Defendants RWH, Prospect Chartercare, Angell, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect Medical Holdings, Prospect East, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams to make the Plan whole for all contributions that should have been made pursuant to ERISA funding standards, and for interest and investment income on such contributions, and requiring Defendants to disgorge any profits accumulated as a result of their fiduciary breaches;

      E.      Ordering declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants RWH, Prospect Chartercare, Angell, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect Medical Holdings, Prospect East, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams from further violating the duties, responsibilities, and obligations imposed on them by ERISA, with respect to the Plan;

      F.      Awarding, declaring, or otherwise providing Plaintiffs and the Class all relief under 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper, and such appropriate relief as the Court may order, including an accounting, surcharge, disgorgement of profits, equitable lien, constructive trust, reformation of the Plan to conform to Defendants' promises and assurances to participants and beneficiaries, reformation of the Plan to comply with ERISA including but not limited to the minimum funding provisions of ERISA, equitable estoppel to fund the Plan, or other remedy;

G.      Awarding to Plaintiffs' counsel attorneys' fees and expenses as provided by the common fund doctrine, 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

H.      Any other relief the Court determines is just and proper.

## COUNT IV (ERISA, DECLARATORY RELIEF)

473.    Plaintiffs repeat and reallege paragraphs 1-210.

474.    29 U.S.C. § 1132(a)(3), authorizes a fiduciary, participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

475.    As Administrator and Receiver of the Plan, the Receiver is a fiduciary entitled to relief under 29 U.S.C. § 1132(a)(3).

476.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief that the Plan is not a Church Plan within the meaning of 29 U.S.C. § 1002(33), and is thus subject to the provisions of Title I and Title IV of ERISA.

WHEREFORE, Plaintiffs demand a declaratory judgment declaring that the Plan is not a Church Plan within the meaning of 29 U.S.C. § 1002(33), and is thus subject to the provisions of Title I and Title IV of ERISA.

## COUNT V (FRAUDULENT TRANSFER, § 6-16-4(A)(1))

477.    Plaintiffs repeat and reallege paragraphs 1-210, 214-224, 227-234, 238-255, 258-318, 319-381, 389-408, and 421-428.

478.   At all relevant times Plaintiffs had "claims" against and were "creditors" of Defendants SJHSRI, RWH, and CCCB, as defined by R.I. Gen. Laws §§ 6-16-1(3) & (4), based upon said Defendants' violations of ERISA and/or obligations imposed by state law.

479.   Fraudulent transfers were made in connection with various transactions, including but not limited to the sale of all of the assets of SJHSRI, RWH, CCCB, and related entities to Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East in connection with the 2014 Asset Sale, and the transfers by SJHSRI and RWH to CC Foundation and by CC Foundation to RI Foundation in connection with the 2015 *Cy Pres* Proceeding, with the actual intent of SJHSRI, CCCB, and RWH as transferors to hinder, delay, or defraud their creditors, within the meaning of R.I. Gen. Laws § 6-16-4(a)(1).

480.   Those transfers are subject to avoidance to the extent necessary to satisfy Plaintiffs' claims, in accordance with R.I. Gen. Laws § 6-16-7(a)(1).

481.   Plaintiffs are entitled to attachment against all of the assets of SJHSRI, RWH, CCCB, and related entities that were transferred to Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, and Prospect East, and all of the assets transferred to CC Foundation and by CC Foundation to RI Foundation pursuant to the 2015 *Cy Pres* Proceeding, in accordance with R.I. Gen. Laws § 6-16-7(a)(2).

482.   Prospect Medical Holdings, Prospect East, and Prospect Chartercare are persons for whose benefit the transfers were made within the meaning of R.I. Gen. Laws § 6-16-8(b)(1), for reasons including but not limited to the fact that Prospect

Medical Holdings had a direct and beneficial interest in the 2014 Asset Sale, Prospect East owned 85% of Prospect Chartercare, and Prospect Chartercare owned 100% of Prospect Chartercare St. Joseph and Prospect Chartercare Roger Williams, and, therefore, they are also liable for the value of the assets transferred.

483.   Plaintiffs are entitled to an injunction against further disposition of the property by Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East, CC Foundation, or the RI Foundation, in accordance with R.I. Gen. Laws § 6-16-7(a)(3)(i).

484.   Plaintiffs are entitled to any other relief the circumstances may require, in accordance with R.I. Gen. Laws § 6-16-7(a)(3)(iii).

485.   Upon entry of judgment on their claims, Plaintiffs are entitled to levy execution on these assets and the proceeds of these assets, in accordance with R.I. Gen. Laws § 6-16-7(b).

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment avoiding the transfers, together with a judgment of money damages against Defendants SJHSRI, RWH, CCCB, Prospect Medical Holdings, Prospect East, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, and CC Foundation, jointly and severally, plus interest and costs, and order Defendant RI Foundation to turn over to Plaintiffs all of the funds it received from CC Foundation, and any proceeds thereof, and such other and further relief as may be just.

COUNT VI (Fraudulent Transfer, §§ 6-16-4(a)(2) and/or 6-16-5(a))

486.   Plaintiffs repeat and reallege paragraphs 1-210, 214-224, 227-234, 238-255, 258-318, 319-381, 389-408, and 421-428.

487.    At times when Plaintiffs had "claims" against and were "creditors" of

Defendants SJHSRI, RWH, and CCCB, as defined by R.I. Gen. Laws §§ 6-16-1(3) &

(4), fraudulent transfers were made within the meaning of R.I. Gen. Laws §§ 6-16-

4(a)(2) and/or 6-16-5(a) in connection with various transactions, including but not limited

to the sale of all of the assets of SJHSRI, RWH, CCCB, and related entities to Prospect

Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams,

Prospect Medical Holdings, and Prospect East in connection with the 2014 Asset Sale,

and the transfers by SJHSRI and RWH to CC Foundation and from CC Foundation to

the RI Foundation in connection with the 2015 Cy Pres Proceeding:

    a.    within the meaning of R.I. Gen. Laws § 6-16-4(a)(2), inasmuch as
          transfers were made without receiving a reasonably equivalent
          value in exchange for the transfers, and the debtor(s) were
          engaged or were about to engage in a business or a transaction for
          which the remaining assets of the debtor(s) were unreasonably
          small in relation to the business or transaction, or the debtor(s)
          intended to incur, or believed or reasonably should have believed
          that they would incur, debts beyond their ability to pay as they
          became due; and/or:

    b.    within the meaning of R.I. Gen. Laws § 6-16-5(a), inasmuch as the
          debtor(s) made the transfer without receiving a reasonably
          equivalent value in exchange for the transfer and the debtor(s) was
          insolvent at that time or the debtor(s) became insolvent as a result
          of the transfer.

488.    Those transfers are subject to avoidance to the extent necessary to satisfy

Plaintiffs' claims, in accordance with R.I. Gen. Laws §§ 6-16-7(a)(2) and/or 6-16-5(a).

489.    Plaintiffs are entitled to attachment against all of the assets of Defendants

SJHSRI, RWH, CCCB, and related entities that were transferred to Prospect

Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams,

Prospect Medical Holdings, and Prospect East, and all of the assets transferred

147

pursuant to the 2015 *Cy Pres* Proceeding, in accordance with R.I. Gen. Laws § 6-16-7(a)(2).

490.    Defendant Prospect Medical Holdings, Prospect East, and Prospect Chartercare are persons for whose benefit the transfers were made within the meaning of R.I. Gen. Laws § 6-16-8(b)(1), for reasons including but not limited to the fact that Prospect Medical Holdings had a direct and beneficial interest in the 2014 Asset Sale, Prospect East owned 85% of Prospect Chartercare, and Prospect Chartercare owned 100% of Prospect Chartercare St. Joseph and Prospect Chartercare Roger Williams, and, therefore, they are also liable for the value of the assets transferred.

491.    Plaintiffs are entitled to an injunction against further disposition of the property by Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, Prospect Medical Holdings, Prospect East, CC Foundation, or the RI Foundation, in accordance with R.I. Gen. Laws § 6-16-7(a)(3)(i).

492.    Plaintiffs are entitled to any other relief the circumstances may require, in accordance with R.I. Gen. Laws § 6-16-7(a)(3)(iii).

493.    Upon entry of judgment on their claims, Plaintiffs are entitled to levy execution on these assets and the proceeds of these assets, in accordance with R.I. Gen. Laws § 6-16-7(b).

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment avoiding the transfers, together with a judgment of money damages against Defendants SJHSRI, RWH, CCCB, Prospect Medical Holdings, Prospect East, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect Chartercare Roger Williams, and CC Foundation, jointly and severally, plus interest, costs, and order Defendant RI

148

Foundation to turn over to Plaintiffs all of the funds it received from CC Foundation, and any proceeds thereof, and such other and further relief as may be just.

COUNT VII (FRAUD THROUGH INTENTIONAL MISREPRESENTATIONS AND OMISSIONS)

494.    Plaintiffs repeat and reallege paragraphs 1-57, 114-210, 214-224, 235-381, and 387-451.

495.    Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, and each of them, made intentional misrepresentations to Plaintiffs and intentionally omitted providing material information under circumstances where said Defendants had a duty to speak.

496.    Plaintiffs reasonably relied upon said Defendants' misrepresentations and omissions.

497.    Plaintiffs suffered damages thereby.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, RWH, CCCB, Angell, Prospect Chartercare, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

COUNT VIII (FRAUDULENT SCHEME)

498.    Plaintiffs repeat and reallege paragraphs 1-57, 114-210, 214-224, 235-

381, and 387-451.

499.    Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect

Chartercare, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect

East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect

Chartercare Roger Williams, and each of them, intentionally defrauded Plaintiffs.

500.    Plaintiffs relied upon Defendants' acts, practices, and courses of business

that operated as a fraud upon Plaintiffs.

501.    Plaintiffs were defrauded thereby.

502.    Plaintiffs suffered damages thereby.

WHEREFORE, Plaintiffs request that the Court certify this action as a class

action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a

judgment of money damages against Defendants SJHSRI, RWH, CCCB,

CC Foundation, Angell, Prospect Chartercare, Corporation Sole, Diocesan

Administration, Diocesan Service, Prospect East, Prospect Medical Holdings, Prospect

Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally,

plus interest, costs, punitive damages, and such other and further relief as may be just.

COUNT IX (CONSPIRACY)

503.    Plaintiffs repeat and reallege paragraphs 1-57, 114-210, 214-224, 235-

381, and 387-451.

504.    Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect

Chartercare, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect

East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect

Chartercare Roger Williams participated in a conspiracy to injure the Plaintiffs, which involved the combination of two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose.

505.   As a result of this conspiracy, Plaintiffs were damaged.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against all Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect Chartercare, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

## COUNT X (ACTUARIAL MALPRACTICE)

506.   Plaintiffs repeat and reallege paragraphs 1-54, 238-251, 255, 259-264, 270, 288-297, 298-312, and 323-335.

507.   Defendant Angell undertook, for a good and valuable consideration, to provide actuarial and administrative services to the Plan which included communicating directly with Plan participants concerning the Plan and the interests of Plan participants concerning the Plan.

508.   At all times mentioned herein, Defendant Angell had a duty to Plaintiffs to conform to the standard of care exercised by the average actuary and provider of administrative services to pension plan participants holding itself out as a specialist in pension plans.

509.   Nevertheless, Defendant Angell breached its duty in that it negligently provided actuarial and administrative services to the Plan and negligently

communicated directly with Plan participants concerning the Plan and the interests of Plan participants concerning the Plan.

510.    As a direct and proximate result of the negligence of Defendant Angell, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, and demand judgment against Defendant Angell for damages, plus interest and costs, and such other and further relief as may be just.

## COUNT XI (BREACH OF CONTRACT)

511.    Plaintiffs repeat and reallege paragraphs 1-57, 211-234, 239, 244-247, and 258-318.

512.    Plaintiffs and Defendant SJHSRI entered into one or more express or implied contracts under which Defendant SJHSRI undertook to fully fund and pay all pension benefits to which Plaintiffs were entitled, which Defendant SJHSRI breached, causing damages to Plaintiffs.

513.    The contracts between Plaintiffs and Defendant SJHSRI each contained an implied covenant of good faith and fair dealing.

514.    Defendant SJHSRI also breached this covenant, causing damages to Plaintiffs.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, and demand judgment against Defendant SJHSRI for damages, plus interest and costs.

## COUNT XII (ALTER EGO)

515.    Plaintiffs repeat and reallege paragraphs 1-381, 387-451, 453-461, 463-469, 471-472, 474-476, 478-485, 487-493, 495-497, 499-502, 504-505, 507-510, and 512-514.

516.    There is a unity of interest and ownership among Defendants SJHSRI, RWH, CCCB, CC Foundation, Prospect Chartercare, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams (the "Alter Ego Group"), such that the separate personalities of the entities and their members do not exist.

517.    Observance of the corporate form would sanction a fraud, promote injustice, or result in inequity.

518.    Each of Defendants in the Alter Ego Group are directly liable to Plaintiffs on one or more claims asserted herein, and the other Defendants in the Alter Ego Group are also liable therefore as the alter egos for the Defendants directly liable to Plaintiffs.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, RWH, CCCB, CC Foundation, Prospect Chartercare, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

COUNT XIII (DE FACTO MERGER)

519.    Plaintiffs repeat and reallege paragraphs 1-381, 387-451, 453-461, 463-469, 471-472, 474-476, 478-485, 487-493, 495-497, 499-502, 504-505, 507-510, 512-514, and 516-518.

520.    There is a continuity of ownership among Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams (the "De Facto Merger Group").

521.    Defendants SJHSRI, RWH, and CCCB have ceased ordinary business and dissolved and/or have become in essence empty shells. SJHSRI and RWH went from owning and operating a hospital and several other health care facilities with hundreds if not thousands of employees to a shell company with no employees in the process of dissolution. CCCB went from managing the health care facilities owned and operated by SJHSRI and RWH to a shell company with no employees with an essentially passive 15% interest in Prospect Chartercare.

522.    Defendants Prospect Chartercare, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams assumed liabilities ordinarily necessary for the uninterrupted continuation of the business of SJHSRI, RWH, and CCCB.

523.    There is a continuity of management, personnel, physical location, assets, and general business operation among the De Facto Merger Group.

524.    Each of Defendants in the De facto Merger Group are directly liable to Plaintiffs on one or more claims asserted herein, and the other Defendants in the De Facto Merger Group are also liable therefore.

154

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, RWH, CCCB, Prospect Chartercare, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

COUNT XIV (JOINT VENTURE)

525.    Plaintiffs repeat and reallege paragraphs 1-381, 387-451, 453-461, 463-469, 471-472, 474-476, 478-485, 487-493, 495-497, 499-502, 504-505, 507-510, 512-514, 516-518, and 520-524.

526.    There existed a joint venture between Defendants CCCB, Prospect East, and Prospect Medical Holdings (the "Joint Venturers").  As represented to state regulators, CCCB and Prospect East have joint control over Fatima Hospital and Roger Williams Hospital, through their control of Prospect Chartercare.  Moreover, each are entitled to share equally in the profits, and can be called upon to make capital contributions if needed by the joint venture, in accordance with their percentage ownership in the joint venture.

527.    Each of Joint Venturers is directly liable to Plaintiffs on one or more claims asserted herein in which the Joint Venturer acted in furtherance of the joint venture, and the other Joint Venturers are also liable therefore.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, and demand a judgment of money damages against Defendants CCCB, Prospect East and Prospect

155

Medical Holdings, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

COUNT XV (S<small>UCCESSOR</small> L<small>IABILITY</small>)

528.    Plaintiffs repeat and reallege paragraphs 1-381, 387-451, 453-461, 463-469, 471-472, 474-476, 478-485, 487-493, 495-497, 499-502, 504-505, 507-510, 512-514, 516-518, 520-524, and 526-527.

529.    Both in connection with the 2014 Asset Sale and the transfer of approximately $8,200,000 to CC Foundation in connection with the 2015 *Cy Pres* Petition, there was a transfer of corporate assets for less than adequate consideration, the new companies continued the business of the transferors; both the transferors and the transferees had at least one common officer or director who was instrumental in the transfer; and the transfers rendered the transferors incapable of paying their creditors because the transferors dissolved either in fact or by law.

530.    Defendants SJHSRI, RWH, and CCCB are liable to Plaintiffs on one or more of the claims asserted herein, for which Defendants CC Foundation, Prospect Chartercare, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams are liable to Plaintiff as successors of Defendants SJHSRI, RWH, and CCCB.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants CC Foundation, Prospect Chartercare, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

156

COUNT XVI (CIVIL LIABILITY UNDER R.I. GEN. LAWS § 9-1-2 FOR VIOLATIONS OF THE
RHODE ISLAND HOSPITAL CONVERSIONS ACT)

531.    Plaintiffs repeat and reallege paragraphs 1-210, 323-381, and 396-414.

532.    Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect
Chartercare, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect
East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect
Chartercare Roger Williams, knowingly violated or failed to comply with one or more
provision of R.I. Gen. Laws § 23-17.14-1 *et seq.* or willingly or knowingly gave false or
incorrect information.

533.    Said Defendants' conduct constituted crimes or offenses under R.I. Gen.
Laws § 23-17.14-30, causing injuries for which Defendants have civil liability under R.I.
Gen. Laws § 9-1-2.

534.    Plaintiffs have been damaged as a result.

WHEREFORE, Plaintiffs request that the Court certify this action as a class
action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a
judgment of money damages against Defendants SJHSRI, RWH, CCCB,
CC Foundation, Angell, Prospect Chartercare, Corporation Sole, Diocesan
Administration, Diocesan Service, Prospect East, Prospect Medical Holdings, Prospect
Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally,
plus interest, costs, punitive damages, and such other and further relief as may be just.

COUNT XVII (CIVIL LIABILITY UNDER R.I. GEN. LAWS § 9-1-2 FOR VIOLATIONS OF 26
U.S.C. § 7206(2))

535.    Plaintiffs repeat and reallege paragraphs 1-210, 214-224, 227-234, 238-
255, 258-318, 319-381, 389-408, and 421-428.

536.    Corporation Sole, Diocesan Administration, and Diocesan Service aided or assisted in, procured, counseled, or advised the preparation or presentation to the IRS of Defendant SJHSRI's Form 990 tax returns, the returns were false as to a material matter; and the acts of Corporation Sole, Diocesan Administration, and Diocesan Service were willful.

537.    Said Defendants' conduct constituted crimes or offenses under 26 U.S.C. § 7206(2), causing injuries for which Defendants have civil liability under R.I. Gen. Laws § 9-1-2.

538.    Plaintiffs have been damaged as a result.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, and demand a judgment of money damages against Corporation Sole, Diocesan Administration, and Diocesan Service, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

## COUNT XVIII (CIVIL LIABILITY UNDER R.I. GEN. LAWS § 9-1-2 FOR VIOLATIONS OF R.I. GEN. LAWS § 11-18-1)

539.    Plaintiffs repeat and reallege paragraphs 1-57, 114-210, 214-224, 235-381, and 387-451.

540.    SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect Chartercare, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams committed violations of R.I. Gen. Laws § 11-18-1 by knowingly giving to an agent, employee, servant in public or private employ, or public official a document in respect of which the principal, master, or employer was interested, which contained a

statement which was false or erroneous, or defective in an important particular, and which, to said Defendants' knowledge, was intended to mislead the principal, master, employer, or state.

541.   Said Defendants' conduct constituted crimes or offenses under of R.I. Gen. Laws § 11-18-1, causing injuries for which Defendants have civil liability under R.I. Gen. Laws § 9-1-2.

542.   Plaintiffs have been damaged as a result.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect Chartercare, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

## COUNT XIX (Civil Liability under R.I. Gen. Laws § 9-1-2 for Violations of R.I. Gen. Laws § 11-41-4)

543.   Plaintiffs repeat and reallege paragraphs 1-57, 114-210, 214-224, 235-381, and 387-451.

544.   SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect Chartercare, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams committed violations of R.I. Gen. Laws § 11-41-4 by obtaining from another designedly, by any false pretense or pretenses, any money or other property, with intent to cheat or defraud.

159

545.    Said Defendants' conduct constituted crimes or offenses under of R.I. Gen. Laws § 11-41-4, causing injuries for which Defendants have civil liability under R.I. Gen. Laws § 9-1-2.

546.    Plaintiffs have been damaged as a result.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Prospect Chartercare, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect East, Prospect Medical Holdings, Prospect Chartercare St. Joseph, and Prospect Chartercare Roger Williams, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

COUNT XX (Liquidation pursuant to R.I. Gen. Laws §§ 7-6-60 & -61)

547.    Plaintiffs repeat and reallege paragraphs 1-381, 387-451, 453-461, 463-469, 471-472, 474-476, 478-485, 487-493, 495-497, 499-502, 504-505, 507-510, 512-514, 516-518, 520-524, 526-527, 529-530, and 532-534.

548.    Defendants SJHSRI, RWH, and CCCB are Rhode Island nonprofit corporations.

549.    Each of them has admitted in writing that the claims of Plaintiffs are due and owing, and these corporations are insolvent.

550.    Each of them should be liquidated and their assets shall be applied and distributed to pay Plaintiffs' claims pursuant to R.I. Gen. Laws §§ 7-6-51 & 7-6-61(c)(1).

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, RWH, and CCCB, jointly and

160

severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

COUNT XXI (Rhode Island Law, Breach of Fiduciary Duty)

551.    Plaintiffs repeat and reallege paragraphs 1-57, 114-210, 214-224, 235-234, 235-255, 258-318, 320-381, 389-408, 421-428, and 433-451.

552.    Defendants SJHSRI, CCCB, Angell, Corporation Sole, Diocesan Administration, and Diocesan Service all owed Plaintiffs fiduciary duties.

553.    Defendants SJHSRI, CCCB, Angell, Corporation Sole, Diocesan Administration, and Diocesan Service all breached their fiduciary duties to Plaintiffs, causing damages.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, CCCB, Angell, Corporation Sole, Diocesan Administration, and Diocesan Service, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

COUNT XXII (Rhode Island Law, Aiding and Abetting Breaches of Fiduciary Duty)

554.    Plaintiffs repeat and reallege paragraphs 1-57, 114-210, 214-224, 235-381, and 387-451.

555.    Defendants RWH, CC Foundation, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect East, and Prospect Medical Holdings knowingly aided, abetted, and participated in, breaches of fiduciary duty by Defendants SJHSRI, CCCB, Angell, Corporation Sole, Diocesan Administration, and Diocesan Service, and Defendants SJHSRI, CCCB, Angell, and Corporation Sole, Diocesan Administration,

161

and Diocesan Service knowingly aided, abetted, and participated in, breaches of fiduciary duty by each other, causing damages.

WHEREFORE, Plaintiffs request that the Court certify this action as a class action pursuant to Fed. R. Civ. P. 23 and, for themselves and the Class, demand a judgment of money damages against Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect East, and Prospect Medical Holdings, jointly and severally, plus interest, costs, punitive damages, and such other and further relief as may be just.

COUNT XXIII (DECLARATORY JUDGMENT, LIABILITY AND TURN OVER OF FUNDS, STATE LAW CLAIMS)

556.    Plaintiffs repeat and reallege paragraphs 477-555.

557.    There exists an actual and legal controversy between Plaintiffs and Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Corporation Sole, Diocesan Administration, Diocesan Service, RI Foundation, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect East, and Prospect Medical Holdings, in which Plaintiffs have an interest, concerning the causes of action asserted herein in at paragraphs 477-555.

558.    That controversy is ripe for determination, even if there are future contingencies that may determine the amount of Plaintiffs' damages.

WHEREFORE Plaintiffs demand a declaratory judgment declaring that Defendants SJHSRI, RWH, CCCB, CC Foundation, Angell, Corporation Sole, Diocesan Administration, Diocesan Service, Prospect Chartercare, Prospect Chartercare St. Joseph, Prospect East, and Prospect Medical Holdings, jointly and severally, are liable

162

to Plaintiffs on the causes of action set forth against them in paragraphs 477-555 herein, and ordering Defendant RI Foundation to turn over to Plaintiffs all of the funds it received from CC Foundation, even if the exact quantum of Plaintiffs' damages cannot yet be determined due to these future contingencies.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on the aforementioned Counts.

Plaintiffs
By their Attorneys,

/s/ Max Wistow
Max Wistow, Esq. (#0330)
Stephen P. Sheehan, Esq. (#4030)
Benjamin Ledsham, Esq. (#7956)
Wistow, Sheehan & Loveley, PC
61 Weybosset Street
Providence, RI  02903
(401) 831-2700
(401) 272-9752 (fax)
mwistow@wistbar.com
spsheehan@wistbar.com
bledsham@wistbar.com

Dated:  October 5, 2018

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that an exact copy of the within document was electronically filed on the 5th day of October, 2018 using the Electronic Case Filing system of the United States District Court and is available for viewing and downloading from the Electronic Case Filing system.  The Electronic Case Filing system will automatically generate and send a Notice of Electronic Filing to the following Filing Users or registered users of record:

Andrew R. Dennington, Esq.
Christopher K. Sweeney, Esq.
Russell V. Conn, Esq.
Conn Kavanaugh Rosenthal
Peisch and Ford, LLP
One Federal Street, 15th Floor
Boston, MA  02110
adennington@connkavanaugh.com
csweeney@connkavanaugh.com
rconn@connkavanaugh.com

David A. Wollin, Esq.
Hinckley Allen & Snyder LLP
100 Westminster Street, Suite 1500
Providence, RI 02903-2319
dwollin@hinckleyallen.com

Preston Halperin, Esq.
James G. Atchison, Esq.
Christopher J. Fragomeni, Esq.
Dean J. Wagner, Esq.
Shechtman Halperin Savage, LLP
1080 Main Street
Pawtucket, RI  02860
phalperin@shslawfirm.com
jatchison@shslawfirm.com
cfragomeni@shslawfirm.com
dwagner@shslawfirm.com

Howard Merten, Esq.
Paul M. Kessimian, Esq.
Christopher M. Wildenhain, Esq.
Eugene G. Bernardo, II, Esq.
Partridge Snow & Hahn LLP
40 Westminster Street, Suite 1100
Providence, RI 02903
hm@psh.com
pk@psh.com
cmw@psh.com
egb@psh.com

Steven J. Boyajian, Esq.
Daniel F. Sullivan, Esq.
Robinson & Cole LLP
One Financial Plaza, Suite 1430
Providence, RI 02903
sboyajian@rc.com
dsullivan@rc.com

Robert D. Fine, Esq.
Richard J. Land, Esq.
Chace Ruttenberg & Freedman, LLP
One Park Row, Suite 300
Providence, RI 02903
rfine@crfllp.com
rland@crfllp.com

Joseph V. Cavanagh, III, Esq.
Joseph V. Cavanagh, Jr., Esq.
Lynne Barry Dolan, Esq.
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI  02903
Jvc3@blishcavlaw.com
jvc@blishcavlaw.com
lbd@blishcavlaw.com

David R. Godofsky, Esq.
Emily S. Costin, Esq.
Alston & Bird LLP
950 F. Street NW
Washington, D.C.  20004-1404
david.godofsky@alston.com
emily.costin@alston.com

164

Ekwan R. Rhow, Esq.
Thomas V. Reichert, Esq.
Bird, Marella, Boxer, Wolpert, Nessim, Drooks,
Licenberg & Rhow, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, CA  90067
erhow@birdmarella.com
treichert@birdmarella.com

/s/ Max Wistow