UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
STEPHEN DEL SESTO, AS RECEIVER          )
AND ADMINISTRATOR OF THE                )
ST. JOSEPH HEALTH SERVICES              )
OF RHODE ISLAND RETIREMENT              )
PLAN; et al.,                           )
                                        )
          Plaintiffs,                   )
                                        )
     v.                                 )     C.A. No. 18-328 WES
                                        )
PROSPECT CHARTERCARE,                   )
LLC; et al.,                            )
                                        )
          Defendants.                   )
_____)

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, District Judge.

     The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, "generally obligates private employers offering pension plans to adhere to an array of rules designed to ensure plan solvency and protect plan participants." Advoc. Health Care Network v. Stapleton, 137 S. Ct. 1652, 1656 (2017).  Churches, and some organizations affiliated with them, may be exempt from those rules if their retirement plan meets the statutory requirements to be considered a "church plan."  Id.; see also 29 U.S.C. § 1002(33).  The question before the Court today is narrow: did the defined-benefit pension plan at the center of this litigation, the St. Joseph Health Services of Rhode Island Retirement Plan ("the Plan"), stop qualifying as a church plan by

April 29, 2013, at the very latest?   The Court answers yes: by that date the Plan no longer qualified as a church plan because there was not a "Principal Purpose Organization" administering it, as required.   See Stapleton, 137 S. Ct. 1652, 1656-57 (2017) (defining Principal Purpose Organization and explaining its significance in the ERISA, church-plan schema).   Defendants'[1] Motion for Summary Judgment on Count IV of the First Amended Complaint, ECF No. 236, is GRANTED.   Plaintiffs' Conditional Rule 56(d) Motion, ECF No. 246, is DENIED.

I.   BACKGROUND

Over many years, more than 2,700 nurses and other employees of St. Joseph Health Services of Rhode Island ("SJHSRI") enrolled in the Plan, and presumably planned their lives and futures on the pension it promised them.   First Amend. Compl. ¶ 1 ("FAC"), ECF No. 60.   In 2017, after a complex healthcare merger, the Plan was placed into a receivership as insolvent.   See St. Joseph Health Servs. of R.I., Inc. v. St. Josephs Health Servs. of R.I. Retirement Plan, as amended, PC-2017-3856 (filed Aug. 18, 2017). Plaintiffs are Stephen Del Sesto, Receiver and Administrator of the Plan, and various beneficiaries, individually and as putative

---

[1] The Diocesan Administration Corporation, Diocesan Service Corporation, and Roman Catholic Bishop of Providence (together, "Diocesan Defendants").

class representatives.[2]  They claim that the hospitals involved and their various corporate parents fraudulently concealed that the Plan was grossly underfunded, then executed a complicated hospital sale and reorganization designed to leave the Plan and its obligations dangling from a corporate entity which had been stripped of all its assets.  See FAC ¶ 55, ECF No. 60.  In doing so, Plaintiffs allege, Defendants "violated ERISA, committed fraud, breached their contractual obligations, violated their duty of good faith and fair dealing, and/or otherwise acted wrongfully." Id. ¶ 56. At this point, nearly all Defendants have settled.  Only three remain: the Diocesan Administration Corporation, Diocesan Service Corporation, and Roman Catholic Bishop of Providence (together, "Diocesan Defendants").

A.  Sale and Merger

The hospital system reorganization at the center of this dispute involves a dense and complicated series of transactions. In sketching the relevant facts and key events, the Court attempts to avoid the many labyrinthine factual byways, sticking to the main points, which follow:

SJHSRI has, under one name or another, operated Catholic hospitals in Rhode Island since 1892.  Pls.' Statement Undisp. And

---

[2] Gail J. Major, Nancy Zompa, Ralph Bryden, Dorothy Willner, Caroll Short, Donna Boutelle, and Eugenia Levesque individually and as named Plaintiffs and putative class representatives.

Disputed Material Facts ¶ 40 ("Pls.' SUF"), ECF No. 243.  In 1995,
SJHSRI established the Plan at issue and created a designated
retirement board to administer it.   Diocesan Defs.' Statement
Undisp. Material Facts ¶¶ 2, 6-7 ("Defs.' SUF"), ECF No. 237.  The
Plan was amended and restated as part of a corporate reorganization
and hospital merger, effective 2011.  Id. ¶¶ 7-8, 22.  As restated,
the Plan did not have a retirement board.  Id. ¶ 25.  Instead, it
provided that "[t]he Employer [SJHSRI] shall be the Plan
Administrator, hereinafter called the Administrator, and named
fiduciary of the Plan, unless the Employer, by action of its Board
of Directors[3] [sic], shall designate a person or committee of
persons to be the Administrator and named fiduciary."  Id. ¶ 27
(quoting Defs.' Ex. 4 at 38, ECF No. 237-4).[4]  SJHSRI's Board of

---

[3] SJHSRI has a board of Trustees, not Directors.

[4] The 2011 restatement also specified the duties inherent in
administering the Plan in some detail:

> The administration of the Plan, as provided herein,
> including the determination of the payment of benefits
> to Participants and their Beneficiaries, shall be the
> responsibility of the Administrator. The Administrator
> shall conduct its business and may hold meetings, as
> determined by it, from time to time. The Administrator
> shall have the right to construe and interpret the Plan,
> decide all questions of eligibility and determine the
> amount, manner and time of payment of any distributions
> under the Plan to the fullest extent provided by law and
> in its sole discretion; and interpretations or decisions
> made by the Administrator will be conclusive and binding
> on all persons having an interest in the Plan. In the
> event more than one party shall act as Administrator,
> all actions shall be made by majority decisions. In the

Trustees never designated a committee to administer the Plan before placing it into receivership. Pls.' SUF ¶¶ 171-172; Defs.' SUF ¶ 30.

On April 29, 2013, a resolution signed by Bishop Thomas J. Tobin, the Bishop of the Diocese of Providence, ratified and confirmed the 2011 Plan restatement. Defs.' SUF ¶ 34. The resolution made clear that SJHSRI, by and through its Board of Trustees, was the entity in charge of administering the Plan, resolving "[t]hat the Board of Trustees of St. Joseph Health Services of Rhode Island is the Retirement Board with respect to the Plan and acts on behalf of St. Joseph Health Services of Rhode Island as the Plan Administrator of the Plan."[5] Id. ¶ 36.

_____

administration of the Plan, the Administrator may (1) employ agents to carry out nonfiduciary responsibilities (other than Trustee responsibilities), (2) consult with counsel who may be counsel to the Employer, and (3) provide for the allocation of fiduciary responsibilities (other than Trustee responsibilities) among its members. Actions dealing with fiduciary responsibilities shall be taken in writing and the performance of agents, counsel and fiduciaries to whom fiduciary responsibilities have been delegated shall be reviewed periodically.

Defs.' Ex. 4 at 38 (2011 Plan), ECF No. 237-4; Defs.' Ex. 5 at 41 (2016 Plan), ECF No. 237-5.

[5] That resolution also said that the SJHSRI Board had designated its retirement board duties to the "Finance Committee of CharterCARE Health Partners." Both parties agree this designation did not happen. Pls.' SUF ¶¶ 171-172; Defs.' SUF ¶ 30. Yet, even if the designation had occurred, it likely would not change the outcome here. The plain terms of the Finance Committees' purpose show it was far broader than administering the retirement Plan. See Defs.' SUF ¶ 38. Therefore, absent a strong

The following fall, all the relevant corporate entities and hospitals applied to the Rhode Island Attorney General under the Rhode Island Hospital Conversion Act, seeking the required approval for a second reorganization, one that would convert their nonprofit health care facilities into a for-profit joint venture ("HCA Application").   Pls.' SUF ¶ 105.   As part of this transaction, SJSHRI would sell its operating assets, including Our Lady of Fatima Hospital, to a larger parent company, Prospect CharterCare, LLC.   Id. ¶¶ 66, 105.  After much back-and-forth with the applicants, the Attorney General conditionally approved the reorganization and conversion in a written decision dated May 19, 2014.  Id. ¶ 146.  In June 2014, SJHSRI's asset sale closed, and the entity entered a wind-down phase.  Id. ¶¶ 147, 158.

The Attorney General required, as a condition of approval, that any of SJHSRI's assets not included in the asset sale (mostly some charitable trusts) be distributed through a cy pres proceeding.  Id. ¶ 161.  After the Attorney General approved the proposed cy pres petition, so did the Rhode Island Superior Court, granting that SJHSRI could use the proceeds of various charitable trusts to pay its pre- and post-closing liabilities, including payments to the Plan.  Id. ¶¶ 163, 165-167.

---

showing that it functioned primarily to administer and maintain the Plan in practice, it would not qualify as a Principal Purpose Organization.

On August 18, 2017, SJHSRI petitioned to place the Plan into a receivership.  Id. ¶ 76.  This lawsuit followed.

B.  Procedural History

Determining when the Plan stopped being a church plan and thus became subject to the strictures and requirements of ERISA, is essential to narrowing the sprawling Complaint and the issues before the Court.  This is so because when ERISA applies, counts relying on its enforcement provisions become potentially applicable, but Plaintiffs' state-law claims, or at least some of them, may be preempted.  See, e.g., FAC ¶¶ 30-32.  The inverse is true if the Plan was a church plan and therefore not subject to ERISA: the ERISA claims are inapt, but the state-law claims may survive.  Id.

Believing an answer to this question would greatly simplify the litigation, the Court directed the parties to file partial summary judgment motions on Count IV of the FAC, which sought a declaratory judgment that the plan stopped being a church plan. See id. ¶ 469(b).  The Court permitted limited discovery, staggered throughout the briefing.  See Stip. & Consent Order Concerning Limited Disc. and Related Summ. J. Mot. ¶¶ 2-5 ("Stip. & Consent Order"), ECF No. 175.

Plaintiffs, following this directive, moved for summary judgment.  They argued that the Court should "enter an order declaring that by April 29, 2013 at the latest, the Plan was not

a Church Plan within the meaning of 29 U.S.C. § 1002(33) and, therefore, was subject to ERISA." Pls.' Mot. Summ. J. on Count IV 27, ECF No. 173. The Court then allowed limited additional discovery relevant to that motion, specifically focused on "whether [the Plan], St. Joseph Health Services of Rhode Island, or any other person or entity responsible therefore complied with the so-called 'principal purpose organization' requirement[s]." Stip. & Consent Order ¶ 2. The Diocesan Defendants initially took no position on Plaintiffs' summary judgment motion but noted its importance to clarifying the case. See Diocesan Defs.' Resp. and Reservation Concerning Pls.' Mot. Summ. J. 1, ECF No. 189. A separate group of Defendants, referred to at the time as the "Prospect Defendants," opposed this motion, but settled with Plaintiffs before it was decided. See Prospect Defs.' Obj. to Pls.' Mot. Summ. J., ECF No. 190.

After the Court approved the settlement with the Prospect Defendants, the Diocesan Defendants filed another notice indicating they assented to Plaintiffs' Motion for Summary Judgment and would stipulate that the Plan stopped being a church plan by April 29, 2013, at the latest. Diocesan Defs.' Notice of Assent to Relief Requested in Pls.' Mot. Summ. J. 1, ECF No. 221. Plaintiffs responded by reversing course. After briefing and with the Court's permission, they withdrew their motion for summary judgment, resulting in the somewhat unusual posture of the

8

litigation as it now stands.  See Dec. 10, 2021, Text Order.  The Diocesan Defendants have held to their late-drawn position and filed a motion for summary judgment which closely mirrors Plaintiffs' initial filing.  Plaintiffs now oppose what is essentially their own previous motion.  Claims of bad faith and strategic connivance abound.

II.  LEGAL STANDARD

Summary judgment is appropriate if there are no genuinely disputed material facts, and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56.  The Court views all facts in the light most favorable to the non-movants, Plaintiffs here.  Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 20-21 (1st Cir. 2018).

III. DISCUSSION

For a plan which is not established and maintained directly by a church to nevertheless qualify as a church plan under ERISA, it must be maintained by what the Supreme Court has termed a "Principal Purpose Organization" ("PPO").[6]  That PPO must be

---

[6] In rather convoluted language, the statute defines a Principal Purpose Organization as:

an organization ... the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches [or employees of church-affiliates], if such organization is controlled by or associated with a church or a convention

affiliated with or controlled by a church,[7] and as the name suggests, "the main job of such an entity . . . is to fund or manage a benefit plan for the employees of churches or . . . church affiliates." Stapleton, 137 S. Ct. at 1656-57.

The parties agree that SJHSRI or its Board of Trustees are the only real PPO candidates during the relevant time frame (April 29, 2013, to August 18, 2017). Plaintiffs also admit that that as of April 29, 2013, neither SJHSRI, nor its Board maintained the Plan as their main job, as they must to qualify as a PPO. See

---

or association of churches.

29 U.S.C. § 1002(33).

[7] Some courts have distilled the convoluted statutory language of ERISA into a three-question test for determining whether a retirement plan run by a church-affiliated entity qualifies for the church-plan exemption:

> The statute imposes a three-step inquiry for entities seeking to use the church-plan exemption for plans maintained by principal-purpose organizations:
>
>> 1. Is the entity a tax-exempt nonprofit organization associated with a church?
>> 2. If so, is the entity's retirement plan maintained by a principal purpose organization? That is, is the plan maintained by an organization whose principal purpose is administering or funding a retirement plan for entity employees?
>> 3. If so, is that principal-purpose organization itself associated with a church?

Medina v. Cath. Health Initiatives, 877 F.3d 1213, 1222 (10th Cir. 2017). For the Plan to be exempt, the answer to all three questions must be yes. Id. Here, only the second question - whether SJHSRI was a PPO - is in dispute. See Pls.' Mem. Opp'n Defs.' Mot. Summ J. 64, ECF No. 245.

Pls.' Mem. Opp'n Defs.' Mot. Summ. J. 66 ("Pls.' Opp'n"), ECF No. 245 ("[I]t is ludicrous to suggest that prior to June 20, 2014, SJHSRI's main job or the main job of SJHSRI's Board of Trustees was administering or funding the Plan."). Thus, it is undisputed that the Plan did not qualify as a church plan on that date.

Instead, Plaintiffs put forth two arguments for why the Plan should be treated as a church plan until it was placed in receivership. First, they contend that after SJHSRI sold its hospitals and went through cy pres proceedings, it had essentially nothing left to do but administer the Plan, making it a PPO by default. Id. at 66-67. They then point to a statutory cure provision in ERISA, 29 U.S.C. § 1002(33)(D), which would require the Court to treat the Plan as if it had always been administered by a PPO. Id. at 68-69. Second, they argue that Defendants are estopped from asserting that the Plan ceased being a church plan before it entered receivership, because this position contradicts statements that SJHSRI made to the Attorney General in the HCA Application. See id. at 74-96. Neither argument persuades the Court.

A.   Plaintiffs' Cure Argument

Plaintiffs' argument that SJHSRI's Board of Trustees unintentionally became a PPO at some point after the asset sale but before the receivership fails for two reasons. First, the documents that create and govern both SJHSRI and its Board make

11

clear that both had a purpose far broader than administering and maintaining the Plan, even after the cy pres proceedings.  Second, even if it is proper to look to the day-to-day operations SJHSRI's Board to discover its purpose, Plaintiffs' factual admissions block their argument.  The facts they do not dispute, their binding judicial admissions, and their own sworn testimony prevent them from manufacturing a material dispute of fact on the question of whether the Board was mainly concerned with the Plan.  As Plaintiffs have long maintained, neither SJHSRI nor its Board's duties were so limited.

When evaluating whether an organization qualifies as a PPO, courts focus primarily (but not only)[8] on documents which create and govern the organization and plan.  See Boden v. St. Elizabeth Med. Ctr., Inc., 404 F. Supp. 3d 1076, 1087 (E.D. Ky. 2019) (noting that "courts look to the documents governing the pension plans for guidance and focus on the responsibilities designated to the organization rather than the day-to-day functions of the organization."); see also Medina v. Cath. Health Initiatives, 877 F.3d 1213, 1226 (10th Cir. 2017) (looking primarily to governing documents).  The Court follows this guidance.  It looks first to

---

[8] Smith v. OSF HealthCare Sys., 933 F.3d 859, 869–70 (7th Cir. 2019) (not convinced that "only paper formalities matter," and remanding for additional discovery to address concern that relevant potential PPOs were not administering or maintaining the plan at all, where committee had met for roughly an hour over an eight-year period).

the documents governing both the Plan and SJHSRI, and then asks if they describe administering and maintaining the Plan as the "main job" of the Board.  See Stapleton, 137 S. Ct. at 1657.

       1.   SJHSRI's Purpose on Paper

The relevant documents are the 2011 and 2016 restatements of the Plan, the documents governing and defining SJHSRI's purpose and mission, and the cy pres opinion from the Rhode Island Superior Court, which potentially cabined them.  These documents do not suggest that the principal purpose of SJHSRI, a healthcare corporation, or its Board of Trustees, was merely to maintain the corporation's pension plan.

First, while the Plan restatements made clear that as the Plan "Administrator" and "fiduciary," the Board of SJHSRI carried responsibility for administering the Plan, neither indicates that this was its main job or principal purpose.  See Defs.' SUF ¶ 27; Defs.' Ex. 4 at 38; Defs.' Ex. 5 at 41.  Instead, the Plan anticipates the Board delegating this authority to another body. Defs.' SUF ¶ 27.  Delegation implies both that the Board carried much broader responsibilities while overseeing a multifaceted healthcare corporation, and that the potentially delegated responsibility was not its principal purpose.

Likewise, the governing documents which speak to the purpose of SJHSRI and its Board of Trustees detail the obvious: The organization's purpose was to provide healthcare and its Board's

purpose was to oversee a healthcare corporation (and later a healthcare corporation in wind-down), not just that corporation's pension plan. For example, the 1892 Act which established SJHSRI's predecessor stated its incorporation was "for the purpose of providing medical aid and surgical treatment for the sick of all denominations." See Defs.' Ex. 40 at 1, ECF No. 252-2. SJHSRI's 2010 bylaws showed the Board's job was to oversee the operation of the whole corporation, and that the corporation's mission was "to foster an environment of collaboration among its partners, medical staff and employees that supports high quality, patient focused and accessible care that is responsive to the needs of the communities it serves." Defs. Ex. 10, SJHSRI Bylaws, §§ 3.2, 4.1, ECF No. 237-10. While the corporation amended its bylaws after the 2014 asset sale, neither provision was altered or made to even mention the Plan, much less indicate that the Board of Trustees was to function as principally as a retirement board from then on. Pls.' Ex. 89, Tab. D, ECF No. 243-89.

As for the role of the Attorney General's decision and cy pres proceedings, the Court agrees with Defendants' position (which was formerly Plaintiffs' position): these left SJHSRI's Board with significant discretion in its wind-down work, such that administering the Plan was not the Board's principal or only purpose. With respect to the effect of these documents, Plaintiffs now argue that:

> the sources and amount of SJHSRI's charitable and other
> assets and SJHSRI's obligation to apply them to pay its
> pre and post-closing liabilities were already determined
> in the Cy Pres proceeding and the prior Decision of the
> Attorney General. Consequently, by that time, virtually
> all ordinary business decisions that SJHSRI management
> would normally make and the board of trustees normally
> would be expected to supervise were pre-determined or
> non-existent for SJHSRI's Board of Trustees.

Pls.' Opp'n 66.  To the contrary, the Attorney General's decision
contemplates a "multi-year wind-down process" during which SJHSRI,
through its Board, would work to settle government cost reports
and oversee the application of income from its charitable trusts
to various remaining liabilities and wind-down expenses.  Pls.'
Ex. 82, Decision Re: Initial Hospital Conversion Application of
Prospect Medical Holdings, Inc., et al. at 25, ECF No. 243-82.
The cy pres opinion agrees, allowing SJHSRI to apply the proceeds
of various charitable trusts towards its pre- and post-sale
liabilities.  See, e.g., Pls.' Ex. 89, Tab. D ¶¶ 6-8, ECF No. 243-
89.  Neither tell SJHSRI how exactly it must apply these funds,
which liabilities and debts to prioritize, or how to negotiate
compromises or settlements, etc.

Thus, the Court concludes that by the papers, after the asset
sale, the Board's main job was to wind down a large healthcare
corporation, with all the duties and responsibilities that
entails.  Neither the fact that the pension was the largest
liability on the books, nor that the cy pres opinion permitted the

Board to apply charitable assets to liabilities, turned the Board of Trustees into a retirement board or PPO for purposes of ERISA.

### 2.   SJHSRI's Purpose in Operation

Most courts have treated the governing organizational documents as essentially dispositive of an organization's purpose, which can generally be ascertained as a matter of law.  See Boden, 404 F. Supp. 3d at 1087-90 (discussing cases).  That said, at least one Court of Appeals has suggested there are circumstances when it is appropriate to probe beyond the purpose and structure of an organization as described on paper and to examine its day-to-day operations in assessing whether it qualifies as a PPO.  See Smith v. OSF HealthCare Sys., 933 F.3d 859, 869-70 (7th Cir. 2019).  But the answer in either event is the same here.  Plaintiffs themselves have made clear from the beginning that SJHSRI and its Board did not qualify as a PPO as a matter of its daily operation.  The Court concludes their own statements preclude them from generating a genuine dispute of material fact on this issue.

As a starting point, Plaintiffs do not dispute that after April 29, 2013, SJHSRI's Board of Trustees never "held separate meetings in their capacity as the Retirement Board, devoted any specific part of their regular meetings to their function as the Retirement Board, . . . proceeded by an agenda specific to their function as the Retirement Board[, or kept] separate minutes concerning its actions as the Retirement Board."  Defs.' SUF ¶ 37.

16

Instead, questions of the Plan's administration were mixed in with the Board's other business.  Id.; see also Pls.' Resp. Defs.' Statement Undisp. Facts, ECF No. 244 (not disputing Defs.' SUF ¶ 37).

Plaintiffs' pleadings make clear precisely what other business concerned the Board as it wound down SJHSRI:

> Prior to the 2014 Asset Sale, SJHSRI owned Fatima Hospital.  Since then, SJHSRI no longer operates a hospital or otherwise provides health care.  Instead, SJHSRI's business consists of defending lawsuits and workers' compensation claims, collecting certain debts and receivables, paying or settling certain liabilities which were excluded from the 2014 Asset Sale, and, until the Receiver was appointed, administering the Plan.

FAC ¶ 16; see also id. ¶¶ 70-81.

"A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., 976 F.2d 58, 61 (1st Cir. 1992); see also Atlas Glass & Mirror, Inc. v. Tri-N. Builders, Inc., 997 F.3d 367, 373 (1st Cir. 2021) (same).  "Unlike ordinary admissions, which are admissible but can be rebutted by other evidence, judicial admissions are conclusive on the party making them." Atlas Glass & Mirror, 997 F.3d at 373.  And while courts retain "broad discretion to relieve parties from the consequences of judicial admission in appropriate cases," id., the Court sees no reason to do so here.[9]

_____

[9] The Court need not decide whether the formal conditions of

17

Having failed to dispute that the Board mixed discussion of the Plan with all its other business and having described the scope of that other business in its pleadings, Plaintiffs are bound to these facts on summary judgment.[10]   With these admissions, the

---

judicial estoppel are met here to note that the animating concern behind the doctrine – "safeguard[ing] the integrity of the courts by preventing parties from improperly manipulating the machinery of the judicial system" – counsels against relief from Plaintiffs' judicial admissions. Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 32-33 (1st Cir. 2004); see also New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (purpose of judicial estoppel is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment") (cleaned up).   Nor does taking this portion of the pleading as a judicial admission conflict with Plaintiffs' right to plead in the alternative.   See Schott Motorcycle Supply, 976 F.2d at 61 ("[A] pleading should not be construed as a judicial admission against an alternative or hypothetical pleading in the same case.").   It is true that Plaintiffs pleaded some state-law claims in the alternative, despite knowing they would be preempted if they received a declaratory judgment that the Plan was subject to ERISA.   See FAC ¶ 32.   Those alternative pleadings do not rest on contradictory or alternative facts, but instead are alternative legal claims whose viability hinges on a question of law (whether the Plan was a church plan).

[10] This conclusion is bolstered by sworn statements from the Plaintiff Receiver, who wrote:

Following the closing of the asset sale on June 20, 2014 until the Plan was placed into Receivership in August of 2017, SJHSRI's other purposes and activities (in addition to administering, maintaining, and funding the Plan) were the hundreds of purposes and actions involved in winding down a hospital and related entities.

Ex. 41 to Diocesan Defs.' Resp. to Pls.' PPO Facts (Pl. Receiver Interrog. Answers) at 11 (answer to No. 5). Or, more to the point, "from the closing of the asset sale on June 20, 2014 until the Plan was placed into Receivership in August of 2017, the principal purpose of SJHSRI was winding down its operations."   Ex. 41 to

Court has little trouble concluding that there is no genuine dispute of material fact as to whether the Board or SJHSRI functioned as a PPO in their day-to-day operations.  They did not.

B.   Plaintiffs' Claims of Estoppel

Plaintiffs claim that the Diocesan Defendants either controlled SJHSRI or had an identity of interest with it, so that SJHSRI's representations to the Attorney General in the HCA Application should be attributed to them for purposes of judicial estoppel.  In other words, because SJHSRI claimed the Plan was a church plan in those proceedings, Defendants should be estopped from asserting it was not a church plan here.

Judicial estoppel may apply when "a party has adopted one position, secured a favorable decision, and then taken a contradictory position in search of legal advantage." Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004) (quoting InterGen N.V. v. Grina, 344 F.3d 134, 144 (1st Cir. 2003)).  It is "intended to protect the courts from the litigatory shenanigans that would result if parties could, without limitation or consequence, swap litigation positions like hats in successive

---

Diocesan Defs.' Resp. to Pls.' PPO Facts (Pl. Receiver Interrog. Answers) at 6 (answer to No. 3).  While the Court must disregard conclusions of law in these statements, the facts in them are admissions properly considered on summary judgment.  See Glob. ePoint, Inc. v. GTECH Corp., 58 F. Supp. 3d 178, 191 (D.R.I. 2014).

cases based on simple expediency or self-benefit." Jarrard v. CDI Telecomms., Inc., 408 F.3d 905, 915 (7th Cir. 2005).

While there is no strict formula for applying this equitable doctrine, the First Circuit has said that three conditions must be satisfied:

> [(1)] the estopping position and the estopped position must be directly inconsistent, [(2)] the responsible party must have succeeded in persuading a court to accept its prior position, and [(3)] the party seeking to assert the inconsistent position must stand to derive an unfair advantage if the new position is accepted by the court.

Diaz-Baez v. Alicea-Vasallo, 22 F.4th 11, 21 (1st Cir. 2021) (internal citations and quotation marks omitted). The prior proceeding need not be judicial; positions taken before administrative agencies can later bind parties before courts. See Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States, 593 F.3d 1346, 1354 (Fed. Cir. 2010); Simon v. Safelite Glass Corp., 128 F.3d 68, 72 (2d Cir. 1997). Neither must the parties be strictly the same. Rather, "a non-party to an action nonetheless may be bound by the issues decided there if it substantially controls, or is represented by, a party to the action." United States v. Bonilla Romero, 836 F.2d 39, 43 (1st Cir. 1987). "The party estopped due to representation by a party to the [prior] action must have been 'so closely related to the interest of the party to be fairly considered to have had his day

20

in court.'" Id. (quoting In re Gottheiner, 703 F.2d 1136, 1139 (9th Cir. 1983)).

Despite this potentially broad applicability, "judicial estoppel is applied with caution to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement." Perry v. Blum, 629 F.3d 1, 11 (1st Cir. 2010) (quoting Teledyne Indus., Inc. v. N.L.R.B., 911 F.2d 1214, 1218 (6th Cir. 1990)).  Similarly, "judicial estoppel is not applicable where a party argues an inconsistent position based on a change in controlling law." Longaberger Co. v. Kolt, 586 F.3d 459, 470-71 (6th Cir. 2009) (collecting cases), abrogated on other grounds by Montanile v. Bd. of Trs. of Nat. Elevator Indus. Health Benefit Plan, 577 U.S. 136 (2016).

Mindful that judicial estoppel is an equitable doctrine resistant to the application of "inflexible prerequisites or an exhaustive formula," New Hampshire v. Maine, 532 U.S. 742, 751 (2001), the Court is disinclined to apply it here.  First, as Defendants point out, any inconsistency in their position before the Attorney General and this Court can be at least partially explained by intervening precedent.  See Defs.' Reply Further Supp. Mot. Summ. J. 43-50 ("Defs.' Reply"), ECF No. 253.  They point to several decisions in this circuit that are no longer tenable after Stapleton clarified the PPO requirement in 2017, but that may have

supported their earlier position that the Plan qualified as a
church plan. Id. at 46-48.

As for the second requirement, the parties dispute how much
the Attorney General truly relied on the church plan status in
approving the HCA application, and whether it is proper to bind
the Diocesan Defendants to representations made by SJHSRI. See,
e.g., id. at 51-56. Ultimately, the Court need not determine
whether this second requirement is met, because the third
requirement is dispositive.

Under the third requirement, the Court looks to whether
Defendants "stand to derive an unfair advantage if the new position
is accepted by the court." Diaz-Baez, 22 F.4th at 21. The Court
concludes it works no unfairness to Plaintiffs to accept a position
which they themselves briefed and vigorously argued in certified
filings before this Court last year. Charges of intentional self-
contradiction for unfair advantage, of "changing positions
according to the exigencies of the moment," and of "improper use
of the judicial machinery," New Hampshire, 532 U.S. at 750, fit
Plaintiffs' conduct on this question at least as well as they fit
Defendants'.

Because the Court determines that accepting Defendants'
position that Plan was no longer a church plan is both excused by
a change in intervening law and works no unfairness to Plaintiffs,
it concludes judicial estoppel does not apply as a matter of law.

For this reason, discovery sought in Plaintiffs' Rule 56(d) motion, is irrelevant.  Plaintiffs' Motion for Additional Discovery, ECF No. 246, is DENIED.

IV.  CONCLUSION

Without judicial estoppel and for the reasons stated above, the Court declares that the Plan was no longer administered by a Principal Purpose Organization by April 29, 2013, and therefore did not qualify as an ERISA church plan after that date. Defendants' Motion for Summary Judgment on Count IV of the First Amended Complaint, ECF No. 236, is GRANTED, and Plaintiffs' Conditional Rule 56(d) Motion to Defer or Deny Diocesan Defendants' Motion for Summary Judgment Pending Discovery, ECF No. 246, is DENIED.  Because the Court expects that this determination narrows the viable claims in the case, Defendants' Motion to Dismiss for Failure to State a Claim, ECF No. 238, is DENIED without prejudice to refiling.  Before filing any such motion, however, the parties are ordered to return to mediation.  Should that mediation fail, no subsequent motion in this case (or response thereto) may exceed 25 pages in length without prior authorization from the Court upon good cause shown.


IT IS SO ORDERED.

_____
William E. Smith
District Judge
Date: September 13, 2022